# Pl's MSJ App Ex 1
# Johnston Deposition Excerpts

Exhibit 26  Magnets FAQs (JM4HT-6701); How      176
to Strengthen a Magnet article
by usmagnetix (JM4HT-6709 to
6710; 6714 to 6715);
totalElement article: "Will
stacking magnets together make
them stronger?" (JM4HT-6721);
Email from Calvert Gamwell re:
Magnet strategy/JM4Tactical
(JM4HT-12360)

Exhibit 27  Beth Alcazar, NRA Training      190
Counselor and Chief Range Safety
Officer - Her Tactical Review
(JM4HT-12329 to 12349)

Exhibit 28  Video of Chad Myers reviewing      201
Her Tactical holster
(JM4HT-17001)

-ooOoo-

Page 6

---

November 2, 2023                    9:35 a.m.

                    P R O C E E D I N G S

                    VICKY ARLENE JOHNSTON,

called as a witness, and having been first duly sworn to
tell the truth, the whole truth, and nothing but the
truth, testified as follows:

(Before commencing, Exhibits No. 1 through 28 were
marked for identification.)  (Rule 30B(5) was waived.)

                    EXAMINATION

BY MR. LEAVITT:

Q. Please state your full name, age, and personal
pronouns.

A. Vicky Arlene Johnston. I'm 50. I don't have
any pronouns.

Q. Please provide your personal residence address
and personal cell phone number.

A. 3288 North 1250 West, Pleasant View, Utah,
post code 84414.

(The reporter asked for clarification.)

A. Sorry, what was the last thing?

Q. And personal cell phone number.

A. Oh. 801-882-9102.

Q. Ms. Johnston, have you ever been deposed
before today?

A. No.

Page 7

---

Q. Well, I appreciate you being here.

A. Yes, it's kind of exciting.

Q. And I appreciate you taking time from your
family and from work to help us answer some questions
today.

A. Thank you.

Q. We have our court reporter here. She's
transcribing everything, so I will try very hard not to
interrupt you. Can you promise to do the same for me?

A. Sure.

Q. And I'm going to ask you a series of
questions. You just need to answer them. Occasionally
your attorney may object to my questions and we might
discuss it. If that happens, just wait until we're done
and then provide your response.

A. Okay.

Q. As long as we don't interrupt each other and
Mr. Pehrson over there doesn't object too much, we
should end up with a clean record, which is good for
everyone.

A. Yeah. Sure.

Q. Okay. Have you ever been involved in
litigation before this case?

A. No.

Q. Did anyone help prepare you for your

Page 8

---

deposition today?

A. Just my attorney.

Q. Please provide your educational background.

A. High school. I've done college in between
five children. I have a 4.0 GPA. I have done lots.
I mean, in terms of -- you know, like, I have done so
much online education, but I just -- yeah. So, yeah.

Q. So do you have any college degrees?

A. No.

Q. What are you working towards?

A. In my college classes?

Q. Uh-huh.

A. I put that aside because I'm really busy.
It's in film production.

Q. Do you have any specialized training?

A. Yes, I've been a casting director for about
14 years.

Q. Does that have any professional license that
comes with that?

A. No. Uh-uh.

Q. Do you have any professional licenses with
respect to your job as a real estate agent?

A. Yes.

Q. Any other professional licenses?

A. I don't think so.

Page 9

---

3 (Pages 6 - 9)

Q. So I take it you're following our conversation? You understand my questions?

A. Sure.

Q. All right. If at any point you don't understand my question, just let me know and I'll try to rephrase it or clarify. Does that work for you?

A. Sure.

Q. I understand that you're here today in both your personal capacity and as a representative of Her Tactical; is that correct?

A. Correct.

Q. And I also understand that you are the sole employee, owner, and officer of Her Tactical; is that correct?

A. Correct.

(Comments off the record.)

Q. In the interest of time and efficiency, when I refer to "you," can we agree that I'm referring to both you personally and Her Tactical?

MR. PEHRSON: I'm going to object to that as being a vague instruction.

(The reporter asked for clarification.)

MR. PEHRSON: The question presents a vague instruction.

BY MR. LEAVITT:

Page 10

Q. Well, to clarify the request, rather than asking every question twice, If I just say "you," can we presume that I'm asking both you and Her Tactical, and if the answer is going to be different, you can distinguish for me?

A. Okay. Yeah, because I'm really here to preface, like, E&R, Her Tactical, this is my business.

Q. All right. So -- and I understand, so I just want to make sure that we are on the same page, otherwise this deposition will be twice as long.

A. Sure.

Q. I will say "you." If it's the same answer, just answer; if it's a different answer for you or for Her Tactical, just clarify.

A. Sure.

Q. Thank you.

All right. So now we're into the tedious part. But I promise --

A. That's fine. Go ahead.

Q. I promise if we get through the tedious part up front, it will make the back end a lot more efficient.

A. Okay.

Q. I am handing you what has been marked as

Page 11

Exhibit 1. Which is what we call a Rule 1006 summary exhibit. Basically I've compiled your discovery responses into these documents so that we don't have to flip through every email, every filing. And this first one, Exhibit 1, are the Requests for Admission.

Let me just introduce how I have summarized this for you. In the first column we have the requests that were posed; the second column, we have the response by Blake Cheal; the third column is your response; and then the fourth column is the response by E&R LLC.

A. Sure.

Q. And then you will notice per row --

A. Yes.

Q. -- if you provided a response on one day and then provided a second response on another day, that's indicated as well. Do you understand?

A. Uh-huh.

Q. So for example on Request for Admission No. 1, I had asked, "You have designed, caused to be designed, or assisted in the design of one or more of the Accused Instrumentalities." And then on the 4th of May it reads that you had denied that, but E&R had admitted that.

A. Correct.

Q. Okay. Can you review this summary exhibit and if you see anything that has changed for you or that you

Page 12

disagree with, can you let us know?

A. You want me to read the whole thing again? Or...

Q. We can go through it line by line if you'd like, but I'm inviting you to review it yourself at the moment.

MR. PEHRSON: I would just like to register an objection for the record that there are 53 Requests for Admission here, and I view that question as too all-encompassing and inappropriate for a deposition.

BY MR. LEAVITT:

Q. All right. Then based on that rejection, we'll go through it line by line. I apologize, Ms. Johnston.

So on Request for Admission No. 1, you denied having designed, caused to be designed, or assisted in the design of the accused instrumentalities on behalf of yourself, but admitted it on behalf of E&R LLC, correct?

A. Yes, that E&R designed the magnet holsters.

Q. And how is that possible if E&R is not a person?

A. Because I'm the sole provider. I'm a person That is a representative of the company.

Q. So you did design it, just not in your personal capacity?

Page 13

4 (Pages 10 - 13)

A. Correct.

Q. You designed it on behalf of E&R?

A. For E&R. Yeah.

Q. Okay. So when I see a similar pattern here, questions 2, 3, 4, 5, 6, where you deny it and E&R admits it, what you're saying is you did it, but you did it on behalf of E&R, not in any personal capacity; is that what you are saying?

A. Not in any personal capacity. I'm employed by E&R.

Q. Okay.

A. It's the same for all of them.

Q. Question No. 3, where I asked if you have profited from the sale of one or more of the accused instrumentalities, you and E&R both denied that Request for Admission; is that correct?

A. Correct.

Q. So E&R has not profited from the sale?

A. No. Not at all.

Q. It's had gross profits, has it not?

A. It's had profit, but my expenses are overexcessive of any profit or income.

Q. Are you aware that you have not produced any evidence of expenses in this case?

A. I think I have, actually. I provided all the

Page 14

Amazon, Etsy, my website information. So I have, but it was like May or something that I provided this.

Q. Well, at any rate, you are aware that you have an obligation to supplement your responses, correct?

A. Sure.

Q. Okay. So if there have been sales or expenses since -- I believe my most recent date is February --

A. Okay. February.

Q. -- you'll be producing those?

A. If I need to, yes. I can produce the sales.

Q. All right. And I will just state for the record that your counsel has not been very forthcoming with these records, and I will be filing a motion to compel if we don't receive them soon.

A. Sure.

Q. Okay.

All right. I'm unable to ask specific questions about your finances because of those delays, and it may result in a need for a second deposition. So if you can produce that to us sooner than later, hopefully we can avoid that.

A. Uh-huh.

Q. Okay.

MR. PEHRSON: Since Mr. Leavitt is stating things for some record, I would also like to state some

Page 15

things for a record. I've received no request for supplementation from Mr. Leavitt and we will make an assessment as to when supplementation is appropriate and do what's called for under the rules.

(Comments off the record.)

MR. LEAVITT: Well, thank you, Mr. Pehrson. We will state that pursuant to the federal rules, your obligation is noted and doesn't need to be specifically requested.

BY MR. LEAVITT:

Q. So back to where we were, Ms. Johnston, questions 4, 5, and 6, your personal denials, you did in fact --

A. As an employee, yes.

Q. -- as an employee for both 4, 5, and 6, correct?

A. Yeah.

Q. Okay. And that's the same as well for 7, 8, 9, 10, and 11?

MR. PEHRSON: I'm going to object to the question as being compound and vague. Also object to this Rule 1006 summary exhibit. We have not had a chance to review the exhibit or determine its accuracy.

BY MR. LEAVITT:

Q. You can take as much time to review it as you

Page 16

would like, Ms. Johnston.

A. Yeah. Uh-huh.

Q. And I'll note that as a summary exhibit, I do have available for review all of the underlying documentation which I submit you also have available. But we can go through the underlying documentation one by one, as necessary, to alleviate any of your concerns.

A. Uh-huh.

Q. But in the interest of efficiency, not keeping you here for the full seven and a half hours, I'm offering this as a courtesy for everyone.

So, Ms. Johnston, if you at any point during these questions, in review of a summary exhibit, would like to see the underlying documentation so you can recollect yourself of the facts, I won't hesitate to provide it to you.

A. Thank you.

Q. Okay. Now, on question 12, I asked if you own the property located at 3288 North 1250 West, Pleasant View, Utah, or if you have authority to conduct business at that address.

A. Yeah.

Q. Now, for your own behalf, you denied that, and then on behalf of E&R you said you don't understand. Could you clarify?

Page 17

5 (Pages 14 - 17)

A. I don't own the property at 3288 North 1250 West, Pleasant View. I kept this a home business. Like, it's a side hustle. So, yes, I do it from home.

Q. And is this your home address?

A. Yes.

Q. So do you, Vicky Johnston, have permission to conduct business at this home or does E&R have permission to conduct business at the home?

A. Well, it's E&R.

Q. Okay. You don't have permission either?

A. Well, I'm -- as an employee of E&R, yes.

Q. Well, what if you were just to set up another company for your own sake, do you not have permission to conduct business out of your own home?

MR. PEHRSON: Object; vague. Unintelligible. Incomplete hypothetical.

BY MR. LEAVITT:

Q. Is there anything unintelligible about the request I just made?

A. It's E&R that conducts that I conduct business out of my home address.

Q. Okay. And my follow-up question is, do you, Vicky Johnston, have the permission to conduct business from that address?

MR. PEHRSON: Same objections.

Page 18

BY MR. LEAVITT:

Q. Now, Mr. Pehrson is going to be objecting a lot today. When he does, you are still obligated to answer unless he specifically instructs you not to. Those objections are for the record and will be reviewed by the court.

A. Okay.

Q. So I would like you to please answer the question.

A. So me, personally, as an employee of E&R, can work from my home residence, yes.

Q. All right. What about not as an employee? You, Vicky Johnston, in your personal capacity, do you have permission to conduct business from that address?

MR. PEHRSON: Same objections.

THE WITNESS: This is more of a trick question. I'm don't know what you are trying to get at. I don't understand. What does that mean really? Like I'm -- I am an employee of E&R, Her Tactical. So I would have no other reason to work out of my home unless it was for my business.

BY MR. LEAVITT:

Q. Well, I'm not asking if you have a reason to. I'm asking if you have the right to.

A. I guess so. I mean, how do you look that up?

Page 19

Like, how does anybody look that up? Like --

Q. Well, I would suggest that usually that permission is granted by the property owner.

A. Oh. Well, yes, I'm like... Weird.

Q. Okay.

A. Yes.

Q. All right. So -- and I'm not trying to trick you, I'm asking direct questions.

A. No, I'm just -- I'm like -- I don't understand. Like, yes, I live there. Yes.

Q. Okay. And because you live there, you feel comfortable conducting business from that address both for your own sake if you needed to, but certainly as an employee of E&R, correct?

A. Sure.

MR. PEHRSON: Same objections.

MR. LEAVITT: All right. Your objection is noted. You can keep repeating it if you would like, but it will make an unclear record.

MR. PEHRSON: I will keep repeating my objections, sir.

MR. LEAVITT: Okay.

BY MR. LEAVITT:

Q. All right. And who gave you the permission to work from that address?

Page 20

A. My husband.

Q. Okay. Is that because he owns the address?

A. He owns the address, yeah.

Q. Okay. And in Request No. 13 I asked if you are the inventor, owner, or assignee of a patent or patent application that contemplates, claims, or discloses one or more of the accused instrumentalities. Do you know what I mean when I say accused instrumentalities?

A. That's Chad's patent that you're talking about, right?

Q. The accused instrumentalities are actually your products that are subject to the lawsuit.

A. Okay.

Q. Okay. So by this request I'm asking if you're the inventor, the owner, or the assignee of a patent or patent application that covers or contemplates one of your products.

MR. PEHRSON: I'm going to object to the question. It calls for a legal conclusion. Also vague.

MR. LEAVITT: It's a factual conclusion. She's either an inventor or she's not.

THE WITNESS: I am the inventor of my products. Yeah.

BY MR. LEAVITT:

Page 21

6 (Pages 18 - 21)

Q. Okay. You -- in your personal capacity or as --

A. No, as the business. I would have no need to invent this stuff on my own without my company. It is only for my company.

Q. Okay. So is it your -- is there an actual application for a patent that's out there somewhere?

A. Yeah, I applied for a patent application, which I needed to continue with.

Q. Did you write your name as the inventor or E&R as the inventor?

A. I would have to check what I -- it was a while ago. It was February last year.

Q. Okay. All right.

(The reporter asked for clarification.)

Q. And we can probably pull it up later, but I recall that it was a provisional patent application; is that correct?

A. Yeah. Uh-huh.

Q. Did you file any ownership paperwork or assignment paperwork for that patent?

A. I don't recall.

Q. And you filed in February of last year. Did you take that provisional patent application and convert it to a nonprovisional patent application?

Page 22

A. No, I haven't done anything with it.

Q. All right. Are you aware that if you did not do so, your application as a provisional has expired?

A. I do, yeah.

Q. Okay. So there is no longer a pending patent application on any of your products, are there?

A. Correct.

Q. In 14, I asked if you owned, operated, created, or managed the content of the URL https://www.youtube.com/@HerTactical.

I'm smiling because we have to spell those out for the court reporter. I can't just like --

A. I know, I knew you had to. I'm just like, okay, this must be for the recording. Just like wow, that's a lot.

Q. Is that your YouTube page?

A. It's for my business, yes.

Q. Okay. And you're the one who --

A. I manage that.

Q. Okay. And you're also the one who manages the Her Tactical website, correct?

A. Uh-huh. Yes.

Q. And https://HerTactical.com is that website?

A. Correct.

Q. Is there any content on that website that

Page 23

didn't come from you?

A. No.

Q. Any changes on that website that didn't come from you?

A. No.

Q. Okay. And you are also the owner/operator of https://www.Facebook.com/Vicky.Johnston.394, correct?

A. Yes, that's my personal Facebook page.

MR. PEHRSON: I'm going to object; the question is vague and ambiguous.

MR. LEAVITT: Please state for the record, Mr. Pehrson, what's vague and ambiguous about that question?

MR. PEHRSON: Actually, I'm not supposed to state anything for the record other than the objection. If you don't think your question is vague and ambiguous, then fire away.

MR. LEAVITT: All right.

MR. PEHRSON: I've made the objection.

BY MR. LEAVITT:

Q. All right. I didn't get to hear your answer over the objection. Do you mind repeating yourself?

A. Oh, I did. Yes, it's my personal Facebook account.

Q. Okay. Are you the owner and operator or

Page 24

creator of https://www.etsy.com/shop/HerTactical?

MR. PEHRSON: Same objection.

THE WITNESS: That is my business shop account.

BY MR. LEAVITT:

Q. Is there any content on that shop account that you don't personally manage?

A. No.

Q. Are you the owner, operator, creator, or manager of https://www.etsy.com/listing/1240884431/her-tactical-magnetic-holster-4?

MR. PEHRSON: Same objection.

THE WITNESS: Yeah, I don't know the number, but if that's the magnetic holster, that would be yes, it's the business listing.

BY MR. LEAVITT:

Q. Okay. And you manage all that content as well?

A. Correct.

Q. In the interest of time, can you state whether or not you're the owner, operator, creator, or manager of the listings at 20, 21, 22, and 23?

MR. PEHRSON: Same objection.

THE WITNESS: I deny 23.

BY MR. LEAVITT:

Page 25

7 (Pages 22 - 25)

Vicky Arlene Johnston , Individ and as 30b6 - November 2, 2023

Q. How about 20, 21, and 22?

A. That's a business listing for a business account. It looks like it.

Q. And you manage all the content on those accounts?

A. Uh-huh. Yeah.

Q. But this Alibaba account is not yours?

A. I don't sell on Alibaba. I'm not a vendor on Alibaba at all.

Q. Do you purchase from Alibaba?

A. Yeah. Most people do.

Q. Okay. You purchase these products from Alibaba?

A. Some of them, yeah.

Q. Where else to you purchase them from?

A. Just through independent manufacturers that I know personally. Not for this product, though.

Q. Okay. Yeah, that's -- I apologize if I was too broad. Specifically for the accused instrumentalities are they all purchased from Alibaba?

A. Yes.

Q. Okay. And you have an account with Alibaba that you use for those purchases?

A. Uh-huh.

Q. Do you communicate with the manufacturer

Page 26

through that account?

A. Yes.

Q. Does the nature of that communication at least involve designing the product?

A. Well, I design it and I give it to them.

Q. Okay. So you gave them specifications --

A. Uh-huh.

Q. -- through that account?

A. Uh-huh.

Q. Okay. I'm assuming there was a back-and-forth dialogue where they ask you questions and you follow up with answers.

A. Sure. Normal business conversation.

Q. Okay. Roughly during what time period were those design conversations?

A. Between -- so I did a lot of product research from August of '21, and it finally got to market almost -- what was it? May -- very end of May is when I sold my very first product.

Q. May of '22?

A. Uh-huh. So what is that? Almost ten months or something.

Q. So...

A. It took a long time.

Q. So at what point did you move from the

Page 27

research phase to the production phase?

A. I think I finally went into production -- they started -- I think I did an order, like, very end of December of '21. And then I received them in April. And then there was another delay, and then started selling at the end of May.

Q. What was the nature of the delay?

A. I needed to get some stickers printed.

Q. So just some hand notes here from your dialogue, research for the accused instrumentalities began 9/21. Your first order went out 12/21.

A. It was August, sorry. Eight, yeah.

Q. Thank you. I might have miswritten that.

A. Yeah.

Q. August '21 for the research. The first order went out December of '21. The products were received by you April of '21.

A. Uh-huh.

Q. April of '22, I apologize. And you had listed them for market and sold them by 5/22?

A. Yes.

Q. Where did you receive the inventory?

A. Where?

Q. Uh-huh.

A. At my home address.

Page 28

Q. Okay. And your development correspondence, if I can call it that, between you and the manufacturer, that would have occurred between August and December?

A. Correct. Yes. I did a full training course, so I was guided, I was mentored as to -- and I was also researching other products that were not related to the firearms industry at all. So I was very well endowed with the USPTO on how to research products.

Q. Okay. Did you say you were endowed with the USPTO?

A. Endowed? Is that what you said?

Q. Is that what you said?

A. Yeah, I was knowledgeable on the USPTO.

Q. Okay. I think it's an accurate use of the word, I just hadn't heard it used that way before.

A. Well, kind of like -- you know, like, you learn stuff and you know how to use the system, so...

Q. Okay.

(Comments off the record.)

Q. All right. So you're pretty comfortable with USPTO procedures; is that what you're saying?

A. No -- well, they've actually changed the system. You've probably noticed that, too. They went through a big overhaul. And I was like, oh, my gosh. But during that time I had hired a patent agent as well,

Page 29

8 (Pages 26 - 29)

Vicky Arlene Johnston , individ and as 30b6 - November 2, 2023

because I was also doing a provisional patent.

Q. You hired them specifically for the purpose of filing the provisional patent application?

A. Yes, I filed it, but I wanted him to continue it.

Q. Okay.

A. I just wanted to get it done before it was out for a year.

Q. Okay. So I think we observed, and we can clarify it later when we the pull up records, but you filed the provisional application in February, correct?

A. Correct.

Q. So you hired a patent agent to help you with that after February?

A. Yes.

Q. Approximately when did you hire him?

A. I don't know. I'm not really sure. I didn't think to think about, like, when. I just had hired him.

Q. Okay. But it's after February of '23?

A. Correct.

Q. Which is after you had already ordered the product, correct?

A. Yeah.

Q. Okay. And I don't want to make any assumptions, so can you be very clear and specific about

Page 30

what you mean when you say you're knowledgeable about the USPTO?

A. In my training I was taught to do Google searches, patent searches, go to the USPTO. Really look around at the different patents that were there. I mean, I looked up magnetic holsters and there was, like, Chad's one and then there was another one which was sort of made of Kydex. It had screws in it that was not relevant.

So I made sure when I looked at Chad's claim that, okay, well, I don't have the three magnets, so -- and then I had my patent agent do an analysis on it.

Q. When did you first look at Chad's claim?

A. It would be in August.

Q. August of --

A. That' when I started doing my research, because I was already using the USPTO for other products.

Q. Okay. So August of '21?

A. '21. Uh-huh.

Q. Okay. So you were --

A. I've been very careful about how I design my products. I researched a lot on the USPTO.

Q. Okay. So you started your search in August of '21. You found JM4's patent.

Page 31

A. Yeah.

Q. And did you -- what did you do after you identified his patent?

A. Just started designing it, ready for prototyping. I certainly didn't order it until well after I had done everything.

Q. And this is personal research, right? Not research with an attorney?

A. Not with an attorney. I didn't need to. I had the training. I had hired professionals. They were -- like, have been in the industry for a very long time. So I was taught well. I didn't feel like I needed an attorney on top of that.

Q. Okay. Did that training expand into the consequences of patent infringement?

A. No. You're in trouble if you infringe. I knew that.

Q. Okay. But that training, in your mind, satisfied you as to your ability to distinguish between patent claims?

A. Yes. Yeah.

Q. Okay.

A. The course I took was in January, so I had already been taking the course for a good six months.

Q. All right. Let's clarify that. When you say

Page 32

you took the course in January, does that mean you completed it or you started it?

A. No, I started it. So where they talk about patents is in module one, lesson eight. So it was in the very first module. There are like eight modules.

Q. Okay. So you reached the module on patents in January of '22?

A. '21. Yeah, it was in '21.

Q. '21?

A. '21.

Q. Even though you didn't even start researching for your product until August of '21?

A. Correct. Yeah.

Q. Okay.

A. I had done six months' worth of training.

Q. I see.

A. And I had already been researching other products for other industries, and then -- yeah, so I had six months of working with the USPTO, of researching, designing, before I looked at Chad's one.

And Chad's -- so the idea of the magnetic holster, I -- so I had purchased The Running Buddy, which is the magnetic cell phone holster, because I am in the film industry, I always have a fanny pack on me. And I wanted something that was a little bit slimmer, so

Page 33

9 (Pages 30 - 33)

I bought The Running Buddy, which is a magnetic holder for a cell phone. I bought that in July. That's what gave me the idea.

I thought, oh, my gosh, this is such a great idea for a holster. And then that's when I started looking.

Q. Okay. I appreciate the clarification. I wasn't looking at dates in January of '21 and so this is when you started your IP training.

A. Yeah.

Q. And then you were satisfied with the quality of that training.

A. Yeah. Well, I mean -- yeah, you look at the first claim, making sure that you are not infringing on every single one of those points of the first claim.

Q. And you felt qualified to make that claim without consulting counsel?

A. Yeah. I don't think you had to be a brain surgeon for that, no. Yes.

Q. We took a little detour there, but we're back to the Requests for Admission. Can you confirm whether or not you've owned, operated, created, or managed the content identified in Request 24 and 25?

A. I don't know the numbers, but it looks like, yes, I managed it for Her Tactical, the business.

Page 34

Q. Okay. And I suppose we'd have to confirm the ASIN number later, but --

A. Yeah, I don't remember ASINs or code numbers or -- yeah.

Q. But at the very least, you're on Amazon --

A. Yes, on the -- yeah. Oh, yeah.

Q. -- and you manage all the content on Amazon?

A. I do.

Q. Okay.

(Comments off the record.)

Q. So you just mentioned you don't remember ASINs.

A. Yeah.

Q. I wouldn't remember them on the fly either.

A. Yeah.

Q. I notice on Request No. 26 that you denied owning, operating, or creating these ASINs.

A. Okay.

Q. If we were to go through them one by one, I'm sure we'd find that at least some of these are Her Tactical products.

A. Yeah, if you've got them from Her Tactical, ASINs, they're likely -- I don't know -- I can't confirm right this second that those are mine, but I'm sure that you're alluding to the ones that are on my Amazon

Page 35

business account.

Q. Okay. So if we look at -- you know, look at this after the fact, we pull them up on the website and it says Her Tactical, and it's got a magnetic holster, we can completely conclude that it's your ASIN?

A. It probably would be, yeah.

Q. Okay.

A. I'm trusting that you put the right ones there.

Q. Now, on 27, I know we're not looking at the screenshot, but --

A. Yeah.

Q. -- it proposes to have provided website screenshots from your website --

A. Okay.

Q. -- and asked whether or not it displays the accused instrumentalities for sale at the URL https://HerTactical.com/product/magnetic-gun-holster/ and you denied that, but isn't that your website?

MR. PEHRSON: I'm going to object. Compound. Vague. Ambiguous.

THE WITNESS: That is my website. I don't see the screenshot, so I cannot confirm.

BY MR. LEAVITT:

Q. But as the manager of your website, I mean,

Page 36

do you recall that you've got a tab for products?

A. Yes.

Q. And do you recall that within that tab for products, you've got a subtab for magnetic gun holsters?

A. I do.

Q. And is that subtab where your accused -- the accused instrumentalities are sold?

MR. PEHRSON: Same objection.

THE WITNESS: Yes, likely to be.

BY MR. LEAVITT:

Q. And that would have been accurate at least as of 2/23/23, when this question was asked?

MR. PEHRSON: Same objection.

THE WITNESS: Possibly, yes.

BY MR. LEAVITT:

Q. Is it accurate now?

MR. PEHRSON: Same objection.

THE WITNESS: It should be. There hasn't been any changes.

BY MR. LEAVITT:

Q. Okay.

Are you friends with Eric Wood?

A. I don't know who that is.

Q. And you disagreed in No. 28 that he was listed as a friend of yours on your Facebook profile?

Page 37

10 (Pages 34 - 37)

Vicky Arlene Johnston - Indiv. and as 30b6 - November 2, 2023

Q. But you're not a volunteer, right? You're an employee, not a volunteer?

A. I'm not a volunteer.

MR. PEHRSON: Object.

And just let me make my objections.

Vague. Ambiguous.

THE WITNESS: Most of this feels voluntary, because I'm not making any money. So let's put it that way.

BY MR. LEAVITT:

Q. But if there were money --

A. Uh-huh. I would pay myself.

Q. -- it goes in your pocket; you're paying yourself?

A. As an employee. Uh-huh.

Q. Okay.

A. Yes.

Q. I'm sorry, turn the page, I want to go back to No. 3 real quick.

A. Sure.

Q. No, I change my mind. It's back to No. 4.

A. No problem.

Q. Sorry for the whiplash.

A. Uh-huh.

Q. No. 4 is related to No. 3. No. 3 was asking

Page 90

about financial relationships.

A. Uh-huh.

Q. And No. 4 is asking about any commonalty of purpose.

A. Okay.

Q. Okay. So for example, I note from several of your court filings -- I note from several of your court filings a personal backstory that kind of led you to this moment where you designed the Her Tactical holsters and maybe even formed the company. Right?

A. Uh-huh.

Q. And that is, if I might suggest the word, "a purpose for you." Is that correct?

A. Sure.

Q. Is that the same purpose that the company E&R has?

A. E&R was established in 2017. So it had a different purpose.

Q. What was that purpose?

A. Running real estate.

Q. Okay. So the entity E&R runs real estate, but now it has a d/b/a for Her Tactical. So does it not at least now share the purpose of the Her Tactical venture?

A. You mean real estate? Now she has the purpose of Her Tactical?

Page 91

Q. Well, I understand --

A. They are completely separate.

Q. Well...

A. It's a d/b/a.

Q. And what does that mean to you?

A. It has -- it's about Her Tactical. So that -- so that -- so the company name is E&R, but my d/b/a is solely about the purpose of why I created Her Tactical. It doesn't cross over with real estate at all.

Q. Okay. But the entity owns that d/b/a?

A. Uh-huh.

Q. It's the entity that receives, for example, payments?

A. Right.

Q. And then distributes those payments to vendors, employees, etc.?

A. Uh-huh.

Q. And it's through that d/b/a that it does it. So you just mentioned that the d/b/a shares your purpose. If the -- if E&R owns the d/b/a, then at least in some part it shares the purpose, right?

A. Yeah. Yeah.

Q. Okay. Does Mr. Cheal share your purpose?

A. He supports me.

MR. PEHRSON: I'm going to object on grounds

Page 92

of relevance. Vague. Ambiguous.

THE WITNESS: Yeah. He cheers me on.

BY MR. LEAVITT:

Q. Okay.

A. You need someone like that.

Q. I agree. I agree. So his purpose is strictly to support you, but not necessarily your purpose, which is to empower -- I mean, I guess I never asked you what your purpose is, but --

A. Yeah.

Q. -- is your purpose to empower women and -- and --

A. Yes, it is. It's for the protection of women, and to provide options so that women can fully protect themselves.

Q. Okay. And through the d/b/a, E&R shares that purpose, but Mr. Cheal doesn't share that purpose. He just supports you in your purpose?

A. Yeah. He's just a cheerleader for me.

Q. Okay.

A. Yeah. He's my biggest fan. He doesn't -- he is an extraordinarily busy person. There's no way he could operate my business.

Q. Okay. What goes into operating your business?

A. Oh --

Page 93

24 (Pages 90 - 93)

Vicky Arlene Johnston - Indiv and as 30b6 - November 2, 2023

MR. PEHRSON: I'm going to object to --

THE WITNESS: There's a lot. I'm sorry.

MR. PEHRSON: -- vagueness.

You've got to let me make my objections. I'll make them very quickly and then it will be your turn.

Vague. Ambiguous.

Please go.

THE WITNESS: So I'm sorry about that. I can't remember what I was going to say.

BY MR. LEAVITT:

Q. The question was, what goes into running your business?

A. Really, it would take up quite some time for me to express everything that goes into my business. You know, everything from photography, marketing, negotiating with manufacturers, designing, graphic design, accounting, web development. All of that. Like, it's just like a normal business would run. Chad could probably tell you how a business is run.

Q. How much of your time goes to that?

A. It depends, because at the beginning it was -- you know, I put in a lot of effort. Since my business had declined, not as much.

Q. Could you estimate roughly how many hours per week?

Page 94

A. It depends.

Q. Maybe an average?

MR. PEHRSON: I'll object on grounds of relevance.

THE WITNESS: I don't know. I'd have to calculate it. Yeah.

BY MR. LEAVITT:

Q. Okay. Is it more than ten hours per week?

A. Oh, yes.

Q. More than 20?

A. Sometimes.

Q. Maybe 15 to 20 roughly?

A. Well, the reason why I say it depends is because sometimes I do trade shows.

Q. Uh-huh.

A. That's a full weekend. Sometimes I don't.

Q. How often do you do trade shows?

A. Just whenever the season has trade shows over the winter.

Q. So over the winter, maybe into the spring. Do you do any in the summer and fall?

A. No. No, because they don't have trade shows in the summer.

Q. How many trade shows per year do you do?

A. Maybe six.

Page 95

Q. Okay. You get a lot of business at those trade shows?

MR. PEHRSON: I'm going to object. Vague and ambiguous.

THE WITNESS: Yeah. I wouldn't do it otherwise.

BY MR. LEAVITT:

Q. Okay. You mentioned that business has slowed down. Is it because we're coming out of the summer?

A. No. It's because of a lawsuit. Sorry if that wasn't obvious. I mean, it's just been terrible.

Q. Well, I mean, I'll be direct about it. What about this lawsuit has slowed down your business?

A. Everything.

Q. Walk me through it.

A. I mean, I can't reach out to retailers. Gosh. Oh, my goodness. Chad spoke to A Girl With a Gun. They sent out, you know, an email to say don't work with me. I have had disparaging videos made about me. All of that has an effect.

Q. Okay.

A. When I'm at trade shows, that's probably more of my happy place, because I actually work with people face to face and they love -- I get so many wonderful compliments from both men and women because they can see

Page 96

my passion and drive behind why I'm doing this. So, yeah. So, I mean, I've had things happen to me on Amazon. Yeah. I have reported it to Amazon. I've had my Etsy store shut down. It's now back up. I don't have the funds to continue buying product because I'm paying for this lawsuit.

Q. I don't have an exhibit for this, but I observe that the product has -- on your website says, "unavailable."

A. Uh-huh.

Q. Is it unavailable because you're out of stock or is it unavailable because you're choosing not to sell it until the resolution of the lawsuit?

A. I am choosing to halt my sales right now.

Q. When did you make that choice?

A. In September.

Q. Why September? This is September of '23, I assume?

A. This -- yeah, just the last month or two. Yeah.

Q. Why did you make that choice in September?

A. Because I'm researching this next patent that has come out.

Q. Okay. So you got notice of a new patent registration, and you have held back sales until you can

Page 97

25 (Pages 94 - 97)

get to the bottom of that?

A. Yeah.

Q. Were you aware of that patent in the spring?

A. I don't recall.

Q. Okay. Are you aware that proof of a notice of allowance for that patent had been produced to your counsel in the spring?

A. I don't recall.

Q. Okay. So the first time you personally became aware of that patent was in September?

A. Yes. When I became aware.

Q. Okay. No. 5 we've had some trouble with. Back to the interrogatories. We have asked for you to identify all the bank accounts that are associated with the accused instrumentalities, the Her Tactical products.

On the one hand you said, "I don't know anything about that in my personal capacity." But then, when speaking with your business hat on, you said irrelevant.

A. Yeah.

Q. All right.

A. That's it.

Q. So let's explore that. When you receive payments for the Her Tactical holster, where do those

Page 98

payments go?

A. To my checking account with the business.

Q. Your personal checking account or E&R's checking --

A. I don't even use my personal checking account. Everything goes through the business.

Q. Okay. So there is a business checking account that receives all payments?

A. Uh-huh.

Q. All expenses, do they come out of that account as well?

A. Correct.

Q. And there is no commingling between your account and these expenses --

A. I'm extremely careful with budgeting.

Q. Okay.

A. And finances.

Q. So your bank records for that account would show all the money coming in and all the money coming out for Her Tactical products?

A. Correct.

Q. How is that not relevant?

A. Well, your question, though -- were you asking about --

Q. Identify the accounts.

Page 99

A. Yeah. There's only one account. I have -- I have a checking account and a PayPal account which goes through my checking account.

Q. Okay.

A. So...

Q. Does your business have a Venmo account?

A. No.

Q. Okay.

A. I received two payments from an Eleace Pierce. She turned up at my -- one of the workshops and she turned up at my house. That went through my Venmo account, but that gets -- introduced funds into my checking account.

Q. Why did you take that payment by Venmo?

A. Because she didn't order it online. She was meeting me in person. She said, "Can I pay by Venmo?" I'm like, "Okay."

Q. Okay.

A. It's not a big deal. Like, it still gets transferred into the accounting system.

Q. And there would be a record of that?

A. Sure. Yeah.

Q. So it seems to me that the E&R checking account, the E&R PayPal account, and at least with respect to that transaction from Venmo, that Venmo

Page 100

account, are in fact, relevant to the claims and defenses in this case. Are they not?

MR. PEHRSON: I'm going to object. It calls for a legal conclusion.

BY MR. LEAVITT:

Q. I mean, do you have any problem with producing those records for us?

A. I would not want to produce those. Those are my, like, business records that -- I mean...

Q. Well, how else are we supposed to confirm, you know, your income and expenses?

A. Well, you can ask me. Like, why would you need my bank account? I can give you, you know, something else, but you don't need to look at all of that.

Q. Well, I've got a question about this later, but -- about something else. We did ask for access to your Alibaba records, which you also denied us.

A. I don't sell on Alibaba.

Q. But you purchase from Alibaba, correct?

A. Yes.

Q. So...

A. And that's private, like, confidential information about my suppliers.

Q. You can mark it confidential. You can even

Page 101

26 (Pages 98 - 101)

mark it attorneys' eyes only and then I'm the only one who sees it.

A. Sure.

Q. If we agree that your bank records and your Alibaba records will be designated attorneys' eyes only, will you produce them to us?

A. I don't see how this is actually relevant to an infringement case.

Q. Well, if we win the infringement case, we get damages. Damages are a disgorgement of profits. So it's important to ascertain what those profits are.

A. Well, we can cross that when we get to it.

Q. Okay. I have the right to ask. If you won't give it to me, I'm going to have to file a motion to compel.

A. Sure.

Q. Do you understand that?

MR. PEHRSON: I'm going to object to the line of questioning. I mean, if you have factual questions for the witness, I invite you to ask them. If you'd like to discuss with me issues related to our production, I'm always happy to discuss that with you.

BY MR. LEAVITT:

Q. So do I understand from you that you won't produce those unless your counsel changes his mind or

Page 102

the court requires it? Is that your position?

MR. PEHRSON: Again, I'm going to object to the question. We're here to obtain facts and not to discuss --

MR. LEAVITT: It's a factual request.

MR. PEHRSON: -- not to discuss litigation strategy or the status of discovery requests.

MR. LEAVITT: It's not litigation strategy or discovery requests.

BY MR. LEAVITT:

Q. I'm asking if you'll produce it. Yes or no?

A. No, not right now.

Q. Okay. Thank you.

Interrogatory Request No. 6. This is related to No. 5. It's asking about who the signers and owners of those accounts are.

So as the only individual involved with E&R, I'm assuming that you are the owner and signer of the business account.

A. Right.

Q. Okay. Does E&R have a separate business account for each of its d/b/a's or is it one account for everything?

A. Just one account.

Q. Okay. So your real estate transactions and

Page 103

income, that goes into the E&R business account as well?

A. Uh-huh.

Q. I think you've got a casting company; is that correct?

A. Uh-huh.

Q. Okay.

(The reporter asked for clarification.)

A. Yes.

Q. Let's try to give yeses and nos for the court reporter. All right. I think we discussed the content of No. 7, so let's move to No. 8. This is one that your counsel and I have gone back and forth quite a bit with.

And on June 14th I've noted that he proposed a supplementary response with the following phrase, "Her Tactical has sold the Accused Instrumentalities. I am a member and manager of Her Tactical. Her Tactical operates as my hobby business and I'm the only person who makes decisions for it. I am the sole agent for Her Tactical and the sole 'employee.' As such, I act in obvious ways to enable various Her Tactical business decisions, including the design and sale of Her Tactical's magnetic holsters for women."

Now, I note that you haven't actually supplemented your responses with that, but it seems consistent with your testimony today. Do you agree with

Page 104

this statement?

A. I do.

Q. Okay. Can we expect that supplementation soon?

A. I don't really know what's involved with that.

MR. PEHRSON: Yes.

MR. LEAVITT: Thank you.

BY MR. LEAVITT:

Q. I'm going to jump back real quick to something we missed on Interrogatory Request No. 1. I asked you at the beginning of the deposition your personal pronouns. You said you have none.

A. Right.

Q. Does that mean you identify as a woman?

A. I just didn't wish to state.

MR. PEHRSON: Hold on.

BY MR. LEAVITT:

Q. Okay.

MR. PEHRSON: Hold on. I object --

THE WITNESS: I have the right not to state.

MR. PEHRSON: -- on grounds of relevance.

BY MR. LEAVITT:

Q. All right. Let's make it relevant. Interrogatory No. 1 --

MR. PEHRSON: Fuck.

Page 105

27 (Pages 102 - 105)

THE WITNESS: Let's not make it political, either.

BY MR. LEAVITT:

Q. And it's not intended to be.

A. Yeah.

Q. My wife actually is very involved with the LGBTQ community as a therapist, so in no way am I hoping to politicize this. I am hoping to clarify a statement that you made.

Interrogatory Request No. 1, on May 4th, your response stated as follows, "The allegations in the Complaint by the Plaintiffs against Ms. Johnston are inaccurate. Ms. Johnston asserts no counterclaims other than a request for his attorney's fees."

And then you amended your response May 31st, and you kept the "his" pronoun. The reason why I thought that was relevant, is because at least with respect to the May 4th response, with the exception that Mr. Cheal is referred to as Mr. Cheal and you're referred to as Ms. Johnston, those responses are word for word. And it would seem to me that they were copied and pasted.

To your knowledge, was your response copied and pasted from Mr. Cheal?

A. It's a typo.

Page 106

Q. Okay.

A. That's all it is.

Q. Okay. Thank you for that clarification.

Let's go back to Interrogatory No. 9. I asked you a lot of questions about stacking magnets, and you said you just didn't understand.

A. Okay.

MR. PEHRSON: I'll object.

BY MR. LEAVITT:

Q. Then here in Interrogatory No. 9, I asked about those magnets and you responded as if you did understand. Could you clarify for me why you seem to have understood it here, but not today?

MR. PEHRSON: Object; argumentative. Mischaracterizes prior testimony. Vague. Ambiguous. Irrelevant.

THE WITNESS: Okay. So what's wrong with my answer?

BY MR. LEAVITT:

Q. So I'm not saying there is anything wrong with it. I'm saying that you answered the question and it seems to me like you understood the question. And it seems from your testimony today that you don't understand. So I'm hoping you could clarify for us.

MR. PEHRSON: I'm going to make the same

Page 107

objections that I made to this question a minute ago.

THE WITNESS: This is asking something different in my mind. So this is asking about -- my response is the difference between -- well, I know that there's a difference between three magnets versus two magnets versus one magnet.

So you were talking about stacking two magnets is the same as one one-inch magnet, which I don't know the answer to that. The thickness, maybe. Yeah. But the function is different.

BY MR. LEAVITT:

Q. Okay. I appreciate the clarification.

No. 10 -- Interrogatory No. 10 is asking about when you became aware of each of the patents-in-suit.

Now, at the time this question was asked, there was only one utility patent-in-suit and several design patents. There are now two utility patents and the design patents.

I understand from your testimony that you were aware of the first utility patent by August of '22, correct?

A. Correct.

Q. And I understand from your testimony that you were aware of the second utility patent by September of '23, correct?

Page 108

A. Correct.

Q. When did you become aware of the design patents?

A. I don't know exactly. I wasn't a -- no, I don't know like a date or anything.

Q. Approximately when?

A. I'm not sure. I'm sorry.

Q. Okay. Did you receive a copy of the lawsuit when you were served?

A. Yes.

Q. And were you served -- what was that? October of '22?

A. Wasn't it September?

Q. Possibly.

A. Of '22? I think it was September.

Q. You might be right. September, maybe October?

A. I mean, I received correspondence from Chad in August. And that's when I sent him a patent analysis and a freedom to operate based on the '530 patent. And then I was served in September with a lawsuit.

Q. And that lawsuit identified the design patents?

A. Correct.

Q. Okay. So I guess September '22 is when you found out?

Page 109

28 (Pages 106 - 109)

A. It possibly was. Yeah.

Q. Okay. Now, there's a subset to this question that talks about -- that's requiring the source of the information and how and when you obtained a copy. So I guess with the design patents, the source would be the lawsuit, correct?

A. Yes.

Q. Did you look up copies of the patent after that?

A. Yes. I had a patent -- another patent analysis done on those also.

Q. Okay. You already had viewed a copy of the '530 patent, right --

A. Yes.

Q. -- by August, correct?

A. Right.

Q. And then I'm presuming you've reviewed a copy of the new utility patent, at least as of September, correct?

A. Correct.

Q. Okay. And who provided you a copy of that? Who --

A. No one. I just looked it up.

Q. Okay. I think we've addressed the content of Interrogatory No. 11.

Page 110

Interrogatory No. 12 is asking for you to identify anybody who has funded, stored, transported, marketed, sold, or facilitated these things with respect to Her Tactical holsters. I think we can safely start with you.

A. Sure.

Q. Anybody else?

MR. PEHRSON: Object; vague. Compound.

THE WITNESS: Yes.

BY MR. LEAVITT:

Q. Who?

A. My husband. I have a couple of girlfriends. My son has helped. Just volunteers.

Q. Grant Cavalli, maybe?

A. No. He has never been involved.

Q. Okay. So family and friends?

A. Yeah.

Q. I think we've addressed Interrogatory No. 13 as well.

A. Yeah. Those are lots of HTTPSs.

Q. You don't have to read it into the record, but --

A. I could be mean and make you say it. Or you could be mean back and make me say it all.

Q. That's right. I think we've established that

Page 111

you're the one who runs that stuff.

A. Yeah.

Q. All right. No. 14 is asking for you to identify every way that you're selling these products.

A. Okay.

Q. And I've provided a bunch of URLs. We've already discussed those.

A. Uh-huh.

Q. And those URLs generally relate to the answer you have here, which is more general, but Amazon, Etsy, Alibaba, and Her Tactical website.

I also observe that you're selling retail, correct?

A. As in, like, to stores?

Q. Like Ace Hardware.

A. Yeah.

Q. Yeah.

A. Yeah.

Q. What are all the retail stores that you're selling in?

A. Just that one.

Q. I think I have a record for two.

A. Or do you? I don't know.

Q. Well, we'll look into it. We'll look into it.

A. I'd like to know.

Page 112

Q. Maybe it's one, maybe it's two. We'll find out. Online, are these the only places you're selling?

A. Amazon, Etsy, Her Tactical. I don't sell on Alibaba. I just -- I think it's just some confusion with Alibaba because it's where I buy products from, but I do not sell there.

Q. Okay. Yeah. I think this response provided some of that confusion. So I --

A. Sorry about that.

Q. -- appreciate that clarification.

A. Yeah. Yeah.

Q. All right. And can you commit to supplementing your response to remove that?

A. Yes.

Q. Thank you.

Well, No. 15 got cut off.

A. Oh.

Q. But what I'm hoping with this question is for you to itemize for me any time you received a legal notice or warning with respect to Her Tactical.

A. Oh, somebody sent me a cease and desist for my logo.

Q. Hot Topic?

A. Yeah. It was like -- I don't know, did Chad get in touch with you? Like, it's just a common, what

Page 113

29 (Pages 110 - 113)

Vicky Arlene Johnston - Indiv and as 30b6 - November 2, 2023

do you call it? Stencil font. So, yeah. Anyway...

Q. Yeah. Well, I think I've got an exhibit for that, but if we don't get to it, I recall that Hot Topic has HT in stencil with pink, and then Her Tactical had HT --

A. No. They didn't have pink. They have totally different colors.

Q. Okay.

A. I'd never heard of them before. My children said, "Oh, yeah, they are in Farmington." I'm like, "Really?" So I looked them up just to see who they are.

Q. They are a pretty big brand.

A. They are. Yeah, but I -- it looks a lot like gothic stuff to me. I don't do gothic, so I would never know about their retail store.

Q. Okay. I think every teenage girl in the '90s...

A. Yes. I said, "Have you guys heard of Hot Topic?" And they are, like, "Yeah. It's there in Farmington." Like, okay.

Q. All right. So they sent you a cease and desist letter.

A. Yes.

Q. What did you do with that?

A. It was really totally irrelevant because it's

Page 114

just a -- it's a stencil font, which is widely used. They don't have a copyright on stencil fonts at all. So I did change it out so that it didn't, you know, upset them.

Q. Okay. So we've got the Hot Topic's cease and desist. We've already identified the August 22 letter from Chad Myers.

A. Right.

Q. Have you received any other cease and desist or legal notices?

A. No. I think it's just all related to this lawsuit.

Q. Okay. Did you communicate with Hot Topic's lawyers at all after you that notice?

A. We responded. Yes, we responded.

Q. Okay.

A. My attorney responded.

Q. Okay. Interrogatory No. 16 is related to the Hot Topic conversation. We are asking for every change that you've made to the look and the branding and the content of Her Tactical both on the website and the logo. So you've identified that you modified the logo.

We had to fight pretty hard to get it, but we got, a couple days ago, your changes to the website. So thank you for that.

Page 115

A. Yeah. I was hustling for you. My husband had just come out of surgery and I was, like, I know I need to get this to you. So I tried really hard. So I stayed up late to get that to you. And then I see COB and then I had to look that up. Like, oh -- like --

Q. Close of business.

A. -- close of business. Like, oh, well, I am an hour and something late. So I apologize. I didn't see that at first.

Q. Well, it came. Might need -- I sent an email to your counsel. We might need a cleaner copy. Some of it got cut off, but I was able to --

A. Yeah.

Q. I was able to make an exhibit out of it. It's one of these in here. Okay.

A. Yeah.

Q. Excellent.

No. 17 is asking about every research, investigation, opinion, consultation that you're aware of with respect to the Her Tactical holster. So from your testimony today, you mentioned that you researched it -- what was it? August of '21?

A. Uh-huh. Yeah.

Q. Okay. Was that written -- did you write down the results of your research or investigation at all?

Page 116

Or --

A. I just kept a lot of it in my head.

Q. Okay.

A. I just know, you know.

Q. Okay.

A. I didn't need to write it down for anybody. It's just me.

Q. Okay.

A. Yeah.

Q. And then you did produce a freedom to operate analysis that was dated in August of '22, correct?

A. Yeah. It was the next business day to receiving Chad's email.

Q. Okay. For the '530 patent?

A. Correct.

Q. I think in court filings there was another analysis that was provided with respect to infringement contentions, noninfringement contentions. We have that one. Is there anything else?

A. As in what?

Q. Any investigation, opinion, consultation that you either requested or received or conducted?

A. Like, before I produced them? Or, like, just over time?

Q. Just period.

Page 117

30 (Pages 114 - 117)

Vicky Arlene Johnston - Indiv and as 30b6 - November 2, 2023

A. Well, I keep in contact with my patent agent.

Q. Okay.

A. So he does do analysis for me. Whenever, you know, there's some new development or there's a product that I want him to research.

Q. Okay. But with respect to the holsters.

A. He's done several analyses, yeah.

Q. Has he provided you written opinions on those analyses?

A. I have a full report, yeah.

Q. I think you're obligated to produce that to us. If it's not listed among the things we've just identified, do --

A. I can provide it. I mean, it's --

Q. Yeah.

A. I mean, it goes in my favor, obviously. But, if you really wanted it, I mean...

Q. Well, all the more reason to get it to me, right?

A. Yeah. Well, I mean, you -- it was never requested. So it's just personal stuff that I do for my business to make sure I'm keeping in check with not infringing on anyone's patent.

Q. Well, Exhibit 3 was a request for production. I think it is requested. So let's make it happen, if

Page 118

that is okay with you.

A. Okay.

Q. All right.

All right. No. 18, we asked for the total number of units sold and their dollar value by quarter, in both gross and net profits. What we got was a single number totaling $26,000 through February of 2023.

A. Okay.

Q. Is there any reason you can't give us updated figures that are broken down into gross and net profits?

MR. PEHRSON: I'm going to object. Vague and ambiguous. And I'll -- I believe there is an accounting definition of gross profits.

BY MR. LEAVITT:

Q. It works to my favor. All I have to do is prove gross profits and I get it all unless you can prove expenses. So you're invited to send me...

A. Yeah. I did, like, all of my sales, as of, like, two days ago. So with all of the magnetic holsters from the time I started, it was 48,000.

Q. Okay. And you will supplement your response in production to reflect those numbers?

A. Yeah. I will need some time to pull the reports.

Q. Okay.

Page 119

MR. PEHRSON: I believe there's some confusion or ambiguity regarding the term profits and revenue. Could you address that, Ms. Johnston?

THE WITNESS: Yeah. It's a gross revenue. I'm sorry that I haven't done anything else other than, like, pull the reports and then give you, like, retail gross revenue on what was made. So that is not including any of my expense whatsoever or even returns.

BY MR. LEAVITT:

Q. All right.

A. Just giving you a full picture of --

Q. I appreciate that. And at the end of the day, it's all I need as a --

A. Okay.

Q. -- plaintiff's attorney. That is the only number I need to prove. Okay.

A. Okay.

Q. Any expenses that you can prove will detract from that. But if you don't produce them, then nobody can rely on them or prepare a plan for them. So if you have expenses, I'm asking that you get them to us so that we can, you know, properly prepare for that. Okay?

A. Uh-huh.

Q. Okay. And of course updated gross revenue figures as well.

Page 120

Okay. No. 19 is just asking who answered these and I see that on May 31st you answered on behalf of yourself and you answered on behalf of E&R; is that correct?

A. Looks like it.

Q. Okay. Thank you.

You guys are still good? No break?

MR. PEHRSON: Can you tell us how much time we've been on the clock?

(Comments off the record.)

MR. LEAVITT: Let's make it a five-minute break then.

(Whereupon a lunch break was taken.)

(Deposition resumed without Mr. Platz.)

BY MR. LEAVITT:

Q. All right. We are back from lunch. I had handed out Exhibit 3 before lunch, but I think we can skip that for now.

Exhibit 4, which I have handed to you, is just to show that you stated you're the owner of Her Tactical, but I think you've already established that, correct?

A. I believe so.

Q. All right. So moving on to Exhibit 5. That exhibit was to show that you were taking preorders for

Page 121

31 (Pages 118 - 121)

Veritext Legal Solutions

calendar-utah@veritext.com 801-746-5080

Vicky Arlene Johnston - Indiv and as 30b6 - November 2, 2023

the accused instrumentalities at least as early as September '21.

A. Oh, yeah.

Q. Now, you didn't actually testify if that is the case, but is that true?

A. That was actually a prototype and I was really excited to get it on the market. Now, my website wasn't really set up to accept any orders.

Q. Okay. In fact, I think from your testimony, you didn't really make -- you didn't even really order them yourself until about December?

A. Yeah.

Q. Okay.

A. That is actually a prototype.

Q. Okay.

A. Yeah.

Q. Did you sell the prototype to anybody?

A. No. I still have it.

Q. Okay. Then let's move on to Exhibit 6. Exhibit 6 is just a bunch of corporate formation documents. And the reason why I'm giving them to you is I want to talk about all the d/b/a's for E&R.

A. Uh-huh. Is it relevant, though? It's got nothing to do with Her Tactical.

Q. Well, I mean, there is some relevancy to --

Page 122

there is some relevancy, and we might get to that. But, at the very least, I'll ask the questions. Okay?

A. Uh-huh.

Q. So I think we are about three pages into this exhibit. And here's a printout from the secretary of state website for E&R and it says, "Doing business as," and then I read, "Utah Casting, Her Tactical, Elegance & Romance, Envy & Revere, and then Utah Relocations." Is that an accurate list of the d/b/a's?

A. Yes. It looks like it.

Q. Is there anything missing from this list?

A. No, I don't think so.

Q. Do you personally run all of those businesses?

A. No. They're just ideas, really. The rest of them are real estate or a store that I thought of doing.

Q. Okay. So which of these -- and I know technically it's all E&R doing business as, but which of these are active businesses?

A. Utah Casting, Her Tactical, and Utah Relocations.

Q. Okay. So Utah Relocations I assume is your real estate business.

A. Uh-huh.

Q. And how much revenue does that bring in?

MR. PEHRSON: I'm going to object on grounds

Page 123

of relevance.

THE WITNESS: Yeah.

BY MR. LEAVITT:

Q. You can still answer.

A. I don't have an answer for that.

Q. Could you approximate?

A. It varies every year.

Q. Does it vary -- I'm assuming because you take commissions on home sales and home sales are not always going to be consistent?

A. Correct.

Q. Okay. But you do -- do you do pretty well as a real estate agent?

A. Sometimes. Some years I have. Yeah.

Q. I imagine things are pretty rough this year, if it's like everybody else.

A. Yeah. It's not like any other year.

Q. Yeah. And then Utah Casting, is that producing revenue?

A. Yes. Every now and then.

Q. Okay. About how much?

A. Oh, I don't know for sure. It's very random.

Q. Okay.

MR. PEHRSON: I just want to register a standing relevance objection to the questions associated

Page 124

with the exhibit.

MR. LEAVITT: Noted. Thank you.

BY MR. LEAVITT:

Q. And you're the registered agent for all of these businesses and that makes sense because they're you, right?

A. Well, they're --

MR. PEHRSON: Objection.

THE WITNESS: -- E&R.

BY MR. LEAVITT:

Q. E&R. Thank you.

All right. Now, the company address is 69 East 200 North, Kaysville. I think I looked that up once. Is that, like, a real estate office? Is that what that is?

A. Yes.

Q. Okay. Do you actually conduct any Her Tactical business out of that office?

A. Some.

Q. All right. Then...

All right. This is one, two, three, four, five, six pages in it looks like. I didn't paginate them. I apologize. I'm looking at the business name d/b/a form --

A. Okay.

Page 125

32 (Pages 122 - 125)

Vicky Arlene Johnston, indiv. and as 30b6 - November 2, 2023

Q. -- for Her Tactical.

A. Uh-huh.

Q. This is JM4HT-0888. All right.

Now, what it shows here is that you applied for this d/b/a on behalf of E&R on January 6, '22, correct?

A. Looks like it.

Q. Okay. Is that the date that you formed the d/b/a for Her Tactical?

A. I guess just by going by this date here, if this is a state form.

Q. Okay. Were you calling the business Her Tactical before you registered the d/b/a?

A. I don't know. I was still going through my training. A lot of things were going on at the same time. I couldn't be precise on a particular date.

Q. You said you started your training in January of '21, right?

A. Uh-huh.

Q. Maybe I misunderstood you. I thought it was about six months of training.

A. The training can go on for years if you want it to.

Q. Okay.

A. Yeah. As long as you -- you pace yourself.

Page 126

It's an online training. And then you have a mentor and you have weekly calls.

Q. When did you finish your training?

A. I don't know the actual date.

Q. Approximately.

A. They've actually revamped it. They've got a new program out, too. So I'd like to redo that. So I guess you could say I've not actually finished the new training.

Q. The original modules, though, have you finished those?

A. I haven't finished the very end ones because I had already found success with this and I -- the most important parts are actually in the first couple of modules. And then you get coaching, personal one-on-one coaching.

Q. Okay. And I apologize, I asked this and I know you answered it, but did you state that you don't recall if you were using the name Her Tactical before your d/b/a registration date?

A. I mean, I don't know officially where I might have been using it. And it would have been -- I mean, you have to have a grace period of a couple of months here and there. But at some point, once I knew that I was going to do holsters for women. But it was, like,

Page 127

okay, like, now the next step is to make it official.

Q. Okay.

I don't have an exhibit for this, but you registered the trademark, right?

A. Yes.

Q. When did you apply for it?

A. I don't know. I would have to have a look. Do you have it?

Q. Well, I am a trademark lawyer and I could look that up very quickly. One moment.

A. Thank you.

Q. I see a filing date of September 8, 2021.

A. Okay.

Q. Is that correct?

A. Probably is correct. Yes.

Q. Looks like you filed for it yourself?

A. Uh-huh.

Q. Okay. No lawyers?

A. No. It's a simple process.

Q. So you might not have an answer for this, but I'm looking at a d/b/a of January '22 and an application for trademark filed in September of '21.

At what point did you actually form the Her Tactical enterprise?

A. I don't have a specific date at all.

Page 128

Q. Okay.

A. It was all part of, like, going through the training, doing certain steps at certain times.

Q. Okay.

A. I didn't ever think that I would need to document any of that.

Q. Now, Exhibit 7 has been marked and it was really just to show that you had created a Facebook page for Her Tactical before you had registered the d/b/a. That is true, right?

A. I have no idea. I really -- again, I'm just going through the process of the course, doing things -- I did a lot of things very rapidly. So I don't know actual dates or care about it.

Q. Well, let's look at Exhibit 7 then, just to get it on record.

A. Okay.

Q. I see a page transparency on Facebook. This says it was created August 20, 2021.

A. Okay.

Q. Does that seem accurate to you?

A. Possibly, yes.

Q. Okay. So if we were to create a timeline here on the last several exhibits, you created the Facebook page August 20, 2021, you filed for the trademark in

Page 129

33 (Pages 126 - 129)

September of '21, you registered the d/b/a in January of '22; is that correct?

A. I don't know.

MR. PEHRSON: I'm going to object -- I'm going to object on grounds of relevance. Asked and answered.

THE WITNESS: I don't know. I have never lined these things up. I don't see how they are important.

BY MR. LEAVITT:

Q. You don't have any reason to dispute the data that we are looking at, though, do you?

A. No. You printed them off.

Q. And that is the page transparency for the Her Tactical Facebook page?

A. Looks like it.

Q. Okay.

Exhibit 8 was to show that you started -- that you collected some payments through your personal Venmo.

A. Sure. I have already stated that.

Q. And you already stated that, so I don't think we need to discuss it. Let's mark it for the record, but we can move on.

A. Okay.

Q. I told you this would be faster if we did the

Page 130

first ones.

A. Yeah.

Q. Exhibit 9... will be faster than my inability to pull up documents here. I think I gave away my Exhibit 9.

A. Did you? Do you want that one?

Q. Well --

MR. PEHRSON: There you go. Have one right here.

THE WITNESS: Okay.

MR. LEAVITT: Thank you.

BY MR. LEAVITT:

Q. All right. So you've referred to -- Exhibit 9 was about showing how Mr. Pehrson has been referring to your business as a hobby business in court filings.

And I recall you referring to it as a hobby business earlier. So do you agree with that characterization?

A. Yeah. It's a passion project. I'm very passionate about protecting women everywhere, so eventually it was going to grow.

Q. Do you feel like the amount of work you've put into this company and the growth that this company has had aligns with how the -- aligns with characterizing it as a hobby?

Page 131

A. So far I have not even stretched my legs with it yet. Like, and I've been stopped, obviously.

Q. Okay.

A. So it hasn't had the opportunity to grow.

Q. So what was it? $40,000 in gross revenue?

A. 48.

Q. 48.

A. Uh-huh.

Q. And that is still on its training wheels? Is that what you're saying?

A. It's definitely on training wheels.

Q. Okay.

A. One day it might be something that -- you know, who knows?

Q. Okay. So we take off the training wheels, you're expecting a lot more revenue?

MR. PEHRSON: I'm going to object on grounds of relevance. Calls for speculation. Opinion.

THE WITNESS: Yeah. I mean, it's what you hope for, right?

BY MR. LEAVITT:

Q. Okay. You testified you have been in trade shows and we talked about all the channels of trade both online and you have got some retail locations.

A. Uh-huh.

Page 132

Q. I don't have an exhibit on this, but you have -- you were on the news as well, correct?

A. Yeah. It's a -- yeah, Good Things Utah. Yeah. So they spotlight certain businesses to promote them.

Q. And all of those different revenue sources and advertising channels, is that consistent with a hobby business?

A. Yes. When you -- when you're starting out, you -- yeah, it's -- it's a baby.

Q. Okay. So it's a hobby because it's new.

A. Well, it's a passion project. It's definitely -- I mean, I put a lot of, you know, effort into this. It's something I'm -- it's more than just, you know, starting a business to make money. Like, I give a lot of my time. I mean, why would I be doing this, you know, if it wasn't a passion project?

Q. Okay. Now, we have discussed that it's a d/b/a of E&R. I'm curious. What does E&R stand for?

A. It's the middle initials of my grandparents.

Q. I like that.

A. Yeah. It was a good blessing thing.

Q. Well, thank you for sharing that. I like that.

A. They have since passed.

Page 133

34 (Pages 130 - 133)

Vicky Arlene Johnston, Indiv and as 30b6 - November 2, 2023

Q. Exhibit 11. That was intended to show that you have done research before designing your products. I think we have covered that already.

A. Okay.

Q. But let's look at Exhibit 12. So on page 0925, at the top there, it's a Facebook post from you, it says, "June 9th," but if you look at the bottom right-hand corner of the print screen, that would have been from 2022, not from 2023. Do you see that?

A. Okay.

Q. So on June 9th of 2022, you posted the statement that "For the past year I have been working on a project that is starting to grow like a vine."

A. Uh-huh.

Q. That is referring to the Her Tactical project?

A. Yes. I do not state that in there.

Q. I'm sorry.

A. I do not state that in there, though.

Q. No, that is what I'm asking. I'm asking if that is a reference to Her Tactical.

A. It is definitely that.

Q. Okay. And approximations being what they are, it would indicate that you started this project June 9th of approximately 2021.

A. Oh, gosh. You're being very specific.

Page 134

I mean... Yes, I would say -- yeah, it's definitely -- that would also include, obviously, my training.

Q. Okay.

A. Yeah.

Q. So I know it's --

A. I have been working on something.

Q. It's a social media post. I understand. It's not a legal document. Well, I guess it is now. But...

A. Well, it is now. Yeah.

Q. It is now.

A. Thank you.

Q. Just tuning in the dates. And so approximately, the summer of 2021, you started your training in the spring, so --

A. Well, I started my training in January. So you could say it was longer than a year, because I was -- this was leading up -- more of my training was leading up to this.

Q. Okay.

Let's look at Exhibits 13 and 14. We're going to explore here the timeline on when you consulted counsel.

In Exhibit 13 on page 0717 --

A. Yeah.

Q. -- we've discussed this email. We haven't

Page 135

looked at it before, but is this the email where -- this is the -- is this the email chain where you and Chad Myers were discussing the cease and desist and...

A. Okay. So I need to go backwards. Okay. Yes. Because, yeah, he reached out in a number of different ways. And then I said, "Please explain the nature of your business." And then he mentioned his patent '530.

And then -- and then I provided a patent analysis. And then Chad said that there are several chart applications. I don't know anything about those because they're not public to me. So, yeah.

Q. All right. And then at the very top of 717 -- and I know that these go reverse chronologically, so this is the last email in the chain, right?

A. Okay.

Q. And I underlined it here. You wrote, "We were careful about designing our magnetic holster and had consulted with a patent agent before moving forward with production."

A. Right.

Q. Okay. But I recall the date of the notice that you sent to Chad Myers as the same day as this email.

A. Okay.

Q. So what was the nature of your consultation

Page 136

before moving forward with production?

A. Like, my consultation with my patent agent?

Q. Yeah. Don't disclose details. That is privileged, right? But I recall from your earlier testimony it was really just about drafting and filing your application, right?

A. Yeah.

Q. And you had done your own personal analysis with respect to the '530 patent, right?

A. Uh-huh.

Q. So what were you hoping to convey with this sentence?

A. Just that I had already researched this. I had already spoken to a patent agent about this. So, I mean, I don't how much more clear I could be. Like, I've followed rules. I followed the training. I've consulted with professionals.

Q. So I think you were clear, but you just said something that makes it less clear. So I'm going to ask about it. Okay?

A. Okay.

Q. I understood from your testimony that when you consulted a patent agent, it was about your application, not about the '530 patent.

A. I've had multiple conversations. So mixed in

Page 137

35 (Pages 134 - 137)

A. I see.

Q. Okay.

A. What about all these people that are wearing my T-shirts, though? Should they be in the lawsuit?

Q. No. But they also weren't on your website, were they?

A. No, they are on my website.

Q. All right. I apologize. The next several exhibits are going to be about this. Okay?

A. Okay.

Q. Exhibit 19 is a social media post and it says, "Vicky Johnston is with Blake Cheal." Do you see that?

A. Uh-huh.

Q. And in the post you're announcing that the Her Tactical trademark had been registered, correct?

A. It had been registered, yes.

Q. Is this a post that you made on your Facebook page?

A. It's from my Facebook page, yeah.

Q. All right.

A. You've got to celebrate the wins.

Q. And you made that announcement with Blake Cheal?

A. I just tagged him, yeah.

Q. Okay.

Page 154

A. His friends like to know how my business is going all the time. So his friends get to see it, too.

Q. You know that technically I'm supposed to be a millennial.

A. Oh, yeah.

Q. But I have never felt like one. I am definitely an older millennial. And I am not so familiar with how somebody is noted to be with somebody else in a social media post.

So are you saying that "Vicky Johnston is with Blake Cheal," that occurred because you tagged him?

A. Yeah. I just tagged him.

Q. Okay. So if you had tagged me, it would say, "Vicky Johnston is with Brandon Leavitt"?

A. Yeah.

Q. Okay.

A. That is how Facebook works.

Q. All right. Well...

A. It's just a tag.

Q. I did clarify. I am a geriatric millennial. Did he have any role whatsoever in helping you obtain the trademark registration?

A. No. He has a full-time job. I do all of this, like, during the day. I'm capable.

Page 155

Q. Exhibit 20 is a Facebook post dated June 9, 2022 where it says that you had the support of an incredible husband. And I think that is consistent with your testimony, correct?

MR. PEHRSON: Objection; relevance.

THE WITNESS: Yes, he is definitely my support.

BY MR. LEAVITT:

Q. Okay. Exhibit 21. This one looks to be a repeat of Exhibit 18. So let's skip that one.

A. Was there another copy of it or...

Q. We may need to revisit that. I thought that exhibit was going to be private investigation reports, but we will go back to it if we need to. Okay.

Exhibit 22. This is the social media post announcing that you were on ABC4 Utah, correct?

A. Correct.

Q. And that is Blake Cheal with you in those photos?

A. Yes.

Q. And then you tagged him as well, correct?

A. Correct.

Q. What was his role in attending this event with you?

A. He's my husband. Again, my support.

Page 156

If I didn't have my husband, it would be, like, my daughter or a friend.

Q. Sure.

Exhibit 23. You had mentioned that the property that you live in, 3288 North 1250 West, Pleasant View, Utah is owned by your husband, correct?

A. It is.

Q. Okay. And that you have his implied permission to do business out of that home, correct?

A. Implied, yes.

Q. It seems to me then that his support is more than just emotional. There's a financial benefit in using property, correct?

A. Is there?

MR. PEHRSON: Objection; argumentative. Relevance.

BY MR. LEAVITT:

Q. Well, I mean, he has --

A. What is it? I would like to know because I will claim it.

Q. Well, I mean, you don't need to rent warehouse space for your products, do you? You don't need a distribution center?

MR. PEHRSON: Objection; argumentative. Relevance.

Page 157

40 (Pages 154 - 157)

THE WITNESS: Maybe.

BY MR. LEAVITT:

Q. You are not paying him for the privilege of storing gun holsters in his -- in the home, are you?

A. I am not paying him anything.

Q. So he's providing to you a financial benefit in allowing those holsters to operate from within his home and not charging you anything?

A. Which is wonderful.

Q. Exhibit 24. This is the one I thought we were going to get to on Exhibit 21. So we can not worry about going back to that.

Do you recognize this text correspondence?

A. Vaguely.

Q. I think you had mentioned this individual earlier in your testimony, Eleace Bartels.

A. Yes, I know the person. I know what she looks like.

Q. Okay. You sold her the holster through Venmo and then --

A. Correct.

Q. -- it looks here like you directed her to pick it up from your home, correct?

A. Correct.

Q. And then here at the bottom it says, "If I'm

Page 158

not home my husband will be."

A. Okay.

Q. And then that number, 801-882-9102, that is your personal number, correct?

A. Yes. I use it for work as well.

Q. Okay.

A. It's the only phone I have.

Q. So you use your personal number for work. You use a personal residence for work. And in this case, you used personal Venmo for work; is that correct?

A. No. I don't use personal Venmo for work. She just happened to be a one-off. She was an unusual -- like, even when she came to the workshop it was, like, I -- something is suspicious about her.

So she didn't have cash on her, and I wasn't ready to take payment. I said, "You can Venmo me," but -- yeah. And then when she reached out a second time, I felt this is very unusual. So I don't operate that way.

Q. Well, but you did at least once or twice?

A. Yeah, I did a special one.

MR. PEHRSON: Objection.

Just let me make my objections before you answer his questions.

Objection; relevance. Argumentative.

Page 159

THE WITNESS: Yes. I made an exception for her. This not how I normally operate.

BY MR. LEAVITT:

Q. And then moving on, so when you see these native files, these are placeholders for a video because you can't put a video on paper, correct?

A. Okay.

Q. I don't have StillShot from the video. So if you don't recognize this video from our production, I'll have to play it for you.

A. Okay.

Q. This is a video that shows Blake Cheal giving somebody a holster from the back of a truck. Have you seen that video?

A. No. Did I make the video?

Q. No. I present to you it was a private investigator.

A. No. I have no idea.

Q. Who -- we can look at the video if you want. We did produce it back in the spring. Would you like to see the video?

A. Sure.

Q. Okay.

MR. LEAVITT: One moment.

(Comments off the record.)

Page 160

THE WITNESS: By the way, it seems pretty crazy that there's spies out there. Like, it's something I definitely wouldn't do, but it is kind of creepy.

BY MR. LEAVITT:

Q. It is difficult to document things that people wouldn't normally admit to. And so...

A. I admit to everything. I'm an open book. Like...

Q. Well, do you admit that Blake Cheal has sold Her Tactical holsters from the back of his truck?

MR. PEHRSON: Objection; calls for a legal conclusion. Objection; relevance.

THE WITNESS: He absolutely has not sold a holster from the back of his truck.

BY MR. LEAVITT:

Q. All right. But I guess we're going to have to --

A. It sounds, like, really bad now. You can't sell my holsters like that. He might have passed one, but I -- it came from my Venmo account. So he has not sold one. But you can take whatever --

Q. Well, I'm still pulling up the video, but, to your point, the private investigator's report, which is not here and I can make sure to get it after a break if

Page 161

41 (Pages 158 - 161)

we need to --

A. Okay. Sure.

Q. -- the private investigator's report states that she approached you at the table and then you directed her to go get one from the truck and --

A. Okay.

Q. -- Blake Cheal gave it to her. Does that sound like something that you would do?

A. Yes. If I'm very busy, I will use the people around me to help.

Q. Okay.

A. I mean, honestly it just seems like really -- this is so...

MR. PEHRSON: I would like to point out the questioning is not legally relevant. The line of questioning is not legally relevant. So I would like to restate my standing objection to all of these questions that are not relevant.

BY MR. LEAVITT:

Q. I have the video, for the record. I am about to hit play. The title of this video is JM4HT-0862, which corresponds with the native file placeholder within Exhibit 24.

(Video playing.)

(Various voices speaking.)

Page 162

FEMALE VOICE 1: "And then, like, how -- I think I want to get like a medium size, you know?"

FEMALE VOICE 2: "Awesome."

(Inaudible.) (Multiple voices in background.)

VICKY: "Hey, I think I know who this is."

ANGELA: "Sorry."

ELEACE: "Sorry, you go ahead."

ANGELA: "Go ahead."

VICKY: "This is Angela and Eleace? Or Megan?"

ELEACE: "I'm Eleace. Megan is on this side."

VICKY: "Okay. So Eleace and then" --

ELEACE: "And I actually was just dropping off a friend here."

VICKY: "Okay."

ELEACE: "So I didn't sign up for a class, but she was telling me you guys sell the holsters."

VICKY: "Yes."

ELEACE: "Do you have any that I" --

VICKY: "I do."

ELEACE: "I was" --

VICKY: "They're in the truck. They're in the back of the truck. So they're all -- yes, because I'm going to display them a little bit later on today."

ELEACE: "Oh, okay."

Page 163

VICKY: "But if you have to have a look at them" --

ELEACE: "Yeah, I wanted to" --

VICKY: -- "Blake will show you" --

ELEACE: -- "take the class. I can't."

VICKY: "Yeah, so just show her out of the back of the truck. Sorry, there's some mannequins in the way" -- (Inaudible.)

ELEACE: "Okay. Sorry."

BLAKE: "Okay. What kind of a gun is it? Compact? Or subcompact?"

ELEACE: "Yeah, compact."

BLAKE: "We have all (inaudible) truck and get" --

ELEACE: "Sorry. I know you probably weren't expecting it."

BLAKE: "No worries. What color are you looking for?"

ELEACE: "If you have purple, purple is my favorite color, but it doesn't -- it doesn't really matter, I guess."

BLAKE: "No, no, you name it."

GRANT: "Yeah, you name it." (Unintelligible.)

ELEACE: "Wow."

Page 164

BLAKE: "So there are pinks, purples, blacks."

ELEACE: "Oh. Oh, yeah, see, this one. Okay."

BLAKE: "These are the magnetic version."

ELEACE: "Yeah. Oh, that's so cool. Yeah, I've seen these online."

BLAKE: "So these are the -- this is the micro. So how small -- do you have a" --

ELEACE: "I need a compact. Yeah, the micro won't -- compact right here, right?"

BLAKE: "Right there."

ELEACE: "Purple one. They're so cute."

BLAKE: "Yeah, you can open it up and look, make sure."

ELEACE: "Okay. Yeah. So cute."

BLAKE: "They get squished together with all the magnets."

ELEACE: "Yeah. Right."

BLAKE: "But they're -- have you messed with these before?"

ELEACE: "Well, my friend has one and I've kind of seen hers."

BLAKE: "Yeah, I wear mine all the time."

ELEACE: "Do you?"

BLAKE: "Yeah. So yeah. Yeah."

Page 165

42 (Pages 162 - 165)

ELEACE: "These are cool. So she made these?"

BLAKE: "Yeah."

ELEACE: "Boy, that's really" --

BLAKE: "Well, she had them designed. And then" --

ELEACE: "That's cool."

BLAKE: "So -- yeah, so there's -- just call your strap. I mean, these will fit a majority of, you know, regular-sized compacts."

ELEACE: "Okay."

BLAKE: "And then obviously the smaller ones are for micros."

ELEACE: "Yeah, these are neat."

BLAKE: "They're super comfy and you can mount them anywhere."

ELEACE: "Yeah, I like how they're so flexible."

BLAKE: "Yeah."

ELEACE: "I like that."

BLAKE: "Yeah, they're really soft."

ELEACE: "Okay."

BLAKE: "So -- and I don't know what she's selling them for. Sorry."

ELEACE: "Yeah, if you want to ask her?"

BLAKE: "Yeah, I will."

Page 166

ELEACE: "And then I don't know if you guys have Venmo?"

BLAKE: "She does."

ELEACE: "If I could Venmo her, that would be great."

(End of video.)

BY MR. LEAVITT:

Q. So just to get a few things on the record, there were two female speakers in that video. One of them was you, correct?

A. Yes. I was in the first part that the video was showing.

Q. And then the second individual identified herself as Eleace, correct?

A. Eleace.

Q. Eleace is spelled E-l-e-a-c-e, last name Bartels, B-a-r-t-e-l-s.

So that was a conversation between you and Eleace. She wanted a holster. You directed her to the first male speaker, which was Blake Cheal, correct?

A. Yes.

MR. PEHRSON: I'd like to remind the witness, please allow me to state objections. Please allow the examining attorney to finish his question before you respond to the question. Okay.

Page 167

Objection; relevance.

BY MR. LEAVITT:

Q. So the first male speaker was Blake Cheal, correct?

A. I believe so.

Q. And then in the video, we had another man walking around. He said a few words. That was Grant Cavalli, correct?

A. I don't know for sure.

Q. Well, just to be clear about the record, I'm going to rewind it a little bit so you can see him.

At 1 minute and 15 seconds, is that Grant Cavalli?

A. Yes. He does the training.

Q. Okay. And that's why he was there, right, because it was a training event?

A. Yes.

Q. All right. And then we see Blake Cheal bring out a box of products and they have a conversation about which one she wants.

A. He is supporting me.

Q. Okay. So he did in fact produce holsters from the back of a truck. Is this his truck?

A. Yeah, he produced holsters out of the back of the truck, but he didn't sell one to her. And I don't

Page 168

think that's relevant anyway. He's -- again, he's not being paid, he's a nonowner of the business.

MR. PEHRSON: I'd just like to remind the witness to just answer the question that's pending before you that gets asked by the examining attorney.

And we will restate our objections on relevance.

BY MR. LEAVITT:

Q. So that truck in the video, do you know who owns it?

A. I don't know who officially owns it, but I just know it as Blake's truck.

Q. I don't have an exhibit for this. It's a question I'm going to ask your husband. But I have documentation that the Blake and Tanya Cheal Family Living Trust owns the truck; is that correct?

A. I don't know.

MR. PEHRSON: Is what correct?

Wait until I make my objections to answer the question.

Asked and answered. She's already testified she doesn't know who owns the truck.

BY MR. LEAVITT:

Q. I have a few more dates here. And you might not know these off the top of your head, but I want to

Page 169

43 (Pages 166 - 169)

just walk through the dates because -- as a foundation to other questions. Is that okay?

A. Okay.

Q. I have the -- we filed -- the plaintiffs filed the lawsuit against you, Her Tactical -- E&R d/b/a Her Tactical and Blake Cheal on September 19, '22. Does that sound about right?

A. Sounds about right.

Q. And I have documentation that you were served on or around September 26th, about a week later.

A. I believe so.

Q. And then about a month after that, on December 21st, your lawyer, Chad Pehrson, moved to dismiss the lawsuit, correct?

A. I believe so.

Q. And the documentation shows that Mr. Pehrson moved to dismiss the lawsuit on behalf of you, E&R, and Mr. Cheal, correct?

A. I believe so.

Q. All right.

MR. PEHRSON: To be clear, you are asking my client what the contents of a motion filed with the court in 2022 are?

MR. LEAVITT: No. I'm asking who you filed on behalf of. If she understands that you represent all

Page 170

three defendants.

MR. PEHRSON: Thank you for the clarification.

BY MR. LEAVITT:

Q. All right. Acknowledging that Mr. Pehrson represents you and E&R and Blake Cheal, who pays his fees?

A. I pay his fees.

Q. And do you pay those fees strictly from the business account?

MR. PEHRSON: I'm going to object to this line of questioning, and the identity and the nature and the timing as to which attorney fees are paid is part of the attorney-client relationship which is subject to protection. So I'm going to instruct Ms. Johnston to not answer questions related to her payment of legal fees. And she obviously can't answer any questions as to other people's payments of legal fees.

MR. LEAVITT: For the record, I disagree with that characterization.

BY MR. LEAVITT:

Q. I think it is highly relevant to help us eliminate your husband as somebody who provides financial support to you and your business. I think it is highly relevant to eliminate your own personal involvement with the -- as a defendant.

Page 171

If the documentation of the record shows that Mr. Pehrson's legal fees are being paid by any entity other than your business, it should be discoverable. And I don't see that it's subject to the attorney-client privilege.

MR. PEHRSON: Okay. We disagree.

BY MR. LEAVITT:

Q. Now, your attorney has instructed you not to answer, so I'm not going to push farther, But I'm stating that for the record, and it will be a subject of a motion to compel.

A. Okay.

Q. Okay.

Have you and Mr. Cheal discussed any potential conflicts of interest with respect to sharing counsel as codefendants?

MR. PEHRSON: Object to the question. It relates to joint legal advice that Ms. Johnston and Mr. Cheal have received. Ms. Johnston is invoking the attorney-client privilege that she shares with Mr. Cheal as codefendants in this litigation.

The existence of some discussion among them about a conflict is improper to ask. It's irrelevant. And I'm instructing Ms. Johnston not to answer the question.

Page 172

BY MR. LEAVITT:

Q. So again, for the record, I'm not asking about your conversations with your lawyer. I'm asking about your conversations with your husband.

MR. PEHRSON: Let me explain to you, Mr. Leavitt, the way the attorney-client privilege works here in the United States. Any action they take on my instructions, any communications that they make in terms of facilitating legal services or legal advice, is covered under the work product protection.

And Ms. Johnston is not answering this question. You can proceed to have -- continue your argument as long as you would like.

MR. LEAVITT: Mr. Pehrson, I have given you a lot of space to state your objections for the record. I'm asking that you give me space to provide my responses.

MR. PEHRSON: Okay.

MR. LEAVITT: I'm not pushing your client for an answer after you told her not to answer.

MR. PEHRSON: That sounds great. That's what I just invited you to do. So please do that.

MR. LEAVITT: Well, and allow me to do it.

MR. PEHRSON: I just did. So please go.

BY MR. LEAVITT:

Page 173

44 (Pages 170 - 173)

Q. So we'll start again. For the record, conversations between you and your husband is the subject of that request. I am not asking you about your conversations with counsel. I'm not asking you to disclose to me conversations between you and Mr. Cheal that were based off of conversations with counsel.

I'm strictly asking you to disclose whether or not you and Mr. Cheal discussed conflicts of interest in sharing co-counsel.

MR. PEHRSON: I'm going to make the same exact speech that I made one minute ago. Would you like me to restate the whole thing?

MR. LEAVITT: It's up to you, Mr. Pehrson.

MR. PEHRSON: And instruct my client not to answer the question.

MR. LEAVITT: So that question, too, will be the subject of a motion to compel.

Mr. Pehrson, can we treat this on-record conversation as our --

MR. PEHRSON: No.

MR. LEAVITT: -- conference on the issue?

MR. PEHRSON: Yes.

MR. LEAVITT: So quick to answer without letting the interrogator finish the question.

MR. PEHRSON: I'm impatient. I grew up on

Page 174

30-minute TV shows and everything should last 30 minutes and then be done. So I appreciate that I interrupted you halfway through your question and changed my answer.

Yes, we have conferenced on this issue. It may be productive for you and I to have an offline discussion about it. We may end up still disagreeing with the law. But, you know, respectfully, I think there may be some things you're missing about the scope of the work product protection, and I'm happy to discuss those with you. So it may be helpful. But if you don't want to do it, that's your prerogative.

MR. LEAVITT: I'm always open for a discussion, so maybe we'll do that off record.

BY MR. LEAVITT:

Q. Let's move to Exhibit 25. This exhibit is intended to show an Amazon order by Shawndalyn Myers for a Her Tactical holster that got cancelled. Do you know anything about that?

A. I do.

Q. Could you explain to us why it was cancelled?

A. I cancelled it because I'm in a lawsuit with them. And I was advised.

Q. All right. So let's just explore it just a -- one layer deeper. Yes, you are in a lawsuit. Did you determine that the cancellation was necessary and

Page 175

appropriate because you were in a lawsuit?

MR. PEHRSON: Objection; relevance.

THE WITNESS: Partly.

BY MR. LEAVITT:

Q. And what other factors went into that?

A. Just advised.

Q. Let's proceed with Exhibit 26. A little bit thick. There will be a little bit of reading in this one.

A. Thank you.

Q. This is a compilation of articles that were previously produced to your counsel back in the spring. I have marked these articles at various points for us to read through.

This goes towards the conversation we have been having on magnets. You have expressed that you don't understand what we're trying to get at with the stacking of magnets, so I have provided you some articles here. Let's read them together and then let's revisit those questions. Okay?

MR. PEHRSON: I have an objection on grounds of foundation to the articles. Also, irrelevant.

MR. LEAVITT: I'm confident we can prove foundation. So let's proceed.

BY MR. LEAVITT:

Page 176

Q. On the first page -- we will go by the JM4 page numbers, 6701. In the boxed portion, on the second sentence, can you read that for the record?

A. In the box?

Q. Uh-huh. The second sentence.

MR. PEHRSON: Same objections.

What is this article?

MR. LEAVITT: If you want to make a standing objection, you're probably going to have a foundational concern with all of them, and I'm going to demonstrate that at trial when we provide exhibits.

MR. PEHRSON: Okay.

THE WITNESS: "It is like the analogy of a full bucket of water, once it is full to the brim, it can't be made any fuller."

BY MR. LEAVITT:

Q. I apologize. I meant the third sentence.

A. The third sentence.

Q. But thank you for doing that.

A. Okay. "By adding one magnet onto the other, e.g. stacking, the stacked magnets will work as one bigger magnet and will exert a greater magnetic performance."

Did you want me to continue?

Q. Let's do one more sentence.

Page 177

45 (Pages 174 - 177)

A. "As more magnets are stacked together, the strength will increase until the length of the stack is equal to the diameter."

Q. So do you disagree that when you stack magnets together, the strength increases?

MR. PEHRSON: I'm going to object to the question. This has been asked and answered. It's neat that you had her read something out of some internet printout, but her answer is the same about what she knows and doesn't know about magnets.

MR. LEAVITT: Objection; mischaracterizes testimony. And you need to give your client an opportunity to answer with the new context.

MR. PEHRSON: I appreciate it. And if you'd like to present the question. I made my objections. My client has already asked -- answered these questions. Reading random things from the internet doesn't advance this litigation, but --

MR. LEAVITT: Your objection is noted. If you would like to make a standing objection so that your client can answer these questions, we are going to proceed.

MR. PEHRSON: Yes, I would like to make my standing objection. Thank you, Mr. Leavitt.

BY MR. LEAVITT:

Page 178

Q. Please proceed.

A. So I am not an expert on magnets. I know they have a function, but I have not done any type of analysis on stacking magnets. So I don't know how -- I still don't know how to answer it. I just know two magnets, if they are facing the right way, they close together.

Q. I appreciate it. I'm going to ask you just a few different ways to just make very certain that even after this, you still don't understand. Okay?

MR. PEHRSON: Objection; mischaracterizes testimony.

BY MR. LEAVITT:

Q. So the next article, this is page 6710.

MR. PEHRSON: Object to whatever this article is. It's obviously just a section of an article that appears to be randomly printed. Whether it is from a website or in a book, no one knows.

MR. LEAVITT: Well, they have been produced to you. We can look at the source files. You also have a standing objection.

MR. PEHRSON: Well, this is a new article with no --

MR. LEAVITT: There are approximately four articles in here, which is why I offered the standing

Page 179

objection.

MR. PEHRSON: Are all of them -- they have no known source and you're not going to tell us the source?

MR. LEAVITT: Every single one of them has been produced to you. If you'd like, on record, we will pull up the source so you can see the URLs and the print dates. And we, of course, also have the Bates numbers. And we can demonstrate the production date of those Bates values. It's also a matter of public record subject to a judicial notice.

MR. PEHRSON: It's up to you how you want to present your deposition.

MR. LEAVITT: I don't have any need --

MR. PEHRSON: I have made my objections. There is no evidentiary foundation for asking these questions. It's -- I'll go to my tried and true it's ridiculous objection, which I think is not on my list of objections I can make. So I think I'll make irrelevance, foundation, form objections.

MR. LEAVITT: I'm noting your objections. I'm proceeding anyway. I have offered you a standing objection. You have taken it. Will you let us proceed?

MR. PEHRSON: I understand. I did want to make clear with this one that it's a new quote/unquote article that's different from that.

Page 180

MR. LEAVITT: I will present to you, Mr. Pehrson, that there are about four articles, maybe five, that we are going to be going through here.

MR. PEHRSON: Okay.

MR. LEAVITT: And I will accept your standing objection for all of them. But let's proceed.

BY MR. LEAVITT:

Q. Ms. Johnston, 6710. Can you read the first two sentences?

A. In the --

Q. In the box.

A. -- box?

Q. Yes, in the box. I'm sorry, I spoke over you. I didn't mean to do that.

A. "One other way to make a weak magnet stronger is to stack more of them together. The stacked magnets will work as one to exert a greater magnetic force. The more magnets you stack, the stronger they will be. That is, until the length of the stack is equal to the diameter of the magnet."

Q. And then on the next page, 6714 -- and it bleeds a little bit into 6715 -- can you read the boxed text there?

A. Down here?

Q. Starting at the bottom of 6714, yes.

Page 181

46 (Pages 178 - 181)

A. Okay. "If you stack 2 magnets together (with opposite poles touching), they will act like a single magnet of the same overall height."

Q. And then on 6721. Let's just do the first of those boxes.

A. "Two or more magnets stacked together will exhibit nearly the same strength as a single magnet of the combined size. This is because the magnetic field lines of the two magnets combine, resulting in a stronger overall field. For example, if you stacked two 1/2 inch diameter or 1/4 inch thick disc magnets to make a 1/2 x 1/2 inch thick combined size, the two magnets would have nearly" -- "would have nearly same strength as a single 1/2 x 1/2 inch magnet." [As read.]

Q. Ms. Johnston, are you aware that the plaintiffs have been arguing that stacking two magnets together functions as one with respect to their three magnet patent?

A. Is it in their patent?

Q. Sorry, I don't understand your question.

A. Well, you're asking me if I know that it's -- like, if it's in their patent, then I would, but I don't -- this -- I don't do this type of study on magnets. I don't know the answer. So...

Q. Have you ever retained an expert on magnets

Page 182

or a --

A. No. I don't do these types of things with magnets. I just know two magnets close. That's it.

Q. And you haven't discussed this with any experts even though we produced these documents back in the spring? We have been making arguments that stacking magnets functions as one since the spring. You haven't looked into that?

MR. PEHRSON: Objection; argumentative. Is there -- would you like some factual information from my client or would you just like to argue your case?

MR. LEAVITT: The actual request is "Have you looked into it?"

MR. PEHRSON: We are not at trial. You are not performing for anyone, sir. She's answered that question.

THE WITNESS: I don't see the relevance. I don't know what you're getting at. I don't understand why I would need to know -- I just care about my product. I mean, it doesn't infringe on Chad's product. And doing research on magnets is something I have not done.

BY MR. LEAVITT:

Q. But didn't you say that the reason you are comfortable proceeding with your product was because

Page 183

yours had two magnets and his had three?

A. Right.

Q. But we have been arguing that three functions as two because we stacked them. So how is that not relevant?

MR. PEHRSON: Same objections. Asked and answered.

THE WITNESS: To me, three is three. I don't know how you make three, two.

BY MR. LEAVITT:

Q. Okay. We're still on Exhibit 26. The final part is an email from Calvert Gamwell, Bates page 12360. In the box, it says, "JM4tactical has chosen to combine two thinner neodymium magnets to create one thicker neodymium magnet in the manufacture of their holster product. This is a very popular strategy among many of our manufacturing clients for several reasons."

So I have here, Ms. Johnston, two JM4 Tactical magnetic holsters. One of them uses only two magnets, and the other one stacks two magnets which it then uses with a third. So one of these holsters has two magnets and one has three. And they operate, as I'm demonstrating to you -- if you want you can --

MR. PEHRSON: I have an objection. We're here -- you didn't hire a videographer. I don't know what

Page 184

you want my witness to do with these two products. If you have a question for her, I suggest you ask the question.

MR. LEAVITT: I'm getting to it, if you'll allow me.

MR. PEHRSON: Ask the question.

BY MR. LEAVITT:

Q. So go ahead and handle these two holsters.

MR. PEHRSON: You are under no obligation to handle anything that he has for you, not until it's a matter of record.

THE WITNESS: I'm really not going to. I have never touched this product. I prefer not to.

BY MR. LEAVITT:

Q. All right. Well, can you tell from a visual inspection which one has two and which one has three?

MR. PEHRSON: Again, same objections.

THE WITNESS: I'm not really an expert in magnets or his design.

BY MR. LEAVITT:

Q. But you did design a holster.

A. My holster, yes.

Q. And you designed a magnetic retention holster, right?

A. No, I did not.

Page 185

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

Vicky Arlene Johnston ,Indiv and as 30b6 - November 2, 2023

MR. PEHRSON: The interest of the court, and as an officer of the court, is in preserving an accurate record here. If you had a videographer, I could imagine that you might make this presentation in a way that would preserve an accurate history for the court and help us determine what the witness's testimony is or isn't.

Absent a videographer, I just don't see how it is possible. I object to the line of questioning. It's confusing and it's misleading.

MR. LEAVITT: We are going to proceed. Any concerns you have about -- about the demonstration or the visuals, we will do it again at trial. Okay?

BY MR. LEAVITT:

Q. So these two holsters --

MR. PEHRSON: If you are going to do it at trial, then do it at trial. You're here in a deposition, the only point of which is to make a stenographic record.

MR. LEAVITT: Right.

MR. PEHRSON: I can't make a stenographic record of your exhibits there. I can't make a stenographic record of you pointing at them or holding them or saying which one or that one.

MR. LEAVITT: But I can ask your client

Page 186

questions and she can answer those questions if you will allow me to proceed.

MR. PEHRSON: I understand, and I will continue to object where I think things are impossible to ascertain what is being meant from a transcript of this proceeding.

MR. LEAVITT: You have made your objection clear. I'm going to proceed. I'm going to keep going until you allow me to finish the questions.

MR. PEHRSON: You haven't asked a question.

MR. LEAVITT: You haven't given me a chance.

MR. PEHRSON: You're just talking and you're arguing. Just ask a question.

MR. LEAVITT: You're talking during my deposition. You have made your objections. Will you allow me to proceed?

MR. PEHRSON: I will object to each question that you ask, sir, related to the show-and-tell which you have brought.

MR. LEAVITT: Okay. Then we will proceed the slow way.

BY MR. LEAVITT:

Q. These two holsters, one has two magnets, one has three magnets. Can you in a visual inspection determine which is which?

Page 187

MR. PEHRSON: Object; irrelevant. These holsters are not part of the litigation. We are not here to ask Ms. Johnston to address these holsters. Objection.

THE WITNESS: I'm not an expert on this product. I don't know.

BY MR. LEAVITT:

Q. Okay. I have invited you to open and close these flaps. Perhaps you can tell a difference in their magnetic strength. Can you test that for me and give me an opinion?

MR. PEHRSON: Ms. Johnston has --

THE WITNESS: I prefer not.

MR. PEHRSON: -- already declined to interface with your exhibits that have no way of making it onto the record that you selected for this particular deposition.

BY MR. LEAVITT:

Q. So your lawyer has objected. Are you --

A. I prefer not to. I would not want to touch his products. I have never seen his products. This is the first time I'm seeing his products in the flesh. I prefer not to touch them.

Q. Okay. So you have never seen a JM4 holster in person before today?

Page 188

MR. PEHRSON: Objection; asked and answered. Please continue.

BY MR. LEAVITT:

Q. Is that correct?

A. I have only seen photos online.

Q. And you conducted your entire infringement analysis off of photos?

A. I don't need a physical product to read a patent.

MR. PEHRSON: Objection. Infringement is connected with patents, as the witness has testified. The questions are improper.

MR. LEAVITT: I note for the record, Mr. Pehrson, I know you favor objections. That one is a speaking objection and is disallowed by Utah's rules on professionalism.

MR. PEHRSON: My objection is that you are misstating the law and trying to mislead the witness.

MR. LEAVITT: Well, the prior statement, you were testifying.

MR. PEHRSON: Are you going to go into court and indicate that as to an infringement lawsuit, those two holsters are relevant and that those two holsters should have been reviewed as part of an infringement analysis as to JM4's patents and my client's products?

Page 189

48 (Pages 186 - 189)