# Pl's MSJ App Ex 2
# Cavalli Deposition Excerpts

many. And that was in California.

Q. And I imagine in your work as a investigator you were called into court on occasion, or...

A. I worked -- and I also did some time with San Diego Police Department. So, yeah, I spent time in court.

Q. Okay. Thank you.

A. You're welcome.

Q. Could you define for us your educational background?

A. I have a bachelor's. And I had some criminal justice.

Q. Now, I understand that you're appearing today pro se, meaning on your own behalf, that you have no lawyer.

A. That is correct.

Q. As I recall our correspondence before this deposition, I had advised that perhaps you might want a lawyer; is that correct?

A. That is correct.

Q. Have you had an opportunity to seek counsel?

A. No.

Q. So to be clear, have you chosen not to seek counsel or have you had -- not had the opportunity to seek counsel?

Page 6

A. I mean, both.

Q. Okay. In what way have you not had the opportunity to seek counsel?

A. Money.

(The reporter asked for clarification.)

A. Money.

Q. And I appreciate -- I appreciate the dialogue we're having. Just as a -- as a kind of administrative rule --

A. No problem.

Q. -- we've got our court reporter here, and she's typing every word that we have, right?

A. She's going crazy over here.

Q. And so it's going to be important for her to be able to do her job that we don't talk over each other.

A. Yeah.

Q. I know in natural conversations, active listening, it's normal for us to --

A. Bounce back and forth. Yes.

Q. Correct. But I'll try very hard to not interrupt you, if you can -- if you can wait until the end of the questions, just so that she can get it on record. And then you --

A. No problem.

Page 7

Q. Okay. Thank you.

All right. What's your... Well, let's go back to the counsel matter real quick. So you said that you don't have counsel because you can't afford counsel.

A. Correct.

Q. Would it be your choice to have counsel if you could afford it?

A. Yes.

Q. Are you confident that you can give a testimony today without the advice of counsel?

A. Yes.

Q. Okay.

Mr. Cavalli, can you describe your relationship with Her Tactical?

A. I'm an instructor. I teach for Her Tactical and I teach for other companies -- other entities besides her.

Q. So Her Tactical isn't the only entity that you are an instructor for?

A. That is correct.

Q. Can you mention off the top of your head all the other entities that you are an instructor for?

A. I will mention one, and that is UCA, United Citizens Alarm. That's the only one in this state, so...

Page 8

Q. As an instructor, what do you do for Her Tactical?

A. Teach the classes, both self-defense and firearms.

Q. Could you walk me through what goes into teaching a self-defense class or a firearm class?

A. Self-defense class, I hold black belts in a couple of arts, so I take them from basics through some steps to be better prepared to protect themselves.

And in firearms, I start them with basics and work them up to a point in each level, depending on what level they are taking.

Q. Can you walk me through the basics that you start them at?

A. Totally basic. "This is a firearm." The holstering, holding a firearm correctly. What to aim, where not to aim. What the targets are in the background. Be careful you're not shooting through and hitting innocent parties. For -- that's just basics.

And then it goes up from there. They -- eventually, they're shooting with both hands before the class is over.

Q. So how many classes does it take to get from "this is a firearm" to "we're shooting with both hands"?

A. First class.

Page 9

3 (Pages 6 - 9)

Q. So your students, they handle firearms in your classes?

A. Yes, they do.

Q. And I apologize if this is an ignorant question, but how many students per instructor is appropriate for a live firearm training?

A. I have two other people that are assisting me. And we only run five or -- five or six at the most on the line at one time.

Q. Who assists you in the Her Tactical classes?

A. Who? By name?

Q. Yes, please.

A. Can I ask why that's relevant?

Q. Well, I'm trying to -- I'm trying to gather a baseline here for what goes into the class, who's helping you out, making sure that it's safe. There might be other factors that it could be relevant for as well. But the nature of a deposition is --

A. You gather the facts.

Q. -- gathering facts. So that's what we're hoping to do today.

A. I don't know if I would be able to release their names without their permission.

Q. Well, I am going to politely ask --

A. Go ahead.

Page 10

Q. -- and you are welcome to decline. But if you do decline, then I would need to file a motion to the court to compel the answer.

A. James Baxter. And Jeff -- what's his last name? I can't remember Jeff's last name right off the top of my head.

Q. So James Baxter, Jeff with the last name that we don't remember, these are the individuals that have helped you at Her Tactical classes?

A. Yes. And other classes.

Q. Okay. Thank you.

A. You're welcome.

Q. Who typically attends these classes?

A. Excuse me?

Q. Who typically attends these classes?

A. Both male and female. Depends on what group I'm teaching.

Q. And these are paying students?

A. Yes, they are.

Q. Do they pay you directly?

A. In one class -- in one group, yes. UCA pays me directly. Those students pay me directly. The others are with Her Tactical. They pay her, her company pays me.

Q. Okay. So you have received payments from

Page 11

Her Tactical?

A. Yes, I have.

Q. Are these checks or direct deposits?

A. Usually they are direct deposits, Venmo to Venmo.

Q. Okay.

A. Also in that, she also sends me the range fees, which I take out, pay for range fees, then send receipts.

Q. And all of this is done through Venmo?

A. Well, Venmo to me, and then I go in and actually hand the money to the range.

Q. Thank you for the clarification. I appreciate that.

A. No problem.

Q. So when you say "her," are you referring to --

A. Her Tactical.

Q. -- Vicky Johnston?

A. Huh?

Q. Are you referring to Vicky Johnston?

A. Yes.

Q. And it's her Venmo that you receive payments from?

A. That's where the payments come to me, is through Venmo.

Page 12

Q. Is it -- I guess I'm asking something a little bit more specific. Is it Vicky Johnston's Venmo that you receive payments from?

A. I can't answer that, because I don't know if it's her company that's sending or her personal. I don't know.

Q. Okay. Would you be willing to share those records with us?

A. My receipts and that for classes?

Q. Yes, sir.

A. Yeah, I have no problem with that if it's necessary. I have no problem with that.

Q. And those Venmo payments as well?

A. Well, the Venmo would be hard. I'd have to figure out how to print that out, because I don't know off the top of my head.

Q. I understand.

A. But I could work on that problem. I'd have no problem doing that.

Q. Now, Venmo, that's -- do you have that as an app on your phone?

A. Yes.

Q. Could you just open it up now and --

A. No. My phone is locked up downstairs.

Q. Okay.

Page 13

4 (Pages 10 - 13)

A. They told me I'd have to surrender my phone, because no electronic devices, recording devices. And all of you have your cell phones, and what the hell -- I don't know.

Q. That's very confusing to me. I apologize that that happened to you.

(Discussion off the record.)

Q. So Mr. Cavalli, if we are not done today before you need to go down and pay for your parking --

A. Mine is good until 3:30 right now.

Q. All right. Then we will probably not run into that problem. Perhaps when we get to a -- we'll take a break, and see if we can get you your phone.

A. I'll go run down.

Q. Yeah.

A. Sounds fair.

Q. Maybe just in the interest of not jumping back and forth, we can take a five-minute break and try?

A. What's that?

Q. Do you think we can take a five-minute break right now and try?

A. Well, I'm good until 3:30 right now.

Q. Right. I just want to see if we can get you the phone and answer that question about Venmo.

A. That was, where it comes from? Which account?

Page 14

Q. Yes.

A. I suppose. I don't know if it -- I don't -- I personally can't say that it -- I know where it would come from, I just know it's Venmo.

Q. Well, we can see it on your phone is what I'm saying. Right?

A. Yeah, I suppose so.

Q. Okay. Well, let's take a five-minute break and go get it from security.

A. Okay. If they'll let me bring it up.

(Whereupon a short break was taken.)

MR. LEAVITT: All right. We are back on record. We went down to security and we grabbed Mr. Cavalli's phone. And we have opened up the Venmo account, and it appears that Mr. Cavalli is receiving payments from Vicky Johnston's personal Venmo.

BY MR. LEAVITT:

Q. Mr. Cavalli, can you confirm that?

A. Based on what I see, yes.

Q. Thank you.

A. You're welcome.

Q. How often have you had the gun trainings with Her Tactical?

A. How often? Just a moment, I'm going to shut this down so I don't have it go "beep, beep" on me all

Page 15

through this thing, because it will. (Phone makes a sound.) Like that.

How many times?

Q. Yes, sir.

A. Let's see, once in October, which we just finished, I did a class. Before that, probably off the top of my head, maybe three other times. I'm not exact on that right off the top of my head.

Q. So maybe four, possibly five times?

A. I couldn't say. Three or four. I will go there.

Q. Okay. Thank you.

Has Blake Cheal ever attended those events?

A. Excuse me?

Q. Blake Cheal ever attended those events?

A. He never attended the event, but he would be bringing food in for the people to eat.

Q. Okay.

A. So that was -- that was his whole thing, was bringing the food for everybody.

Q. Got you. Got you.

Did he buy the food?

A. I don't know who bought the food. I can't answer that question. I don't know.

Q. I understand that at some of these training

Page 16

events, you -- Her Tactical has sold their holsters at those events; is that correct?

A. Yes.

Q. Have you helped them sell any of those holsters?

A. I don't deal in that range. That's up to her.

Q. All right. Did Blake Cheal bring the holsters to those events as well?

A. No.

Q. Who brought them?

A. She did.

Q. And by "she," you're referring to Vicky Johnston?

A. Vicky. That's correct.

Q. Has Vicky Johnston ever attended those events in a truck?

A. Has she? No. Car.

Q. How about Blake Cheal?

A. I'm not sure.

You're talking about a very large parking lot. And all I know is the food is there, and that I don't know if he brings it in a truck or a car. I couldn't answer -- honestly give you an answer to that.

Q. I appreciate that.

A. If I could, I would.

Page 17

5 (Pages 14 - 17)

Q. I'm handing you what has been marked Exhibit 21. This is a document we reviewed yesterday.

A. Okay.

Q. For you, the first time, I understand.

I present that it's a video posted by Her Tactical of one of these self-defense firearms trainings. And if you rifle through this, you can see that we took some screenshots of the video.

Do you recognize yourself on that first screenshot?

A. That's -- I'll just scan through it real quick. Just a minute. On the first one?

Q. Yes, sir.

A. I believe it -- let me get to it. Let's see here. Yes.

Q. All right. Do you -- is this one of your training seminars?

A. Yes.

Q. And the man circled there, is that Blake Cheal?

A. The picture is kind of hard to say. So I'm not sure, but it's possible.

Q. Okay. Let's look at the second page.

A. Okay.

Q. You're in that second page as well, correct?

Page 18

A. Correct. So is one of my assistants.

Q. This assistant to your left, is that James or Jeff?

A. That would be James.

Q. And the man to your right?

A. The man behind me, again, it's kind of blurry, but -- I can't swear to it by that picture.

(The reporter asked for clarification.)

Q. On the second-to-last page, the man that's circled there --

A. Just a minute. Second to the last?

Q. Yes, sir.

A. Okay. Yep, there we go.

That might be him, meaning Blake.

Q. Okay. A little bit more clear there?

A. Yes.

Q. And the very last page, is that Blake?

A. Just a minute.

Yes, he was there as an observer.

Q. All right. And I observe that the man we've been seeing in each of these pictures has a Her Tactical shirt and shorts, and this is the same event. Can we assume that if it's Blake Cheal in the last two pages, it's probably Blake Cheal in the first three or four?

A. You're asking me to come to a conclusion

Page 19

there, and I really won't -- don't want to do that. I will say that the last two we looked at, I believe those are him. And that's when he brought the food, probably.

MR. TODD: I will object to the form of the question.

THE WITNESS: Huh?

MR. TODD: I'm sorry, go ahead and answer.

THE WITNESS: Are we good?

MR. TODD: Yeah. I was just objecting to the form of the question.

THE WITNESS: Okay.

BY MR. LEAVITT:

Q. Yeah. It's normal in a deposition to hear objections. And...

A. Oh, I understand that, too.

Q. It's something to preserve for the record.

MR. LEAVITT: And I appreciate you stepping in there with the objection.

BY MR. LEAVITT:

Q. Can't really tell in this last picture if they are eating food there, but it looks they might be. I guess you're saying that he probably brought that?

A. Well, they -- he -- a lot of the time -- and I have to phrase it that way, a lot of the times, I have

Page 20

seen him bring the food, because it's already in the classroom.

Q. Yeah.

A. And then he's just in the classroom. He's not assisting me in any way, doing any of the training, because he's not qualified.

Q. Okay. Thank you.

A. You're welcome.

Q. Now, I understand that you were featured in a video where you were trying to pull the trigger of a Her Tactical holster; is that correct?

A. Yes.

Q. And I think I have an exhibit that shows StillShots from that video, if I can find it for you.

A. Okay.

Q. Exhibit 29. That number under there, JM4HT-1163 --

A. Uh-huh.

Q. -- that is what we call a Bates label. It's a way for us to paginate evidence.

A. Okay.

Q. So --

A. Okay.

Q. So what that means is, this is a document that has been produced to some of the other defendants in the

Page 21

6 (Pages 18 - 21)