# Pl's MSJ App Ex 3
# Myers Deposition Excerpts

Page 38

invention in January of 2016, what -- what things were you hoping to accomplish?

A. Me and my wife had raised four boys. We're raising four boys. They were in sports. She was always on the go. Our accomplish was -- my first accomplish was to get her something she could wear comfortably and that she could depend on, and that if she needed to ever draw her pistol, that she could draw it quickly. That was my main objective when we put patents on it.

And also to do a couple of gun shows, sell them, make some extra ends meet because, I mean, we have four boys and we're working, and that's very costly when you have four boys in sports.

Q. So initially it was you were thinking I need to help my wife be able to protect herself, so let me make something for my wife; is that correct?

A. Yes.

Q. And eventually you thought maybe I could grow this into something bigger or -- is that correct?

A. It was never really meant to be this big. I would have never dreamed that. It's the American Dream. You develop something. But it was to sell it at a few gun shows. You know, try to make some extra money. I mean, we have four boys.

Page 39

Q. So you start -- yeah. So you started kind of as a side hustle, for lack of a better term?

A. Well, not a side hustle because we LLC'd the company and we put insurance on the company, so we wanted to make sure that everything we did was legit and by the law. So we had an LLC, we had a trademark -- or JM4 trademark which started -- started the process of the patents, before the holster was even put on the market. We also, what was it, yeah, because we went down and we had company insurance.

Q. And I'm sorry. When I said side hustle, I meant that more of you had your primary job at Coke --

A. Yes.

Q. -- but you were doing this on the side?

A. Yes.

Q. Okay. And I wasn't trying to infer --

A. Okay.

Q. -- to make any --

A. It's okay.

Q. -- implications that you were doing anything illegal or not by the books --

A. Okay.

Q. -- so thank you for clarifying that.

At what point did you think this could work and maybe I can leave my job at Coke?

Page 40

A. It's scary to leave something like that. Even though we were doing six figures a month, I think somewhere around there, I can't remember, that was put in discovery when y'all asked for it, but the company grew really fast, but I still continued to work 12-hour shifts every night.

Q. To this day?

A. No. Up until December.

Q. Oh, okay.

A. But the company was -- it grew so fast, but it's still a scary moment to leave your income because you're still not sure about this. Does that make sense?

Q. So when you -- and is JM4 your only employment currently?

A. I am an instructor for JM4 Dimensions.

Q. And is that a completely separate entity?

A. Yes.

Q. Okay. But you no longer work at Coke; correct?

A. As of December of 2016, no.

Q. And since December of 2016, JM4 Tactical and JM4 Dimensions have been your primary --

A. Yes.

Q. -- employment? Okay. Thank you.

Page 41

Are you certified as a firearms instructor anywhere outside of Texas?

A. No. Well, at USCCA, yes, I'm certified to teach in all 50 states under USCCA's guidelines.

Q. And USCCA, for the record, could you --

A. United States Concealed Carry Association.

Q. Okay.

A. So I can teach firearms in any state that they're in, which is all 50 of them, and any state -- every state that I'm legally allowed to carry.

Q. Okay.

A. And -- go ahead.

Q. I was going to say when you say legally allowed to carry, does that mean states that have a constitutional open carry law or -- or do you have a concealed carry permit with reciprocity in different states?

A. There's not a state that has a constitutional carry law.

Q. Okay.

A. If it was constitutional, then it would be the entire United States. It's permitless carry.

Q. Okay. Have you taught in any states other than Texas?

A. No.

JM4 TACTICAL vs HER TACTICAL
JAMES MYERS - 04/22/2024

Pages 42..45

Page 42

Q.   Okay.  So even though you could, you just have not had the opportunity to?  Or taken the opportunity, rather?

A.   Yes.

Q.   Okay.  Thank you.

A.   I'm busy enough in Texas.

Q.   Okay, great.  I want to get into some of the patents.  Are you good to keep still going, do you want to take a break?

A.   Let's take a ten minute.

Q.   Okay, great.

A.   Because I was kind of rushed up here.

Q.   Okay, yeah.

A.   Okay.

(Recess taken from 10:10 a.m. to 10:27 a.m.)

MR. TODD:  All right.  We're just -- for the record, we're now joined by Colin Platz on Teams.

Q.   (BY MR. TODD) Okay.  All right.  So I want to get into some of these patents that you have.  First of all, do you know off the top of your head how many patents JM4 or you have -- have been a part of?

A.   Not off the top of my head, no.

Q.   Not off the top of your head, okay.  I want to start off by looking at this.

(Exhibit 3 marked.)

Page 43

Q.   (BY MR. TODD) Okay.  So this is Exhibit 3 and it is the U.S. patent, and the one -- I'm sorry.  Actually, that's the wrong one.  I don't want to talk about that one just quite yet, but we'll keep that marked as Exhibit 3.

Okay.  Exhibit 4.  I'm sorry, Exhibit 3 is right.  Exhibit 3 is right.  This is the patent ending in 530.  Okay.  Sorry about that.

Okay.  Mr. Myers, do you recognize this patent?

A.   Yes.

Q.   Can you -- and are you the inventor listed here on this patent?

A.   I should be, yes.

Q.   And you're the applicant as well; correct?

A.   Yes.

Q.   Okay.  Was there any other person who helped contribute to this invention besides yourself?

A.   No.

Q.   So you're the sole inventor of this patent?

A.   Yes.

Q.   Okay.  Can you tell me a little bit about the, you know, we've talked a little bit about your -- the reasons you got into holsters and founded JM4.  Can you tell me a little bit more specifically about this

Page 44

patent and its development?

A.   You asked that question earlier.

Q.   So I want to know -- well, we talked kind of generally, you know, about -- you explained to me how you had your holster, the idea that you came up from the wallet, but I want to know a little bit more about, you know, now you decided to file.  Was this the first patent application you filed?

A.   (Peruses document.)

Who filed this one?  This is not the provisional.  This is the actual patent application.

Q.   Correct.  This has a filing date of December 20 -- or December 6th, 2016 I will represent to you.

A.   Yeah, there was a provisional.

Q.   And the provisional was for this patent?

A.   Mm-hm.

Q.   Okay.

A.   The provisional was filed January -- January, something like that, of 2016.

Q.   So you were able to get a full application filed before one year; correct?

A.   Yeah.

Q.   Okay, great.  What were the kind of key components of this patent?  Or of this invention.

Page 45

A.   I don't understand what your question is.

Q.   When you decided to patent -- to patent your invention on this holster, what were the things that you identified as new or novel?

A.   It being able to hold to the waistline, not having to wear a belt.

Q.   Okay.  But what specific aspects of it?  Did you say I'm, you know, I'm going to include this because no one else is doing this?

A.   That was to be able to hold to your -- hold to your waistline without a belt.

Q.   Okay.

A.   In your appendix carry.

Q.   Okay.

A.   Or be able to cant it at 4:00 o'clock.

Q.   Say that one more time.

A.   Cant it --

Q.   What does that mean?

A.   -- at 4:00 o'clock.  That means your 4:00 o'clock position where your pistol's canted.

Q.   Like right --

A.   Yes.

Q.   -- canted right here (indicating)?

A.   It hides the grip while conceal carrying it or be able to carry it appendix with the pistol leaning

Page 46

up and down.

Q.   Appendix is in the appendix, right here (indicating)?

A.   Yes.

Q.   So you would put the -- put the holster right here (indicating)?

A.   Mm-hm, yes.

Q.   And that's considered a safe way to carry?

A.   One hundred percent.  Any DSF instructor is going to carry it that way.

Q.   Okay.

A.   And then I want to go back.  Give me -- if you're doubting that, but that is -- I'm going to go back into that as an expert.

Carrying behind your back, even at 4:00 o'clock, in a high stress situation you're not able to remember your OODA loop.  How many times -- turn your pants around backwards and try to button them and zip them up behind your back, and do it quickly. That's not a familiar area.  Your appendix is a familiar area.  Everything right here, this is your workspace (indicating), so appendix is a lot faster if you come out of your holster.

So any DSF instructor from Jason Speller to Rob Pincus to Beth and Shawn Outts, I mean, anybody

Page 47

high level, they're going to teach you to carry appendix because it's a faster shorter draw and it's all in front of you.

Plus women a majority of the time are attacked from behind, so if their pistols are here in their work area, and they're attacked from behind, it's easier for them to get their pistol out (indicating). Does that make sense?

Q.   Yeah, that makes sense.  My question, I guess, is it seems to me when you sit down, if you were carrying right there, that you could be pointing the gun directly at yourself.  Is that a risk?

A.   Yeah, that's why you have to have a safe holster that you can't pull the trigger through the sidewall.

Q.   And is there any other way that the trigger could go off?

A.   Not inside of a holster.

Q.   Okay.  Are you aware of any accidents that have happened from people carrying it appendix?

A.   Appendix?  Just about the same -- same amount that is carrying it 4:00 o'clock, you know, shooting yourself in the buttocks, okay?  It just -- we train to look your pistol back into your holster -- in a high stress --

Page 48

Q.   To visibly -- once you're done, you visibly watch yourself put it back in?  Is that what you mean?

A.   Yes.  Or if it's a collapsible holster, you need to pull the holster off and reinsert it because in a situation we're always in a hurry to pull it out, but never in a hurry to put it up.  Does that make sense?

Because if your life is on the line, what are you in a hurry to do?  In a hurry to get your gun out. But there's never ever any hurry to ever put it up until the safe -- until your surroundings and the situation is neutralized and safe for you to look your pistol back into your holster or to pull your holster off and reinsert it.

Q.   So you mentioned a collapsible holster.

A.   Mm-hm.

Q.   Is a collapsible holster just one that's maybe softer?

A.   Yeah.

Q.   Okay.

A.   Our magnetics collapse.

Q.   And so they don't hold a rigid form?  Is that what I understand about them?

A.   That's correct.  They'll start to mold over time because it's leather.  I mean, any leather product wearing it over time's going to start to mold around

Page 49

your firearm.

Q.   So at some point does a collapsible holster become, you know, not as collapsible or not collapsible?

A.   That means the opening is still going to collapse.  It doesn't matter.  I mean, if it's going to -- it's a softer material, it's more comfortable to wear.  You're going to find Kydex is going to be an open end top to where you can reholster, but you have to understand there's a difference between civilian carry and cop carry.

Q.   What is that difference?  Can you educate me?

A.   I'm going to stand up and demonstrate; okay?

Q.   Okay.

A.   So in a self defense situation to where I'm being attacked, I have to go -- it's quicker if I'm here to go here and come out with my pistol (indicating).  Do you see what I'm saying?

Q.   Okay.

A.   Okay.  Now, once I notice that situation is neutralized, I've done my lateral movements, I got off the X, I'm looking to my left and looking to my right. I am making sure that situation's neutralized.

Now, if this holster's collapsed and I'm a civilian, I'm carrying comfortably; right?  I'm going

Page 106

Q.   Did you contact any of the places that were selling the products?

A.   No, I did not.

Q.   You did not?

A.   No.

Q.   Okay.  Did you take any -- let's see.  Did you examine the Defendants' -- any of their social media platforms?

A.   We looked on their social media platforms, but nothing's ever been publicly said or shared.

Q.   About the holsters?

A.   About the Defendants or anything.

Q.   Okay.

A.   It's never -- I mean, I've not talked about this to anyone or shared anything that they've done.

Q.   Okay.  Now, I'm assuming -- so you have listed in your initial disclosures that Shawndalyn would have information regarding this lawsuit; is that correct?

A.   Yes.  She'll have some.

Q.   Would she know about these Freedom to Operate Analyses?

A.   You'll have to ask her.

Q.   Okay.  Have you spoken with her about them?

A.   I'm married to her.  No, we don't speak much

Page 107

about this.

Q.   Okay.  Have you personally been harmed by any -- by any of the allegations you've set forth in the Complaint?

A.   Oh, yeah.

Q.   Can you explain to me how?

A.   Well, you know, JM4 Tactical has done really well over the years and it was based on creating American jobs, never about being rich because I didn't come from a rich family.  My family was picking cotton on a cotton form out in Hermleigh, Texas.  We lived with 15 aunts and uncles in one trailer when I was born, with no air-condition, so I'm not worried about money.  But, however, I used to do a lot of things for kids, donating, things like that, and it's not look at me, I'm donating money, look at me.  We just did it, did it out of my own pocket because JM4 Tactical did really well.

Well, this lawsuit has put us in a lot of legal financials.  One day I was sitting in my kid's office, his dentist office where he gets his braces and stuff, and there was a little Hispanic boy there that their family was from Rosco.  He was being raised by his grandparents and usually they didn't have the money to get started on his braces.  Usually I would get up

Page 108

and just call the receptionist and let them know that I'll pay for his braces or I'd pay half of it or give them the $500 down or whatever they needed.  You understand?

That is probably the most hurtful it ever made me is because I sat in that chair and I could not pay for these kids' braces because of these individuals and your clients.  So it's not just affecting me emotionally, it's affecting the people that I help.

Q.   Okay.

A.   And that's -- that's being for real.  So -- yeah, and she's sitting over there laughing thinking it's funny because the simple fact is I'm used to helping people.  It's not about the dollar with me.  It never has been.  It's been about helping individuals, giving jobs.  That's what this company's always been about.  It's been family oriented.  And I've not been able do a lot of things.

You know, Texas Dog Pound Boxing.  We used to write them really good checks.  We never wanted publicity for it because they took kids off the street and took them and taught them how to box, and that money helped these kids go to like Lubbock and Fort Worth to compete because their parents didn't have the money to send them.

Page 109

I haven't been able to write them a check in a couple of years, but we used to be their biggest donor.  We're not talking about -- and their board makes no money, so 100 percent of my money goes to these kids.  We did things like that, but we can't do that.

Q.   Okay.  So is that -- is that a harm to you as an individual --

A.   Yeah.

Q.   -- the financial --

A.   It's emotional.

Q.   Emotional harm?

A.   Yeah.

Q.   Okay.

A.   If you want to get technical.  Because it bothers me not to be able to do this.  I mean, that day really bothered me.  I'm being honest here.  That day bothered me, you know, because, I mean, Hispanic family out of Roscoe, Texas, or Rotan, one of the two, the grandparents couldn't afford it.  I feel bad because some people, you know, are not as privileged as others --

Q.   Okay.

A.   -- and grow up with money.

Q.   Have you been harmed personally by HER

Page 110

Tactical's references to its products as brand-new?

A.   What do you mean?

Q.   Referencing that their products were "brand-new" on the market, not thought of before.  How has that harmed you personally?

A.   What are you -- I mean, like let's talk about the way they're marketing?

Q.   Yes.

A.   Like what are you asking?  Like why do I see it as intent or are you asking --

Q.   I'm just saying how has that harmed you as an individual, whether that's emotionally, financially?

A.   Like I guess I'm not understanding.

Q.   I mean --

A.   I just told you.  I mean, emotionally, I mean, there's things I normally could do that I can't do, you know.

Q.   Okay.

A.   That I would have loved to do, but it's not feasible at this point.  But if you're talking about, I mean, I don't understand.  I guess I'm not understanding.

Q.   Okay.  Has the reference that the products are brand-new hurt you?

A.   Them using the terminology?

Page 111

Q.   Yes.

A.   Like revolutionary?

Q.   Yes.

A.   So them using the terminology from JM4 Tactical's website like key words or are you talking about SEO?

Q.   Have the words revolutionary and brand-new been used by JM4 describing their products?

A.   Yeah, when it was brand-new and revolutionary.  Like silent draw.  We don't use the word silent draw for magnetic because any soft holster you're going to have silent draw, and why would you even use that.  We use it for the Relics which are in the process of being patented.  They have been.  I think they're patented.  I don't know about the Relics.  So I guess I'm not understanding where you're coming from.

Q.   Well, I'm just asking in what ways have them using different terminology to market their products personally affected you as far as have they impacted your sales, your --

A.   That's something we're going to have to hire a financial expert to look at.

Q.   Okay.

A.   I mean, I don't know the extensive of damage

Page 112

of that, of them using those wordage, because that's a JM4 Tactical question or referred to the company.  Because the simple fact is that those terminologies aren't directing at me, they're directing at JM4 Tactical's SEO.  I'm not -- I don't personally have SEO work done for Chad Myers.

Q.   Okay.  So you say that you did not reach out to any -- any retailers regarding the sale of --

A.   No, I did not.

Q.   -- J4 Tactical?  You did not personally; is that correct?

A.   No.

Q.   Are you aware that retailers were contacted?

A.   No.  I don't know.

Q.   Okay.  So you're not aware that Smith & Edwards was asked to take down their sales or their products?

A.   That's right.  I did.

Q.   Okay.

A.   I want to recant -- reback that.  There's so much on this lawsuit.  I can't remember everything.  Do you understand?  But that was put into discovery and it was given to y'all line for line in the emails.  So it was provided to you in discovery.

Q.   Okay.

Page 113

A.   So it's already been provided to you.  I forgot about that because there's so much on this lawsuit, but yes, it's in discovery.

Q.   Was that you personally who reached out to them?  Do you recall?

A.   Not me personally.

Q.   Okay.  Are you aware that Hot Topic was reached out to?

A.   No.

Q.   Okay.  Do you want to do a 10-minute break?  Should we do a 15-minute break real quick?

THE WITNESS:  Yeah, let's do 15.

MR. LEAVITT:  Let's do 15 minutes.

MR. TODD:  Let's do 15 and maybe -- but I think we can power through this.

(Recess taken from 12:01 p.m. to 12:21 p.m.)

Q.   (BY MR. TODD) Okay.  So I want to just talk generally about these patents that you've asserted.  On each patent we already established that you were the inventor.  Have you made assignment for these patents are you aware of?  Or, I guess, who is the owner of them now?

A.   JM4 Tactical is the owner of a lot of them.

Q.   Okay.  I believe we do have, if you want to look at them.

Page 114

First, I only have one copy, Brandon, but I have your production, the assignments for the different patents, and so we can review those as Exhibit 10.

(Exhibit 10 marked.)

Q.   (BY MR. TODD) Would you just look through those really quickly and can you agree that those assign your patents that you invented to JM4 Tactical?

A.   (Complies.)

If they were assigned to JM4 Tactical, then I would have assigned them.  Nobody else would have.

Q.   And is that your signature at the bottom?

A.   Yes.  Well, if that's what you're asking, yes.

Q.   Yes, that's what I'm asking.

A.   Yes.

(Peruses document.)

Yes.

Q.   Okay.  And when you first filed your patent application in January of 2016, was that the first patent application you had ever filed?

A.   Yes.

Q.   Okay.  Maybe not your first invention, but the first one you sought to get a patent on.  Since then, you know, we have that you've invented several other patents.  Do you have a rough idea of how many

Page 115

inventions you have total?

A.   Not without sitting down and looking at which design patents are, you know, are what we filed.

Q.   Okay.

A.   Without sitting down with it layed out in front of me, no.

Q.   Would you say -- is it, you know, you don't have to give me an exact number.  Would you guess it's more than 20?

A.   I don't -- probably.  I mean, honestly, we would -- I would design out a new holster design and send it to the lawyers and that and tell them, let them know that if we need to file a design and they felt we needed to, then they would and the company would pay.

Q.   Okay.

A.   We'd go from there on that end of it without me actually sitting down and looking at it.  I'm pretty sure everything was provided to y'all in discovery of all the patents that were owned by me and JM4 Tactical, so we could go through them and count them if you'd like.  But, I mean, I don't want to speak on, you know, something that I'm not 100 percent sure about, but I do know that we do have the -- you've got the documentation of all the ones we own.

Q.   So do you feel like you became fairly

Page 116

familiar with the process of patenting?

A.   I know more than what I knew in 2016.  I mean, but as like an expert or like -- not really.  I mean, that's why --

Q.   No, I'm just -- yeah.

A.   That's why we have patent lawyers.

Q.   Right.  And I'm just asking for you -- for you yourself.  I mean, you've clearly walked through it at least six times, you know a little bit of the process, so what was your involvement with obtaining these patents?

A.   Well, what I would -- I would look at the designs, and they would send them to us, and I would look at what was -- to make sure everything matched everything before we filed them was mainly my involvement, and to make sure everything that was on record or that we were filing was correct like as is in the design, making sure the design looked like what we were selling on the market, but yes.

Q.   And so in your words, you know --

A.   I'm not an expert.  I mean --

Q.   No, no.  I'm saying -- I'm not asking as an expert.

A.   Yeah.

Q.   But, you know, in your words, your

Page 117

understanding, what is a patent?

A.   Well, I mean, a patent is a U.S. patent.  I mean, it's something where somebody either functionality or design.  I mean, most of the stuff is designs except for a couple of utilities, but the design of what it's for, and these are gun holsters.  So the design of a J frame holster, the patent on that would be the design patent, the shape of it.  Utility's how it functions.

I mean, that's the basis of what I know about patents.  But like I said, that's why we have patent lawyers to make sure that we're doing everything on the right and up and up.  That's why I hired them.  Or that's why they're, you know, there's law firms there to make sure.  Same thing with trademarks.  I mean, we ask and send them stuff and they make sure everything's done.

Q.   Do you feel like you understand the different parts like, you know, when you look at a patent that you have, do you feel like you understand what the different parts of the patent are?  And what I mean by that is do you understand, you know, you have the drawings and the specification and the claims?

A.   Somewhat.  I mean, I'm not --

Q.   Okay.

Page 118

A. -- a hundred percent on that, but somewhat I have maybe a little bit of an understanding on that.

Q. Okay.

A. I mean, that's really why we have our lawyers.

Q. Yeah. But, you know, I just wanted to see what you understand about your rights.

A. I mean, just, you know.

Q. Okay. Have you sought to get any valuations on any of your patents asserted in this case?

A. That would be another question for our law -- for our law firm because, I mean, if they did evaluations, I'm sure it would be in discovery and there would be an evaluation in there. But, I mean, honestly, I don't even know what you're talking about. Like --

Q. So what I mean is have you gone to somebody to say I've got, you know, this 109 patent, what do you think it's worth in the marketplace?

A. Oh, no, we have not done that.

Q. Okay, yeah.

A. Yeah, that's --

Q. I said a value -- sorry.

A. Yeah.

Q. A valuation, not an evaluation.

Page 119

A. You said evaluation and that's why I was like no, we have not --

Q. Okay.

A. -- evaluated the -- because, I mean, the evaluations of the patent, we have not done that.

Q. Okay.

A. I'm not an expert on that, so.

Q. Yeah, no. I mean, that's a question more of seeking to monetize the patents through licensing and that sort of thing.

A. We do know -- if we were going to license it, we do have a base, but, again, that's under an NDA and these two would have -- I'd be more than happy to tell you, but these two have to leave the room.

Q. Okay. Did you just -- did you come up with that base figure yourself or did you have an outside --

A. No. They did.

Q. An outside firm did?

A. Yes, they did.

Q. Do you know who that outside firm was?

A. Again, that's under -- that's under -- all that stuff, that whole contract, I mean, we'd have to ask them to leave and we could explain that to you.

Q. Okay.

A. More than happy.

Page 120

MR. TODD: Do you -- do you mind leaving for a minute (to Ms. Johnston and Mr. Cheal)?

(Ms. Johnston and Mr. Cheal left the proceedings.)

(END OF REGULAR NON-CONFIDENTIAL TESTIMONY)

(PAGES 121-159 BOUND SEPARATELY)

Page 131

START OF NON-CONFIDENTIAL TESTIMONY

(Ms. Johnston and Mr. Cheal entered the proceedings.)

Q. (BY MR. TODD) Okay. So you mentioned earlier Beth. Is that Beth Alcazar?

A. No. Beth Alcazar is our expert witness.

Q. Okay. Who was Beth that you mentioned earlier?

A. She handles a lot of the trademarks and she works for AVIP or something like that. I'd have to email you --

Q. Okay.

A. -- her last name. But she's -- she's done a lot of stuff for us over the years. I think it's AVIP.

Q. You can check later. This is not --

A. She does a lot of our trademark stuff also, JM4 Tactical, changed the way to carry, things like that, but it's -- it fumbles between Eldridge Law Firm and her.

Q. Okay.

A. But they work --

Q. Is she a lawyer?

A. Yes.

Q. Okay.

A. So they work together, her, you know, on our stuff.