Chad S. Pehrson (Utah Bar No. 12622) cpehrson@knh.law
Nathan Gardner (Utah Bar No. 19537) ngardner@knh.law
**KNH LLP**
50 W. Broadway, 9th Floor
Salt Lake City, Utah 84101
Telephone: (801) 994-4646

*Attorneys for Defendants*

---

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| JM4 TACTICAL, LLC; and JAMES CHADWICK MYERS,<br><br>    Plaintiffs,<br><br>    v.<br><br>HER TACTICAL, LLC; E & R LLC, d/b/a HER TACTICAL; VICKY ARLENE JOHNSTON, an individual; and BLAKE CHEAL, individually and as settlor and trustee of THE BLAKE AND TANYA CHEAL FAMILY LIVING TRUST,<br><br>    Defendants. | **DEFENDANTS' JOINT APPENDIX OF EVIDENCE IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT**<br><br>Case No. 1:22-cv-00121-AMA-DBP<br><br>District Judge Ann Marie McIff Allen<br><br>Magistrate Judge Dustin B. Pead |

## COVER-PAGE INDEX OF EXHIBITS

    Pursuant to DUCivR 56-1(e)(2)(A), Defendants HER TACTICAL, LLC; E & R LLC d/b/a HER TACTICAL, Vicky Arlene Johnston, and Blake Cheal (individually and as settlor and trustee of The Blake and Tanya Cheal Family Living Trust) submit this Joint Appendix of Evidence in support of their concurrently filed Motions for Summary Judgment. The exhibits listed below are appended in the order shown, with continuous Bates-stamped pagination throughout. Each Defendant's motion cites this Appendix by tab number with pin-cite particularity, as required by DUCivR 56-1(b)(3) and (b)(4).

| Tab | Description / Title | Source | |
|---|---|---|---|
| 1 | **U.S. Patent No. 9,784,530 ("'530 Patent")** Gun Holster System and Method of Use; issued October 10, 2017. | U.S. Patent and Trademark Office; issued patent reproduced in full from official USPTO records. | |
| 2 | **U.S. Patent No. 11,747,109 ("'109 Patent")** Gun Holster System and Method of Use; issued September 5, 2023. | U.S. Patent and Trademark Office; issued patent reproduced in full from official USPTO records. | |
| 3 | **Plaintiffs' LPR 3.1 Final Infringement Contentions** Served by Plaintiffs JM4 Tactical, LLC and James Chadwick Myers in this action. | Served by Plaintiffs in this action; produced as a discovery disclosure under Local Patent Rule 3.1. | |
| 4 | **Freedom-to-Operate Analysis** Prepared by Michael R. Schramm of Schramm Patent Services, LLC, dated August 22, 2022. | Pre-litigation patent-counsel analysis prepared at the request of Vicky Johnston / Her Tactical and provided to Plaintiffs in August 2022. | |
| 5 | **USPTO Office Actions Refusing Trade Dress Registration on Functionality Grounds** Application No. 90/520,663 (Office Action, Sept. 13, 2021); and Application No. 90/518,181 (Final Office Action, Nov. 7, 2022). | U.S. Patent and Trademark Office; from the official trademark prosecution histories of Plaintiffs' trade dress applications. The '520,663 application was abandoned April 4, 2022 without response. | |
| 6 | **Amendment in Response to Office Action** Filed June 1, 2017, in the prosecution of U.S. Application No. 15/370,465 (issued as the '530 Patent). | U.S. Patent and Trademark Office; excerpt from the official prosecution history of the '530 Patent. | |
| 7 | **Supplemental Amendment** Filed July 31, 2017, in the prosecution of U.S. Application No. 15/370,465 (issued as the '530 Patent). | U.S. Patent and Trademark Office; excerpt from the official prosecution history of the '530 Patent. | |

| Tab | Description / Title | Source | |
|-----|---------------------|--------|---|
| 8 | **Examiner Interview Summary** Dated August 21, 2017, in the prosecution of U.S. Application No. 15/370,465 (issued as the '530 Patent). | U.S. Patent and Trademark Office; PTOL-413 form from the official prosecution history of the '530 Patent. | |
| 9 | **Notice of Allowance and Examiner's Statement of Reasons for Allowance** Dated August 25, 2017, in the prosecution of U.S. Application No. 15/370,465 (issued as the '530 Patent). | U.S. Patent and Trademark Office; from the official prosecution history of the '530 Patent. | |
| 10 | **Face Page of U.S. Design Patent No. D811,731** Showing references cited including U.S. Design Patent No. D788,451 as prior art. | U.S. Patent and Trademark Office; first page of issued patent. | |
| 11 | **Face Page of U.S. Design Patent No. D836,329** Showing references cited including U.S. Design Patent No. D788,451 as prior art. | U.S. Patent and Trademark Office; first page of issued patent. | |
| 12 | **Face Page of U.S. Design Patent No. D841,979** Showing references cited including U.S. Design Patent No. D788,451 as prior art. | U.S. Patent and Trademark Office; first page of issued patent. | |
| 13 | **Plaintiffs' Initial Infringement Contentions** Served April 19, 2023. | Served by Plaintiffs in this action; produced as a discovery disclosure under Local Patent Rule 2. | |
| 14 | **Joint Submission of Claim Terms for Construction** Filed August 8, 2025 (Dkt. 132). | Court record: ECF Dkt. 132, filed jointly by the parties on August 8, 2025. | |
| 15 | **Minute Entry re Claim Construction Hearing** Entered December 19, 2025 (Dkt. 144), reflecting Judge Allen's ruling at the December 18, 2025 hearing declining to construe Plaintiffs' proposed terms and adopting plain and ordinary meanings. | Court record: ECF Dkt. 144. | |

3

| Tab | Description / Title | Source | |
|-----|--------------------|---------|---|
| 16 | **Excerpts from the Deposition of Vicky Arlene Johnston**<br>Taken in this action on November 2, 2023. | Deposition of Vicky Arlene Johnston, taken under oath in this action on November 2, 2023, reported by Deirdre Rand, RPR, CSR, CCR. Per DUCivR 56-1(e)(2)(B), excerpts include the relevant cited pages plus the four pages before and four pages after each cited section. | |
| 17 | **Declaration of Vicky Arlene Johnston**<br>Executed May 6, 2026. | Sworn declaration of Defendant Vicky Arlene Johnston, executed in support of her concurrently filed Motion for Summary Judgment. | |
| 18 | **Declaration of Blake Cheal**<br>Individually and as settlor and trustee of The Blake and Tanya Cheal Family Living Trust. | Sworn declaration of Defendant Blake Cheal, executed in support of his concurrently filed Motion for Summary Judgment (in his individual and trustee capacities). | |
| 19 | **Defendants' Final Non-Infringement Contentions**<br>Served June 27, 2025. | Served by Defendants in this action; produced as a discovery disclosure under Local Patent Rules 3.1(b) and 2.4(c)–(e). | |

DATED this 8th day of May 2026.

Respectfully submitted,

**KNH LLP**

*/s/ Chad S. Pehrson*
Chad S. Pehrson
Nathan Gardner

*Attorneys for Defendants*

4

TAB

# 1

# U.S. Patent No. 9,784,530 ("'530 Patent")

Gun Holster System and Method of Use; issued October 10, 2017.

SOURCE

*U.S. Patent and Trademark Office; issued patent reproduced in full from official USPTO records.*

US009784530B1

## (12) United States Patent
### Myers

(10) Patent No.: **US 9,784,530 B1**
(45) Date of Patent: **Oct. 10, 2017**

(54) **GUN HOLSTER SYSTEM AND METHOD OF USE**

(71) Applicant: **James Myers**, Abilene, TX (US)

(72) Inventor: **James Myers**, Abilene, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/370,465**

(22) Filed: **Dec. 6, 2016**

### Related U.S. Application Data

(60) Provisional application No. 62/414,292, filed on Oct. 28, 2016.

(51) **Int. Cl.**
| | |
|---|---|
| *F41C 33/00* | (2006.01) |
| *F41C 33/02* | (2006.01) |
| *F41C 33/04* | (2006.01) |

(52) **U.S. Cl.**
CPC ........ **F41C 33/0236** (2013.01); **F41C 33/041** (2013.01); *F41C 33/0272* (2013.01)

(58) **Field of Classification Search**
CPC . F41C 33/0236; F41C 33/041; F41C 33/0272
USPC .......................... 224/183, 192, 193, 196, 198
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,003,670 A | * | 10/1961 | Stella | F41C 33/0209 224/192 |
| 3,008,617 A | * | 11/1961 | Villwock | F41C 33/0209 224/183 |
| 3,707,250 A | * | 12/1972 | Esposito | F41C 33/0227 224/243 |
| 4,620,654 A | * | 11/1986 | Cook | F41C 33/0227 224/192 |
| 5,018,653 A | * | 5/1991 | Shoemaker | F41C 33/0227 224/193 |
| 5,251,798 A | * | 10/1993 | Theodore | F41C 33/0227 224/192 |
| 5,322,200 A | * | 6/1994 | Blanchard | F41A 17/02 224/192 |
| 5,632,426 A | * | 5/1997 | Beletsky | A45F 5/021 224/192 |
| 5,820,003 A | * | 10/1998 | Nichols | F41C 33/0227 224/192 |
| 6,604,657 B2 | * | 8/2003 | Yirmiyahu | F41C 33/0227 224/243 |
| 2007/0163164 A1 | * | 7/2007 | Avrahami | F41C 33/0227 42/87 |
| 2013/0221045 A1 | * | 8/2013 | McStay | A45F 5/021 224/183 |

* cited by examiner

*Primary Examiner* — Adam Waggenspack
*Assistant Examiner* — Lester L Vanterpool
(74) *Attorney, Agent, or Firm* — Richard Eldredge; Eldredge Law Firm

(57) **ABSTRACT**

A gun holster system includes a body having a front side and a back side forming an upper opening disposed therebetween and forming a lower opening at a lower surface of the body; a strap assembly integrally secured to the body; a first magnet disposed within a thickness of the fastener protrusion; and a second magnet disposed within a thickness of the housing. The strap assembly includes an elongated strap extending from the body; a fastener protrusion extending from a surface of the elongated strap; and a faster housing extending from an outer surface of the back side of the body.

**3 Claims, 4 Drawing Sheets**



U.S. Patent        Oct. 10, 2017        Sheet 1 of 4        US 9,784,530 B1



FIG. 1
(Prior Art)

App-002



FIG. 2

App-003

Case 1:22-cv-00121-AMA-DBP    Document 157    Filed 05/08/26    PageID.3548    Page 9
of 277



FIG. 3

App-004

**U.S. Patent**     Oct. 10, 2017     Sheet 4 of 4     US 9,784,530 B1



FIG. 4B



FIG. 4A

App-005

US 9,784,530 B1

**1**

# GUN HOLSTER SYSTEM AND METHOD OF USE

## BACKGROUND

### 1. Field of the Invention

The present invention relates generally to gun holsters.

### 2. Description of Related Art

Gun holsters are well known in the art and are effective means to carry a firearm. For example, FIG. 1 is a front view of a conventional gun holster **101** having a body **103** forming an opening configured to receive a pistol **105** therein. A strap **107** is integrally attached to the body **103** at one end and removably engaged at a second end via a fastener **111**, e.g., a button. The gun holster **101** is secured to an article of clothing such as a belt (not shown) of a user via a clip **109**.

One of the common problems associated with holster **101** is the limited use and weight. For example, the bulkiness of holster **101** restricts the user's ability to effectively conceal the firearm and the weight deters some parties from carrying the firearm. Although great strides have been made in the area of gun holsters, many shortcomings remain.

## DESCRIPTION OF THE DRAWINGS

The novel features believed characteristic of the embodiments of the present application are set forth in the appended claims. However, the embodiments themselves, as well as a preferred mode of use, and further objectives and advantages thereof, will best be understood by reference to the following detailed description when read in conjunction with the accompanying drawings, wherein:

FIG. 1 is a front view of a conventional gun holsters;

FIG. 2 is front oblique view of a gun holster system in accordance with a preferred embodiment of the present invention;

FIG. 3 is a back oblique view of the gun holster of FIG. 2;

FIGS. 4A and 4B are side views of the gun holster of FIG. 2.

While the system and method of use of the present application is susceptible to various modifications and alternative forms, specific embodiments thereof have been shown by way of example in the drawings and are herein described in detail. It should be understood, however, that the description herein of specific embodiments is not intended to limit the invention to the particular embodiment disclosed, but on the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the present application as defined by the appended claims.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Illustrative embodiments of the system and method of use of the present application are provided below. It will of course be appreciated that in the development of any actual embodiment, numerous implementation-specific decisions will be made to achieve the developer's specific goals, such as compliance with system-related and business-related constraints, which will vary from one implementation to another. Moreover, it will be appreciated that such a devel-

**2**

opment effort might be complex and time-consuming, but would nevertheless be a routine undertaking for those of ordinary skill in the art having the benefit of this disclosure.

The system and method of use will be understood, both as to its structure and operation, from the accompanying drawings, taken in conjunction with the accompanying description. Several embodiments of the system are presented herein. It should be understood that various components, parts, and features of the different embodiments may be combined together and/or interchanged with one another, all of which are within the scope of the present application, even though not all variations and particular embodiments are shown in the drawings. It should also be understood that the mixing and matching of features, elements, and/or functions between various embodiments is expressly contemplated herein so that one of ordinary skill in the art would appreciate from this disclosure that the features, elements, and/or functions of one embodiment may be incorporated into another embodiment as appropriate, unless described otherwise.

The preferred embodiment herein described is not intended to be exhaustive or to limit the invention to the precise form disclosed. It is chosen and described to explain the principles of the invention and its application and practical use to enable others skilled in the art to follow its teachings.

Referring now to the drawings wherein like reference characters identify corresponding or similar elements throughout the several views, the figures depict various views of a gun holster system **201** and method of use in accordance with a preferred embodiment of the present application. It will be appreciated that the gun holster system **201** overcomes one of more of the above-listed problems commonly associated with the conventional gun holsters.

In FIG. 2, a front oblique view of system **201** is shown having a strap assembly **203** integrally attached to a body **205**. During use, the body **205** is configured to carry a firearm while assembly **203** is configured to secure the body and firearm to an article of clothing.

Body **205** forms an upper opening **207** with partially separated sides **209, 211**. The upper opening **207** is designed to receive a firearm (not shown) therein while sides **209, 211** are configured to come in contact with the sides of the firearm and configured to secure the firearm in a removably fixed position. Body **205** further includes a lower opening **301** that extend through a bottom surface **213**. The opening **301** is adapted to receive the barrel of the firearm therethrough.

Assembly **203** includes an elongated strap **215** that has a fastener protrusion **219** that extends from surface **401**, as depicted in FIG. 4A. The fastener protrusion is configured to engage within a cavity **307** created by a housing **305** that extends from surface **303**. As depicted in FIGS. 4A and 4B, the protrusion fits within housing, which in turn creates a means to secure the assembly to the body. Accordingly, the protrusion and the cavity have the same geometric cylindrical shape.

The system **201** is further provided with 2 magnets **217** disposed within the thickness of the protrusion **219** and a third magnet disposed within the thickness of housing **305**. The two magnets provide additional means to secure the strap **215** to the body **205**. The magnet in **217** and **307** when connected cause retention on the gun so the gun will not fall out.

As shown in FIGS. 4A and 4B, the strap **215** is configured to fold about a joint **403** that enables connection between protrusion **219** and housing **305**. The area between strap **215**

US 9,784,530 B1

**3**

and surface **303** of body **205** is adapted to receive an article of clothing there between and magnet retention on the gun.

The particular embodiments disclosed above are illustrative only, as the embodiments may be modified and practiced in different but equivalent manners apparent to those skilled in the art having the benefit of the teachings herein. It is therefore evident that the particular embodiments disclosed above may be altered or modified, and all such variations are considered within the scope and spirit of the application. Accordingly, the protection sought herein is as set forth in the description. Although the present embodiments are shown above, they are not limited to just these embodiments, but are amenable to various changes and modifications without departing from the spirit thereof.

What is claimed is:

1. A gun holster system for carrying a gun, comprising:
a body having a front side and a back side forming an upper opening disposed therebetween and forming a lower opening at a lower surface of the body;
a strap assembly integrally secured to the back side body, the strap assembly having:
an elongated strap extending from and integrally secure to the back side of the body;
a fastener protrusion extending from a back surface of the elongated strap; and

**4**

a fastener housing extending from an outer surface of the back side of the body, the fastener housing being configured to engage with the fastener protrusion;
wherein the elongated strap folds backwards and away from the upper opening to cause the fastener protrusion and the fastener housing to engage;
two magnets disposed within a thickness of the fastener protrusion; and
a third magnet disposed within a thickness of the housing;
wherein the two magnets are configured to engage with the third magnet;
wherein engaging the two magnets with the third magnet does not obstruct the upper opening and does not obstruct or hinder entire removal of the gun from the body; and
wherein a combined magnetic retention strength generated by the two magnets and third magnet is strong enough to retain the gun within the body.

2. The system of claim **1**, further comprising:
a cavity formed by the housing;
wherein the protrusion removably secured within the cavity.

3. The system of claim **1**, wherein the lower opening is configured to receive a portion of the gun therethrough.

* * * * *

App-007

TAB

# 2

# U.S. Patent No. 11,747,109 ("'109 Patent")

Gun Holster System and Method of Use; issued September 5, 2023.

SOURCE

*U.S. Patent and Trademark Office; issued patent reproduced in full from official USPTO records.*

US011747109B1

## (12) United States Patent
### Myers

(10) **Patent No.:**  US 11,747,109 B1
(45) **Date of Patent:**  *Sep. 5, 2023

---

(54) **GUN HOLSTER SYSTEM AND METHOD OF USE**

(71) Applicant: **James Myers**, Abilene, TX (US)

(72) Inventor: **James Myers**, Abilene, TX (US)

(73) Assignee: **JM4 Tactical LLC**, Abilene, TX (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/905,267**

(22) Filed: **Feb. 26, 2018**

### Related U.S. Application Data

(63) Continuation of application No. 29/580,081, filed on Oct. 5, 2016, now Pat. No. Des. 811,731.

(51) **Int. Cl.**
F41C 33/04 (2006.01)
F41C 33/02 (2006.01)

(52) **U.S. Cl.**
CPC .................................... **F41C 33/041** (2013.01); **F41C 33/0236** (2013.01)

(58) **Field of Classification Search**
CPC ... F41C 33/0236; F41C 33/041; F41C 33/0272
USPC .. 224/183, 192, 193, 196, 198, 242, 243, 911, 224/912
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

2,910,804 A * 11/1959 White ................. F41C 33/041 D3/222

3,003,670 A * 10/1961 Stella ................. F41C 33/0209 224/192
3,008,617 A * 11/1961 Villwock ............ F41C 33/0209 224/183
3,707,250 A * 12/1972 Esposito ............. F41C 33/0227 224/243
4,312,466 A * 1/1982 Clark ................. F41C 33/0227 224/192
D264,240 S * 5/1982 Bianchi ......................... D3/222
4,620,654 A * 11/1986 Cook ................ F41C 33/0227 224/192
4,858,800 A * 8/1989 Holtzclaw, Jr. et al. ................... F41C 33/0227 D3/222
5,018,653 A * 5/1991 Shoemaker ......... F41C 33/0227 224/193
5,251,798 A * 10/1993 Theodore ........... F41C 33/0227 224/192
5,322,200 A * 6/1994 Blanchard ............. F41A 17/02 224/192
5,632,426 A * 5/1997 Beletsky et al. ....... A45F 5/021 224/192

(Continued)

*Primary Examiner* — Nathan J Newhouse
*Assistant Examiner* — Lester L Vanterpool
(74) *Attorney, Agent, or Firm* — AVEK IP

(57)  **ABSTRACT**

A gun holster system includes a body having a front side and a back side forming an upper opening disposed therebetween and forming a lower opening at a lower surface of the body; a strap assembly integrally secured to the body; a first magnet disposed within a thickness of the fastener protrusion; and a second magnet disposed within a thickness of the housing. The strap assembly includes an elongated strap extending from the body; a fastener protrusion extending from a surface of the elongated strap; and a faster housing extending from an outer surface of the back side of the body.

**4 Claims, 4 Drawing Sheets**



## US 11,747,109 B1

Page 2

(56)            **References Cited**

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,820,003 | A * | 10/1998 | Nichols | F41C 33/046 |
| | | | | 224/575 |
| 6,209,769 | B1* | 4/2001 | Seals et al. | A45C 1/04 |
| | | | | 224/675 |
| 6,604,657 | B2* | 8/2003 | Yirmiyahu et al. | F41C 33/0227 |
| | | | | 224/243 |
| 7,806,309 | B2* | 10/2010 | Korchmar | A45F 3/14 |
| | | | | 224/183 |
| D788,451 | S * | 6/2017 | Myers | D3/222 |
| 9,777,988 | B2* | 10/2017 | Karcher | F41C 33/041 |
| 10,141,092 | B2* | 11/2018 | Bennett | H01F 7/021 |
| 2003/0071095 | A1* | 4/2003 | Dedrick | A45F 5/00 |
| | | | | 224/183 |
| 2007/0163164 | A1* | 7/2007 | Avrahami et al. | F41C 33/0227 |
| | | | | 42/87 |
| 2009/0314813 | A1* | 12/2009 | Woolery | A45F 5/02 |
| | | | | 224/660 |
| 2013/0221045 | A1* | 8/2013 | McStay | A45F 5/021 |
| | | | | 224/183 |
| 2014/0224847 | A1* | 8/2014 | Miller | F41C 33/04 |
| | | | | 224/183 |
| 2015/0369559 | A1* | 12/2015 | Del Rosario | G08C 19/12 |
| | | | | 340/686.4 |

* cited by examiner

App-009



FIG. 1
(Prior Art)

App-010



FIG. 2

App-011



FIG. 3

App-012

Case 1:22-cv-00121-AMA-DBP    Document 157    Filed 05/08/26    PageID.3558    Page
19 of 277



FIG. 4A                    FIG. 4B

App-013

US 11,747,109 B1

1

# GUN HOLSTER SYSTEM AND METHOD OF USE

## BACKGROUND

### 1. Field of the Invention

The present invention relates generally to gun holsters.

### 2. Description of Related Art

Gun holsters are well known in the art and are effective means to carry a firearm. For example, FIG. 1 is a front view of a conventional gun holster 101 having a body 103 forming an opening configured to receive a pistol 105 therein. A strap 107 is integrally attached to the body 103 at one end and removably engaged at a second end via a fastener 111, e.g., a button. The gun holster 101 is secured to an article of clothing such as a belt (not shown) of a user via a clip 109.

One of the common problems associated with holster 101 is the limited use and weight. For example, the bulkiness of holster 101 restricts the user's ability to effectively conceal the firearm and the weight deters some parties from carrying the firearm. Although great strides have been made in the area of gun holsters, many shortcomings remain.

## DESCRIPTION OF THE DRAWINGS

The novel features believed characteristic of the embodiments of the present application are set forth in the appended claims. However, the embodiments themselves, as well as a preferred mode of use, and further objectives and advantages thereof, will best be understood by reference to the following detailed description when read in conjunction with the accompanying drawings, wherein:

FIG. 1 is a front view of a conventional gun holsters;

FIG. 2 is front oblique view of a gun holster system in accordance with a preferred embodiment of the present invention;

FIG. 3 is a back oblique view of the gun holster of FIG. 2;

FIGS. 4A and 4B are side views of the gun holster of FIG. 2.

While the system and method of use of the present application is susceptible to various modifications and alternative forms, specific embodiments thereof have been shown by way of example in the drawings and are herein described in detail. It should be understood, however, that the description herein of specific embodiments is not intended to limit the invention to the particular embodiment disclosed, but on the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the present application as defined by the appended claims.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Illustrative embodiments of the system and method of use of the present application are provided below. It will of course be appreciated that in the development of any actual embodiment, numerous implementation-specific decisions will be made to achieve the developer's specific goals, such as compliance with system-related and business-related constraints, which will vary from one implementation to another. Moreover, it will be appreciated that such a development effort might be complex and time-consuming, but would nevertheless be a routine undertaking for those of ordinary skill in the art having the benefit of this disclosure.

2

The system and method of use will be understood, both as to its structure and operation, from the accompanying drawings, taken in conjunction with the accompanying description. Several embodiments of the system are presented herein. It should be understood that various components, parts, and features of the different embodiments may be combined together and/or interchanged with one another, all of which are within the scope of the present application, even though not all variations and particular embodiments are shown in the drawings. It should also be understood that the mixing and matching of features, elements, and/or functions between various embodiments is expressly contemplated herein so that one of ordinary skill in the art would appreciate from this disclosure that the features, elements, and/or functions of one embodiment may be incorporated into another embodiment as appropriate, unless described otherwise.

The preferred embodiment herein described is not intended to be exhaustive or to limit the invention to the precise form disclosed. It is chosen and described to explain the principles of the invention and its application and practical use to enable others skilled in the art to follow its teachings.

Referring now to the drawings wherein like reference characters identify corresponding or similar elements throughout the several views, the figures depict various views of a gun holster system 201 and method of use in accordance with a preferred embodiment of the present application. It will be appreciated that the gun holster system 201 overcomes one of more of the above-listed problems commonly associated with the conventional gun holsters.

In FIG. 2, a front oblique view of system 201 is shown having a strap assembly 203 integrally attached to a body 205. During use, the body 205 is configured to carry a firearm while assembly 203 is configured to secure the body and firearm to an article of clothing.

Body 205 forms an upper opening 207 with partially separated sides 209, 211. The upper opening 207 is designed to receive a firearm (not shown) therein while sides 209, 211 are configured to come in contact with the sides of the firearm and configured to secure the firearm in a removably fixed position. Body 205 further includes a lower opening 301 that extend through a bottom surface 213. The opening 301 is adapted to receive the barrel of the firearm therethrough.

Assembly 203 includes an elongated strap 215 that has a fastener protrusion 219 that extends from surface 401, as depicted in FIG. 4A. The fastener protrusion is configured to engage within a cavity 307 created by a housing 305 the extends from surface 303. As depicted in FIGS. 4A and 4B, the protrusion fits within housing, which in turn creates a means to secure the assembly to the body. Accordingly, the protrusion and the cavity have the same geometric cylindrical shape.

The system 201 is further provided with 2 magnets 217 disposed within the thickness of the protrusion 219 and a third magnet disposed within the thickness of housing 305. The two magnets provide additional means to secure the strap 215 to the body 205. The magnet in 217 and 307 when connected cause retention on the gun so the gun will not fall out.

As shown in FIGS. 4A and 4B, the strap 215 is configured to fold about a joint 403 that enables connection between protrusion 219 and housing 305. The area between strap 215 and surface 303 of body 205 is adapted to receive an

US 11,747,109 B1

3

article of clothing there between and magnet retention on the gun.

The particular embodiments disclosed above are illustrative only, as the embodiments may be modified and practiced in different but equivalent manners apparent to those skilled in the art having the benefit of the teachings herein. It is therefore evident that the particular embodiments disclosed above may be altered or modified, and all such variations are considered within the scope and spirit of the application. Accordingly, the protection sought herein is as set forth in the description. Although the present embodiments are shown above, they are not limited to just these embodiments, but are amenable to various changes and modifications without departing from the spirit thereof.

What is claimed is:

1. A gun holster system for carrying a gun, comprising:

a body having a front side and a back side that form an upper opening disposed therebetween;

a strap assembly secured to the back side of the body, the strap assembly having:

an elongated strap extending from the back side of the body;

a fastener protrusion extending from a back surface of the elongated strap; and

a fastener housing extending from an outer surface of the back side of the body, the fastener housing being configured to engage with the fastener protrusion;

4

wherein the elongated strap folds backwards and away from the upper opening to cause the fastener protrusion and the fastener housing to engage;

a first magnet disposed within a thickness of the fastener protrusion; and

a second magnet disposed within a thickness of the housing;

wherein the first magnet is configured to engage with the second magnet, and wherein the engaging of the first magnet and the second magnet does not cause the elongated strap to obstruct the upper opening of the body and does not obstruct or hinder removal of the gun from the body;

wherein a combined magnetic retention strength generated by the first magnet and the second magnet is strong enough to retain the gun within the body; and

wherein the elongated strap is configured to fold over an article of clothing such that the first magnet and the second magnet provide magnetic retention to retain the gun holster system to the article of clothing.

2. The system of claim 1, further comprising:

a cavity formed by the housing;

wherein the fastener protrusion is configured to secure within the cavity.

3. The system of claim 1, wherein the body further comprises a lower opening configured to receive a portion of a pistol therethrough.

4. The system of claim 1, wherein the body forms a lower opening at a lower surface of the body.

* * * * *

TAB

# 3

# Plaintiffs' LPR 3.1 Final Infringement Contentions

Served by Plaintiffs JM4 Tactical, LLC and James Chadwick Myers in this action.

SOURCE

*Served by Plaintiffs in this action; produced as a discovery disclosure under Local Patent Rule 3.1.*

Brandon James Leavitt, TX Bar No. 24078841, *pro hac vice*
ELDREDGE LEAVITT LAW FIRM
4204 SW Green Oaks Blvd., Suite 140
Arlington, TX 76107
(214) 727-2055
brandon@uslawpros.com


Jason K. Smith (Utah Bar No. 14323)
MK SMITH, APC
9891 Irvine Center Dr., Ste. 200
Irvine, CA 92618
801-916-8723
jsmith@mks-law.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| JM4 TACTICAL, LLC; and JAMES CHADWICK MYERS <br><br> **Plaintiffs,** <br><br> v. <br><br> E & R LLC *d/b/a* HER TACTICAL; VICKY ARLENE JOHNSTON *d/b/a* HER TACTICAL; BLAKE CHEAL, individually and in his capacity as settlor and trustee of THE BLAKE AND TANYA CHEAL FAMILY LIVING TRUST; and GRANT LEE CAVALLI <br><br> **Defendants.** | **PLAINTIFFS' FINAL INFRINGEMENT CONTENTIONS** <br><br> Civil No. 1:22-cv-00121-DAK <br><br> Judge Dale A. Kimball <br><br> Magistrate Judge Dustin B. Pead <br><br> **JURY DEMANDED** |

Pursuant to LPR 2.3, LPR 3.1, and the Scheduling Order of this Court (Dkt No. 33),

Plaintiffs, **JM4 Tactical, Inc.** and **James Chadwick Myers** hereby provide their final

infringement contentions.

**FINAL INFRINGEMENT CONTENTIONS**                                    **Page 1 of 39**

App-016

**LPR 2.3(a)**  identification of each claim of each asserted patent that is allegedly infringed by the opposing party, including for each claim the applicable statutory subsection of 35 U.S.C. § 271;

| Infringed Claim | Applicable subsection(s) of 35 U.S.C. § 271 with respect to: | | |
|---|---|---|---|
| | E & R | Vicky Johnston | Blake Cheal |
| 11/747,109 claim 1 | §271(a)-§271(b) | §271(a)-§271(b) | §271(a)-§271(b) |
| 9/784,530 claim 1 | §271(a)-§271(b) | §271(a)-§271(b) | §271(a)-§271(b) |
| 9/784,530 claim 3 | §271(a)-§271(b) | §271(a)-§271(b) | §271(a)-§271(b) |
| D788,451 claim 1 | §271(a)-§271(b) | §271(a)-§271(b) | §271(a)-§271(b) |
| D811,731 claim 1 | §271(a)-§271(b) | §271(a)-§271(b) | §271(a)-§271(b) |
| D836,329 claim 1 | §271(a)-§271(b) | §271(a)-§271(b) | §271(a)-§271(b) |
| D841,979 claim 1 | §271(a)-§271(b) | §271(a)-§271(b) | §271(a)-§271(b) |

**LPR 2.3(b)**  separately for each asserted claim, identification of each Accused Instrumentality of which the party claiming infringement is aware. Each Accused Instrumentality must be identified by name, if known, or by any product, device, or apparatus which, when used, allegedly results in the practice of the claimed method or process;

| Infringed Claim | SKU Names of Accused Instrumentalities |
|---|---|
| 11/747,109 claim 1 | Magnet-Holster-Micro-Purple-R<br>Magnet-Holster-Micro-Black-R<br>Magnet-Holster-Micro-Pink-R<br>HT-Neo-Magnet-Holster<br>HT-Neo-Magnet-Holster<br>HT-Neo-Magnet-Holster<br>Magnet-Holster-Compact-Purple-R<br>Magnet-Holster-Compact-Black-R<br>Magnet-Holster-Compact-Pink-R<br>HT-Neo-Magnet-Holster<br>HT-Neo-Magnet-Holster<br>HT-Neo-Magnet-Holster |
| 9/784,530 claim 1 | Magnet-Holster-Micro-Purple-R<br>Magnet-Holster-Micro-Black-R<br>Magnet-Holster-Micro-Pink-R<br>HT-Neo-Magnet-Holster<br>HT-Neo-Magnet-Holster<br>HT-Neo-Magnet-Holster<br>Magnet-Holster-Compact-Purple-R<br>Magnet-Holster-Compact-Black-R<br>Magnet-Holster-Compact-Pink-R<br>HT-Neo-Magnet-Holster<br>HT-Neo-Magnet-Holster<br>HT-Neo-Magnet-Holster |

FINAL INFRINGEMENT CONTENTIONS

Page 2 of 39

App-017

| Infringed Claim | SKU Names of Accused Instrumentalities |
|---|---|
| 9/784,530 claim 3 | Magnet-Holster-Micro-Purple-R |
| | Magnet-Holster-Micro-Black-R |
| | Magnet-Holster-Micro-Pink-R |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | Magnet-Holster-Compact-Purple-R |
| | Magnet-Holster-Compact-Black-R |
| | Magnet-Holster-Compact-Pink-R |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| D788,451 claim 1 | Magnet-Holster-Micro-Purple-R |
| | Magnet-Holster-Micro-Black-R |
| | Magnet-Holster-Micro-Pink-R |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | Magnet-Holster-Compact-Purple-R |
| | Magnet-Holster-Compact-Black-R |
| | Magnet-Holster-Compact-Pink-R |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| D811,731 claim 1 | Magnet-Holster-Micro-Purple-R |
| | Magnet-Holster-Micro-Black-R |
| | Magnet-Holster-Micro-Pink-R |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | Magnet-Holster-Compact-Purple-R |
| | Magnet-Holster-Compact-Black-R |
| | Magnet-Holster-Compact-Pink-R |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |

App-018

| Infringed Claim | SKU Names of Accused Instrumentalities |
|---|---|
| D836,329 claim 1 | Magnet-Holster-Micro-Purple-R |
| | Magnet-Holster-Micro-Black-R |
| | Magnet-Holster-Micro-Pink-R |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | Magnet-Holster-Compact-Purple-R |
| | Magnet-Holster-Compact-Black-R |
| | Magnet-Holster-Compact-Pink-R |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| D841,979 claim 1 | Magnet-Holster-Micro-Purple-R |
| | Magnet-Holster-Micro-Black-R |
| | Magnet-Holster-Micro-Pink-R |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | Magnet-Holster-Compact-Purple-R |
| | Magnet-Holster-Compact-Black-R |
| | Magnet-Holster-Compact-Pink-R |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |

**LPR 2.3(c)** a chart identifying specifically where each element of each asserted claim is found within each Accused Instrumentality, including for each element that such party contends is governed by 35 U.S.C. § 112(f), a description of the claimed function of that element and the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function;

**LPR 2.3(d)** whether each element of each asserted claim is claimed to be present in the Accused Instrumentality literally or under the doctrine of equivalents. For any claim under the doctrine of equivalents, the Initial Infringement Contentions must include an explanation of each function, way, and result that is alleged to be equivalent and why any differences are not substantial;

### A. 11/747,109 claim 1

| 11/747,109 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| **PREAMBLE.** A gun holster system for carrying a gun, comprising: | Each Accused Instrumentality satisfies this requirement literally because they are respectively designed as described and shown in the Defendants' disclosures. *Compare* HerTactical_0837, HerTactical_0840, *and* Hertactical_0003 |

FINAL INFRINGEMENT CONTENTIONS                                Page 4 of 39

| 11/747,109 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| | (excerpts from the '324 application) *with* HerTactical_0001-0002 (providing photographs of representative Accused Instrumentalities).<br><br><br><br>*Compare* HerTactical_0003 *with* HerTactical_0001. |
| **Limitation A.** a body having a front side and a back side that form an upper opening disposed therebetween; | Each Accused Instrumentality meets this limitation literally because they each comprise a body having a front side and a back side with an upper and lower opening, as described and shown in the Defendants' disclosures:<br><br>**Body** is an encasement with a **front**, side and **back** that contains a wide **opening in the top end** to insert and encase a gun within the body . . . A smaller **opening at the lower end of the body** for the barrel tip of an inserted gun to protrude through.<br><br><br><br>*Compare* HerTactical_830, Description (emphasis added) *and* HerTactical_0003 (emphasis added) *with* HerTactical_0001. |
| **LIMITATION B.** a strap assembly secured to the back side of the body, the strap assembly having: | Each Accused Instrumentality meets this limitation literally because they are each designed with a strap assembly secured to the back side of the body, as described and shown in Defendants' disclosures:<br><br>"A **flap attached to the front side of the body** . . ." |

**FINAL INFRINGEMENT CONTENTIONS**                                    **Page 5 of 39**

| 11/747,109 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| |   *Compare* HerTactical_830, Description (emphasis added) *and* HerTactical_0003 *with* HerTactical_0829. To the extent that this claim element is deemed to be not literally present in or performed by the Accused Instrumentalities, that element is also satisfied under the doctrine of equivalents. **Point 1.** One of ordinary skill at the time of infringement would conclude that the "flap" as described in Defendants' disclosures is indistinguishable from the "strap" claimed in the '530 patent because it performs the same function, in the same way, to achieve the same result. *Compare Strap*, Oxford Languages (last accessed Apr. 6, 2023) ("a strip of leather, cloth, or other flexible material, often with a buckle, used to fasten, secure, or carry something or to hold onto something.") *with Flap*, Oxford Languages (last accessed Apr. 6, 2023 ("a piece of something thin, such as cloth, paper, or metal, hinged or attached only on one side, that covers an opening or hangs down from something."). Here, the Parties' respective flap/strap assemblies are each configured to secure the product to an article of clothing. *Compare* HerTactical_0568, col. 2, ln. 39 ("[strap] assembly is configured to secure the [holster] body and firearm to an article of clothing.") *with* HerTactical_0830 ("flap closes over the fabric of an undergarment . . . to keep the [holster] body firmly in place on the undergarment."). Accordingly, any perceived distinction between the term "flap" and "strap" in this case is semantic and not substantial. |

**FINAL INFRINGEMENT CONTENTIONS**                                                  **Page 6 of 39**

| 11/747,109 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| | **Point 2.** One of ordinary skill at the time of infringement would conclude that the "front" position of the flap as described in the Defendants' disclosures is indistinguishable from the "back" position of the strap claimed in the '530 patent because they each refer to the same side of the product, albeit from different viewer perspectives. Accordingly, any perceived distinction between these terms is semantic and not substantial. |
| **LIMITATION B(i).** an elongated strap extending from the back side of the body; | Each Accused Instrumentality meets this limitation literally because they each comprise an elongated strap extending from the back side of the body, as described and shown in the Defendants' disclosures: <br><br> "Fig. 2: is a front elevation view of the magnetic gun holster with the front magnetic flap shown open;" <br><br> <br><br> *Compare* HerTactical_830, Description *and* HerTactical_0003 (emphases added) *with* HerTactical_0829 (emphasis added). <br><br> To the extent that this claim element is deemed to be not literally present in or performed by the Accused Instrumentalities, that element is also satisfied under the doctrine of equivalents. <br><br> **Point 3.** Incorporating Point 1, *supra*, one of ordinary skill at the time of infringement would conclude that the respective flap/strap assemblies are each long in relation to their widths to enable the same function, in the same way, and to achieve the same result—by specifically enabling the holster to fold over an article of clothing via the elongated |

| 11/747,109 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| | flap/strap assembly. *See* Point 1, *supra. See also Elongated*, <u>Oxford Languages</u> (last accessed Apr. 6, 2023) ("long in relation to width . . . ").<br><br>Accordingly, any perceived distinction between the respective elongations of the respective flap/strap assemblies is not substantial. |
| **LIMITATION B(ii).** a fastener protrusion extending from a back surface of the elongated strap; | Each Accused Instrumentality meets this limitation literally because they each comprise a fastener protrusion extending from the back surface of the elongated strap, as described and shown in the Defendants' disclosures:<br><br>"FIG. 4: is a center elevation view of the outside spine"<br><br><br><br>*Compare* HerTactical_0830, Description *and* HerTactical_0003 (emphasis added) *with* HerTactical_0817 *and* HerTactical_0829 (emphasis added). *See also Protrusion*, <u>Oxford Languages</u> (last accessed Apr. 6, 2023) ("something that protrudes"); *Protrude*, <u>Oxford Languages</u> (last accessed Apr. 6, 2023) ("extend beyond or above a surface.").<br><br>To the extent that this claim element is deemed to be not literally present in or performed by the Accused Instrumentalities, that element is also satisfied under the doctrine of equivalents.<br><br>**Point 4.** Incorporating by reference Points 1-2 and 3, *supra*, one of ordinary skill at the time of infringement would further conclude that the fasteners of the respective flap/strap assemblies each comprise magnets that extend beyond or above the surface of their respective housings to |

App-023

| 11/747,109 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
|  | engage with each other—thus performing the same function, in the same way, and to achieve the same result. *Compare cf.* HerTactical_0830 ("using magnetic force pull to maintain closure") *and* HerTactical_0829 (showing a protrusion at each magnet) *with* HerTactical_0568-0569, co. 2 ln. 66- co. 3 ln 2 (describing how magnetic retention occurs at the points of protrusion).<br><br>Accordingly, any perceived distinction between the fastener protrusions of the respective flap/strap assemblies is not substantial. |
| **LIMITATION B(iii).** a fastener housing extending from an outer surface of the back side of the body, the fastener housing being configured to engage with the fastener protrusion; | Each Accused Instrumentality meets this limitation literally because they each comprise a fastener housing (depicted in red) extending (depicted in orange) from an outer surface of the body and are configured to engage with the protrusion (depicted in blue), as described and shown in the Defendants' disclosures:<br><br><br><br>*Compare* HerTactical_0003 (emphases added) *and* HerTactical_0829 (emphasis added) *with* HerTactical_0003 (emphases added) *and* HerTactical_0820 (emphases added). *See also* HerTactical_845 from 00:18 to 00:25.<br><br>To the extent that this claim element is deemed to be not literally present in or performed by the Accused Instrumentalities, that element is also satisfied under the doctrine of equivalents.<br><br>**Point 5.** Incorporating by reference Points 1-2 and 3-5, *supra*, one of ordinary skill at the time of infringement would further conclude that the elongated flap/strap assemblies, which respectively extend beyond the body when open, further comprise the housing for fasteners that engage with one another when closed—thus performing the same function, in the same way, and to achieve the same result. *Compare cf.* HerTactical-0830 ("magnets disposed in the thickness of the flap and configured on either end to fold |

App-024

| 11/747,109 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| | down and attach") *and* HerTactical_0568-0569, co. 2 ln. 65-co. 3 ln 2 (describing the same). |
| | Accordingly, any perceived distinction between the fastener housing and protrusions of the respective flap/strap assemblies is not substantial. |
| **LIMITATION B(iv).** wherein the elongated strap folds backwards and away from the upper opening to cause the fastener protrusion and the fastener housing to engage; | Each Accused Instrumentality meets this limitation literally because they each comprise an elongated strap that folds backwards and away from the upper opening to cause the fastener protrusion and the fastener housing to engage, as described and shown in the Defendants' disclosures: *Compare* HerTactical_0816 (emphases added) *and* HerTactical_0810 (emphasis added) *with* HerTactical_0813 (emphases added) *and* HerTactical_0820 (emphases added). *See also* HerTactical_845 from 00:18 to 00:25. To the extent that this claim element is deemed to be not literally present in or performed by the Accused Instrumentalities, that element is also satisfied under the doctrine of equivalents. **Point 6.** Incorporating by reference Points 1-2 and 3-5, *supra*, one of ordinary skill at the time of infringement would further conclude that the elongated flap/strap assemblies each have a housing that comprises fastener protrusions configured to engage when folded away from the holster's opening—thus performing the same function, in the same way, and to achieve the same result. *Compare* HerTactical-0830 ("magnets disposed in the thickness of the flap and configured on either end to fold down and attach") *and* HerTactical_0568-0569, co. 2 ln. 65- co. 3 ln 2 (describing the same). Accordingly, any perceived distinction between the engagement of the fastener housing and protrusions of the respective flap/strap assemblies is not substantial. |

**FINAL INFRINGEMENT CONTENTIONS** Page 10 of 39

| 11/747,109 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| **LIMITATION C.** a first magnet disposed within a thickness of the fastener protrusion;<br><br>**LIMITATION D.** a second magnet disposed within a thickness of the housing;<br><br>**LIMITATION E.** wherein the first magnet is configured to engage with the second magnet, and wherein the engaging of the first magnet and the second magnet does not cause the elongated strap to obstruct the upper opening of the body and does not obstruct or hinder removal of the gun from the body;<br><br>**Limitation F.** wherein a combined magnetic retention strength generated by the first magnet and the second magnet is strong enough to retain the gun within the body; | Each Accused Instrumentality meets these limitations literally because they each comprise a first magnet disposed within a thickness of the fastener protrusion, a second magnet disposed within a thickness of the housing, wherein the two magnets combine to retain a gun within the body of the holster without obstructing or hindering removal of the gun from the body—as described and shown in the Defendants' disclosures:<br><br>  <br><br>*Compare* HerTactical_0831 (describing 2 embedded magnets that secure the folded flap) *and* HerTactical_0813 *with* HerTactical_0820 *and* HerTactical_0738 (emphasizing the "strong magnetic hold" of their holsters "to keep your gun securely in place"). *See also* HerTactical_845 from 00:18 to 00:25. |
| **Limitation G.** wherein the elongated strap is configured to fold over an article of clothing such that the first magnet and the second magnet provide magnetic retention to retain the gun holster system to the article of clothing. | Each Accused Instrumentality meets this limitation literally because they each comprise an elongated strap configured to fold over an article of clothing such that the first magnet and second magnet provide magnetic retention to retain the gun holster system to the article of clothing,—as described and shown in the Defendants' disclosures:<br><br>"The body is designed to be placed on the inside of an undergarment, and the magnetic flap closes over the fabric of an undergarment engaging the magnets closed to keep the body firmly in place on the undergarment." HerTactical_0830.<br><br>"The flap folds around the undergarment to keep the holster securely in place using the 2 magnets embedded into the flap." HerTactical_0831. |

App-026

| 11/747,109 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| | 11: Body placed on the inside of the bra gore / 13: Body placed on the inside of the side of a bra / 12: Magnetic flap closed over the outside of the bra gore / 14: Magnetic flap closed over the front of the side of a bra <br><br> HerTactical_0003 ("magnetic flap closed **over** the outside of the bra") (emphasis added). *See also* HerTactical_0845, generally. |

## B. 9/784,530 claim 1

| 9/784,530 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| **PREAMBLE.** A gun holster system for carrying a gun, comprising: | Each Accused Instrumentality satisfies this requirement literally because they are respectively designed as described and shown in the Defendants' disclosures. *Compare* HerTactical_0837, HerTactical_0840, *and* Hertactical_0003 (excerpts from the '324 application) *with* HerTactical_0001-0002 (providing photographs of representative Accused Instrumentalities). <br><br> <br><br> *Compare* HerTactical_0003 *with* HerTactical_0001. |
| **Limitation A.** a body having a front side and a back side forming an upper opening disposed there between and forming a lower opening at a lower surface of the body; | Each Accused Instrumentality meets this limitation literally because they each comprise a body having a front side and a back side with an upper and lower opening, as described and shown in the Defendants' disclosures: <br><br> **Body** is an encasement with a **front**, side and **back** that contains a wide **opening in the top end** to insert and encase a gun within the body . . . A smaller **opening at the lower end of the body** for the barrel tip of an inserted gun to protrude through. |

**FINAL INFRINGEMENT CONTENTIONS**                                    **Page 12 of 39**

| 9/784,530 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| | *Compare* HerTactical_830, Description (emphasis added) *and* HerTactical_0003 (emphasis added) *with* HerTactical_0001. |
| **LIMITATION B.** a strap assembly integrally secured to the back side body, the strap assembly having: | Each Accused Instrumentality meets this limitation literally because they are each designed with a strap assembly integrally secured to the back side of the body, as described and shown in Defendants' disclosures: **"A flap attached to the front side of the body . . ."** *Compare* HerTactical_830, Description (emphasis added) *and* HerTactical_0003 *with* HerTactical_0829. To the extent that this claim element is deemed to be not literally present in or performed by the Accused Instrumentalities, that element is also satisfied under the doctrine of equivalents. **Point 1.** One of ordinary skill at the time of infringement would conclude that the "flap" as described in Defendants' disclosures is indistinguishable from the "strap" claimed in the '530 patent because it performs the same function, in the |

App-028

| 9/784,530 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| | same way, to achieve the same result. *Compare Strap,* Oxford Languages (last accessed Apr. 6, 2023) ("a strip of leather, cloth, or other flexible material, often with a buckle, used to fasten, secure, or carry something or to hold onto something.") *with Flap,* Oxford Languages (last accessed Apr. 6, 2023 ("a piece of something thin, such as cloth, paper, or metal, hinged or attached only on one side, that covers an opening or hangs down from something."). |
| | Here, the Parties' respective flap/strap assemblies are each configured to secure the product to an article of clothing. *Compare* HerTactical_0568, col. 2, ln. 39 ("[strap] assembly is configured to secure the [holster] body and firearm to an article of clothing.") *with* HerTactical_0830 ("flap closes over the fabric of an undergarment . . . to keep the [holster] body firmly in place on the undergarment."). |
| | Accordingly, any perceived distinction between the term "flap" and "strap" in this case is semantic and not substantial. |
| | **Point 2.** One of ordinary skill at the time of infringement would conclude that the "front" position of the flap as described in the Defendants' disclosures is indistinguishable from the "back" position of the strap claimed in the '530 patent because they each refer to the same side of the product, albeit from different viewer perspectives. Accordingly, any perceived distinction between these terms is semantic and not substantial. |
| | **Point 3.** One of ordinary skill at the time of infringement would further conclude that "attached", as shown by the Defendants' disclosures and "integrally secured" as claimed in the '530 patent are semantically identical and that any perceived distinction between these terms is not substantial. |
| **LIMITATION B(i).** an elongated strap extending from and integrally secure to the back side of the body; | Each Accused Instrumentality meets this limitation literally because they each comprise an elongated strap extending from and integrally secured to the back side of the body, as described and shown in the Defendants' disclosures: <br><br> "Fig. 2: is a front elevation view of the magnetic gun holster with the front magnetic flap shown open;" |

**FINAL INFRINGEMENT CONTENTIONS**                    Page 14 of 39

App-029

| 9/784,530 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| | FIG. 2: Front View - Magnetic Flap, Shown Open<br><br>4: Inside of Front magnet<br>7: Center fold line of flap<br>8: Flap attached to body<br>9: Second magnet<br><br>*Compare* HerTactical_830, Description *and* HerTactical_0003 (emphases added) *with* HerTactical_0829 (emphasis added).<br><br>To the extent that this claim element is deemed to be not literally present in or performed by the Accused Instrumentalities, that element is also satisfied under the doctrine of equivalents.<br><br>**Point 4.** Incorporating Point 1, *supra*, one of ordinary skill at the time of infringement would conclude that the respective flap/strap assemblies are each long in relation to their widths to enable the same function, in the same way, and to achieve the same result—by specifically enabling the holster to fold over an article of clothing via the elongated flap/strap assembly. *See* Point 1, *supra. See also Elongated*, Oxford Languages (last accessed Apr. 6, 2023) ("long in relation to width . . . ").<br><br>Accordingly, any perceived distinction between the respective elongations of the respective flap/strap assemblies is not substantial. |
| **LIMITATION B(ii).** a fastener protrusion extending from a back surface of the elongated strap; | Each Accused Instrumentality meets this limitation literally because they each comprise a fastener protrusion extending from the back surface of the elongated strap, as described and shown in the Defendants' disclosures:<br><br>"FIG. 4: is a center elevation view of the outside spine" |

App-030

| 9/784,530 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| | FIG. 4: Center Spine View (side)<br><br>1: Retention strap<br>2: Snap closure<br>3: Folded flap<br>4: Front magnet<br>9: Second magnet<br><br>*Compare* HerTactical_0830, Description *and* HerTactical_0003 (emphasis added) *with* HerTactical_0817 *and* HerTactical_0829 (emphasis added). *See also* *Protrusion*, Oxford Languages (last accessed Apr. 6, 2023) ("something that protrudes"); *Protrude*, Oxford Languages (last accessed Apr. 6, 2023) ("extend beyond or above a surface.").<br><br>To the extent that this claim element is deemed to be not literally present in or performed by the Accused Instrumentalities, that element is also satisfied under the doctrine of equivalents.<br><br>**Point 5.** Incorporating by reference Points 1-2 and 4, *supra*, one of ordinary skill at the time of infringement would further conclude that the fasteners of the respective flap/strap assemblies each comprise magnets that extend beyond or above the surface of their respective housings to engage with each other—thus performing the same function, in the same way, and to achieve the same result. *Compare cf.* HerTactical_0830 ("using magnetic force pull to maintain closure") *and* HerTactical_0829 (showing a protrusion at each magnet) *with* HerTactical_0568-0569, co. 2 ln. 66- co. 3 ln 2 (describing how magnetic retention occurs at the points of protrusion).<br><br>Accordingly, any perceived distinction between the fastener protrusions of the respective flap/strap assemblies is not substantial. |
| **LIMITATION B(iii).** a fastener housing extending from an | Each Accused Instrumentality meets this limitation literally because they each comprise a fastener housing (depicted in |

**FINAL INFRINGEMENT CONTENTIONS**

**Page 16 of 39**

App-031

| 9/784,530 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| outer surface of the back side of the body, the fastener housing being configured to engage with the fastener protrusion; | **red**) extending (depicted in **orange**) from an outer surface of the body and are configured to engage with the protrusion (depicted in **blue**), as described and shown in the Defendants' disclosures:<br><br>   <br><br>*Compare* HerTactical_0003 (emphases added) and HerTactical_0829 (emphasis added) *with* HerTactical_0003 (emphases added) *and* HerTactical_0820 (emphases added). *See also* HerTactical_845 from 00:18 to 00:25.<br><br>To the extent that this claim element is deemed to be not literally present in or performed by the Accused Instrumentalities, that element is also satisfied under the doctrine of equivalents.<br><br>**Point 6.** Incorporating by reference Points 1-2 and 4-5, *supra*, one of ordinary skill at the time of infringement would further conclude that the elongated flap/strap assemblies, which respectively extend beyond the body when open, further comprise the housing for fasteners that engage with one another when closed—thus performing the same function, in the same way, and to achieve the same result. *Compare cf.* HerTactical-0830 ("magnets disposed in the thickness of the flap and configured on either end to fold down and attach") *and* HerTactical_0568-0569, co. 2 ln. 65-co. 3 ln 2 (describing the same).<br><br>Accordingly, any perceived distinction between the fastener housing and protrusions of the respective flap/strap assemblies is not substantial. |
| **LIMITATION B(iv).** wherein the elongated strap folds backwards and away from the upper opening to cause the fastener protrusion and the fastener housing to engage; | Each Accused Instrumentality meets this limitation literally because they each comprise an elongated strap that folds backwards and away from the upper opening to cause the fastener protrusion and the fastener housing to engage, as described and shown in the Defendants' disclosures: |

**FINAL INFRINGEMENT CONTENTIONS**                    **Page 17 of 39**

App-032

| 9/784,530 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| | *Compare* HerTactical_0816 (emphases added) *and* HerTactical_0810 (emphasis added) *with* HerTactical_0813 (emphases added) *and* HerTactical_0820 (emphases added). *See also* HerTactical_845 from 00:18 to 00:25. |
| | To the extent that this claim element is deemed to be not literally present in or performed by the Accused Instrumentalities, that element is also satisfied under the doctrine of equivalents. |
| | **Point 7.** Incorporating by reference Points 1-2 and 4-6, *supra*, one of ordinary skill at the time of infringement would further conclude that the elongated flap/strap assemblies each have a housing that comprises fastener protrusions configured to engage when folded away from the holster's opening—thus performing the same function, in the same way, and to achieve the same result. *Compare* HerTactical-0830 ("magnets disposed in the thickness of the flap and configured on either end to fold down and attach") *and* HerTactical_0568-0569, co. 2 ln. 65- co. 3 ln 2 (describing the same). |
| | Accordingly, any perceived distinction between the engagement of the fastener housing and protrusions of the respective flap/strap assemblies is not substantial. |
| **LIMITATION C.** two magnets disposed within a thickness of the fastener protrusion;<br><br>**LIMITATION D.** a third magnet disposed within a thickness of the housing;<br><br>**LIMITATION E.** wherein the two magnets are configured to engage with the third magnet; | Whereas Limitations C-D collectively implement a total of three magnets, the Accused Instrumentalities only implement two magnets to perform the same functions contemplated in Limitations E-F, as shown in the Defendants' disclosures:<br><br>"The flap folds around the undergarment to keep the holster securely in place using the 2 magnets embedded into the flap." |

**FINAL INFRINGEMENT CONTENTIONS**                              **Page 18 of 39**

| 9/784,530 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| **LIMITATION F.** wherein a combined magnetic retention strength generated by the two magnets and third magnet is strong enough to retain the gun within the body. |   *Compare* HerTactical_0831 Summary *with* HerTactical_0813 (emphases added) *and* HerTactical_0820 (emphases added). *See also* HerTactical_845 from 00:18 to 00:25. Specifically, because the Accused Instrumentalities each embed a singular magnet within the housing/fastener protrusion, Limitation D is literally met by each Instrumentality whereas Limitation C, claiming two such magnets, is not. Consequently, Limitations E-F, establishing how the magnets of Limitations C-D engage with each to retain the gun within the body of the holster, cannot be literally infringed by Accused Instrumentalities. Nevertheless, the Accused Instrumentalities each satisfy Limitations C and E-F under the doctrine of equivalents. **Point 8.** One of ordinary skill at the time of infringement would conclude that "[b]y adding one magnet on to the other, e.g. stacking, the **stacked magnets will work as one bigger magnet** and will exert a greater magnetic performance. As more magnets are stacked together, the strength will increase . . ." *Can I increase the strength of a magnet I already have?*, FIRST4MAGNETS, https://www.first4magnets.com/us/tech-centre-i1093/frequently-asked-questions-i1402#20 (last visited Apr. 10, 2023) (emphasis added). *Accord Will stacking magnets together make them stronger?*, ELEMENT MAGNETS, https://totalelement.com/blogs/working-with-neodymium-magnets/will-stacking-magnets-together-make-them-stronger (last accessed Apr. 10, 2023) ("Two or more magnets stacked together will exhibit nearly the same strength as a single magnet of the combined size. This is because the magnetic field lines of **the two magnets combine**, resulting in a stronger overall field.") (emphasis added); *Doubled Forces*, K&J MAGNETICS, https://www.kjmagnetics.com/blog.asp?p=doubled-forces |

| 9/784,530 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| | (last accessed Apr. 10, 2023) ("If you stack 2 magnets together . . . **they will act like a single magnet**[.]") (emphasis added); *How to Strengthen a Magnet*, US MAGNETIX, https://usmagnetix.com/how-to-strengthen-a-magnet/ (Apr. 26, 2022) ("**[S]tacked magnets will work as one** to exert a greater magnetic force.") (emphasis added). |
| | Here, Defendants *emphasize* the "strong magnetic hold" of their holsters "to keep your gun securely in place". HerTactical_0738 and Plaintiffs both confirm and document this claim as follows: |
| | |
| | Specifically, the above photograph shows a representative Accused Instrumentality securing a gun in place within the holster via the magnetic retention of its combined two magnets. |
| | Accordingly, the *two* stacked magnets of the Accused Instrumentalities work as one to exert a greater magnetic force sufficient to retain a gun in a holster in the same way that Limitations C-E stack *three* magnets to achieve the same result. |
| | Accordingly, and by further incorporating by reference Points 5-7, *supra*, any perceived distinction between the number of magnets that engage with one another for the purpose of combining magnetic retention strength is not substantial. |

## C. 9/784,530 claim 3

| 9/784,530 Claim 3 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| **PREAMBLE.** The system of claim 1, | As noted in the identification and analysis of the '530 patent claim 1, *supra*, each of the Accused Instrumentalities infringes the system of claim 1 via the doctrine of equivalents. |

**FINAL INFRINGEMENT CONTENTIONS**                    **Page 20 of 39**

App-035

| 9/784,530 Claim 3 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| **LIMITATION A.** wherein the lower opening is configured to receive a portion of the gun therethrough; | Each Accused Instrumentality meets this limitation literally because they each comprise a lower opening configured to receive a portion of a gun therethrough, as described and shown in the Defendants' disclosures: <br><br> A smaller opening at the lower end of the body for the barrel tip of an inserted gun to protrude through. <br><br> *Compare* HerTactical_830, Description *and* HerTactical_0003 (emphasis added) *with* HerTactical_0001. |

### D. D788,451 claim 1

1.      Claim 1 of the '451 patent is directed towards an ornamental design. Therefore, a review of the overall impression of the design is more appropriate than an element-by-element analysis thereof. And here, the claimed design and Accused Instrumentalities are so plainly similar that an ordinary observer would consider the commercial impression of the two designs to be substantially the same. Accordingly, the Accused Instrumentalities each literally infringe the '451 design.

2.      Alternatively, the Accused Instrumentalities infringe the claimed design via the doctrine of equivalents because an ordinary observer, familiar with prior art designs, without unusually careful effort, would be unable in a side-by-side comparison to easily distinguish the claimed design and any of the Accused Instrumentalities. For example, the Accused Instrumentalities are far closer to the claimed design than the prior art, as shown below:

**FINAL INFRINGEMENT CONTENTIONS**                                  **Page 21 of 39**

App-036



| Prior Art (from D788,451) | D788,451 – claim 1 | Accused Instrumentality |
|---|---|---|
| U.S. Patent No. 4,435,506 (issued Apr. 20, 1982) | HerTactical_0811 and HerTactical_0813. | HerTactical_0811 and HerTactical_0813. |
| U.S. Patent No. D543,354 (issued May 29, 2007) | HerTactical_0811 | HerTactical_0003 |
| U.S. Patent No. D543,353 (issued May 29, 2007) | HerTactical_0811 | HerTactical_0003 |
| Cox, U.S. Patent No. D718,523 (Dec. 02, 2014) | HerTactical_0811 | HerTactical_0003 |
| | HerTactical_0811 | HerTactical_0003 |

**FINAL INFRINGEMENT CONTENTIONS**                              **Page 22 of 39**

| Prior Art (from D788,451) | D788,451 – claim 1 | Accused Instrumentality |
|---|---|---|
| Crouch, U.S. Patent No. D770,172 (Nov. 01, 2016) | | |

## E. D811,731 claim 1

3.      Claim 1 of the '731 patent is directed towards an ornamental design. Therefore, a review of the overall impression of the design is more appropriate than an element-by-element analysis thereof. And here, the claimed design and Accused Instrumentalities are so plainly similar that an ordinary observer would consider the commercial impression of the two designs to be substantially the same. Accordingly, the Accused Instrumentalities each literally infringe the '731 design.

4.      Alternatively, the Accused Instrumentalities infringe the claimed design via the doctrine of equivalents because an ordinary observer, familiar with prior art designs, without unusually careful effort, would be unable in a side-by-side comparison to easily distinguish the claimed design and any of the Accused Instrumentalities. For example, the Accused Instrumentalities are far closer to the claimed design than the prior art, as shown below:

| Prior Art (from D811,731) | D811,731 – claim 1 | Accused Instrumentality |
|---|---|---|
| Nichols, U.S. Patent No. D811,731 (Jan. 19, 1988) | HerTactical_0815 | HerTactical_0003 |

**FINAL INFRINGEMENT CONTENTIONS**                                    **Page 23 of 39**

| Prior Art (from D811,731) | D811,731 – claim 1 | Accused Instrumentality |
|---|---|---|
| Kalasountas, U.S. Patent No. D356,677 (Mar. 28, 1995) | HerTactical_0815 | HerTactical_0003 |
| Cox, U.S. Patent No. D718,523 (Dec. 02, 2014) | HerTactical_0815 | HerTactical_0003 |
| Crouch, U.S. Patent No. D770,172 (Nov. 01, 2016) | HerTactical_0815 | HerTactical_0003 |
| Myers, U.S. Patent No. D788,731 (patent-in-suit) | HerTactical_0815 | HerTactical_0003 |

## F. D836,329 claim 1

5. Claim 1 of the '329 patent is directed towards an ornamental design. Therefore, a review of the overall impression of the design is more appropriate than an element-by-element analysis thereof. And here, the claimed design and Accused Instrumentalities are so plainly similar that an ordinary observer would consider the commercial impression of the two designs

FINAL INFRINGEMENT CONTENTIONS                                    **Page 24 of 39**

to be substantially the same. Accordingly, the Accused Instrumentalities each literally infringe the '329 design.

6.    Alternatively, the Accused Instrumentalities infringe the claimed design via the doctrine of equivalents because an ordinary observer, familiar with prior art designs, without unusually careful effort, would be unable in a side-by-side comparison to easily distinguish the claimed design and any of the Accused Instrumentalities. For example, the Accused Instrumentalities are far closer to the claimed design than the prior art, as shown below:

| Prior Art (from D836,329) | D836,329 – claim 1 | Accused Instrumentality |
|---|---|---|
| Nichols, U.S. Patent No. D811,731 (Jan. 19, 1988) | HerTactical_0820 | HerTactical_0003 |
| Kalasountas, U.S. Patent No. D356,677 (Mar. 28, 1995) | HerTactical_0820 | HerTactical_0003 |
| Cox, U.S. Patent No. D718,523 (Dec. 02, 2014) | HerTactical_0820 | HerTactical_0003 |

**FINAL INFRINGEMENT CONTENTIONS**                                    **Page 25 of 39**

App-040

| Prior Art (from D836,329) | D836,329 – claim 1 | Accused Instrumentality |
|---|---|---|
| Crouch, U.S. Patent No. D770,172 (Nov. 01, 2016) | HerTactical_0820 | HerTactical_0003 |
| Myers, U.S. Patent No. D788,731 (patent-in-suit) | HerTactical_0820 | HerTactical_0003 |

## G. D841,979 claim 1

7.    Claim 1 of the '979 patent is directed towards an ornamental design. Therefore, a review of the overall impression of the design is more appropriate than an element-by-element analysis thereof. And here, the claimed design and Accused Instrumentalities are so plainly similar that an ordinary observer would consider the commercial impression of the two designs to be substantially the same. Accordingly, the Accused Instrumentalities each literally infringe the '979 design.

8.    Alternatively, the Accused Instrumentalities infringe the claimed design via the doctrine of equivalents because an ordinary observer, familiar with prior art designs, without unusually careful effort, would be unable in a side-by-side comparison to easily distinguish the claimed design and any of the Accused Instrumentalities. For example, the Accused Instrumentalities are far closer to the claimed design than the prior art, as shown below:

App-041

| Prior Art (from D841,979) | D841,979 – claim 1 | Accused Instrumentality |
|---|---|---|
| Nichols, U.S. Patent No. D811,731 (Jan. 19, 1988) | HerTactical_0825 | HerTactical_0003 |
| Kalasountas, U.S. Patent No. D356,677 (Mar. 28, 1995) | HerTactical_0825 | HerTactical_0003 |
| Cox, U.S. Patent No. D718,523 (Dec. 02, 2014) | HerTactical_0825 | HerTactical_0003 |
| Crouch, U.S. Patent No. D770,172 (Nov. 01, 2016) | HerTactical_0825 | HerTactical_0003 |
| Myers, U.S. Patent No. D788,731 (patent-in-suit) | HerTactical_0825 | HerTactical_0003 |

FINAL INFRINGEMENT CONTENTIONS                    Page 27 of 39

**LPR 2.3(e)**   for each claim that is alleged to have been indirectly infringed, an identification of any direct infringement and a description of the acts of the alleged indirect infringer that contribute to or are inducing that direct infringement. If alleged direct infringement is based on joint acts of multiple parties, the role of each such party in the direct infringement must be described;

## A.   Identification of direct infringement

9.   Subject to additional and pending disputed discovery, Plaintiffs have identified

the following acts of direct infringement:

| Dates | Infringer | Description |
|-------|-----------|-------------|
| 8/18/22 | E & R / Johnston | Magnet-Holster-Compact-Black-R shipped to Mackenzie Barnes. |
| 8/22/22 | E & R / Johnston | Magnet-Holster-Compact-Purple-R shipped to Katie Kish. |
| 9/30/22 | E & R / Johnston | At least 4 Accused Instrumentalities (Magnet-Holster-Compact-Pink-R, Magnet-Holster-Compact-Purple-R, Magnet-Holster-Compact-Pink-R, and Magnet-Holster-Compact-Purple-R) were sold to a private investigator of the Plaintiffs at Smith & Edwards located at 3936 N 2000 W in Pleasant View, UT 84414 |
| 10/1/22 | Cheal | Sold an Accused instrumentality to a private investigator of the Plaintiffs and accepted payment via Johnston's personal Venmo account. |
| 12/21/22 | Johnston | Sold an Accused Instrumentality to a private investigator of the Plaintiffs and accepted payment via her personal Venmo account. Johnston also stated that the buyer could pick up the holster from her personal residence, provided her personal number, and confirmed that if she were not home to provide delivery, her husband (Defendant Cheal) would be. |
| 2/11/23 | E & R / Johnston | Magnet-Holster-Compact-Pink-R shipped to Alex Moreno. |
| 3/25/23 | E & R / Johnston | Magnet-Holster-Compact-Pink-R sold to a private investigator of the Plaintiffs at the "Crossroads of the West" gun show located at the Davis Conferences Center in 1651 N 700 W Layton, UT 84041. |
| 4/15/23-4/16/23 | Johnston / Cheal | Sold Accused Instrumentalities from a Her Tactical booth at the Crossroads of the West Gun Show at 9575 S. State Street Sandy, UT 84070. |

App-043

| Dates | Infringer | Description |
|-------|-----------|-------------|
| Pending Disputed Discovery | Pending Disputed Discovery | Accused Instrumentalities are or have been sold at a variety of online locations such as: <br><br> • Her Tactical Website (https://hertactical.com/product/magnetic-gun-holster/) <br><br> • Etsy(https://www.etsy.com/shop/HERTACTICAL?ref=shop_sugg) <br><br> • Amazon(https://www.amazon.com/HER-TACTICAL-Magnetic-Concealed-Universal/dp/B09PH2RBDN/ref=sr_1_37?crid=AHLTW6B62LZD&keywords=Magnetic+Gun+Holster&qid=166118280&sprefix=magnetic+gun+holster%2Caps%2C126&sr=8-37)and(https://www.amazon.com/stores/HERTACTICAL/page/CD657032-5B7E-4D76-A606-621D822E988F?ref_=ast_bln)•Ebay(https://www.ebay.com/str/envyandreverec) <br><br> • Facebook (https://www.facebook.com/hertactical) and(https://www.facebook.com/vicky.johnston.397) <br><br> • Instagram (https://www.instagram.com/her.tactical/) <br><br> • Tik Tok(https://www.tiktok.com/@hertactical) <br><br> • Pinterest(https://www.pinterest.com/hertactical/) <br><br> • Etsy (https://www.etsy.com/listing/1240884431/her-tactical-magnetic-holster-for) <br><br> • Ace Hardwarebranch-Smith and Edwards Co. (9010 S. Redwood Rd.,West Jordan, UT 84088) <br><br> • Alibaba.com (https://www.alibaba.com/product-detail/Woman-holsters-purple-portable-universal-carry_1600262078292.html?spm=a2700.details.0.0.6b2d6a9aAPesx5). <br><br> • https://www.youtube.com/watch?v=JiMKulTAIT0; <br><br> • www.ebay.com; <br><br> • www.poshmark.com; <br><br> • www.pinterest.com. <br><br> Identification of the relevant quantities, dates, and items for such sales are pending disputed discovery. |

FINAL INFRINGEMENT CONTENTIONS                                    Page 29 of 39

App-044

| Dates | Infringer | Description |
|---|---|---|
| Pending Disputed Discovery | Pending Disputed Discovery | One or more Accused Instrumentalities are or have been sold at a variety of trade shows and exhibits in Utah.<br><br>Identification of the relevant quantities, dates, and items for such sales are pending disputed discovery. |
| Pending Disputed Discovery | Pending Disputed Discovery | One or more Accused Instrumentalities are or have been sold at one or more retail outlets in Utah.<br><br>Identification of the relevant quantities, dates, locations, and items for such sales are pending disputed discovery. |
| Pending Disputed Discovery | Pending Disputed Discovery | One or more Accused Instrumentalities are or have been sold at workshops, seminars, and training classes.<br><br>Identification of the relevant quantities, dates, locations, and items for such sales are pending disputed discovery. |

**B. Acts that contribute to or are inducing the direct infringement**

**a. Acts of contribution or inducement by Defendant E & R, LLC**

10. Incorporating by reference LPR 2.3(a) through LPR 2.3(e)(A), *supra*, each and every Accused Instrumentality sold by Her Tactical directly infringes the asserted claims of the asserted patents.

11. Defendant E & R, LLC took action that was intended to cause and led to the infringing acts by Her Tactical because all actions by Her Tactical—a registered *dba* of E & R— are attributable to its *dba* registrant. Plaintiff further observes that many "Her Tactical" products are billed to and shipped by E & R.

12. Incorporating by reference LPR 2.3(g), *infra*, E & R was aware of the asserted patents and knew that the acts, if taken, would constitute infringement of one or more of those patents. Alternatively, E & R believed there was a high probability that the acts by Her Tactical would infringe one or more of the asserted patents and took deliberate steps to avoid learning of that infringement. Alternatively, E & R believed there was a high probability that the acts by Her

**FINAL INFRINGEMENT CONTENTIONS**                                    **Page 30 of 39**

Tactical infringed the asserted patents and took deliberate steps to avoid learning of that infringement.

### b. Acts of contribution or inducement by Defendant Blake Cheal

13.   Incorporating by reference LPR 2.3(a) through LPR 2.3(e)(A), *supra*, each and every Accused Instrumentality sold by Defendants Her Tactical and/or E & R, LLC (collectively, the "venture") directly infringes the asserted claims of the asserted patents.

14.   Defendant Blake Cheal took action that was intended to cause and led to the infringing acts by Her Tactical and/or E & R because he is an authorized administrator having input in the direction of Her Tactical's financial and supply chain transactions. For example, Johnston has credited Cheal for his support in the Her Tactical venture, identified him as a business partner in that venture, and offered him to consumers as her proxy for Her Tactical sales and transactions.

15.   More specifically, Cheal took action that was intended to cause and led to the infringing acts by Her Tactical, at least as follows: (a) on 10/1/22, standing in for Johnston to conduct a Point of Sale (POS) and Free On Board (FOB) transaction by which Her Tactical sold one or more Accused Instrumentalities and transferred ownership thereof to the buyer; (b) on 12/21/22 permitting his real estate to serve as the FOB destination at which Her Tactical transferred ownership of one or more Accused Instrumentalities to a buyer; (c) on 3/24/23 assisting Johnston in setting up an exhibit at which Her Tactical sold one or more Accused Instrumentalities; and (d) on 4/15/22-4/16/22, staffing an exhibit that enabled Her Tactical to sell one or more Accused Instrumentalities.

16.   Incorporating by reference LPR 2.3(g), *infra*, Cheal was aware of the asserted patents and knew that the acts, if taken, would constitute infringement of one or more of those patents. Alternatively, Cheal believed there was a high probability that the acts by Her Tactical

FINAL INFRINGEMENT CONTENTIONS                                    Page 31 of 39

would infringe one or more of the asserted patents and took deliberate steps to avoid learning of that infringement. Alternatively, Cheal believed there was a high probability that the acts by Her Tactical infringed the asserted patents and took deliberate steps to avoid learning of that infringement.

### c.   Acts of contribution or inducement by Defendant Vicky Johnston

17.   Incorporating by reference LPR 2.3(a) through LPR 2.3(e)(A), *supra*, each and every Accused Instrumentality sold by E & R, LLC (*dba* Her Tactical) and/or Blake Cheal directly infringes the asserted claims of the asserted patents.

18.   Defendant Vicky Johnston took action that was intended to cause and led to the infringing acts by Her Tactical because she is an authorized administrator having input in the direction of the Her Tactical's financial and supply chain transactions. At the very least, Johnston is the sole registered owner and agent of Her Tactical and can be assumed to be directing all activities. But Plaintiffs also observe that Johnston features herself prominently on the Her Tactical's marketing and promotions, frequently refers to herself as "Her Tactical", and directly answers administrative correspondence on the Her Tactical's behalf. And, to the extent Cheal's direct acts of infringement were conducted strictly within his capacity as a supportive husband, all such actions would have resulted from Johnston's actions, intents, or expressions.

19.   More specifically, Johnston took action that was intended to cause and led to the infringing acts by E & R and/or Cheal, at least as follows: (a) on 8/18/22, 8/22/22, and 2/11/23, authorizing Her Tactical to ship one or more Accused Instrumentalities to buyers; (b) on 9/30/22 authorizing Her Tactical to sell one or more Accused Instrumentalities at Utah retail outlets; (c) on 10/1/22 using her intangible personal property as a POS for Accused Instrumentalities sold on behalf of Her Tactical and offering for Cheal to complete the transaction; (d) on 12/21/22 negotiating on behalf of Her Tactical for the sale and delivery of one or more Accused

**FINAL INFRINGEMENT CONTENTIONS**                              **Page 32 of 39**

Instrumentalities—using her intangible personal property as a POS, Cheal's real property as the FOB destination, and offering for Cheal to complete the transaction; and (e) on 3/25/23, 4/15/23, and 4/16/23, staffing exhibits that enabled Her Tactical to sell one or more Accused Instrumentalities.

20.     Incorporating by reference LPR 2.3(g), *infra*, Johnston was aware of the asserted patents and knew that the acts, if taken, would constitute infringement of one or more of those patents. Alternatively, Johnston believed there was a high probability that the acts by Her Tactical or Cheal would infringe one or more of the asserted patents and took deliberate steps to avoid learning of that infringement. Alternatively, Johnston believed there was a high probability that the acts by Her Tactical and/or Cheal infringed the asserted patents and took deliberate steps to avoid learning of that infringement.

**LPR 2.3(f)**     for any patent that claims priority to an earlier application, the priority date to which each asserted claim allegedly is entitled;

| Infringed Claim | Description | Priority Date |
|---|---|---|
| 11/747,109 claim 1 | Claims priority from D811,731 | 10/05/2016 |
| 9/784,530 claim 1 | Claims priority from a provisional application | 10/28/2016 |
| 9/784,530 claim 3 | Claims priority from a provisional application | 10/28/2016 |
| D788,451 claim 1 | Does not claim priority to any application | 04/26/2016 |
| D811,731 claim 1 | Does not claim priority to any application | 10/05/2016 |
| D836,329 claim 1 | Does not claim priority to any application | 06/21/2017 |
| D841,979 claim 1 | Does not claim priority to any application | 12/20/2017 |

**LPR 2.3(g)**     the basis for any allegation of willful infringement;

21.     As discussed below, Defendants: (A) have not acted consistently with the standards of behavior for companies bound by the laws of US commerce; (B) intentionally copied the Plaintiffs' patented product; (C) did not make a good-faith effort to avoid infringing the Patents in Suit; and (D) have tried to cover up their infringement.

App-048

**A.      Defendants have not acted consistently with the standards of behavior set for US commerce**

22.     The industry standard for the sale or offering for sale of products in US commerce is to respect the intellectual property of others.

23.     However, Plaintiffs can show that much of the Defendants' website comprises stock photos which, on information and belief, do not entirely follow the purchase and licensing guidelines set forth by the authors of those images.

24.     Defendants have also misappropriated and diluted the trademarks and goodwill of the entity Hot Topic, Inc., which, on 3/22/23 was obligated to send the Defendants a cease-and-desist letter showing the following side-by-side comparison:



25.     Plaintiffs observe that the identical stenciled font of the respective primary word marks and secondary acronym marks bear a striking resemblance between two brands marketed primarily to females.

26.     Defendants apparently agree with this assessment, as they have since changed the bridge locations for the letters "T", "A", and "C", and removed such stenciling from the letters "H", "E", and "R" altogether. Defendants also changed the acronym mark from "HT" to "HER", as shown below:

**FINAL INFRINGEMENT CONTENTIONS**                                    **Page 34 of 39**

App-049



| Original Her Tactical Mark | New Her Tactical Mark |
|---|---|

27. Without addressing the sufficiency of these changes, Plaintiffs herein assert that Defendants knew of the similarities between their logos and the Hot Topic logos, and only changed their own to mitigate the risk of compounding intellectual property litigation beyond the present dispute.

28. Defendants also infringe the patented products of third party Can Can Concealment, LLC, as shown herein:



| Can Can Concealment "Garter Elite" | Her Tactical "Luxury Thigh Holster" |
|---|---|

29. Plaintiffs understand that Can Can Concealment considers Her Tactical's product to be an infringement of its patent but cannot yet begin litigation without first marshalling its resources. Accordingly, absent the threat of compounding intellectual property litigation beyond the present dispute, Defendants have not apparently made any changes to this infringing product.

FINAL INFRINGEMENT CONTENTIONS                     Page 35 of 39

App-050

**B.      Defendants intentionally copied the Plaintiffs' patented products**

30.      Incorporating by reference their initial pleadings and related briefing, Plaintiffs

have provided the connections between themselves, their marketing efforts, the connections

between Johnston and the entities and individuals helping Plaintiffs with their marketing, and the

closeness in time these marketing efforts had with Johnston's production, marketing, and selling

of the Accused Instrumentalities. These events occurred from approximately July 2021 to

January 2022—with Johnston likely learning of the Plaintiffs' patents on or around 9/24/21.

31.      Plaintiffs' initial pleadings and related briefing also provide that on 8/19/22

Johnston specifically acknowledged that she knew of Plaintiffs' '530 patent and related products

but declined to cease and desist her infringement.

**C.      Defendants did not make a good faith effort to avoid infringing the Patent in Suit**

32.      Rather than comply with Plaintiffs' demand letter, Johnston provided two legal

opinions, drafted 8/22/22 and 10/1/22, to justify her continued infringement. However, these

letters post-date her decision to development and sell the Accused Instrumentalities by

approximately a year.

33.      In addition to Defendants' connection to and knowledge of Plaintiffs' products

and marketing efforts, Plaintiffs have also asserted in their initial pleadings and related briefing

Defendants' piggy-back marketing and sales of the Accused Instrumentalities to the front center

of the bra. At trial, Plaintiffs would further show: (a) Defendants refer to themselves as the

"HerNation Family" and "Her Family" in the same manner that Plaintiffs first referred to

themselves as the "JM4 Family"; (b) Defendants have copied, verbatim, multiple portions of the

Plaintiff's warranties and disclaimers; and (c) Defendants consistently market that the Accused

Instrumentalities have a "silent draw"—a phrase used only by the entities helping Plaintiffs with

FINAL INFRINGEMENT CONTENTIONS                                          Page 36 of 39

their marketing and to whom Johnston is connected. Defendants piggyback marketing of the Plaintiffs is so pervasive they even copy the essential motif of one the Plaintiffs' logos:

| **JM4 Tactical** | **Her Tactical** |
|---|---|
| Two pistols, back-to-back, wherein the negative space between the pistols comprises a religious symbol—namely a cross | Two pistols, back-to-back, wherein the negative space between the pistols comprises a religious symbol—namely an angel |
| | |

34.    Thus, on the balance, the Defendants clearly did not make a good faith effort to avoid copying Plaintiffs' marketing, motifs, or content. Thus, when taken in context with their intentional copying of third party intellectual property (supra LPR 2.3(g)(A)) and Plaintiff's patented holsters (supra LPR 2.3(g)(B)), Defendants did not make a good faith effort to avoid infringing the Patents in Suit.

### D. Defendants have tried to cover up their infringement

35.    Defendants received Plaintiff's initial notice of infringement on or around 8/19/22 and first denied infringement on or around 8/22/22.

36.    But on 9/22/22 Plaintiff's principal Shawndalyn Myers purchased one Magnet-Holster-Compact-Pink-R and three Magnet-Holster-Compact-Purple-R (order # 114-5457898-8209815) from "Her Tactical" via ASIN B09PHL8JB and on 9/23/22 "Her Tactical" cancelled the order without explanation.

37.    Likewise, on 9/24/22 Sean Alcazar, who is clearly affiliated with JM4 Tactical, purchased "Her Tactical Magnetic Holster for Compact & Micro Sized Guns-PINK"—identified herein as Accused Instrumentality Magnet-Holster-Micro-Pink-R—from poshmark.com via

**FINAL INFRINGEMENT CONTENTIONS**                                         **Page 37 of 39**

App-052

order ID 632fa2eb84b3077c497dd463. But within a few minutes the seller, "Her Tactical",

cancelled the order without explanation.

38.    Then, on or around 9/18/22 "Her Tactical" turned off comments to its youtube

videos that market the Accused Instrumentalities rather than listen to "false accusations that are

not productive."

39.    Yet although Defendants no longer sell products to Plaintiffs or its known

affiliates, and have disallowed public discourse on the authenticity of these sales, Defendants

continue to sell Accused Instrumentalities to Plaintiffs' private investigators and the public.

40.    Likewise, Blake Cheal, who Johnston has credited as a partner and who

investigators regularly found involved with Her Tactical, has largely withdrawn from public

view since he was named as a co-Defendant in this dispute.

41.    On at least one occasion, Cheal attempted to hide his identity from the Plaintiffs'

private investigators when he suspected that he was being monitored. And yet, when Her

Tactical is publicly exhibiting the Accused Instrumentalities, private investigators have identified

him helping before and after public hours.

**LPR 2.3(h)**    if a party claiming patent infringement wishes to preserve the right to rely, for any purpose, on the assertion that its own or its licensee's apparatus, product, device, process, method, act, or other instrumentality embodies or practices the claimed invention, the party must identify, separately for each asserted patent, each such apparatus, product, device, process, method, act, or other instrumentality that incorporates or reflects that particular claim, including whether there has been marking pursuant to statute.

42.    Plaintiffs sell left-handed and right-handed variations, in up to 22 sizes and 6

color options of the following gun holsters protected by the asserted claims herein:

**FINAL INFRINGEMENT CONTENTIONS**                                    **Page 38 of 39**



Dated this 7th day of September 2023.

Respectfully Submitted,

/Brandon J. Leavitt/

**Brandon James Leavitt**

App-054

TAB

# 4

# Freedom-to-Operate Analysis

Prepared by Michael R. Schramm of Schramm Patent Services, LLC, dated August 22, 2022.

SOURCE

*Pre-litigation patent-counsel analysis prepared at the request of Vicky Johnston / Her Tactical and provided to Plaintiffs in August 2022.*

Michael R. Schramm
Schramm Patent Services, LLC
E-mail: mikeschramm@besstek.net


August 22, 2022


Vicky Johnston
Her Tactical
E-mail: vicky@hertactical.com


  Re: <u>Freedom to Operate Analysis</u>


Dear Vicky:

You have requested that I perform a freedom to operate (FTO) analysis of the Her Tactical gun holster (the Product) relative to the US patent 9,784,530 ('530). This letter is in response to that request.

As a background I note that "*Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device*" (see: Kahn v. Gen. Motors Corp., 135 F.3d 1472, 1477 (Fed. Cir. 1998)). Thus as applied to the instant case, even if only one element of any independent claim of '530 is not practiced by the Product, infringement of '530 by the product is avoided. Turning to '530, I note that '530 includes three claims, only one of which, claim 1, is an independent claim. Claim 1 of '530 reads as follows:

> "*A gun holster system for carrying a gun, comprising: a body having a front side and a back side forming an upper opening disposed therebetween and forming a lower opening at a lower surface of the body; a strap assembly integrally secured to the back side body, the strap assembly having: an elongated strap extending from and integrally secure to the back side of the body; a fastener protrusion extending from a back surface of the elongated strap; and a fastener housing extending from an outer surface of the back side of the body, the fastener housing being configured to engage with the fastener protrusion; wherein the elongated strap folds backwards and away from the upper opening to cause the fastener protrusion and the fastener housing to engage; **two magnets disposed within a thickness of the fastener protrusion; and a third magnet disposed within a thickness of the housing; wherein the two magnets are configured to engage with the third magnet; wherein engaging the two magnets with the third magnet does not obstruct the upper opening and does not obstruct or hinder entire removal of the gun from the body; and wherein a combined magnetic retention strength generated by the two magnets and third magnet is strong enough to retain the gun within the body*.**"*

While a limitation by limitation of the analysis is a useful tool in an assessment of FTO, in this case, as non-infringement of '530 by the Product is so obvious, I will forgo such a full detailed analysis and will instead focus on one aspect, namely the three magnet limitation (e.g. see the bolded claim text above). As you know, the Product has less than three magnets, and therefore the Product does not literally practice claim 1 (or any claim) of '530.

Moreover, it is also my opinion that the doctrine of equivalents would not apply here. I note that the three magnet limitation was not mere oversight. When applicant Meyers (James Meyers -

presumably a relative of Chad Meyers) originally filed the application that resulted in '530, claim 1 (and none of the claims of the '530 application) included the three magnet limitation (see attached "9784530 161206 Application as Filed").  These claims were rejected in the April 19, 2017 (see attached "9784530 170419 Office Action").  In an attempt to overcome the rejection, in a June 1, 2017 OA response, Meyers amended the claims to include the three magnet limitation (see attached "9784530 170601 OA Response & Amendment").  It is pointed out that in the June 1, 2017 response, Meyers expressly stated, inter alia, on the record, that:

> "*The Applicant respectfully traverses these rejections for at least the following reasons. Claim 1 is hereby amended to include the features: (1) **two magnets disposed within the fastener protrusion; (2) engaging the two magnets and the third magnet does not obstruct the upper opening; and (3) combined magnetic retention strength generated by the two magnets and third magnet is strong enough to retain the gun within the body**.*"

Further, in an August 21, 2017 mailed interview summary of a July 28, 2017 interview (see attached "9784530 170821 Interview Summary"), the examiner stated inter alia that:

> "*Ms. Felix discussed the amended claims which were formally filed on June 01. 2017.  Amended claim 1, lines 10 - 18 filed on June 01, 2017 recite: "**two magnets disposed within a thickness of the fastener protrusion: and a third magnet disposed within a thickness of the housing; wherein the two magnets are configured to engage with the third magnet; wherein engaging the two magnets with the third magnet does not obstruct the upper opening; and wherein a combined magnetic retention strength generated by the two magnets and third magnet is strong enough to retain the gun within the body**." Examiner Vanterpool stated the amended claim 1 filed on June 01, 2017 is a step in the right direction.  **In particular,  the limitation of: "wherein engaging the two magnets magnets with the third magnet does not obstruct the upper opening; and wherein a combined magnetic retention strength generated by the two magnets and third magnet is strong enough to retain the gun within the body.**"*"

Lastly, I note that in the August 25, 2017 notice of allowance (see attached "9784530 170825 Notice of Allowance"), the examiner, in affirming the criticality of the three magnet limitation, expressly stated, inter alia, on the record, that:

> "*However, Stella does not disclose the fastener housing extending from the outer surface of the back side of the body, the fastener housing configured to engage with the fastener protrusion; **two magnets disposed within the thickness of the fastener protrusion; and the third magnet disposed within the thickness of the housing; the two magnets are configured to engage with the third magnet; engaging the two magnets with the third magnet does not obstruct the upper opening and does not obstruct or hinder entire removal of the gun from the body; and the combined magnetic retention strength generated by the two magnets and third magnet is strong enough to retain the gun within the body**.*"

And

> *However, Esposito '250 does not disclose the strap assembly having: the elongated strap (12) extending from and integrally secured to the back side of the body (11 ); wherein the elongated strap (12) folded backwards and away from the upper opening to cause the fastener protrusion and the fastener housing to engage; **two magnets disposed within the thickness of the fastener protrusion; and the third magnet disposed within the thickness of the housing; the two magnets are configured to engage with the third magnet; engaging the two magnets with the third magnet does not obstruct the upper opening and does not obstruct or hinder entire removal of the gun form the body; and the combined magnetic retention strength generated by the two magnets and third magnet is strong enough to retain the gun within the body**.*

And

"*However, McStay '045 does not disclose the strap assembly having: the elongated strap (108) extending from and integrally secured to the back side of the body; the fastener housing (142) extending from the outer surface of the body; the elongated strap (108) folded backwards and away from the upper opening to cause the fastener protrusion (120) and the fastener housing (142) to engage;* **engaging the two magnets with the third magnet does not obstruct the upper opening and does not obstruct or hinder entire removal of the stored object (118) from the body; and wherein the combined magnetic retention strength generated by the two magnets and third magnet being strong enough to retain the stored object (118) within the body**."

In addition to the above, I note that even if, in the nearly impossible scenario, where Meyers were to suggest some rational in a continuing application as to why claims based on the original Meyers applications should be allowed with the three magnet limitation, inasmuch as there are no children applications that claims priority to '530 (see attached "9784530 220822 Continuity Data"), Meyers is foreclosed from so arguing.

Separate from above, I note that where a third party asserts a baseless claim for patent infringement, the accused infringers has a plurality of options, one of which would be for the accused to seek a declaratory judgment (DJ) against the accuser, with a request to recover attorney's fees and other damages caused by the accuser. Should you be interested in seeking such remedies, I would be happy to provide a reference to a competent patent attorney.

DATE: August 22, 2022            Respectfully submitted,

Michael R. Schramm
Registered Patent Agent
Reg. No. 56,441

TAB

# 5

# USPTO Office Actions Refusing Trade Dress Registration on Functionality Grounds

Application No. 90/520,663 (Office Action, Sept. 13, 2021); and Application No. 90/518,181 (Final Office Action, Nov. 7, 2022).

SOURCE

*U.S. Patent and Trademark Office; from the official trademark prosecution histories of Plaintiffs' trade dress applications. The '520,663 application was abandoned April 4, 2022 without response.*

| **To:** | JM4 tactical (beth@uslawpros.com) |
|---|---|
| **Subject:** | U.S. Trademark Application Serial No. 90520663 - 3168CM-8TBF |
| **Sent:** | September 13, 2021 04:12:58 PM |
| **Sent As:** | ecom108@uspto.gov |
| **Attachments:** | Attachment - 1<br>Attachment - 2<br>Attachment - 3<br>Attachment - 4<br>Attachment - 5 |

**United States Patent and Trademark Office (USPTO)**
**Office Action (Official Letter) About Applicant's Trademark Application**

**U.S. Application
Serial No.**
90520663

**Mark:**

**Correspondence
Address:**
BETH FELIX
LEAVITT &
ELDREDGE LAW
FIRM
4204 SW GREEN
OAKS BLVD
STE 140
ARLINGTON, TX
76017
**Applicant:** JM4
tactical

**Reference/Docket
No.** 3168CM-8TBF

**Correspondence
Email Address:**

beth@uslawpros.com

# NONFINAL OFFICE ACTION

The USPTO must receive applicant's response to this letter within  six months  of the issue date below or the application will be **abandoned**. Respond using the Trademark Electronic Application System (TEAS).  A link to the appropriate TEAS response form appears at the end of this Office action.

**Issue date:  September 13, 2021**

 The referenced application has been reviewed by the assigned trademark examining attorney.  Applicant must respond timely and completely to the issue(s) below.  15 U.S.C. §1062(b); 37 C.F.R. §§2.62(a), 2.65(a); TMEP §§711, 718.03.

DATABASE SEARCH

 The trademark examining attorney searched the USPTO database of registered and pending marks and found no conflicting marks that would bar

registration under Trademark Act Section 2(d).  15 U.S.C. §1052(d); TMEP §704.02.

SECTION 2(e)(5) FUNCTIONAL REFUSAL

Registration is refused because the applied-for mark, which consists of a three-dimensional configuration of the goods, appears to be a functional design for such goods.  Trademark Act Section 2(e)(5), 15 U.S.C. §1052(e)(5); *see* TMEP §1202.02(a)-(a)(ii).  A feature is functional if it is "'essential to the use or purpose of the [product]'" or "'it affects the cost or quality of the [product].'"        *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 33, 58 USPQ2d 1001, 1006 (2001) (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165, 34 USPQ2d 1161, 1163-64 (1995)); *Inwood Labs., Inc., v. Ives Labs., Inc*., 456 U.S. 844, 850 n.10, 214 USPQ 1, 4 n.10 (1982); TMEP §1202.02(a)(iii)(A).

A mark that consists of a three-dimensional configuration of a product or its packaging is functional, and thus unregistrable, when the evidence shows that the design provides identifiable utilitarian advantages to the user; i.e., the product or container "has a particular shape because it works better in [that] shape."  *Valu Eng'g, Inc. v. Rexnord Corp.* , 278 F.3d 1268, 1274, 61 USPQ2d 1422, 1425 (Fed. Cir. 2002) (internal punctuation and citation omitted); *see* TMEP §1202.02(a)(iii)(A).

The evidence need not establish that the configuration at issue is the very best design for the particular product or product packaging.  A configuration can be held functional when the evidence shows that it provides a specific utilitarian advantage that makes it one of a few superior designs available.  *See In re Bose Corp.*, 772 F.2d 866, 227 USPQ 1 (Fed. Cir. 1985) (holding shape of a loudspeaker system enclosure functional because it conforms to the shape of the sound matrix and is thereby an efficient and superior design); *In re Dietrich*, 91 USPQ2d 1622 (TTAB 2009) (holding particular spoke arrangement of a bicycle wheel functional because it is more stable and provides better performance than wheels with other spoke arrangements featuring the same or greater number of spokes); *In re Am. Nat'l Can Co.* , 41 USPQ2d 1841 (TTAB 1997) (holding metal beverage containers with vertical fluting functional because vertical fluting is one of a limited number of ways to strengthen can sidewalls and it allows for an easier way to grip and hold the can); TMEP §1202.02(a)(v), (a)(v)(C).

On the other hand, where the evidence shows that the specific product or container configuration at issue provides no real utilitarian advantages to the user, but is one of many equally feasible, efficient and competitive designs, then it may be registrable.  *See In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 213 USPQ 9 (C.C.P.A. 1982).  However, a product configuration cannot be registered on the Principal Register without a showing of acquired distinctiveness.  *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 54 USPQ2d 1065 (2000); TMEP §1202.02(b)-(b)(i).

A third-party utility patent is relevant evidence of functionality when the patent discloses the utilitarian advantages of the applied-for product or product packaging configuration sought to be registered*.  See, e.g.*, *Kistner Concrete Prods. Inc. v. Contech Arch Techs., Inc.*, 97 USPQ2d 1912, 1921 n.7 (TTAB 2011); *In re Dietrich*, 91 USPQ2d 1622, 1627 (TTAB 2009); TMEP §1202.02(a)(v)(A).  The owner of a utility patent is not relevant to determining functionality.  *In re Heatcon, Inc.*, 116 USPQ2d 1366, 1371 (TTAB 2015) (citing *In re Pohl-Boskamp GmbH & Co.*, 106 USPQ2d 1042, 1046 n.22 (TTAB 2013); *In re Mars Inc.*, 105 USPQ2d 1859, 1861 (TTAB 2013); *In re Virshup*, 42 USPQ2d 1403, 1405 (TTAB 1997)).

As seen from the attached patent, the use of a magnet embedded on/in the holster lends to the improved method of securing the firearm or other holstered weapon.  The use of magnets on the present holster also creates a utilitarian advantage regarding the applied-for product.  Therefore the applied-for product design is functional and registration must be refused pursuant to Section 2(e)(5) of the Trademark Act.

A determination that an applied-for configuration mark is functional constitutes an absolute bar to registration on the Principal or Supplemental Registers, regardless of any evidence of acquired distinctiveness.  Trademark Act Sections 2(e)(5) and 23, 15 U.S.C. §§1052(e)(5), 1091; *see TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29, 58 USPQ2d 1001, 1006 (2001); *In re Controls Corp. of Am.*, 46 USPQ2d 1308, 1311 (TTAB 1998); TMEP §1202.02(a)(iii)(A).

INFORMATION REQUEST

Applicant must provide the following information and documentation regarding the applied-for three-dimensional configuration mark:

    (1)    A written statement as to whether the applied-for mark, or any feature(s) thereof, is or has been the subject of a design or utility patent or patent application, including expired patents and abandoned patent applications.  Applicant must also provide copies of the patent and/or patent application documentation.

    (2)    Advertising, promotional, and/or explanatory materials concerning the applied-for configuration mark, particularly materials specifically related to the design feature(s) embodied in the applied-for mark.

(3)    A written explanation and any evidence as to whether there are alternative designs available for the feature(s) embodied in the applied-for mark, and whether such alternative designs are equally efficient and/or competitive.  Applicant must also provide a written explanation and any documentation concerning similar designs used by competitors.

(4)    A written statement as to whether the product design or packaging design at issue results from a comparatively simple or inexpensive method of manufacture in relation to alternative designs for the product/container.  Applicant must also provide information regarding the method and/or cost of manufacture relating to applicant's goods.

(5)    Any other evidence that applicant considers relevant to the registrability of the applied-for configuration mark.

(6)    Respond to the following questions:
   1. What consists of the "securement device" on the holster?
   2. Does the securement device at an end of the strap consist of a magnet or magnets?
   3. Does the securement device extending from the body of the holster consist of a magnet or magnets?

*See* 37 C.F.R. §2.61(b); *In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 1340-41, 213 USPQ 9, 15-16 (C.C.P.A. 1982); TMEP §§1202.02(a)(v) *et seq.*

Any document filed with the USPTO becomes part of the official public application record and will not be returned or removed.  TMEP §§404, 814.  If any of the information requested above is confidential or applicant does not want such information to become part of the public record for a valid reason, applicant should submit an explanation of those circumstances or redact confidential portions prior to submission.  *See* TMEP §814.  Applicants are not required to submit confidential information into the record; a written explanation or summary of that information may suffice.  *Id.*

Regarding the requirement for this information, the Trademark Trial and Appeal Board and its appeals court have recognized that the necessary technical information for ex parte determinations as to functionality is usually more readily available to an applicant, and thus an applicant is normally the source of most of the evidence in these cases.  *In re Teledyne Indus. Inc.*, 696 F.2d 968, 971, 217 USPQ 9, 11 (Fed. Cir. 1982); *see In re Babies Beat Inc.*, 13 USPQ2d 1729, 1731 (TTAB 1990) (holding registration was properly refused where applicant failed to comply with trademark examining attorney's request for copies of patent applications and other patent information); TMEP §1202.02(a)(v).

Failure to comply with a request for information can be grounds for refusing registration.  *In re AOP LLC*, 107 USPQ2d 1644, 1651 (TTAB 2013); *In re DTI P'ship LLP* , 67 USPQ2d 1699, 1701-02 (TTAB 2003); TMEP §814.

Applicant should note the following additional ground for refusal.

## SECTIONS 1, 2, AND 45 NON-DISTINCTIVE CONFIGURATION REFUSAL

Registration is also refused because the applied-for mark consists of a nondistinctive product design or nondistinctive features of a product design that is not registrable on the Principal Register without sufficient proof of acquired distinctiveness.  Trademark Act Sections 1, 2, and 45, 15 U.S.C. §§1051-1052, 1127; *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210, 213-14, 54 USPQ2d 1065, 1068-69 (2000); *In re Slokevage*, 441 F.3d 957, 961, 78 USPQ2d 1395, 1398 (Fed. Cir. 2006); *see* TMEP §1202.02(b)(i).

A product design can never be inherently distinctive as a matter of law; consumers are aware that such designs are intended to render the goods more useful or appealing rather than identify their source.  *See Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. at 212-13, 54 USPQ2d at 1068-69; *In re Slokevage*, 441 F.3d at 962, 78 USPQ2d at 1399.  Thus, consumer predisposition to equate a product design with its source does not exist.  *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. at 213, 54 USPQ2d at 1069.

Applicant may respond by providing evidence of acquired distinctiveness, such as verified statements of long term use, advertising and sales expenditures, examples of advertising, affidavits and declarations of consumers, customer surveys.  *See* 37 C.F.R. §2.41(a)(3); TMEP §§1212.02(g), 1212.06 *et seq*.  When determining whether the evidence shows the mark has acquired distinctiveness, the trademark examining attorney will consider the following six factors:  (1) association of the mark with a particular source by actual purchasers (typically measured by customer surveys linking the name to the source); (2) length, degree, and exclusivity of use; (3) amount and manner of advertising; (4) amount of sales and number of customers; (5) intentional copying; and (6) unsolicited media coverage.  *See Converse, Inc. v. ITC*, 909 F.3d 1110, 1120, 128 USPQ2d 1538, 1546 (Fed. Cir. 2018) ("the *Converse* factors").  "[N]o single factor is determinative."  *In re Steelbuilding.com*, 415 F.3d 1293, 1300, 75 USPQ2d 1420, 1424 (Fed. Cir. 2005); *see* TMEP §§1212.06 *et seq*.  Rather, all factors are weighed together in light of all the circumstances to determine whether the mark has acquired distinctiveness.  *In re Steelbuilding.com*, 415 F.3d at 1300, 75 USPQ2d at 1424.  This

evidence must demonstrate that the relevant public understands the primary significance of the mark as identifying the *source* of applicant's service. *Id.* at 1297, 75 USPQ2d at 1422. However, "[t]he evidence must relate to the promotion and recognition of the specific configuration embodied in the applied-for mark and not to the goods in general." *In re Change Wind Corp.*, 123 USPQ2d 1453, 1467 (TTAB 2017) (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11, 214 USPQ 1, 4 n.11 (1982)).

To establish acquired distinctiveness, an applicant may rely only on use in commerce that may be regulated by the U.S. Congress. *See* 15 U.S.C. §§1052(f), 1127. Use solely in a foreign country or between two foreign countries is not evidence of acquired distinctiveness in the United States. TMEP §§1010, 1212.08; *see In re Rogers*, 53 USPQ2d 1741, 1746-47 (TTAB 1999).

Also note, evidence of five years' use considered alone is generally not sufficient to show acquired distinctiveness for nondistinctive product design marks. *E.g.*, *In re R.M. Smith, Inc.*, 734 F.2d 1482, 1485, 222 USPQ 1, 3 (Fed. Cir. 1984); *In re Change Wind Corp.*, 123 USPQ2d 1453, 1467 (TTAB 2017).

As an alternative to claiming acquired distinctiveness, applicant may amend the application to the Supplemental Register. 15 U.S.C. §1091; *see* 37 C.F.R. §§2.47, 2.75(a); TMEP §§816, 1202.02(b)(i).

DUPLICATE APPLICATION

Registration is refused because this application and U.S. Application Serial No. 90518181 appear to be duplicate applications. 37 C.F.R. §2.48; TMEP §703. The USPTO will not issue duplicate registrations. 37 C.F.R. §2.48; TMEP §703. Applicant may respond to this refusal by abandoning one of them.

Although applicant's mark has been refused registration, applicant may respond to the refusal(s) by submitting evidence and arguments in support of registration.

ASSISTANCE

Please call or email the assigned trademark examining attorney with questions about this Office action.

**How to respond. Click to file a response to this nonfinal Office action.**

/Karen K. Bush/
Trademark Examining Attorney
Law Office 108
571-272-9136
Karen.Bush@uspto.gov

## RESPONSE GUIDANCE

- **Missing the response deadline to this letter will cause the application to abandon.** A response or notice of appeal must be received by the USPTO before midnight **Eastern Time** of the last day of the response period. TEAS and ESTTA maintenance or unforeseen circumstances could affect an applicant's ability to timely respond.

- **Responses signed by an unauthorized party** are not accepted and can **cause the application to abandon.** If applicant does not have an attorney, the response must be signed by the individual applicant, all joint applicants, or someone with legal authority to bind a juristic applicant. If applicant has an attorney, the response must be signed by the attorney.

- If needed, **find contact information for the supervisor** of the office or unit listed in the signature block.

App-061











CUCILync
11.6.5.62840
2:04.49 PM 9/13/2021
Windows 10 Enterprise N 2016 LTSB 64-bit Build 14393

| **To:** | JM4 tactical (beth@uslawpros.com) |
|---|---|
| **Subject:** | U.S. Trademark Application Serial No. 90520663 - 3168CM-8TBF |
| **Sent:** | September 13, 2021 04:13:00 PM |
| **Sent As:** | ecom108@uspto.gov |
| **Attachments:** | |

### United States Patent and Trademark Office (USPTO)

### USPTO OFFICIAL NOTICE

Office Action (Official Letter) has issued
on **September 13, 2021** for
**U.S. Trademark Application Serial No. 90520663**

Your trademark application has been reviewed by a trademark examining attorney. As part of that review, the assigned attorney has issued an official letter that you must respond to by the specified deadline or your application will be abandoned. Please follow the steps below.

**(1) Read the official letter.**

**(2) Direct questions** about the contents of the Office action to the assigned attorney below.

/Karen K. Bush/
Trademark Examining Attorney
Law Office 108
571-272-9136
Karen.Bush@uspto.gov

Direct questions about navigating USPTO electronic forms, the USPTO website, the application process, the status of your application, and/or whether there are outstanding deadlines or documents related to your file to the Trademark Assistance Center (TAC).

**(3) Respond within 6 months** (or earlier, if required in the Office action) from **September 13, 2021**, using the Trademark Electronic Application System (TEAS). The response must be received by the USPTO before midnight **Eastern Time** of the last day of the response period. See the Office action for more information about how to respond

## GENERAL GUIDANCE

·   **Check the status** of your application periodically in the Trademark Status & Document Retrieval (TSDR) database to avoid missing critical deadlines.

·   **Update your correspondence email address**, if needed, to ensure you receive important USPTO notices about your application.

·   **Beware of misleading notices sent by private companies about your application.** Private companies not associated with the USPTO use public information available in trademark registrations to mail and email trademark-related offers and notices – most of which require fees. All **official USPTO correspondence** will only be **emailed from the domain "@uspto.gov."**

| | |
|---|---|
| **To:** | Brandon James Leavitt(secretary@uslawpros.com) |
| **Subject:** | U.S. Trademark Application Serial No. 90518181 - - 3168CM-7TBF |
| **Sent:** | November 07, 2022 05:18:32 PM EST |
| **Sent As:** | tmng.notices@uspto.gov |

**Attachments**

screencapture-pagefirearmstrainingllc-com-safe-magnetic-gun-holster-16669607675341
her tactical magnetic holster.jpg
urban magnetic holster.jpg
TWAW magnetic holster 1.jpg
TWAW magnetic holster 1-2.jpg
JM4 magnetic holster 1.jpg
JM4 magnetic holster 1-2.jpg
screencapture-jm4tactical-com-product-original-magnetic-quick-click-carry-holster-16673261770631

**United States Patent and Trademark Office (USPTO)**
**Office Action (Official Letter) About Applicant's Trademark Application**

**U.S. Application Serial No.** 90518181

**Mark:**

**Correspondence Address:**
Brandon James Leavitt
LEAVITT & ELDREDGE LAW FIRM
4204 S.W. Green Oaks Blvd. Suite #140
Arlington TX 76017 UNITED STATES

**Applicant:**  JM4 tactical

**Reference/Docket No.** 3168CM-7TBF

**Correspondence Email Address:**  secretary@uslawpros.com

**FINAL OFFICE ACTION**

**The USPTO must receive applicant's response to this letter within <u>six months</u> of the issue date below or the application will be <u>abandoned</u>.** Respond using the Trademark Electronic Application

App-068

System (TEAS) and/or Electronic System for Trademark Trials and Appeals (ESTTA). A link to the appropriate TEAS response form and/or to ESTTA for an appeal appears at the end of this Office action.

**Issue date:** November 07, 2022

This Office action is in response to applicant's communication filed on 10/11/2022. As to the Sections 1, 2, and 45 non-distinctive configuration refusal, the applicant amended the application to the Supplemental Register. In addition, the applicant argued against the stated Section 2(e)(5) refusal. After due consideration of the applicant's arguments, the refusal to register pursuant to Section 2(e)(5) is repeated and made final.

SECTION 2(e)(5) FUNCTIONAL REFUSAL

Registration was refused because the applied-for mark, which consists of a three-dimensional configuration of the goods, appears to be a functional design for such goods. Trademark Act Section 2(e)(5), 15 U.S.C. §1052(e)(5); *see* TMEP §1202.02(a)-(a)(ii). A feature is functional if it is "'essential to the use or purpose of the [product]'" or "'it affects the cost or quality of the [product].'" *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 33, 58 USPQ2d 1001, 1006 (2001) (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165, 34 USPQ2d 1161, 1163-64 (1995)); *Inwood Labs., Inc., v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10, 214 USPQ 1, 4 n.10 (1982); TMEP §1202.02(a)(iii)(A).

As stated previously, a mark that consists of a three-dimensional configuration of a product or its packaging is functional, and thus unregistrable, when the evidence shows that the design provides identifiable utilitarian advantages to the user; i.e., the product or container "has a particular shape because it works better in [that] shape." *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1274, 61 USPQ2d 1422, 1425 (Fed. Cir. 2002) (internal punctuation and citation omitted); *see* TMEP §1202.02(a)(iii)(A).

The evidence need not establish that the configuration at issue is the very best design for the particular product or product packaging. A configuration can be held functional when the evidence shows that it provides a specific utilitarian advantage that makes it one of a few superior designs available. *See In re Bose Corp.*, 772 F.2d 866, 227 USPQ 1 (Fed. Cir. 1985) (holding shape of a loudspeaker system enclosure functional because it conforms to the shape of the sound matrix and is thereby an efficient and superior design); *In re Dietrich*, 91 USPQ2d 1622 (TTAB 2009) (holding particular spoke arrangement of a bicycle wheel functional because it is more stable and provides better performance than wheels with other spoke arrangements featuring the same or greater number of spokes); *In re Am. Nat'l Can Co.*, 41 USPQ2d 1841 (TTAB 1997) (holding metal beverage containers with vertical fluting functional because vertical fluting is one of a limited number of ways to strengthen can sidewalls and it allows for an easier way to grip and hold the can); TMEP §1202.02(a)(v), (a)(v)(C).

The applicant states "even though the applied for mark does not describe magnets", the examining attorney considers them a feature of the ark "simply because the actual product includes them." [Applicant's 10/11/22 response, p. 1.] To the contrary, the examining attorney considers the magnets are a feature of the mark because the drawing as well as the description of the mark claims the magnet securement device as a feature of the mark. The drawing of the mark depicts the strap and the *securement devices in solid lines,* and describes the mark as "a product configuration of a holster, wherein the holster comprises a strap attached to a holster body, the strap *having a securement device* at

an end of the strap, the body having a *second securement device* extending from the body, the dashed lines of the body represent positioning of the strap and securement devices and are not claimed as part of the mark." [Emphasis added.] In addition, on page 6 of the applicant's response dated 3/14/22, the applicant "acknowledges that the 'securement device' on the holster comprises 3 magnets integrated within the products strap assembly". By depicting the securement devices, which applicant confirms are magnets, in solid lines on the drawing, the applicant is thereby claiming them as a feature of the mark. Furthermore, by stating in the description that the mark consists of 'the strap *having a securement device* at an end of the strap, the body having a *second securement device* extending from the body', the applicant is claiming the magnetic securement devices as a feature of the mark.

Because the drawing of the applied-for mark as well as the description of the applied-for mark references the magnet securement devices as being a specific and claimed feature of the goods, the overall mark must be considered functional pursuant to Section 2(e)(5) of the Trademark Act. As previously discussed, the use of the magnets depicted on the holster configuration creates a utilitarian advantage regarding the applied-for product. A utility patent claiming the design features at issue is strong evidence that those features are functional. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29-30, 58 USPQ2d 1001, 1005 (2001); *In re Becton, Dickinson & Co.*, 675 F.3d 1368, 1375, 102 USPQ2d 1372, 1377 (Fed. Cir. 2012); *see* TMEP §1202.02(a)(iv), (a)(v)(A). However, a patent need not claim the exact configuration for which trademark protection is sought to prove functionality. *See In re Becton, Dickinson & Co.*, 675 F.3d at 1375, 102 USPQ2d at 1377 (citing *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. at 32-33, 34-35, 58 USPQ2d at 1005). "[S]tatements in a patent's specification illuminating the purpose served by a design may constitute equally strong evidence of functionality." *In re Loggerhead Tools, LLC*, 119 USPQ2d 1429, 1432 (TTAB 2016) (quoting *In re Becton, Dickinson & Co.*, 675 F.3d at 1375, 102 USPQ2d at 1377).

As seen from the applicant's utility patent No. 9784530, the utility patent claims "two magnets disposed within the thickness of the fastener protrusion; and a third magnet disposed within the thickness of housing; wherein the two magnets are configured to engage with the third magnet" and "wherein a combined magnetic retention strength generated by the two magnets and the third magnet is strong enough to retain the gun within the body". In this case, the utility patent claims the design features at issue, specifically the magnet securement that are stated both on the drawing and in the description of the mark.

Furthermore, competitors' advertising and promotional materials that extol specific utilitarian advantages of the applied-for product design or product packaging are strong evidence that the matter sought to be registered is functional. TMEP §1202.02(a)(v)(B); *see, e.g.*, *In re MK Diamond Prods., Inc.*, 2020 USPQ2d 10882, at *14 (TTAB 2020); *In re Heatcon, Inc.*, 116 USPQ2d 1366, 1374-75 (TTAB 2015). As seen from the previously attached sampling of third-party websites and articles, as well as the additional third-party websites and articles attached to the present action, the use of magnets on holsters serves a utilitarian advantage in that the magnets secure the holster to one's apparel and also secures the weapon in the holster.

The functionality of the magnets is specifically touted in the attached articles regarding applicant's holsters that state:

> Instead of clips, these IWB handgun holsters use strong, rare earth magnets that are strategically attached to serve two functions:

1. The first function of these magnets is to click into place on your waistband. This allows these concealed carry holsters to stay right where you put them, anywhere on your waist.

2. The second function, is that of magnetic gun holster retention. What this means is that once your gun is in this leather gun holster, it won't come out unless you want it to.

The current drawing of the mark depicts the securement devices in solid lines. In addition, the description of the marks references the securement devices as features of the mark. The applicant stated for the record that the securement devices consist of three magnets integrated within the products strap assembly. The record reflects the magnets are being claimed as a feature of the mark. Because the use of magnets on holsters serves a utilitarian advantage, the applied-for mark is deemed functional. For the above reasons, the applied-for product design is functional and the refusal to register pursuant to Section 2(e)(5) of the Trademark Act is made final.

As previously stated, a determination that an applied-for configuration mark is functional constitutes an absolute bar to registration on the Principal or Supplemental Registers, regardless of any evidence of acquired distinctiveness. Trademark Act Sections 2(e)(5) and 23, 15 U.S.C. §§1052(e)(5), 1091; *see TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29, 58 USPQ2d 1001, 1006 (2001); *In re Controls Corp. of Am.*, 46 USPQ2d 1308, 1311 (TTAB 1998); TMEP §1202.02(a)(iii)(A).

ASSISTANCE

Please call or email the assigned trademark examining attorney with questions about this Office action.

**How to respond. Click to file a response to this final Office action and/or appeal it to the Trademark Trial and Appeal Board (TTAB).**

/Karen K. Bush/
Trademark Examining Attorney
Law Office 108
(571) 272-9136
karen.bush@uspto.gov

**RESPONSE GUIDANCE**

- **Missing the response deadline to this letter will cause the application to abandon.** A response or notice of appeal must be received by the USPTO before midnight **Eastern Time** of the last day of the response period. TEAS and ESTTA maintenance or unforeseen circumstances could affect an applicant's ability to timely respond.

- **Responses signed by an unauthorized party** are not accepted and can **cause the application to abandon**. If applicant does not have an attorney, the response must be signed by the individual applicant, all joint applicants, or someone with legal authority to bind a juristic applicant. If applicant has an attorney, the response must be signed by the attorney.

- If needed, **find contact information for the supervisor** of the office or unit listed in the signature block.

App-072

https://pagefirearmstrainingllc.com/safe-magnetic-gun-holster/     at 08:39:32, 10/28/2022



HOME   TRAINING ⌄   PRODUCTS ⌄   EVENTS   ABOUT   THOUGHTS   ONLINE GUN STORE   🛒

## WHY USING A MAGNETIC GUN HOLSTER IS SAFE?

by Page Firearms Training Oklahoma | Nov 4, 2021 | Gun Safety Training



There are a wide variety of different types of holsters on the market, all with their own benefits and drawbacks. The magnetic concealed carry holster seems to be the newest item in this market. They're designed for people who enjoy practicality, freedom of movement, and convenience with firearms. From this quick article, we'll address the different types of magnets used for gun holsters, how to choose a magnet weapon mount with proper safety measures in place, and how to take proper care of your magnetic holsters.



### UPCOMING EVENTS

There are no upcoming events at this time.

**(918) 708-1575**
**108 E.MONROE ST.**
**TAHLEQUAH**
**OKLAHOMA**
Hours
**Tuesday: 10am – 2:30pm**
**Wednesday: 10am – 6pm**
**Thursday: 10am – 6pm**
**Friday: 10am – 6pm**
**Saturday: 10am – 4pm**
**CLOSED sunday & monday**

### SIGNUP FOR OUR NEWSLETTER

First Name *(Required)*

Last Name *(Required)*

Email *(Required)*

☐ I'm not a robot   reCAPTCHA Privacy - Terms



Join Today



### WHAT ARE TRUCK GUN MAGNET CARRY HOLSTER FOR HANDGUNS?

There are three types of magnets commonly used in the world today: rare earth magnets, neodymium, and magnetized steel. Rare earth ones are considered to toxic if ingested. Neodymium magnets are considered safe for ingestion. Magnetized steel is a mixture of metallic alloys combined with either rare earth or neodymium. In most cases, you will find that magnetized steel is used to make a quick mounted tactical glock magnetic holster or holder.

### HOW SAFE IS A MAGNETIC GUN MOUNT?

There are a few things you need to consider when deciding whether or not a gun magnet holster is suitable for your needs. First, you need to know the type of magnet used in making the holster before making your purchase. Second, you want to make sure that both your firearms and your body are kept safe from possible harm.

Here are a few things you should look for in terms of product quality:

- price
- concealment
- quick access
- stock mounting
- glock model compatibility
- shield plastic

The purpose of a gun magnet holster is to keep firearms safely secured to your body, so it does not take much effort to unholster loaded related products, aim, and fire it. You can also practice drawing and holstering your Springfield XD repeatedly if this is necessary for your profession.

### WHY ARE THEY SAFE?

Some new customer reviews argue that a magnetic holster does not provide enough safety to keep your firearm and yourself safe. However, you can get a magnetized gun holster that will sufficiently keep the firearm and your body safe – just look for a great product with reviews or ratings that reach 5 stars.

During the years of testing, we've found that magnetic pistol holsters with steel guns will hold the firearms securely in place without causing any injuries or injuries during normal use. Your firearm, your car truck or vehicle and yourself are kept safe and separated from each other while wearing a magnetized holster.

### HOW IMPACTFUL ARE THEY?

Another question people may have is how impactful the magnet is on a handgun. The answer depends on how you design your holster. Are they strong enough?

It depends on how much stress is put on them during the draw. If you want to make sure that they are safe to use, then making sure that the firearm is unloaded before holstering it is very important.

### PAGE FIREARMS TRAINING: VERIFIED QUALITY TACTICAL SHOOTING TRAINING IN OKLAHOMA

Page Firearms Training has been approved by the Oklahoma Council on Law Enforcement Education and Training (CLEET).



*Save 10% on holsters from Concealment Express!*



App-074

We are proud to be one of the very few firearms training schools in Oklahoma that is qualified to offer firearms shooting training under the privileges of your Oklahoma concealed carry permit. We teach

Ready to get started on handling firearms? Contact our office today for more information on price or save on special offers!



HOME    CLASSES    PRIVACY    TERMS    BLOG    CONTACT

108 Monroe Street
Tahlequah, OK 74464
(918) 708-1575

©2018 - 2022 Page Firearms & Training LLC | ALL RIGHTS RESERVED | Site by Direct Allied Agency

App-075





When we were developing the Urban Carry G2 holster, we wanted to minimize and eliminate, if possible, any accidental "flashes" of a firearm. In many states, unknowingly flashing the handle of your firearm can land you a fine by the police. We wanted to avoid that and make a truly concealed carry holster that doesn't show any part of the weapon, so we developed an inside the pants holster the sits below the waistband. What we've come up with is an appendix inside the waistband "pouch" for concealed carry. This patented pocket behind the pocket design allows deep concealment of a firearm, enhancing comfort while reducing common concealed carry issues, such as printing or gun dig. With other concealed carry holsters it wouldn't be possible to access the handgun easily, but with the Urban Carry's "pop-up" design you can quickly draw the weapon on a seconds notice.

Next Urban Carry wanted to make sure there was no printing of the handgun.   Printing is when a bystander, or officer, can tell through your pocket or waistline that you are wearing a gun. Again, this can result in a hefty fine from law enforcement depending on concealed carry laws where you live. To prevent this from happening, we first made sure while the weapon was at rest it was completely covered by premium, saddle grade  leather. We have five different size for the G2 holster that cover everything from a pocket pistol, like the Bodyguard .380, all the way up to a full size firearm such as the Glock 17. With the right size holster, you're going to get a comfortable concealed carry without any printing.

Security and ease of use were our next goals to tackle. I won't mention which brand it was but when testing one of the other concealed carry holsters I actually had my Walther PPK fall out, twice, and land on the floor while just using it in normal every day use. Suffice it to say I quickly moved on to another sample to test and made sure that firearm retention was a key aspect to focus on. The last thing you want is for your firearm to fall out or for your assailant to have access to it. With your handgun in the Urban Carry, the grip of the pistol is tucked about two inches below the waistline, making it difficult for anyone to get to and nearly impossible to lose or fall out. Not until you open the magnetic flap and firmly pull up does your handgun become exposed.

To top it off we made sure the Urban Carry was comfortable.  It's difficult to find any inside waistband holster that's comfortable, since many who carry want to keep their full size .45 caliber 1911 on them at all times.  That's perfectly understandable, and we know the only reason you went with a 45 is because they don't make a 46.  If that's the case we just recommend that you wear pants about 1 to 1.5" larger than you would normally wear to accommodate carrying a handgun inside. We made sure to use top quality leather, 100% made in America, (even the Cows were raised in Tennessee, you can't find much more American than that), and the leather is very comfortable and breathable.  To make sure the Urban Carry was an easy to use concealed carry holster we included premium neodymium magnets in the flap to access the weapon quickly simply by pulling up.

App-078



App-080



App-082





App-086





MOST POPULAR!

LOVED BY LADIES!

*DESIGNED FOR EVERYONE

## Original Magnetic Quick, Click & Carry Holster

$79.95 – $239.99

Manufacturer

Choose a manufacturer

Color Choice

Choose an option

The selected size for this model is:

Choose your model

Hand

Choose an option

I agree and understand that if I order without using the sizing recommendation of JM4 Tactical I may be subject to an additional shipping charge in order to exchange.*

☐ I Agree

Accommodate Optic/RMR Sight (+$5.00) Mounted ABOVE Slide*

Pick One

We're Live

https://jm4tactical.com/product/original-magnetic-quick-click-carry-holster/          at 02:09:47, 11/01/2022

HOLSTERS   APPAREL   ACCESSORIES   CLEARANCE   COFFEE   MERCH STORE   FAQS   ABOUT US   BLOG

Authorized Dealers    Login    $0.00







$0.00

| Options Price: | $0.00 |
| Product Price: | $79.95 |
| Total: | $79.95 |

Earn up to **240** Points.

| - | 1 | + | Add to cart |

★ Trustpilot

★ ★ ★ ★ ★

TrustScore **4.8** | **6,134** reviews

YOU MAY ALSO LIKE...



High-Ride Quick, Click & Carry Holster

$89.95 – $249.99

**SELECT OPTIONS**



Tuckable High-Ride Magnetic Quick, Click, & Carry Holster

$89.95 – $104.95

**SELECT OPTIONS**



We're Live

DESCRIPTION

| Color Choice | Basic Tan, Black, Black Shark, Brown, Brown Shark, Pink, Purple, Teal |
| Hand | Left Hand – Designed to be worn as Left Hand IWB or if you plan to wear Right Hand OWB, Right Hand – |



App-088



*Designed to be worn as Right Hand IWB or if you plan to wear Left Hand OWB*

When it hits the fan and your life is on the line, the last thing you want to have on your hip is a gimmicky concealed carry holster made of cheap plastic with parts that may fail you in a time of crisis. You need a gun holster as reliable as the firearm you trust, that also helps your gun disappear in comfort when you conceal it from prying eyes.

The JM4 Tactical Quick Click & Carry is the first ever, and only, Magnetic Retention concealed carry holster that provides you with a way to carry your firearm no matter what you wear from jeans and dress pants, to active wear like shorts and yoga pants. The Original Quick Click & Carry leather gun holster allows you to be armed without the hassle of belts or clips that can damage your clothing while maintaining a level of unprecedented comfort.

The Quick Click & Carry Holster is designed to be worn for hours at a time, and forgotten about until needed no matter what you're wearing, or what you're doing. Going for a jog? Hitting the gym? Sitting at the computer desk? The patented JM4 Tactical holster has you covered, no matter where life takes you.

Historically, gun holsters had only men in mind with their design. But the Quick Click & Carry is great for both men and women who wish to arm themselves in comfort, convenience, and the deep concealment that can only be found with this magnetic holster. If you prefer a higher ride height and shooters grip be sure to check out our High-Ride Magnetic Holster option.

We're Live



hermann-oak-logo1.pngThese leather pistol and revolver holsters are made with two layers of stitched Hermann Oak Grade A Vegetable Tanned Steer Hide that is PH balanced for extended contact with your gun. In other words, you'll never need to worry about damaging your gun's finish.

JM4 Tactical's patented Leather Holsters are different than everything else available on the market which can be seen in the quality of the materials. Only the finest leathers, the best threads for stitching, and dual-purpose rare earth magnets are used in each one.

Furthermore, the Original Quick Click & Carry uses no hard plastic from injected molds known to damage a firearm's finish, nor does it use metal or plastic clips that could damage your clothing.

Instead of clips, these IWB handgun holsters use strong, rare earth magnets that are strategically attached to serve two functions:

1. The first function of these magnets is to click into place on your waistband. This allows these concealed carry holsters to stay right where you put them, anywhere on your waist.

2. The second function, is that of magnetic gun holster retention. What this means is that once your gun is in this leather gun holster, it won't come out unless you want it to.

The JM4 Tactical Leather Gun Holsters are available for just about every size gun you can think of. It doesn't matter if you need a 1911 holster, one for a Glock 19, or a Sig P938 pocket pistol, there is one for you no matter the size of your self-defense gun.

This the best concealed carry holster on the market. To prove it, here are some customer and professional testimonials:

"*I can't say enough about this company. I bought a magnetic IWB holster for my FNX 45. As a guy with a large body frame, I could not*

We're Live

App-090



*find a IWB holster that was comfortable. I hit the jackpot with JM4 Tactical. Their holster is amazing! Very comfortable for a IWB holster for guys with large frames. This holster changed the way I conceal carry."* **— Lance Smith, Facebook Review**

*"I was really set on going with a al\*\*n g\*\*r setup. My dad is old school and always talks about how much he loves his leather holsters and 'there's no substitute for real leather', so i found the jm4 thru a facebook ad and gave it a try. This thing is perfect!!! Securely and comfortably holds my fullsize 45xd in board shorts, jeans, sweatpants, basketball shorts etc... Perfect fit, excellent quality, well worth the money. There's no way i'm gonna buy that kydex crap after having my jm4 holster. Best part is both my fullsize xd 45 and sub compact mod 2 9mm both fit perfectly in the same holster without changing out "shells" like the kydex ones require you to. 2 thumbs up!!!"* **— Josh Baily, Facebook Review**

*"A cool feature of the Quick Click & Carry is it'll also store your gun on a metal bedframe, the dashboard of your classic pickup, or motorcycle tank, and the gun will stay there. I slapped this one onto a Connex wall upside down, and it just stuck there, gun and all."* **— Eve Flanigan, Guns.c**om

*"Any concealed carrier worth his salt knows — your concealed carry rig is only as good as the holster that keeps your defensive tool handy. That's why when I conceal my handgun, nine times out of ten it's riding along in a holster made by JM4 Tactical."* **— John Falkenburg, ConcealedNation.com**



*"Overall, this is honestly one of my favorite holsters. It's a slick new idea to use the magnet in this way and it really made for an effective product. The price is resonable and it is not hard to conceal. With several different options in several different leathers colors and sizes, it's coming highly recommended."* **— Sara Tipton, TTAG**

*"It's my opinion that the JM4 Tactical Quick Click & Carry is the best concealed carry holster of this type, and one of the top concealed carry*

*holsters available on the market right now. I'm not usually a fan of non gun-specific gun holsters, but this one does its job well."* — **Joshua Gillem, DownRangeDaily.com**

When you buy a JM4 Tactical product, you're supporting a Marine Veteran-owned American small business. All of JM4 Tactical's products are made right here in the USA, by American patriots. That means when you buy a JM4 Tactical gun holster, you help feed one of the American families they employ.

**You trust your gun to protect your life, isn't it about time you began to trust your holster?**

Change the way you carry buy adding comfort to your concealment. Buy a JM4 Tactical Quick Click & Carry Gun Holster, today.

<span style="color:red">**With the exception of the original large ALL of our Quick, Click, & Carry holsters come standard with a sweat guard. These are more pronounced with the sizes above the large. Please refer to generated image once you have selected your size, color (if applicable), and hand. The image will be the specified item you are purchasing.**</span>

 We're Live

*Due to the additional supplies needed to achieve different colored gun holsters, the colored holsters are priced $15 more than the basic tan.

**To keep our holsters as comfortable as possible, we don't apply a sealant to the black or brown IWB holsters, therefore the color may bleed onto the skin or your clothing during the first couple uses. This will diminish after time.

***The teal, purple, and pink concealed carry holsters are made with two different leathers stitched together with only the Hermann Oak Grade A Vegetable Tanned Steer Hide contacting the firearm you trust your life with, ensuring that your bluing is protected and no hard plastics hurt your gun's finish.

****We do offer a 10 day money back guarantee so buy with



**United States Patent and Trademark Office (USPTO)**

# USPTO OFFICIAL NOTICE

Office Action (Official Letter) has issued
on November 07, 2022 for
**U.S. Trademark Application Serial No.  90518181**

A USPTO examining attorney has reviewed your trademark application and issued an Office action.  You must respond to this Office action in order to avoid your application abandoning.  Follow the steps below.

**(1)  Read the Office action**. This email is NOT the Office action.

**(2)  Respond to the Office action by the deadline** using the Trademark Electronic Application System (TEAS). Your response must be received by the USPTO on or before 11:59 p.m. **Eastern Time** of the last day of the response period. Otherwise, your application will be abandoned. See the Office action itself regarding how to respond.

**(3)  Direct general questions** about using USPTO electronic forms, the USPTO website, the application process, the status of your application, and whether there are outstanding deadlines to the Trademark Assistance Center (TAC).

After reading the Office action, address any question(s) regarding the specific content to the USPTO examining attorney identified in the Office action.

# GENERAL GUIDANCE

- **Check the status of your application periodically** in the Trademark Status & Document Retrieval (TSDR) database to avoid missing critical deadlines.

- **Update your correspondence email address** to ensure you receive important USPTO notices about your application.

- **Beware of trademark-related scams**. Protect yourself from people and companies that may try to take financial advantage of you. Private companies may call you and pretend to be the USPTO or may send you communications that resemble official USPTO documents to trick you. We will never request your credit card number or social security number over the phone. And all official USPTO correspondence will only be emailed from the domain "@uspto.gov." Verify the correspondence originated from us by using your Serial Number in our database, TSDR, to confirm that it appears under the "Documents" tab, or contact the Trademark Assistance Center.

- **Hiring a U.S.-licensed attorney.** If you do not have an attorney and are not required to have one under the trademark rules, we encourage you to hire a U.S.-licensed attorney specializing in trademark law to help guide you through the registration process. The USPTO examining attorney is not your attorney and cannot give you legal advice, but rather works for and represents the USPTO in trademark matters.

TAB

# 6

# Amendment in Response to Office Action

Filed June 1, 2017, in the prosecution of U.S. Application No. 15/370,465 (issued as the '530 Patent).

SOURCE

*U.S. Patent and Trademark Office; excerpt from the official prosecution history of the '530 Patent.*

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Attorney Docket No. **3168-1A-1NRE**

In Re Application of:                          §    Examiner:  **VANTERPOOL, LESTER**
                                               §
**JAMES MYERS**                                §
                                               §
Serial No: **15/370/465**                      §    Art Unit:  **3782**
                                               §
Filed:  **06 DECEMBER 2016**                   §
                                               §
For:   **GUN HOLSTER SYSTEM  AND**             §    Confirmation No. **4666**
       **METHOD OF USE**                       §


**AMENDMENT**


**Filed via EFS-Web**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

        This Amendment is being filed in response to the Office Action dated 19 April 2017, which provides for a three-month response period ending 19 July 2017.

        Please enter the following amendments and consider the following remarks.

| CERTIFICATE OF TRANSMISSION UNDER 37 C.F.R. § 1.8(a)(1)(i)(C) |
| --- |
| Date of Transmission:  1 June 2017 |
| I hereby certify that this correspondence is being transmitted to the U.S. Patent and Trademark Office (USPTO) via the USPTO electronic filing system (EFS-Web) on the date shown above.<br><br>By:      /richardgeldredge/<br>              Richard G. Eldredge |

App-097

**IN THE DRAWINGS**:

The drawings are objected to for failing to show every feature of the invention specified in the claims.

The claims are hereby amended to overcome the objection to the drawings.

The Applicant submits that no new matter is added.

App-098

**IN THE CLAIMS:**

The following is a complete listing of the claims and replaces all prior versions and listings of claims in the subject application.  Please amend the claims as follows:

1.      **(Currently Amended)** A gun holster system <u>for carrying a gun</u>, comprising:

a body having a front side and a back side forming an upper opening disposed therebetween and forming a lower opening at a lower surface of the body;

a strap assembly integrally secured to the body, the strap assembly having:

an elongated strap extending from the body;

a fastener protrusion extending from a surface of the elongated strap; and

a ~~faster~~ <u>fastener</u> housing extending from an outer surface of the back side of the body, the fastener housing being configured to engage with the fastener protrusion;

~~a first~~ <u>two magnets</u> ~~magnet~~ disposed within a thickness of the fastener protrusion; and

a ~~second~~ <u>third</u> magnet disposed within a thickness of the housing;

wherein the <u>two magnets are</u> ~~first magnet is~~ configured to engage with the ~~second~~ <u>third</u> magnet;

<u>wherein engaging the two magnets with the third magnet does not obstruct the upper opening; and</u>

<u>wherein a combined magnetic retention strength generated by the two magnets and third magnet is strong enough to retain the gun within the body.</u>

~~wherein the strap assembly is configured to fold over and secure to a belt~~.

2.      **(Original)** The system of claim 1, further comprising:

a cavity formed by the housing;

wherein the protrusion removably secured within the cavity.

3.      **(Currently Amended)** The system of claim 1, wherein the lower opening is configured to receive a portion of ~~a pistol~~ <u>the gun</u> therethrough.

App-099

The Applicant submits that the foregoing amendments add no new matter to the application.

**REMARKS:**

Claims 1-3 are currently pending in the present Application.

Claims 1 is objected to for an informality. Claim 1 stands rejected under 35 U.S.C. § 112(b) as being indefinite.

Claims 1-3 stand rejected under 35 U.S.C. § 103 as being unpatentable over Esposito (US 3,707,250) in view of McStay (US 2013/0221045 A1).

In view of the following comments, allowance of all the claims pending in the application is respectfully requested.

**Claim Objection and Rejections Under 35 U.S.C. § 112(b):**

Claim 1 is hereby amended to overcome the objection and 112 rejection.

**Rejections Under 35 U.S.C. § 103:**

The claims stand rejected for the various reasons outlined above.  The Applicant respectfully traverses these rejections for at least the following reasons.

Claim 1 is hereby amended to include the features: (1) two magnets disposed within the fastener protrusion; (2) engaging the two magnets and the third magnet does not obstruct the upper opening; and (3) combined magnetic retention strength generated by the two magnets and third magnet is strong enough to retain the gun within the body.

After review of the art, it is submitted that the cited references fail to disclose or teach features (1)-(3) hereby amended in the base claim.

The Applicant submits that support for the above amendments is disclosed in at least paragraph 0013 of the specification.

In the present Application:

FIG. A below is taken from FIG. 4B in the drawings and illustrate feature 1 hereby amended in the base claims.  Specifically, the engaging of the first and second magnets does not obstruct the opening 207.  The Applicants submit that the features (1)-(3) are neither disclosed nor taught by the cited references.



FIG. 4B

FIG. A: the claimed invention as shown in FIG. 4B.

<u>Esposito (US 3,707,250)</u>

FIG. B below is taken from FIG. 3 of Esposito and illustrates a conventional holster.  Although relevant in the art, it is submitted that the art fails to teach features (1)-(3) hereby amended in the claims. The Applicants submit that features (1)-(3) discussed above are unique to the present application.



FIG. B: the Esposito holster as shown in FIG. 3.

In contrast to the present invention, the Esposito holster does not teach the magnetic retention on the firearm or the engaging of a strap apparatus so as to not obstruct the opening.

McStay (US 2013/0221045 A1)

FIG. C below is taken from FIG. 4 of McStay and illustrates a holster for hair styling shears. Although relevant in the art, it is submitted that the art fails to teach features (1)-(3) hereby amended in the claims. The Applicants submit that features (1)-(3) discussed above are unique to the present application.



FIG. 4

FIG. C: the McStay art as shown in FIG. 4.

In contrast to the present invention, the Mcstay art does not teach or disclose the magnetic retention on the firearm or the engaging of a strap apparatus so as to not obstruct the opening.

It comparison to the cited references as a whole, it is believed that the art fails to disclose or teach the features hereby amended in the present claims.

Accordingly, the Applicant submits that the art fails to disclose or teach the features (1)-(3) of the base claims.  In view of the foregoing amendments and remarks, the Applicants request that the present 103 rejections be reconsidered, withdrawn, and that the pending claims be placed in condition for allowance.

**Distinctions, Other Than Those Discussed, May Exist:**

It should be noted that the Applicant has merely discussed example distinctions from the references cited by the Examiner.  Other distinctions may exist and Applicant

App-105

reserves the right to discuss these additional distinctions in a future Response or on Appeal.  By not responding to the additional statements made by the Examiner, the Applicant does not acquiesce to the Examiner's additional statements.  The remarks provided above are believed sufficient to overcome the present rejections.

**CONCLUSION:**

The Applicant submits that the subject application is now considered to be in condition for allowance, and an early reconsideration and issuance of a Notice of Allowance are earnestly solicited. The Examiner is invited to contact the undersigned at (682) 201-8577 with any questions, comments, or suggestions relating to the referenced patent application.

This Amendment is being filed via the U.S. Patent and Trademark Office's EFS-Web electronic filing system. No fees are deemed to be necessary.

Respectfully submitted,


1 June 2017 _____                      _____/richardgeldredge/_____
Date                               Richard G. Eldredge
                                   Reg. No. 61,902
                                   Eldredge Law Firm
                                   777 Main Street, Ste. 600
                                   Fort Worth, Texas 76112
                                   (682) 201-8577 (Voice)
                                   richard@dfwpatentlaw.com

                                   **CUSTOMER NO. 107111**

                                   ATTORNEY FOR APPLICANT

TAB

# 7

# Supplemental Amendment

Filed July 31, 2017, in the prosecution of U.S. Application No. 15/370,465 (issued as the '530 Patent).

SOURCE

*U.S. Patent and Trademark Office; excerpt from the official prosecution history of the '530 Patent.*

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Attorney Docket No. **3168-1A-1NRE**

| | | |
|---|---|---|
| In Re Application of: | § | Examiner: **VANTERPOOL, LESTER** |
| | § | |
| **JAMES MYERS** | § | |
| | § | |
| Serial No: **15/370/465** | § | Art Unit: **3782** |
| | § | |
| Filed: **06 DECEMBER 2016** | § | |
| | § | |
| For: **GUN HOLSTER SYSTEM AND** | § | Confirmation No. **4666** |
| **METHOD OF USE** | § | |

## SUPPLEMENTAL AMENDMENT

**Filed via EFS-Web**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

This Amendment is being filed in response to the Examiner Interview conducted on 28 July 2017.

Please enter the following amendments and consider the following remarks.

---

**CERTIFICATE OF TRANSMISSION UNDER 37 C.F.R. § 1.8(a)(1)(i)(C)**

Date of Transmission: 31 July 2017

I hereby certify that this correspondence is being transmitted to the U.S. Patent and Trademark Office (USPTO) via the USPTO electronic filing system (EFS-Web) on the date shown above.

By:      /richardgeldredge/
         Richard G. Eldredge

---

**IN THE CLAIMS:**

The following is a complete listing of the claims and replaces all prior versions and listings of claims in the subject application.  Please amend the claims as follows:

1.      **(Currently Amended)** A gun holster system for carrying a gun, comprising:

a body having a front side and a back side forming an upper opening disposed therebetween and forming a lower opening at a lower surface of the body;

a strap assembly integrally secured to the back side body, the strap assembly having:

an elongated strap extending from and integrally secure to the back side of the body;

a fastener protrusion extending from a back surface of the elongated strap; and

a fastener housing extending from an outer surface of the back side of the body, the fastener housing being configured to engage with the fastener protrusion;

wherein the elongated strap folds backwards and away from the upper opening to cause the fastener protrusion and the fastener housing to engage;

two magnets disposed within a thickness of the fastener protrusion; and

a third magnet disposed within a thickness of the housing;

wherein the two magnets are configured to engage with the third magnet;

wherein engaging the two magnets with the third magnet does not obstruct the upper opening and does not obstruct or hinder entire removal of the gun from the body; and

wherein a combined magnetic retention strength generated by the two magnets and third magnet is strong enough to retain the gun within the body.

2.      **(Original)** The system of claim 1, further comprising:

a cavity formed by the housing;

wherein the protrusion removably secured within the cavity.

3.      **(Previously Presented)** The system of claim 1, wherein the lower opening is configured to receive a portion of the gun therethrough.

The Applicant submits that the foregoing amendments add no new matter to the application.

**REMARKS:**

Claims 1-3 are currently pending in the present Application.

Claims 1-3 stand rejected under 35 U.S.C. § 103 as being unpatentable over Esposito (US 3,707,250) in view of McStay (US 2013/0221045 A1).

In view of the following comments, allowance of all the claims pending in the application is respectfully requested.

**Rejections Under 35 U.S.C. § 103:**

The claims stand rejected for the various reasons outlined above.  The Applicant respectfully traverses these rejections for at least the following reasons.

Claim 1 is hereby amended to include the features: <u>(1) the elongated strap extends from and is integral with the back side of the body, wherein the elongated strap is configured to fold backward and away from the upper opening to allow the magnets to engage; (2) engaging the two magnets and the third magnet does not obstruct the upper opening and does not obstruct or hinder entire removal of the gun from the body; and (3) combined magnetic retention strength generated by the two magnets and third magnet is strong enough to retain the gun within the body.</u>

After review of the art, it is submitted that the cited references fail to disclose or teach features (1)-(3) hereby amended in the base claim.

The Applicant submits that support for the above amendments is disclosed in at least paragraph 0013 of the specification.

<u>In the present Application:</u>

FIG. A below is taken from FIG. 4B in the drawings and illustrate feature 1 hereby amended in the base claims.  Specifically, the engaging of the first and second magnets does not obstruct the opening 207 or obstruct or hinder removal of the gun.  In

addition, the strap is configured to fold backward and away from opening 207. The Applicants submit that the features (1)-(3) are neither disclosed nor taught by the cited references.



FIG. A: the claimed invention as shown in FIG. 4B.

Esposito (US 3,707,250)

FIG. B below is taken from FIG. 3 of Esposito and illustrates a conventional holster. Although relevant in the art, it is submitted that the art fails to teach features (1)-(3) hereby amended in the claims. The Applicants submit that features (1)-(3) discussed above are unique to the present application.



FIG. B: the Esposito holster as shown in FIG. 3.

In contrast to the present invention, the Esposito holster does not teach the magnetic retention on the firearm or the engaging of a strap apparatus so as to not obstruct the entire removal of a gun. Esposito specifically shows a strap holding the gun in place.

McStay (US 2013/0221045 A1)

FIG. C below is taken from FIG. 4 of McStay and illustrates a holster for hair styling shears. Although relevant in the art, it is submitted that the art fails to teach features (1)-(3) hereby amended in the claims. The Applicants submit that features (1)-(3) discussed above are unique to the present application.



FIG. 4

FIG. C: the McStay art as shown in FIG. 4.

In contrast to the present invention, the Mcstay art does not teach or disclose the magnetic retention on the firearm or the engaging of a strap apparatus so as to not obstruct the opening, wherein the strap apparatus folds backward and away from the opening.

It comparison to the cited references as a whole, it is believed that the art fails to disclose or teach the features hereby amended in the present claims.

Accordingly, the Applicant submits that the art fails to disclose or teach the features (1)-(3) of the base claims. In view of the foregoing amendments and remarks, the Applicants request that the present 103 rejections be reconsidered, withdrawn, and that the pending claims be placed in condition for allowance.

**<u>Distinctions, Other Than Those Discussed, May Exist</u>:**

It should be noted that the Applicant has merely discussed example distinctions from the references cited by the Examiner.  Other distinctions may exist and Applicant reserves the right to discuss these additional distinctions in a future Response or on Appeal.  By not responding to the additional statements made by the Examiner, the Applicant does not acquiesce to the Examiner's additional statements.  The remarks provided above are believed sufficient to overcome the present rejections.

**CONCLUSION:**

The Applicant submits that the subject application is now considered to be in condition for allowance, and an early reconsideration and issuance of a Notice of Allowance are earnestly solicited. The Examiner is invited to contact the undersigned at (682) 201-8577 with any questions, comments, or suggestions relating to the referenced patent application.

This Amendment is being filed via the U.S. Patent and Trademark Office's EFS-Web electronic filing system. No fees are deemed to be necessary.

Respectfully submitted,

31 July 2017            /richardgeldredge/
Date                       Richard G. Eldredge
                              Reg. No. 61,902
                              Eldredge Law Firm
                              777 Main Street, Ste. 600
                              Fort Worth, Texas 76112
                              (682) 201-8577 (Voice)
                              richard@dfwpatentlaw.com

**CUSTOMER NO. 107111**

ATTORNEY FOR APPLICANT

TAB

# 8

# Examiner Interview Summary

Dated August 21, 2017, in the prosecution of U.S. Application No. 15/370,465 (issued as the '530 Patent).

SOURCE

*U.S. Patent and Trademark Office; PTOL-413 form from the official prosecution history of the '530 Patent.*

| **_Applicant-Initiated Interview Summary_** | Application No. | Applicant(s) |
|---|---|---|
| | 15/370,465 | MYERS, JAMES |
| | Examiner | Art Unit |
| | LESTER L. VANTERPOOL | 3782 |

All participants (applicant, applicant's representative, PTO personnel):

(1) _LESTER L. VANTERPOOL, (Patent Examiner)_.              (3)_____.

(2) _BETH A. FELIX (Atty. of Rec.)_.                          (4)_____.

Date of Interview: _28 July 2017_.

Type:    ☒ Telephonic    ☐ Video Conference
         ☐ Personal [copy given to: ☐ applicant    ☐ applicant's representative]

Exhibit shown or demonstration conducted:    ☐ Yes    ☒ No.
    If Yes, brief description: _____.

Issues Discussed    ☐101 ☐112 ☐102 ☐103 ☐Others
(For each of the checked box(es) above, please describe below the issue and detailed description of the discussion)

Claim(s) discussed: _1_.

Identification of prior art discussed: _(U.S. Pat. No. 3,707,250 to Esposito); (U.S. Pub. No. 2013/0221045)_.

Substance of Interview
(For each issue discussed, provide a detailed description and indicate if agreement was reached. Some topics may include: identification or clarification of a reference or a portion thereof, claim interpretation, proposed amendments, arguments of any applied references etc...)

_Ms. Felix (Attorney of Record) provided a background description of applicant's invention and provided insight to the particular feature and / or features that applicant consider to be novelty feature(s).  Specifically, Ms. Felix explained that the handgun is retained within the handgun holster by the use of magnets only.  In addition, Ms. Felix stated the magnet located within the sidewall body of the handgun holster secures the elongated strap assembly and the stored handgun. Furthermore, Ms. Felix stated the handgun holster upper top and side opening provides no obstruction during quick fast retrival removal of the handgun._

_Secondly, Ms. Felix discussed the amended claims which were formally filed on June 01, 2017.  Amended claim 1, lines 10 - 18 filed on June 01, 2017 recite: "two magnets disposed within a thickness of the fastener protrusion; and a third magnet disposed within a thickness of the housing; wherein the two magnets are configured to engage with the third magnet; wherein engaging the two magnets with the third magnet does not obstruct the upper opening; and wherein a combined magnetic retention strength generated by the two magnets and third magnet is strong enough to retain the gun within the body."  Examiner Vanterpool stated the amended claim 1 filed on June 01, 2017 is a step in the right direction.  In particular, the limitation of: "wherein engaging the two magnets magnets with the third magnet does not obstruct the upper opening; and wherein a combined magnetic retention strength generated by the two magnets and third magnet is strong enough to retain the gun within the body"._

_Examiner Vanterpool recommended language with respect to the holster strap assembly should be amended to more clearly define applicant's invention.  Instead of "a strap assembly integrally secured to the body", Examiner Vanterpool stated the language should clearly point out the precise way of how and where the strap is secured to the body.  In order to properly over the prior art of record Esposito '250, Examiner Vanterpool suggested, - - the strap assembly is integrally secured to and engaged with the back side of the holster body when the elongated strap is folded backwards upon itself and away from the upper opening of the handgun holster. - -   Ms. Felix thought the added suggestion would be useful to clearly teach the fact that the strap assembly of the handgun holster does not cover the handgun opening and would not hinder complete removal of the handgun from the handgun holster.  No definitive decision was reach with respect to the proposed amended claims._

_Lastly, Examiner Vanterpool advised Ms. Felix to file a Supplemental Amendment with any added changes to replace the amended claims that were previously filed on June 01, 2017.  Finally, Examiner Vanterpool advised Ms. Felix that an updated search will be conducted upon filing of the supplemental amendment._

App-116

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview

**Examiner recordation instructions**: Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

☐ Attachment

| /ADAM WAGGENSPACK/ Primary Examiner, Art Unit 3782 | /LESTER L. VANTERPOOL/ Examiner, Art Unit 3782 |
|---|---|

U.S. Patent and Trademark Office
PTOL-413 (Rev. 8/11/2010)　　　　　　**Interview Summary**　　　　　　Paper No. 20170808

**Continuation Sheet (PTOL-413)**                        Application No.   15370465
### Summary of Record of Interview Requirements

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**
A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

**Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews**
Paragraph (b)

In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant.  An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132)

37 CFR §1.2  Business to be transacted in writing.
All business with the Patent or Trademark Office should be transacted in writing.  The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary.  The action of the Patent and Trademark Office will be based exclusively on the written record in the Office.  No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

_____

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.
It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so.  It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks.  Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below.  Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper.  In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview.  In the case of a telephone or video-conference interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication. If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
– Application Number (Series Code and Serial Number)
– Name of applicant
– Name of examiner
– Date of interview
– Type of interview (telephonic, video-conference, or personal)
– Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
– An indication whether or not an exhibit was shown or a demonstration conducted
– An identification of the specific prior art discussed
–    An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable).  Note: Agreement as to allowability is tentative and does not restrict further action by the examiner to the contrary.
– The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of the interview of each case. It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.
A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
(The identification of arguments need not be lengthy or elaborate.  A verbatim or highly detailed description of the arguments is not required.  The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file.  Of course, the applicant may desire to emphasize and fully describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.
Examiners are expected to carefully review the applicant's record of the substance of an interview.  If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

### Examiner to Check for Accuracy

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiner's version of the statement attributed to him or her.  If the record is complete and accurate, the examiner should place the indication, "Interview Record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.

App-118

TAB

# 9

# Notice of Allowance and Examiner's Statement of Reasons for Allowance

Dated August 25, 2017, in the prosecution of U.S. Application No. 15/370,465 (issued as the '530 Patent).

SOURCE

*U.S. Patent and Trademark Office; from the official prosecution history of the '530 Patent.*

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

107111          7590          08/25/2017
Eldredge Law Firm
777 Main Street
Ste 600
Fort Worth, TX 76102

| EXAMINER |
|---|
| VANTERPOOL, LESTER L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3782 | |

DATE MAILED: 08/25/2017

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/370,465 | 12/06/2016 | James Myers | 3168-1A-1NRE | 4666 |

TITLE OF INVENTION: GUN HOLSTER SYSTEM AND METHOD OF USE

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | MICRO | $240 | $0 | $0 | $240 | 11/27/2017 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. **SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN <u>THREE MONTHS</u> FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. <u>THIS STATUTORY PERIOD CANNOT BE EXTENDED.</u> SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to:** <u>Mail</u>  Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450
or <u>Fax</u>  (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

| 107111 | 7590 | 08/25/2017 |
|---|---|---|

Eldredge Law Firm
777 Main Street
Ste 600
Fort Worth, TX 76102

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/370,465 | 12/06/2016 | James Myers | 3168-1A-1NRE | 4666 |

TITLE OF INVENTION: GUN HOLSTER SYSTEM AND METHOD OF USE

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | MICRO | $240 | $0 | $0 | $240 | 11/27/2017 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| VANTERPOOL, LESTER L | 3782 | 224-183000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).
  ❏ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.
  ❏ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
  (1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
  (2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                    (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) :  ❏ Individual  ❏ Corporation or other private group entity  ❏ Government

4a. The following fee(s) are submitted:
  ❏ Issue Fee
  ❏ Publication Fee (No small entity discount permitted)
  ❏ Advance Order - # of Copies _____

4b. Payment of Fee(s): (**Please first reapply any previously paid issue fee shown above**)
  ❏ A check is enclosed.
  ❏ Payment by credit card. Form PTO-2038 is attached.
  ❏ The director is hereby authorized to charge the required fee(s), any deficiency, or credits any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

5. **Change in Entity Status** (from status indicated above)
  ❏ Applicant certifying micro entity status. See 37 CFR 1.29
  ❏ Applicant asserting small entity status. See 37 CFR 1.27
  ❏ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.

NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.

NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____    Date _____

Typed or printed name _____    Registration No. _____

Page 2 of 3

PTOL-85 Part B (10-13) Approved for use through 10/31/2013.    OMB 0651-0033    U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

App-120



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/370,465 | 12/06/2016 | James Myers | 3168-1A-1NRE | 4666 |

107111    7590    08/25/2017
Eldredge Law Firm
777 Main Street
Ste 600
Fort Worth, TX 76102

| EXAMINER |
|---|
| VANTERPOOL, LESTER L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3782 | |

DATE MAILED: 08/25/2017

**Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)**
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

App-121

**OMB Clearance and PRA Burden Statement for PTOL-85 Part B**

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

**Privacy Act Statement**

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:
1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

App-122

| | Application No. | Applicant(s) |
|---|---|---|
| **Notice of Allowability** | 15/370,465 | MYERS, JAMES |
| | Examiner | Art Unit | AIA (First Inventor to File) Status |
| | LESTER L. VANTERPOOL | 3782 | Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *July 31, 2017*.

    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on_____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☒ The allowed claim(s) is/are *1-3*. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    **Certified copies:**

      a) ☐ All    b) ☐ Some  *c) ☐ None of the:

        1. ☐ Certified copies of the priority documents have been received.

        2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

        3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☒ Notice of References Cited (PTO-892)

2. ☐ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____

3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

4. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

5. ☐ Examiner's Amendment/Comment

6. ☒ Examiner's Statement of Reasons for Allowance

7. ☐ Other _____.

| | |
|---|---|
| /LESTER L. VANTERPOOL/<br>Examiner, Art Unit 3782 | |

**Notice of Allowability**    Part of Paper No./Mail Date

Application/Control Number: 15/370,465                                    Page 2
Art Unit: 3782

**DETAILED ACTION**

1.      This office action is in response to the amendment and / or remarks filed on July

31, 2017.  Claims 1 – 3 are pending and currently being examined.

***Notice of Pre-AIA or AIA Status***

2.      The present application, filed on or after March 16, 2013, is being examined

under the first inventor to file provisions of the AIA.

***Allowable Subject Matter***

3.      The following is an examiner's statement of reasons for allowance:

(U.S. Patent Number 3,003,670) to Stella discloses the gun holster system

comprising: the body (4) having the front side and the back side forming the upper

opening disposed therebetween and forming the lower opening at the lower surface of

the body (4) (See Figure 3);

the strap assembly (See Figure 3) integrally secured to the back side body (See

Figure 3), the strap assembly having: the elongated strap (2) <u>extending from and</u>

<u>integrally secured</u> to the back side of the body (4) (See Figure 3);

the fastener protrusion (11) extending from the back surface of the elongated

strap (2);

wherein the elongated strap (2) folds backwards and away from the upper

opening to cause the fastener protrusion (11); and

Application/Control Number: 15/370,465                                    Page 3

Art Unit: 3782

the lower opening (12) <u>configured</u> to receive the portion of the gun (G)

therethrough (See Figures 3 & 5).


However, Stella **does not** disclose the fastener housing extending from <u>the outer</u>

<u>surface</u> of the back side of the body, the fastener housing configured to engage with the

fastener protrusion; two magnets disposed within the thickness of the fastener

protrusion; and the third magnet disposed within the thickness of the housing; the two

magnets are configured to engage with the third magnet; engaging the two magnets

with the third magnet does not obstruct the upper opening and does not obstruct or

hinder entire removal of the gun from the body; and the combined magnetic retention

strength generated by the two magnets and third magnet is strong enough to retain the

gun within the body.


(U.S. Patent Number 3,707,250) to Esposito discloses the gun holster system

comprising: the body (11) having the front side and the back side forming the upper

opening disposed therebetween and forming the lower opening at the lower surface of

the body (11) (See Figures 1 & 2);

the strap assembly (See Figures 2 & 3) integrally secured to the back side body

(See Figure 3), the strap assembly having: the elongated strap (12) extending from the

front side and secured to the back side of the body (11) (See Figure 3);

the fastener protrusion (i.e. Male Snap Fastener) extending from the back

surface of the elongated strap (12); and

Application/Control Number: 15/370,465                                      Page 4
Art Unit: 3782

the fastener housing (i.e. Female Snap Fastener) extending from the outer

surface of the body (11), the fastener housing (i.e. Female Snap Fastener) being

<u>configured</u> to engage with the fastener protrusion (i.e. Male Snap Fastener);

the lower opening <u>configured</u> to receive the portion of the gun (24) therethrough

(See Figures 2 & 3).


However, Esposito '250 **<u>does not</u>** disclose the strap assembly having: the

elongated strap (12) extending from and integrally secured to the back side of the body

(11); wherein the elongated strap (12) folded backwards and away from the upper

opening to cause the fastener protrusion and the fastener housing to engage; two

magnets disposed within the thickness of the fastener protrusion; and the third magnet

disposed within the thickness of the housing; the two magnets are <u>configured</u> to engage

with the third magnet; engaging the two magnets with the third magnet <u>does not</u>

obstruct the upper opening and <u>does not</u> obstruct or hinder entire removal of the gun

form the body; and the combined magnetic retention strength generated by the two

magnets and third magnet is strong enough to <u>retain</u> the gun <u>within</u> the body.


(U.S. Patent Publication Number 2013 / 0221045 A1) to McStay discloses the

holster system (100) comprising: the body having the front side and the back side

forming the upper opening disposed therebetween and forming the lower opening at the

lower surface of the body (See Figures 1 & 3);

Application/Control Number: 15/370,465                                    Page 5
Art Unit: 3782

the strap assembly (See Figures 1, 2, 3 & 4) integrally secured to the back side

body (See Figure 3), the strap assembly having: the elongated strap (108) extending

from the back side and secured to the front side of the body (See Figures 3 & 4);

the fastener protrusion (120) extending from the back surface of the elongated

strap (108); and

the fastener housing (142) extending from the inner surface of the body (See

Figures 3, 4 & 5), the fastener housing (142) being configured to engage with the

fastener protrusion (120) (See Figure 4);

magnets (114, 144 & 152); two magnets capably disposed within the thickness of

the fastener protrusion (See Paragraph 0028);

the magnet (114, 144 & 152) disposed within the thickness of the housing (142);

and wherein the two magnets are configured to engage with the third magnet.


However, McStay '045 **does not** disclose the strap assembly having: the

elongated strap (108) extending from and integrally secured to the back side of the

body; the fastener housing (142) extending from the outer surface of the body; the

elongated strap (108) folded backwards and away from the upper opening to cause the

fastener protrusion (120) and the fastener housing (142) to engage; engaging the two

magnets with the third magnet does not obstruct the upper opening and does not

obstruct or hinder entire removal of the stored object (118) from the body; and wherein

the combined magnetic retention strength generated by the two magnets and third

magnet being strong enough to retain the stored object (118) within the body.

Application/Control Number: 15/370,465                                        Page 6
Art Unit: 3782

Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

*Conclusion*

4.    Any inquiry concerning this communication or earlier communications from the examiner should be directed to LESTER L. VANTERPOOL whose telephone number is (571)272-8028. The examiner can normally be reached on Monday - Friday (8:30 - 5:00) EST.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Nathan J. Newhouse can be reached on 571-272-4544. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

App-128

Application/Control Number: 15/370,465                                          Page 7
Art Unit: 3782

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/L. L. V./
Examiner, Art Unit 3782

August 09, 2017

/ADAM WAGGENSPACK/
Primary Examiner, Art Unit 3782

TAB

# 10

# Face Page of U.S. Design Patent No. D811,731

Showing references cited including U.S. Design Patent No. D788,451 as prior art.

SOURCE

*U.S. Patent and Trademark Office; first page of issued patent.*



US00D811731S

(12) **United States Design Patent**
Myers

(10) Patent No.: **US D811,731 S**
(45) Date of Patent: ** **Mar. 6, 2018**

(54) **GUN HOLSTER**

(71) Applicant: **James Myers**, Abilene, TX (US)

(72) Inventor: **James Myers**, Abilene, TX (US)

(**) Term: **15 Years**

(21) Appl. No.: **29/580,081**

(22) Filed: **Oct. 5, 2016**

(51) **LOC (11) Cl.** ................................................ **03-01**
(52) **U.S. Cl.**
USPC ........................................................ **D3/222**
(58) **Field of Classification Search**
USPC .................. D3/222–223; 224/191–193, 238, 224/243–244, 911–912
CPC .... A45F 3/14; F41C 33/0227; F41C 33/0209; F41C 33/0263
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| D237,079 | S | * | 10/1975 | Taylor | D3/222 |
| D293,741 | S | * | 1/1988 | Nichols | D3/222 |
| D356,677 | S | * | 3/1995 | Kalasountas | D3/222 |
| D718,523 | S | * | 12/2014 | Cox | D3/222 |
| D770,172 | S | * | 11/2016 | Crouch | D3/222 |
| D788,451 | S | * | 6/2017 | Myers | D3/222 |

* cited by examiner

*Primary Examiner* — Catherine R Oliver-Garcia
(74) *Attorney, Agent, or Firm* — Richard G. Eldredge; Eldredge Law Firm

(57) **CLAIM**

The ornamental design for a gun holster, as shown and described.

**DESCRIPTION**

FIG. **1** is a side elevation view of a gun holster according to the present invention;
FIG. **2** is front elevation view thereof;
FIG. **3** is a rear view thereof; and,
FIG. **4** is top plan view thereof.

**1 Claim, 1 Drawing Sheet**



TAB

# 11

## Face Page of U.S. Design Patent No. D836,329

Showing references cited including U.S. Design Patent No. D788,451 as prior art.

SOURCE

*U.S. Patent and Trademark Office; first page of issued patent.*

US00D836329S

## (12) United States Design Patent
### Myers

(10) Patent No.: **US D836,329 S**

(45) Date of Patent: ** **Dec. 25, 2018**

(54) **GUN HOLSTER**

(71) Applicant: **James Myers**, Abilene, TX (US)

(72) Inventor: **James Myers**, Abilene, TX (US)

(**) Term: **15 Years**

(21) Appl. No.: **29/608,386**

(22) Filed: **Jun. 21, 2017**

(51) **LOC (11) Cl.** .............................................. **03-01**

(52) **U.S. Cl.**
USPC ...................................................... **D3/222**

(58) **Field of Classification Search**
USPC .................. D3/222–223; 224/191–193, 238, 224/243–244, 911–912
CPC .... F41C 33/02; F41C 33/041; F41C 33/0209; F41C 33/0227; F41C 33/0236; Y10S 224/911; A45F 3/14
See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| D237,079 S | * | 10/1975 | Taylor | D3/222 |
| D293,741 S | * | 1/1988 | Nichols | D3/222 |
| D356,677 S | * | 3/1995 | Kalasountas | D3/222 |
| D718,523 S | * | 12/2014 | Cox | D3/222 |
| D770,172 S | * | 11/2016 | Crouch | D3/222 |
| D788,451 S | * | 6/2017 | Myers | D3/222 |

* cited by examiner

*Primary Examiner* — Catherine R Oliver-Garcia
(74) *Attorney, Agent, or Firm* — Eldredge Law Firm, LLC; Richard Eldredge; Beth Felix

(57) **CLAIM**

The ornamental design for a gun holster, as shown and described.

## DESCRIPTION

FIG. **1** is a front view of a gun holster according to the present application.
FIG. **2** is a right side view of the gun holster.
FIG. **3** is a left side view of the gun holster; and,
FIG. **4** is top view of the gun holster.

**1 Claim, 1 Drawing Sheet**



TAB

# 12

# Face Page of U.S. Design Patent No. D841,979

Showing references cited including U.S. Design Patent No. D788,451 as prior art.

SOURCE

*U.S. Patent and Trademark Office; first page of issued patent.*



US00D841979S

(12) **United States Design Patent**
Myers

(10) Patent No.: **US D841,979 S**
(45) Date of Patent: ** **Mar. 5, 2019**

(54) **GUN HOLSTER**

(71) Applicant: **James Myers**, Abilene, TX (US)

(72) Inventor: **James Myers**, Abilene, TX (US)

(**) Term: **15 Years**

(21) Appl. No.: **29/630,329**

(22) Filed: **Dec. 20, 2017**

(51) **LOC (11) Cl.** ............................................. **03-01**
(52) **U.S. Cl.**
USPC ......................................................... **D3/222**
(58) **Field of Classification Search**
USPC ........ 224/222–223, 191–193, 238, 243–244,
224/911–912, 914, 672, 931, 674;
D3/222–223, 215, 221, 224, 226, 228
CPC .... A45F 5/00; A45F 5/02; A45F 5/021; A45F
3/14; F41C 33/0227; F41C 33/0209;
F41C 33/0263
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| D237,079 S | * | 10/1975 | Taylor | D3/222 |
| D293,741 S | * | 1/1988 | Nichols | D3/222 |
| D356,677 S | * | 3/1995 | Kalasountas | D3/222 |
| D718,523 S | * | 12/2014 | Cox | D3/222 |
| D770,172 S | * | 11/2016 | Crouch | D3/222 |
| D788,451 S | * | 6/2017 | Myers | D3/222 |

* cited by examiner

*Primary Examiner* — Catherine R Oliver-Garcia
(74) *Attorney, Agent, or Firm* — Eldredge Law Firm,
LLC; Richard Eldredge; Beth Felix

(57) **CLAIM**

The ornamental design for a gun holster, as shown and described.

**DESCRIPTION**

FIG. **1** is a front view of a gun holster according to the present application.
FIG. **2** is a side view of the gun holster.
FIG. **3** is an opposite side view of the gun holster;
FIG. **4** is a rear view of the gun holster; and,
FIG. **5** is a front view of the gun holster, shown open.

**1 Claim, 2 Drawing Sheets**



TAB

# 13

# Plaintiffs' Initial Infringement Contentions

Served April 19, 2023.

SOURCE

*Served by Plaintiffs in this action; produced as a discovery disclosure under Local Patent Rule 2.*

Brandon James Leavitt, Tx Bar No. 24078841, *pro hac vice*
LEAVITT ELDREDGE LAW FIRM
4204 SW Green Oaks Blvd., Suite 140
Arlington, TX 76107
(214) 727-2055
brandon@uslawpros.com

Jason K. Smith, 14323
MK SMITH, APC
9891 Irvine Center Dr., Ste. 200
Irvine, CA 92618
801-916-8723
jsmith@mks-law.com

ATTORNEYS FOR PLAINTIFFS

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH
### NORTHERN DIVISION

| | |
|---|---|
| JM4 TACTICAL, LLC; and JAMES CHADWICK MYERS<br><br>**Plaintiffs,**<br><br>vs.<br><br>HER TACTICAL, LLC; E & R LLC *dba* HER TACTICAL; VICKY ARLENE JOHNSTON; and BLAKE CHEAL<br><br>**Defendants.** | **PLAINTIFFS' INITIAL INFRINGEMENT CONTENTIONS**<br><br>Case No. 1:22-cv-01121-DAK-DBP<br><br>Judge Dale A. Kimball<br><br>Magistrate Judge Dustin B. Pead<br><br>**Jury Demand** |

Pursuant to LPR 2.3 and the Scheduling Order of this Court (Dkt No. 33), Plaintiffs,

**JM4 Tactical, Inc.** and **James Chadwick Myers** hereby provide their initial infringement

contentions.

INITIAL INFRINGEMENT CONTENTIONS                                              **Page 1 of 31**

**LPR 2.3(a)**    identification of each claim of each asserted patent that is allegedly infringed by the opposing party, including for each claim the applicable statutory subsection of 35 U.S.C. § 271;

| Infringed Claim | Applicable subsection(s) of 35 U.S.C. § 271 with respect to: | | | |
|---|---|---|---|---|
| | Her Tactical | E & R | Vicky Johnston | Blake Cheal |
| 9/784,530 claim 1 | §271(a) | §271(a)-§271(b) | §271(a)-§271(b) | §271(a)-§271(b) |
| 9/784,530 claim 3 | §271(a) | §271(a)-§271(b) | §271(a)-§271(b) | §271(a)-§271(b) |
| D788,451 claim 1 | §271(a) | §271(a)-§271(b) | §271(a)-§271(b) | §271(a)-§271(b) |
| D811,731 claim 1 | §271(a) | §271(a)-§271(b) | §271(a)-§271(b) | §271(a)-§271(b) |
| D836,329 claim 1 | §271(a) | §271(a)-§271(b) | §271(a)-§271(b) | §271(a)-§271(b) |
| D841,979 claim 1 | §271(a) | §271(a)-§271(b) | §271(a)-§271(b) | §271(a)-§271(b) |

**LPR 2.3(b)**    separately for each asserted claim, identification of each Accused Instrumentality of which the party claiming infringement is aware. Each Accused Instrumentality must be identified by name, if known, or by any product, device, or apparatus which, when used, allegedly results in the practice of the claimed method or process;

| Infringed Claim | SKU Names of Accused Instrumentalities |
|---|---|
| 9/784,530 claim 1 | Magnet-Holster-Micro-Purple-R |
| | Magnet-Holster-Micro-Black-R |
| | Magnet-Holster-Micro-Pink-R |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | Magnet-Holster-Compact-Purple-R |
| | Magnet-Holster-Compact-Black-R |
| | Magnet-Holster-Compact-Pink-R |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| 9/784,530 claim 3 | Magnet-Holster-Micro-Purple-R |
| | Magnet-Holster-Micro-Black-R |
| | Magnet-Holster-Micro-Pink-R |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | Magnet-Holster-Compact-Purple-R |
| | Magnet-Holster-Compact-Black-R |
| | Magnet-Holster-Compact-Pink-R |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |

INITIAL INFRINGEMENT CONTENTIONS                                    Page 2 of 31

| Infringed Claim | SKU Names of Accused Instrumentalities |
| --- | --- |
| D788,451 claim 1 | Magnet-Holster-Micro-Purple-R |
| | Magnet-Holster-Micro-Black-R |
| | Magnet-Holster-Micro-Pink-R |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | Magnet-Holster-Compact-Purple-R |
| | Magnet-Holster-Compact-Black-R |
| | Magnet-Holster-Compact-Pink-R |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| D811,731 claim 1 | Magnet-Holster-Micro-Purple-R |
| | Magnet-Holster-Micro-Black-R |
| | Magnet-Holster-Micro-Pink-R |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | Magnet-Holster-Compact-Purple-R |
| | Magnet-Holster-Compact-Black-R |
| | Magnet-Holster-Compact-Pink-R |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| D836,329 claim 1 | Magnet-Holster-Micro-Purple-R |
| | Magnet-Holster-Micro-Black-R |
| | Magnet-Holster-Micro-Pink-R |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | Magnet-Holster-Compact-Purple-R |
| | Magnet-Holster-Compact-Black-R |
| | Magnet-Holster-Compact-Pink-R |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |

App-135

| Infringed Claim | SKU Names of Accused Instrumentalities |
|---|---|
| D841,979 claim 1 | Magnet-Holster-Micro-Purple-R |
| | Magnet-Holster-Micro-Black-R |
| | Magnet-Holster-Micro-Pink-R |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | Magnet-Holster-Compact-Purple-R |
| | Magnet-Holster-Compact-Black-R |
| | Magnet-Holster-Compact-Pink-R |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |
| | HT-Neo-Magnet-Holster |

**LPR 2.3(c)** a chart identifying specifically where each element of each asserted claim is found within each Accused Instrumentality, including for each element that such party contends is governed by 35 U.S.C. § 112(f), a description of the claimed function of that element and the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function;

**LPR 2.3(d)** whether each element of each asserted claim is claimed to be present in the Accused Instrumentality literally or under the doctrine of equivalents. For any claim under the doctrine of equivalents, the Initial Infringement Contentions must include an explanation of each function, way, and result that is alleged to be equivalent and why any differences are not substantial;

### A. 9/784,530 claim 1

| 9/784,530 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| **PREAMBLE.** A gun holster system for carrying a gun, comprising: | Each Accused Instrumentality satisfies this requirement literally because they are respectively designed as described and shown in the Defendants' disclosures. *Compare* HerTactical_0837, HerTactical_0840, *and* Hertactical_0003 (excerpts from the '324 application) *with* HerTactical_0001-0002 (providing photographs of representative Accused Instrumentalities).<br><br> |

**INITIAL INFRINGEMENT CONTENTIONS**                    **Page 4 of 31**

| 9/784,530 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| | *Compare* HerTactical_0003 *with* HerTactical_0001. |
| **Limitation A.** a body having a front side and a back side forming an upper opening disposed there between and forming a lower opening at a lower surface of the body; | Each Accused Instrumentality meets this limitation literally because they each comprise a body having a front side and a back side with an upper and lower opening, as described and shown in the Defendants' disclosures: <br><br> **Body** is an encasement with a **front**, side and **back** that contains a wide **opening in the top end** to insert and encase a gun within the body . . . A smaller **opening at the lower end of the body** for the barrel tip of an inserted gun to protrude through. <br><br> <br><br> *Compare* HerTactical_830, Description (emphasis added) *and* HerTactical_0003 (emphasis added) *with* HerTactical_0001. |
| **LIMITATION B.** a strap assembly integrally secured to the back side body, the strap assembly having: | Each Accused Instrumentality meets this limitation literally because they are each designed with a strap assembly integrally secured to the back side of the body, as described and shown in Defendants' disclosures: <br><br> "A **flap attached to the front side of the body** . . ." |

**INITIAL INFRINGEMENT CONTENTIONS**                                    **Page 5 of 31**

App-137

| 9/784,530 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| | *Compare* HerTactical_830, Description (emphasis added) *and* HerTactical_0003 *with* HerTactical_0829. To the extent that this claim element is deemed to be not literally present in or performed by the Accused Instrumentalities, that element is also satisfied under the doctrine of equivalents. **Point 1.** One of ordinary skill at the time of infringement would conclude that the "flap" as described in Defendants' disclosures is indistinguishable from the "strap" claimed in the '530 patent because it performs the same function, in the same way, to achieve the same result. *Compare Strap,* Oxford Languages (last accessed Apr. 6, 2023) ("a strip of leather, cloth, or other flexible material, often with a buckle, used to fasten, secure, or carry something or to hold onto something.") *with Flap,* Oxford Languages (last accessed Apr. 6, 2023 ("a piece of something thin, such as cloth, paper, or metal, hinged or attached only on one side, that covers an opening or hangs down from something."). Here, the Parties' respective flap/strap assemblies are each configured to secure the product to an article of clothing. *Compare* HerTactical_0568, col. 2, ln. 39 ("[strap] assembly is configured to secure the [holster] body and firearm to an article of clothing.") *with* HerTactical_0830 ("flap closes over the fabric of an undergarment . . . to keep the [holster] body firmly in place on the undergarment."). Accordingly, any perceived distinction between the term "flap" and "strap" in this case is semantic and not substantial. |

**INITIAL INFRINGEMENT CONTENTIONS**                                    **Page 6 of 31**

| 9/784,530 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
|  | **Point 2.** One of ordinary skill at the time of infringement would conclude that the "front" position of the flap as described in the Defendants' disclosures is indistinguishable from the "back" position of the strap claimed in the '530 patent because they each refer to the same side of the product, albeit from different viewer perspectives. Accordingly, any perceived distinction between these terms is semantic and not substantial. |
|  | **Point 3.** One of ordinary skill at the time of infringement would further conclude that "attached", as shown by the Defendants' disclosures and "integrally secured" as claimed in the '530 patent are semantically identical and that any perceived distinction between these terms is not substantial. |
| **LIMITATION B(i).** an elongated strap extending from and integrally secure to the back side of the body; | Each Accused Instrumentality meets this limitation literally because they each comprise an elongated strap extending from and integrally secured to the back side of the body, as described and shown in the Defendants' disclosures: <br><br> "Fig. 2: is a front elevation view of the magnetic gun holster with the front magnetic flap shown open;" <br><br> <br><br> FIG. 2: Front View - Magnetic Flap, Shown Open <br><br> *Compare* HerTactical_830, Description *and* HerTactical_0003 (emphases added) *with* HerTactical_0829 (emphasis added). <br><br> To the extent that this claim element is deemed to be not literally present in or performed by the Accused Instrumentalities, that element is also satisfied under the doctrine of equivalents. |

INITIAL INFRINGEMENT CONTENTIONS

Page 7 of 31

| 9/784,530 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| | **Point 4.** Incorporating Point 1, *supra*, one of ordinary skill at the time of infringement would conclude that the respective flap/strap assemblies are each long in relation to their widths to enable the same function, in the same way, and to achieve the same result—by specifically enabling the holster to fold over an article of clothing via the elongated flap/strap assembly. *See* Point 1, *supra. See also Elongated,* Oxford Languages (last accessed Apr. 6, 2023) ("long in relation to width . . . ").<br><br>Accordingly, any perceived distinction between the respective elongations of the respective flap/strap assemblies is not substantial. |
| **LIMITATION B(ii).** a fastener protrusion extending from a back surface of the elongated strap; | Each Accused Instrumentality meets this limitation literally because they each comprise a fastener protrusion extending from the back surface of the elongated strap, as described and shown in the Defendants' disclosures:<br><br>"FIG. 4: is a center elevation view of the outside spine"<br><br><br>FIG. 4: Center Spine View (side)<br><br>*Compare* HerTactical_0830, Description *and* HerTactical_0003 (emphasis added) *with* HerTactical_0817 *and* HerTactical_0829 (emphasis added). *See also Protrusion*, Oxford Languages (last accessed Apr. 6, 2023) ("something that protrudes"); *Protrude*, Oxford Languages (last accessed Apr. 6, 2023) ("extend beyond or above a surface.").<br><br>To the extent that this claim element is deemed to be not literally present in or performed by the Accused |

**INITIAL INFRINGEMENT CONTENTIONS**      **Page 8 of 31**

| 9/784,530 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
|  | Instrumentalities, that element is also satisfied under the doctrine of equivalents. |
|  | **Point 5.** Incorporating by reference Points 1-2 and 4, *supra*, one of ordinary skill at the time of infringement would further conclude that the fasteners of the respective flap/strap assemblies each comprise magnets that extend beyond or above the surface of their respective housings to engage with each other—thus performing the same function, in the same way, and to achieve the same result. *Compare cf.* HerTactical_0830 ("using magnetic force pull to maintain closure") *and* HerTactical_0829 (showing a protrusion at each magnet) *with* HerTactical_0568-0569, co. 2 ln. 66- co. 3 ln 2 (describing how magnetic retention occurs at the points of protrusion). |
|  | Accordingly, any perceived distinction between the fastener protrusions of the respective flap/strap assemblies is not substantial. |
| **LIMITATION B(iii).** a fastener housing extending from an outer surface of the back side of the body, the fastener housing being configured to engage with the fastener protrusion; | Each Accused Instrumentality meets this limitation literally because they each comprise a fastener housing (depicted in **red**) extending (depicted in **orange**) from an outer surface of the body and are configured to engage with the protrusion (depicted in **blue**), as described and shown in the Defendants' disclosures:<br><br><br><br>*Compare* HerTactical_0003 (emphases added) and HerTactical_0829 (emphasis added) *with* HerTactical_0003 (emphases added) *and* HerTactical_0820 (emphases added). *See also* HerTactical_845 from 00:18 to 00:25.<br><br>To the extent that this claim element is deemed to be not literally present in or performed by the Accused Instrumentalities, that element is also satisfied under the doctrine of equivalents.<br><br>**Point 6.** Incorporating by reference Points 1-2 and 4-5, *supra*, one of ordinary skill at the time of infringement |

| 9/784,530 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| | would further conclude that the elongated flap/strap assemblies, which respectively extend beyond the body when open, further comprise the housing for fasteners that engage with one another when closed—thus performing the same function, in the same way, and to achieve the same result. *Compare cf.* HerTactical-0830 ("magnets disposed in the thickness of the flap and configured on either end to fold down and attach") *and* HerTactical_0568-0569, co. 2 ln. 65-co. 3 ln 2 (describing the same).<br><br>Accordingly, any perceived distinction between the fastener housing and protrusions of the respective flap/strap assemblies is not substantial. |
| **LIMITATION B(iv).** wherein the elongated strap folds backwards and away from the upper opening to cause the fastener protrusion and the fastener housing to engage; | Each Accused Instrumentality meets this limitation literally because they each comprise an elongated strap that folds backwards and away from the upper opening to cause the fastener protrusion and the fastener housing to engage, as described and shown in the Defendants' disclosures:<br><br><br><br>*Compare* HerTactical_0816 (emphases added) *and* HerTactical_0810 (emphasis added) *with* HerTactical_0813 (emphases added) *and* HerTactical_0820 (emphases added). *See also* HerTactical_845 from 00:18 to 00:25.<br><br>To the extent that this claim element is deemed to be not literally present in or performed by the Accused Instrumentalities, that element is also satisfied under the doctrine of equivalents.<br><br>**Point 7.** Incorporating by reference Points 1-2 and 4-6, *supra*, one of ordinary skill at the time of infringement would further conclude that the elongated flap/strap assemblies each have a housing that comprises fastener protrusions configured to engage when folded away from the holster's opening—thus performing the same function, in the same way, and to achieve the same result. *Compare* HerTactical-0830 ("magnets disposed in the thickness of the |

| 9/784,530 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| | flap and configured on either end to fold down and attach") *and* HerTactical_0568-0569, co. 2 ln. 65- co. 3 ln 2 (describing the same). |
| | Accordingly, any perceived distinction between the engagement of the fastener housing and protrusions of the respective flap/strap assemblies is not substantial. |
| **LIMITATION C.** two magnets disposed within a thickness of the fastener protrusion;<br><br>**LIMITATION D.** a third magnet disposed within a thickness of the housing;<br><br>**LIMITATION E.** wherein the two magnets are configured to engage with the third magnet;<br><br>**LIMITATION F.** wherein a combined magnetic retention strength generated by the two magnets and third magnet is strong enough to retain the gun within the body. | Whereas Limitations C-D collectively implement a total of three magnets, the Accused Instrumentalities only implement two magnets to perform the same functions contemplated in Limitations E-F, as shown in the Defendants' disclosures:<br><br>"The flap folds around the undergarment to keep the holster securely in place using the 2 magnets embedded into the flap."<br><br><br><br>*Compare* HerTactical_0831 Summary *with* HerTactical_0813 (emphases added) *and* HerTactical_0820 (emphases added). *See also* HerTactical_845 from 00:18 to 00:25.<br><br>Specifically, because the Accused Instrumentalities each embed a singular magnet within the housing/fastener protrusion, Limitation D is literally met by each Instrumentality whereas Limitation C, claiming two such magnets, is not. Consequently, Limitations E-F, establishing how the magnets of Limitations C-D engage with each to retain the gun within the body of the holster, cannot be literally infringed by Accused Instrumentalities.<br><br>Nevertheless, the Accused Instrumentalities each satisfy Limitations C and E-F under the doctrine of equivalents.<br><br>**Point 8.** One of ordinary skill at the time of infringement would conclude that "[b]y adding one magnet on to the other, e.g. stacking, the **stacked magnets will work as one bigger magnet** and will exert a greater magnetic |

**INITIAL INFRINGEMENT CONTENTIONS**                                           Page 11 of 31

| 9/784,530 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| | performance. As more magnets are stacked together, the strength will increase . . ." *Can I increase the strength of a magnet I already have?*, FIRST4MAGNETS, https://www.first4magnets.com/us/tech-centre-i1093/frequently-asked-questions-i1402#20 (last visited Apr. 10, 2023) (emphasis added). *Accord Will stacking magnets together make them stronger?*, ELEMENT MAGNETS, https://totalelement.com/blogs/working-with-neodymium-magnets/will-stacking-magnets-together-make-them-stronger (last accessed Apr. 10, 2023) ("Two or more magnets stacked together will exhibit nearly the same strength as a single magnet of the combined size. This is because the magnetic field lines of **the two magnets combine**, resulting in a stronger overall field.") (emphasis added); *Doubled Forces*, K&J MAGNETICS, https://www.kjmagnetics.com/blog.asp?p=doubled-forces (last accessed Apr. 10, 2023) ("If you stack 2 magnets together . . . **they will act like a single magnet**[.]") (emphasis added); *How to Strengthen a Magnet*, US MAGNETIX, https://usmagnetix.com/how-to-strengthen-a-magnet/ (Apr. 26, 2022) ("**[S]tacked magnets will work as one** to exert a greater magnetic force.") (emphasis added). <br><br> Here, Defendants *emphasize* the "strong magnetic hold" of their holsters "to keep your gun securely in place". HerTactical_0738 and Plaintiffs both confirm and document this claim as follows: <br><br> <br><br> Specifically, the above photograph shows a representative Accused Instrumentality securing a gun in place within the holster via the magnetic retention of its combined two magnets. <br><br> Accordingly, the *two* stacked magnets of the Accused Instrumentalities work as one to exert a greater magnetic force sufficient to retain a gun in a holster in the same way |

INITIAL INFRINGEMENT CONTENTIONS                    Page 12 of 31

| 9/784,530 Claim 1 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| | that Limitations C-E stack *three* magnets to achieve the same result. |
| | Accordingly, and by further incorporating by reference Points 5-7, *supra*, any perceived distinction between the number of magnets that engage with one another for the purpose of combining magnetic retention strength is not substantial. |

### B.  9/784,530 claim 3

| 9/784,530 Claim 3 Elements | Where the Element is Found within each Accused Instrumentality (*see* LPR 2.3(b) for products that apply) |
|---|---|
| **PREAMBLE.** The system of claim 1, | As noted in the identification and analysis of the '530 patent claim 1, *supra*, each of the Accused Instrumentalities infringes the system of claim 1 via the doctrine of equivalents. |
| **LIMITATION A.** wherein the lower opening is configured to receive a portion of the gun therethrough; | Each Accused Instrumentality meets this limitation literally because they each comprise a lower opening configured to receive a portion of a gun therethrough, as described and shown in the Defendants' disclosures: A smaller opening at the lower end of the body for the barrel tip of an inserted gun to protrude through. *Compare* HerTactical_830, Description *and* HerTactical_0003 (emphasis added) *with* HerTactical_0001. |

### C.  D788,451 claim 1

1.      Claim 1 of the '451 patent is directed towards an ornamental design. Therefore, a review of the overall impression of the design is more appropriate than an element-by-element analysis thereof. And here, the claimed design and Accused Instrumentalities are so plainly

**INITIAL INFRINGEMENT CONTENTIONS**                                      **Page 13 of 31**

similar that an ordinary observer would consider the commercial impression of the two designs

to be substantially the same. Accordingly, the Accused Instrumentalities each literally infringe

the '451 design.

2.      Alternatively, the Accused Instrumentalities infringe the claimed design via the

doctrine of equivalents because an ordinary observer, familiar with prior art designs, without

unusually careful effort, would be unable in a side-by-side comparison to easily distinguish the

claimed design and any of the Accused Instrumentalities. For example, the Accused

Instrumentalities are far closer to the claimed design than the prior art, as shown below:

| Prior Art (from D788,451) | D788,451 – claim 1 | Accused Instrumentality |
|---|---|---|
| U.S. Patent No. 4,435,506 (issued Apr. 20, 1982) | HerTactical_0811 and HerTactical_0813. | HerTactical_0811 and HerTactical_0813. |
| U.S. Patent No. D543,354 (issued May 29, 2007) | HerTactical_0811 | HerTactical_0003 |

**INITIAL INFRINGEMENT CONTENTIONS**                                    **Page 14 of 31**

| Prior Art (from D788,451) | D788,451 – claim 1 | Accused Instrumentality |
|---|---|---|
| U.S. Patent No. D543,353 (issued May 29, 2007) | HerTactical_0811 | HerTactical_0003 |
| Cox, U.S. Patent No. D718,523 (Dec. 02, 2014) | HerTactical_0811 | HerTactical_0003 |
| Crouch, U.S. Patent No. D770,172 (Nov. 01, 2016) | HerTactical_0811 | HerTactical_0003 |

### D.  D811,731 claim 1

3.      Claim 1 of the '731 patent is directed towards an ornamental design. Therefore, a review of the overall impression of the design is more appropriate than an element-by-element analysis thereof. And here, the claimed design and Accused Instrumentalities are so plainly similar that an ordinary observer would consider the commercial impression of the two designs to be substantially the same. Accordingly, the Accused Instrumentalities each literally infringe the '731 design.

4.      Alternatively, the Accused Instrumentalities infringe the claimed design via the doctrine of equivalents because an ordinary observer, familiar with prior art designs, without unusually careful effort, would be unable in a side-by-side comparison to easily distinguish the

INITIAL INFRINGEMENT CONTENTIONS                                    Page 15 of 31

claimed design and any of the Accused Instrumentalities. For example, the Accused

Instrumentalities are far closer to the claimed design than the prior art, as shown below:

| Prior Art (from D811,731) | D811,731 – claim 1 | Accused Instrumentality |
|---|---|---|
| Nichols, U.S. Patent No. D811,731 (Jan. 19, 1988) | HerTactical_0815 | HerTactical_0003 |
| Kalasountas, U.S. Patent No. D356,677 (Mar. 28, 1995) | HerTactical_0815 | HerTactical_0003 |
| Cox, U.S. Patent No. D718,523 (Dec. 02, 2014) | HerTactical_0815 | HerTactical_0003 |
| Crouch, U.S. Patent No. D770,172 (Nov. 01, 2016) | HerTactical_0815 | HerTactical_0003 |

INITIAL INFRINGEMENT CONTENTIONS

Page 16 of 31

| Prior Art (from D811,731) | D811,731 – claim 1 | Accused Instrumentality |
|---|---|---|
| Myers, U.S. Patent No. D788,731 (patent-in-suit) | HerTactical_0815 | HerTactical_0003 |

### E.  D836,329 claim 1

5.      Claim 1 of the '329 patent is directed towards an ornamental design. Therefore, a review of the overall impression of the design is more appropriate than an element-by-element analysis thereof. And here, the claimed design and Accused Instrumentalities are so plainly similar that an ordinary observer would consider the commercial impression of the two designs to be substantially the same. Accordingly, the Accused Instrumentalities each literally infringe the '329 design.

6.      Alternatively, the Accused Instrumentalities infringe the claimed design via the doctrine of equivalents because an ordinary observer, familiar with prior art designs, without unusually careful effort, would be unable in a side-by-side comparison to easily distinguish the claimed design and any of the Accused Instrumentalities. For example, the Accused Instrumentalities are far closer to the claimed design than the prior art, as shown below:



| Prior Art (from D836,329) | D836,329 – claim 1 | Accused Instrumentality |
|---|---|---|
| Nichols, U.S. Patent No. D811,731 (Jan. 19, 1988) | HerTactical_0820 | HerTactical_0003 |

INITIAL INFRINGEMENT CONTENTIONS                                   **Page 17 of 31**

| Prior Art (from D836,329) | D836,329 – claim 1 | Accused Instrumentality |
|---|---|---|
| Kalasountas, U.S. Patent No. D356,677 (Mar. 28, 1995) | HerTactical_0820 | HerTactical_0003 |
| Cox, U.S. Patent No. D718,523 (Dec. 02, 2014) | HerTactical_0820 | HerTactical_0003 |
| Crouch, U.S. Patent No. D770,172 (Nov. 01, 2016) | HerTactical_0820 | HerTactical_0003 |
| Myers, U.S. Patent No. D788,731 (patent-in-suit) | HerTactical_0820 | HerTactical_0003 |

### F. D841,979 claim 1

7. Claim 1 of the '979 patent is directed towards an ornamental design. Therefore, a review of the overall impression of the design is more appropriate than an element-by-element analysis thereof. And here, the claimed design and Accused Instrumentalities are so plainly similar that an ordinary observer would consider the commercial impression of the two designs

INITIAL INFRINGEMENT CONTENTIONS

Page 18 of 31

to be substantially the same. Accordingly, the Accused Instrumentalities each literally infringe the '979 design.

8.     Alternatively, the Accused Instrumentalities infringe the claimed design via the doctrine of equivalents because an ordinary observer, familiar with prior art designs, without unusually careful effort, would be unable in a side-by-side comparison to easily distinguish the claimed design and any of the Accused Instrumentalities. For example, the Accused Instrumentalities are far closer to the claimed design than the prior art, as shown below:

| Prior Art (from D841,979) | D841,979 – claim 1 | Accused Instrumentality |
|---|---|---|
| Nichols, U.S. Patent No. D811,731 (Jan. 19, 1988) | HerTactical_0825 | HerTactical_0003 |
| Kalasountas, U.S. Patent No. D356,677 (Mar. 28, 1995) | HerTactical_0825 | HerTactical_0003 |
| Cox, U.S. Patent No. D718,523 (Dec. 02, 2014) | HerTactical_0825 | HerTactical_0003 |

INITIAL INFRINGEMENT CONTENTIONS                                    Page 19 of 31



| Prior Art (from D841,979) | D841,979 – claim 1 | Accused Instrumentality |
|---|---|---|
| Crouch, U.S. Patent No. D770,172 (Nov. 01, 2016) | HerTactical_0825 | HerTactical_0003 |
| Myers, U.S. Patent No. D788,731 (patent-in-suit) | HerTactical_0825 | HerTactical_0003 |

**LPR 2.3(e)**   for each claim that is alleged to have been indirectly infringed, an identification of any direct infringement and a description of the acts of the alleged indirect infringer that contribute to or are inducing that direct infringement. If alleged direct infringement is based on joint acts of multiple parties, the role of each such party in the direct infringement must be described;

## A.   Identification of direct infringement

9.      Subject to additional and pending discovery, Plaintiffs have identified the

following acts of direct infringement:

| Dates | Infringer | Description |
|---|---|---|
| 8/18/22 | Her Tactical | Magnet-Holster-Compact-Black-R shipped to Mackenzie Barnes. |
| 8/22/22 | Her Tactical | Magnet-Holster-Compact-Purple-R shipped to Katie Kish. |
| 9/30/22 | Her Tactical / E & R | At least 4 Accused Instrumentalities (Magnet-Holster-Compact-Pink-R, Magnet-Holster-Compact-Purple-R, Magnet-Holster-Compact-Pink-R, and Magnet-Holster-Compact-Purple-R) were sold to a private investigator of the Plaintiffs at Smith & Edwards located at 3936 N 2000 W in Pleasant View, UT 84414 |
| 10/1/22 | Cheal | Sold an Accused instrumentality to a private investigator of the Plaintiffs and accepted payment via Johnston's personal Venmo account. |

**INITIAL INFRINGEMENT CONTENTIONS**                                              **Page 20 of 31**

| Dates | Infringer | Description |
|---|---|---|
| 12/21/22 | Johnston | Sold an Accused Instrumentality to a private investigator of the Plaintiffs and accepted payment via her personal Venmo account. Johnston also stated that the buyer could pick up the holster from her personal residence, provided her personal number, and confirmed that if she were not home to provide delivery, her husband (Defendant Cheal) would be. |
| 2/11/23 | E & R | Magnet-Holster-Compact-Pink-R shipped to Alex Moreno. |
| 3/25/23 | Her Tactical / E & R | Magnet-Holster-Compact-Pink-R sold to a private investigator of the Plaintiffs at the "Crossroads of the West" gun show located at the Davis Conferences Center in 1651 N 700 W Layton, UT 84041. |
| 4/15/23-4/16/23 | Johnston / Cheal | Sold Accused Instrumentalities from a Her Tactical booth at the Crossroads of the West Gun Show at 9575 S. State Street Sandy, UT 84070. |
| Pending Discovery | Pending Discovery | Accused Instrumentalities are or have been sold at a variety of online locations such as:<br><br>• Her Tactical Website (https://hertactical.com/product/magnetic-gun-holster/)<br><br>• Etsy(https://www.etsy.com/shop/HERTACTICAL?ref=shop_sugg)<br><br>• Amazon(https://www.amazon.com/HER-TACTICAL-Magnetic-Concealed-Universal/dp/B09PH2RBDN/ref=sr_1_37?crid=AHLTW6B62LZD&keywords=Magnetic+Gun+Holster&qid=166118280 8&sprefix=magnetic+gun+holster%2Caps%2C126&sr=8-37)and(https://www.amazon.com/stores/HERTACTICAL/page/CD657032-5B7E-4D76-A606-621D822E988F?ref_=ast_bln)•Ebay(https://www.ebay.com/str/envyandreverec)<br><br>• Facebook (https://www.facebook.com/hertactical) and(https://www.facebook.com/vicky.johnston.397)<br><br>• Instagram (https://www.instagram.com/her.tactical/)<br><br>• Tik Tok(https://www.tiktok.com/@hertactical)<br><br>• Pinterest(https://www.pinterest.com/hertactical/)<br><br>• Etsy (https://www.etsy.com/listing/1240884431/her-tactical-magnetic-holster-for) |

**INITIAL INFRINGEMENT CONTENTIONS**                                      **Page 21 of 31**

App-153

| Dates | Infringer | Description |
|-------|-----------|-------------|
| | | • Ace Hardwarebranch-Smith and Edwards Co. (9010 S. Redwood Rd.,West Jordan, UT 84088)<br><br>• Alibaba.com (https://www.alibaba.com/product-detail/Woman-holsters-purple-portable-universal-carry_1600262078292.html?spm= a2700.details.0.0.6b2d6a9aAPesx5).<br><br>• https://www.youtube.com/watch?v=JiMKulTAIT0;<br><br>• www.ebay.com;<br><br>• www.poshmark.com;<br><br>• www.pinterest.com.<br><br>Identification of the relevant quantities, dates, and items for such sales are pending discovery. |
| Pending Discovery | Pending Discovery | One or more Accused Instrumentalities are or have been sold at a variety of trade shows and exhibits in Utah.<br><br>Identification of the relevant quantities, dates, and items for such sales are pending discovery. |
| Pending Discovery | Pending Discovery | One or more Accused Instrumentalities are or have been sold at one or more retail outlets in Utah.<br><br>Identification of the relevant quantities, dates, locations, and items for such sales are pending discovery. |
| Pending Discovery | Pending Discovery | One or more Accused Instrumentalities are or have been sold at workshops, seminars, and training classes.<br><br>Identification of the relevant quantities, dates, locations, and items for such sales are pending discovery. |

## B. Acts that contribute to or are inducing the direct infringement

### a. Acts of contribution or inducement by Defendant E & R, LLC

10.  Incorporating by reference LPR 2.3(a) through LPR 2.3(e)(A), *supra*, each and every Accused Instrumentality sold by Defendant Her Tactical directly infringes the asserted claims of the asserted patents.

11.  Defendant E & R, LLC took action that was intended to cause and led to the infringing acts by Her Tactical because all actions by Her Tactical—a registered *dba* of E & R—

INITIAL INFRINGEMENT CONTENTIONS                                    Page 22 of 31

App-154

are attributable to its *dba* registrant. Plaintiff further observes that many "Her Tactical" products are billed to and shipped by E & R.

12.    Incorporating by reference LPR 2.3(g), *infra*, E & R was aware of the asserted patents and knew that the acts, if taken, would constitute infringement of one or more of those patents. Alternatively, E & R believed there was a high probability that the acts by Her Tactical would infringe one or more of the asserted patents and took deliberate steps to avoid learning of that infringement. Alternatively, E & R believed there was a high probability that the acts by Her Tactical infringed the asserted patents and took deliberate steps to avoid learning of that infringement.

### b. Acts of contribution or inducement by Defendant Blake Cheal

13.    Incorporating by reference LPR 2.3(a) through LPR 2.3(e)(A), *supra*, each and every Accused Instrumentality sold by Defendants Her Tactical and/or E & R, LLC (collectively, the "venture") directly infringes the asserted claims of the asserted patents.

14.    Defendant Blake Cheal took action that was intended to cause and led to the infringing acts by Her Tactical and/or E & R because he is an authorized administrator having input in the direction of the venture's financial and supply chain transactions. For example, Johnston has credited Cheal for his support in the Her Tactical venture, identified him as a business partner in that venture, and offered him to consumers as her proxy for Her Tactical sales and transactions.

15.    More specifically, Cheal took action that was intended to cause and led to the infringing acts by Her Tactical and/or E & R, at least as follows: (a) on 10/1/22, standing in for Johnston to conduct a Point of Sale (POS) and Free On Board (FOB) transaction by which the venture sold one or more Accused Instrumentalities and transferred ownership thereof to the buyer; (b) on 12/21/22 permitting his real estate to serve as the FOB destination at which the

**INITIAL INFRINGEMENT CONTENTIONS**                                   **Page 23 of 31**

venture transferred ownership of one or more Accused Instrumentalities to a buyer; (c) on 3/24/23 assisting Johnston in setting up an exhibit at which the venture sold one or more Accused Instrumentalities; and (d) on 4/15/22-4/16/22, staffing an exhibit that enabled the venture to sell one or more Accused Instrumentalities.

16.     Incorporating by reference LPR 2.3(g), *infra*, Cheal was aware of the asserted patents and knew that the acts, if taken, would constitute infringement of one or more of those patents. Alternatively, Cheal believed there was a high probability that the acts by the venture would infringe one or more of the asserted patents and took deliberate steps to avoid learning of that infringement. Alternatively, Cheal believed there was a high probability that the acts by the venture infringed the asserted patents and took deliberate steps to avoid learning of that infringement.

c.  **Acts of contribution or inducement by Defendant Vicky Johnston**

17.     Incorporating by reference LPR 2.3(a) through LPR 2.3(e)(A), *supra*, each and every Accused Instrumentality sold by Defendants Her Tactical and/or E & R, LLC (collectively, the "venture") and/or Blake Cheal directly infringes the asserted claims of the asserted patents.

18.     Defendant Vicky Johnston took action that was intended to cause and led to the infringing acts by Her Tactical and/or E & R because she is an authorized administrator having input in the direction of the venture's financial and supply chain transactions. At the very least, Johnston is the sole registered owner and agent of the venture and can be assumed to be directing all activities. But Plaintiffs also observe that Johnston features herself prominently on the venture's marketing and promotions, frequently refers to herself as "Her Tactical", and directly answers administrative correspondence on the venture's behalf. And, to the extent Cheal's direct acts of infringement were conducted strictly within his capacity as a supportive husband, all such actions would have resulted from Johnston's actions, intents, or expressions.

**INITIAL INFRINGEMENT CONTENTIONS**                                    **Page 24 of 31**

19.     More specifically, Johnston took action that was intended to cause and led to the infringing acts by Her Tactical and/or E & R and/or Cheal, at least as follows: (a) on 8/18/22, 8/22/22, and 2/11/23, authorizing the venture to ship one or more Accused Instrumentalities to buyers; (b) on 9/30/22 authorizing the venture to sell one or more Accused Instrumentalities at Utah retail outlets; (c) on 10/1/22 using her intangible personal property as a POS for Accused Instrumentalities sold on behalf of the venture and offering for Cheal to complete the transaction; (d) on 12/21/22 negotiating on behalf of the venture for the sale and delivery of one or more Accused Instrumentalities—using her intangible personal property as a POS, Cheal's real property as the FOB destination, and offering for Cheal to complete the transaction; and (e) on 3/25/23, 4/15/23, and 4/16/23, staffing exhibits that enabled the venture to sell one or more Accused Instrumentalities.

20.     Incorporating by reference LPR 2.3(g), *infra*, Johnston was aware of the asserted patents and knew that the acts, if taken, would constitute infringement of one or more of those patents. Alternatively, Johnston believed there was a high probability that the acts by the venture or Cheal would infringe one or more of the asserted patents and took deliberate steps to avoid learning of that infringement. Alternatively, Johnston believed there was a high probability that the acts by the venture and/or Cheal infringed the asserted patents and took deliberate steps to avoid learning of that infringement.

**LPR 2.3(f)**     for any patent that claims priority to an earlier application, the priority date to which each asserted claim allegedly is entitled;

| Infringed Claim | Description | Priority Date |
|---|---|---|
| 9/784,530 claim 1 | Claims priority from a provisional application | 10/28/2016 |
| 9/784,530 claim 3 | Claims priority from a provisional application | 10/28/2016 |
| D788,451 claim 1 | Does not claim priority to any application | 04/26/2016 |
| D811,731 claim 1 | Does not claim priority to any application | 10/05/2016 |
| D836,329 claim 1 | Does not claim priority to any application | 06/21/2017 |
| D841,979 claim 1 | Does not claim priority to any application | 12/20/2017 |

**INITIAL INFRINGEMENT CONTENTIONS**                                    **Page 25 of 31**

**LPR 2.3(g)** the basis for any allegation of willful infringement;

21. As discussed below, Defendants: (A) have not acted consistently with the standards of behavior for companies bound by the laws of US commerce; (B) intentionally copied the Plaintiffs' patented product; (C) did not make a good-faith effort to avoid infringing the Patents in Suit; and (D) have tried to cover up their infringement.

### A. Defendants have not acted consistently with the standards of behavior set for US commerce

22. The industry standard for the sale or offering for sale of products in US commerce is to respect the intellectual property of others.

23. However, Plaintiffs can show that much of the Defendants' website comprises stock photos which, on information and belief, do not entirely follow the purchase and licensing guidelines set forth by the authors of those images.

24. Defendants have also misappropriated and diluted the trademarks and goodwill of the entity Hot Topic, Inc., which, on 3/22/23 was obligated to send the Defendants a cease-and-desist letter showing the following side-by-side comparison:



| Hot Topic Mark | Her Tactical Mark |
|---|---|

25. Plaintiffs observe that the identical stenciled font of the respective primary word marks and secondary acronym marks bear a striking resemblance between two brands marketed primarily to females.

**INITIAL INFRINGEMENT CONTENTIONS** **Page 26 of 31**

26.    Defendants apparently agree with this assessment, as they have since changed the bridge locations for the letters "T", "A", and "C", and removed such stenciling from the letters "H", "E", and "R" altogether. Defendants also changed the acronym mark from "HT" to "HER", as shown below:



| Original Her Tactical Mark | New Her Tactical Mark |

27.    Without addressing the sufficiency of these changes, Plaintiffs herein assert that Defendants knew of the similarities between their logos and the Hot Topic logos, and only changed their own to mitigate the risk of compounding intellectual property litigation beyond the present dispute.

28.    Defendants also infringe the patented products of third party Can Can Concealment, LLC, as shown herein:



| Can Can Concealment "Garter Elite" | Her Tactical "Luxury Thigh Holster" |

**INITIAL INFRINGEMENT CONTENTIONS**                                   **Page 27 of 31**

29.     Plaintiffs understand that Can Can Concealment considers Her Tactical's product to be an infringement of its patent but cannot yet begin litigation without first marshalling its resources. Accordingly, absent the threat of compounding intellectual property litigation beyond the present dispute, Defendants have not apparently made any changes to this infringing product.

**B.     Defendants intentionally copied the Plaintiffs' patented products**

30.     Incorporating by reference their initial pleadings and related briefing, Plaintiffs have provided the connections between themselves, their marketing efforts, the connections between Johnston and the entities and individuals helping Plaintiffs with their marketing, and the closeness in time these marketing efforts had with Johnston's production, marketing, and selling of the Accused Instrumentalities. These events occurred from approximately July 2021 to January 2022—with Johnston likely learning of the Plaintiffs' patents on or around 9/24/21.

31.     Plaintiffs' initial pleadings and related briefing also provide that on 8/19/22 Johnston specifically acknowledged that she knew of Plaintiffs' '530 patent and related products but declined to cease and desist her infringement.

**C.     Defendants did not make a good faith effort to avoid infringing the Patent in Suit**

32.     Rather than comply with Plaintiffs' demand letter, Johnston provided two legal opinions, drafted 8/22/22 and 10/1/22, to justify her continued infringement. However, these letters post-date her decision to development and sell the Accused Instrumentalities by approximately a year.

33.     In addition to Defendants' connection to and knowledge of Plaintiffs' products and marketing efforts, Plaintiffs have also asserted in their initial pleadings and related briefing Defendants' piggy-back marketing and sales of the Accused Instrumentalities to the front center of the bra. At trial, Plaintiffs would further show: (a) Defendants refer to themselves as the

INITIAL INFRINGEMENT CONTENTIONS                                    **Page 28 of 31**

"HerNation Family" and "Her Family" in the same manner that Plaintiffs first referred to themselves as the "JM4 Family"; (b) Defendants have copied, verbatim, multiple portions of the Plaintiff's warranties and disclaimers; and (c) Defendants consistently market that the Accused Instrumentalities have a "silent draw"—a phrase used only by the entities helping Plaintiffs with their marketing and to whom Johnston is connected. Defendants piggyback marketing of the Plaintiffs is so pervasive they even copy the essential motif of one the Plaintiffs' logos:

| JM4 Tactical | Her Tactical |
|---|---|
| Two pistols, back-to-back, wherein the negative space between the pistols comprises a religious symbol—namely a cross | Two pistols, back-to-back, wherein the negative space between the pistols comprises a religious symbol—namely an angel |
| | |

34. Thus, on the balance, the Defendants clearly did not make a good faith effort to avoid copying Plaintiffs' marketing, motifs, or content. Thus, when taken in context with their intentional copying of third party intellectual property (supra LPR 2.3(g)(A)) and Plaintiff's patented holsters (supra LPR 2.3(g)(B)), Defendants did not make a good faith effort to avoid infringing the Patents in Suit.

### D. Defendants have tried to cover up their infringement

35. Defendants received Plaintiff's initial notice of infringement on or around 8/19/22 and first denied infringement on or around 8/22/22.

36. But on 9/22/22 Plaintiff's principal Shawndalyn Myers purchased one Magnet-Holster-Compact-Pink-R and three Magnet-Holster-Compact-Purple-R (order # 114-5457898-

INITIAL INFRINGEMENT CONTENTIONS                                    Page 29 of 31

App-161

8209815) from "Her Tactical" via ASIN B09PHL8JB and on 9/23/22 "Her Tactical" cancelled the order without explanation.

37.    Likewise, on 9/24/22 Sean Alcazar, who is clearly affiliated with JM4 Tactical, purchased "Her Tactical Magnetic Holster for Compact & Micro Sized Guns-PINK"—identified herein as Accused Instrumentality Magnet-Holster-Micro-Pink-R—from poshmark.com via order ID 632fa2eb84b3077c497dd463. But within a few minutes the seller, "Her Tactical", cancelled the order without explanation.

38.    Then, on or around 9/18/22 "Her Tactical" turned off comments to its youtube videos that market the Accused Instrumentalities rather than listen to "false accusations that are not productive."

39.    Yet although Defendants no longer sell products to Plaintiffs or its known affiliates, and have disallowed public discourse on the authenticity of these sales, Defendants continue to sell Accused Instrumentalities to Plaintiffs' private investigators and the public.

40.    Likewise, Blake Cheal, who Johnston has credited as a partner and who investigators regularly found involved with the venture, has largely withdrawn from public view since he was named as a co-Defendant in this dispute.

41.    On at least one occasion, Cheal attempted to hide his identity from the Plaintiffs' private investigators when he suspected that he was being monitored. And yet, when Her Tactical is publicly exhibiting the Accused Instrumentalities, private investigators have identified him helping before and after public hours.

INITIAL INFRINGEMENT CONTENTIONS                                           Page 30 of 31

**LPR 2.3(h)** if a party claiming patent infringement wishes to preserve the right to rely, for any purpose, on the assertion that its own or its licensee's apparatus, product, device, process, method, act, or other instrumentality embodies or practices the claimed invention, the party must identify, separately for each asserted patent, each such apparatus, product, device, process, method, act, or other instrumentality that incorporates or reflects that particular claim, including whether there has been marking pursuant to statute.

42.     Plaintiffs sell left-handed and right-handed variations, in up to 22 sizes and 6

color options of the following gun holsters protected by the asserted claims herein:



| ROUGHNECK $59.95 | ORIGINAL $74.95 - $89.95 | HIGH-RIDE $84.95 - $99.95 | TUCKABLE HIGH-RIDE $84.95 - $99.95 |
|---|---|---|---|
| Designed for **ALL** attire | Designed for **ALL** attire | Designed for **JEANS/BELTS** | Designed for **JEANS/BELTS** |
| **MOST** magnetic retention | **MOST** magnetic retention | **LIMITED** magnetic retention | **LIMITED** magnetic retention |
| **DEEP** concealment | **DEEP** concealment | **Higher** Ride Height | **Higher** Ride Height |
| Available in **TAN** Only | **6** Color Options | **3** Color Options | **3** Color Options |
| **MOST** Versatility | **MOST** Versatility | **MOST** Versatility | **LIMITED** Versatility |
| **22** Different Sizes | **22** Different Sizes | **15** Different Sizes | **15** Different Sizes |
| **KENTUCKY** Leather | **HERMANN OAK** Leather | **HERMANN OAK** Leather | **HERMANN OAK** Leather |
| **SINGLE** Leather Layer | **DOUBLE** Leather Layers stitched together | **DOUBLE** Leather Layers stitched together | **DOUBLE** Leather Layers stitched together |
| **SINGLE** reinforced stitching at stretch points | **DOUBLE** reinforced stitching at stretch points | **DOUBLE** reinforced stitching at stretch points | **DOUBLE** reinforced stitching at stretch points |

**PLEASE NOTE:** Each holster size is designed to accomodate the specific models of firearms assigned to them on our sizing chart. You are encouraged to check the image generated once you select your holster options to see the specific design of holster you are ordering. In addition, our Magnetic Holster Lines are designed and funtion best as "inside the waistband" holsters. When ordering hand orientation refers to the holster being worn IWB as recommended.

Dated this 19th day of April 2023.

Respectfully Submitted,

/Brandon J. Leavitt/

**Brandon James Leavitt**

INITIAL INFRINGEMENT CONTENTIONS                    Page 31 of 31

TAB

# 14

# Joint Submission of Claim Terms for Construction

Filed August 8, 2025 (Dkt. 132).

SOURCE

*Court record: ECF Dkt. 132, filed jointly by the parties on August 8, 2025.*

Brandon James Leavitt, TX Bar No. 24078841, *pro hac vice*
Eldredge Leavitt Law Firm
4204 SW Green Oaks Blvd., Suite 140 Arlington, TX 76107
(214) 727-2055
brandon@uslawpros.com

Jason K. Smith (Utah Bar No. 14323) MK SMITH, APC
9891 Irvine Center Dr., Ste. 200
Irvine, CA 92618
801-916-8723
jsmith@mks-law.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH
## NORTHERN DIVISION

| | |
|---|---|
| **JM4 TACTICAL, LLC; and JAMES CHADWICK MYERS,**<br><br>Plaintiffs,<br><br>*versus*<br><br>**E & R LLC d/b/a HER TACTICAL; *et. al.***<br><br>Defendants. | **JOINT SUBMISSION OF CLAIM TERMS FOR CONSTRUCTION**<br><br>**LPR 4.2(b)**<br><br>Case No. 1:22-cv-01121-DAK-DBP<br><br>Judge Dale A. Kimball<br>Magistrate Judge Dustin B. Pead<br><br>**Jury Demanded** |

TO THE HONORABLE COURT:

Pursuant to Local Patent Rule 4.1(b) [now 4.2(b)], the parties have met and conferred regarding claim terms and phrases for the Court to construe. The parties were unable to agree on ten terms for construction. Accordingly, pursuant to LPR 4.2(b), five terms are allocated collectively to all plaintiffs and five terms are allocated collectively to all defendants.

App-164

## I.    Terms Allocated to Plaintiffs

| Claim Terms and Phrases for the Court to Construe | Plaintiff's Proposed Constructions | Defendants' Proposed Construction | 35 U.S.C. § 112(f) Elements |
|---|---|---|---|
| *fastener protrusion* | A component that secures one object to another and extends beyond a surface | Plain ordinary meaning | N/A |
| *fastener housing* | A structure that contains or surrounds a fastening mechanism | Plain ordinary meaning | N/A |
| *disposed within a thickness* | Positioned inside the depth dimension of a material or structure | Plain ordinary meaning | N/A |
| *two magnets* | Two magnetic elements that work together | Plain ordinary meaning | N/A |
| *integrally secured* | Permanently attached to form a unified whole | Plain ordinary meaning | N/A |

## II.    Terms Allocated to Defendants

Defendants do not believe any claim construction is needed, and that the plain ordinary meaning should apply.

**Joint Submission of Claim Terms**                                    Page 2 of 3

## III.    Conclusion

The parties respectfully request that the Court construe these terms and phrases in

accordance with the briefing schedule established by the Local Patent Rules.

Respectfully Submitted,

/Brandon J. Leavitt/

**Brandon James Leavitt**
Counsel for Plaintiffs

Agreed as to Form and Substance:

/Bryan Todd/ (by permission)
**Bryan Todd**
Counsel for Defendants

TAB

# 15

# Minute Entry re Claim Construction Hearing

Entered December 19, 2025 (Dkt. 144), reflecting Judge Allen's ruling at the December 18, 2025 hearing declining to construe Plaintiffs' proposed terms and adopting plain and ordinary meanings.

SOURCE

*Court record: ECF Dkt. 144.*

| From: | utd_enotice@utd.uscourts.gov |
|---|---|
| To: | ecf_notice@utd.uscourts.gov |
| Subject: | Activity in Case 1:22-cv-00121-AMA-DBP JM4 Tactical et al v. Her Tactical et al Miscellaneous Hearing |
| Date: | Friday, December 19, 2025 7:16:25 AM |

- EXTERNAL EMAIL -

**This is an automatic e-mail message generated by the CM/ECF system. If you need assistance, call the Help Desk at (801)524-6100.**
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including unrepresented parties) who receive notice by email to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. Access to the one free electronic copy expires as designated by PACER. To avoid incurring charges later, download and save a copy of the document during the first access. However, if the referenced document is a transcript, the free download restrictions and 30-page limit do not apply.

***NOTICE REGARDING MAILING COPIES OF NEFS AND DOCUMENTS*** The court will mail a copy of the NEF and associated document of court-generated documents (e.g., reports and recommendations, orders, and notices of hearings) to parties who are not registered to receive electronic notice, as indicated under "Notice has been delivered by other means to. . . ". The court will not mail NEFs and documents of party-generated filings to any party (including the filing party) even if the "Notice has been delivered by other means to. . . " states otherwise. The filing party is responsible for serving a copy of the NEF or document on parties who do not receive electronic notice.

## US District Court Electronic Case Filing System

## District of Utah

## Notice of Electronic Filing

The following transaction was entered on 12/19/2025 at 7:15 AM MST and filed on 12/18/2025

**Case Name:**     JM4 Tactical et al v. Her Tactical et al
**Case Number:**     1:22-cv-00121-AMA-DBP
**Filer:**
**Document Number:** 144(No document attached)

**Docket Text:**
**Minute Entry for proceedings held before District Judge Ann Marie McIff Allen: Claim Construction Hearing held on 12/18/2025. Discussion and argument heard from the parties. The Court rules: For the reasons stated on the record, the Court declines to construe any of the terms proposed by plaintiff and will adopt the plain and ordinary meanings. This ruling can be revisited in the future if necessary.**

**Attorney for Plaintiff: Brandon Leavitt, Attorney for Defendant: Chad Pehrson. Court Reporter: Laura Robinson.(rlr)**

**1:22-cv-00121-AMA-DBP Notice has been electronically mailed to:**

Chad S. Pehrson    cpehrson@kba.law, acoats@kba.law, calendar@kba.law, cpehrson.kba.law@recap.email

Jason K. Smith    jsmith@mks-law.com

Brandon James Leavitt    brandon@uslawpros.com

**1:22-cv-00121-AMA-DBP Notice has been delivered by other means to:**

Grant Lee Cavalli(Terminated)
2340 N 600 E
Ogden, UT 84414

TAB

# 16

# Excerpts from the Deposition of Vicky Arlene Johnston

Taken in this action on November 2, 2023.

SOURCE

*Deposition of Vicky Arlene Johnston, taken under oath in this action on November 2, 2023, reported by Deirdre Rand, RPR, CSR, CCR. Per DUCivR 56-1(e)(2)(B), excerpts include the relevant cited pages plus the four pages before and four pages after each cited section.*

*Deposition Cover Page (for Court reference)*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

-ooOoo■5

JM4 TACTICAL, LLC; and ) JAMES CHADWICK MYERS, ) ) Plaintiffs, ) Civil No.

v. HER TACTICAL, LLC; E&R ) 1:22-cv-00121-DAK-DBP ) ) LLC dba HER TACTICAL; )

VICKY ARLENE JOHNSTON; BLAKE CHEAL, individually and in his capacity as ) ) )

settlor and trustee of THE BLAKE AND TANYA CHEAL ) )

FAMILY LIVING TRUST; and GRANT LEE CAVALLI, ) )

Defendants. ) ) )

RULE 30(b)(6) DEPOSITION OF: E&R LLC d/b/a HER TACTICAL (VICKY ARLENE JOHNSTON), AND

VICKY ARLENE JOHNSTON, IN HER INDIVIDUAL CAPACITY

Taken on November 2, 2023 At 9:35 a.m. to 3:14 p.m.

At the United States District Court

District of Utah 351 South West Temple

Salt Lake City, Utah 84101

Reported by: Deirdre Rand, RPR, CSR, CCR

App-169

didn't come from you?

A. No.

Q. Any changes on that website that didn't come from you?

A. No.

Q. Okay. And you are also the owner/operator of https://www.Facebook.com/Vicky.Johnston.394, correct?

A. Yes, that's my personal Facebook page.

MR. PEHRSON: I'm going to object; the question is vague and ambiguous.

MR. LEAVITT: Please state for the record, Mr. Pehrson, what's vague and ambiguous about that question?

MR. PEHRSON: Actually, I'm not supposed to state anything for the record other than the objection. If you don't think your question is vague and ambiguous, then fire away.

MR. LEAVITT: All right.

MR. PEHRSON: I've made the objection.

BY MR. LEAVITT:

Q. All right. I didn't get to hear your answer over the objection. Do you mind repeating yourself?

A. Oh, I did. Yes, it's my personal Facebook account.

Q. Okay. Are you the owner and operator or

Page 23

creator of https://www.etsy.com/shop/HerTactical?

MR. PEHRSON: Same objection.

THE WITNESS: That is my business shop account.

BY MR. LEAVITT:

Q. Is there any content on that shop account that you don't personally manage?

A. No.

Q. Are you the owner, operator, creator, or manager of https://www.etsy.com/listing/1240884431/ her-tactical-magnetic-holster-4?

MR. PEHRSON: Same objection.

THE WITNESS: Yeah, I don't know the number, but if that's the magnetic holster, that would be yes, it's the business listing.

BY MR. LEAVITT:

Q. Okay. And you manage all that content as well?

A. Correct.

Q. In the interest of time, can you state whether or not you're the owner, operator, creator, or manager of the listings at 20, 21, 22, and 23?

MR. PEHRSON: Same objection.

THE WITNESS: I deny 23.

BY MR. LEAVITT:

Page 24

Q. How about 20, 21, and 22?

A. That's a business listing for a business account. It looks like it.

Q. And you manage all the content on those accounts?

A. Uh-huh. Yeah.

Q. But this Alibaba account is not yours?

A. I don't sell on Alibaba. I'm not a vendor on Alibaba at all.

Q. Do you purchase from Alibaba?

A. Yeah. Most people do.

Q. Okay. You purchase these products from Alibaba?

A. Some of them, yeah.

Q. Where else to you purchase them from?

A. Just through independent manufacturers that I know personally. Not for this product, though.

Q. Okay. Yeah, that's -- I apologize if I was too broad. Specifically for the accused instrumentalities are they all purchased from Alibaba?

A. Yes.

Q. Okay. And you have an account with Alibaba that you use for those purchases?

A. Uh-huh.

Q. Do you communicate with the manufacturer

through that account?

A. Yes.

Q. Does the nature of that communication at least involve designing the product?

A. Well, I design it and I give it to them.

Q. Okay. So you gave them specifications --

A. Uh-huh.

Q. -- through that account?

A. Uh-huh.

Q. Okay. I'm assuming there was a back-and-forth dialogue where they ask you questions and you follow up with answers.

A. Sure. Normal business conversation.

Q. Okay. Roughly during what time period were those design conversations?

A. Between -- so I did a lot of product research from August of '21, and it finally got to market almost -- what was it? May -- very end of May is when I sold my very first product.

Q. May of '22?

A. Uh-huh. So what is that? Almost ten months or something.

Q. So...

A. It took a long time.

Q. So at what point did you move from the

App-173

research phase to the production phase?

A. I think I finally went into production -- they started -- I think I did an order, like, very end of December of '21. And then I received them in April. And then there was another delay, and then started selling at the end of May.

Q. What was the nature of the delay?

A. I needed to get some stickers printed.

Q. So just some hand notes here from your dialogue, research for the accused instrumentalities began 9/21. Your first order went out 12/21.

A. It was August, sorry. Eight, yeah.

Q. Thank you. I might have miswritten that.

A. Yeah.

Q. August '21 for the research. The first order went out December of '21. The products were received by you April of '21.

A. Uh-huh.

Q. April of '22, I apologize. And you had listed them for market and sold them by 5/22?

A. Yes.

Q. Where did you receive the inventory?

A. Where?

Q. Uh-huh.

A. At my home address.

App-174

Q. Okay. And your development correspondence, if I can call it that, between you and the manufacturer, that would have occurred between August and December?

A. Correct. Yes. I did a full training course, so I was guided, I was mentored as to -- and I was also researching other products that were not related to the firearms industry at all. So I was very well endowed with the USPTO on how to research products.

Q. Okay. Did you say you were endowed with the USPTO?

A. Endowed? Is that what you said?

Q. Is that what you said?

A. Yeah, I was knowledgeable on the USPTO.

Q. Okay. I think it's an accurate use of the word, I just hadn't heard it used that way before.

A. Well, kind of like -- you know, like, you learn stuff and you know how to use the system, so...

Q. Okay.

(Comments off the record.)

Q. All right. So you're pretty comfortable with USPTO procedures; is that what you're saying?

A. No -- well, they've actually changed the system. You've probably noticed that, too. They went through a big overhaul. And I was like, oh, my gosh. But during that time I had hired a patent agent as well,

Page 28

because I was also doing a provisional patent.

Q. You hired them specifically for the purpose of filing the provisional patent application?

A. Yes, I filed it, but I wanted him to continue it.

Q. Okay.

A. I just wanted to get it done before it was out for a year.

Q. Okay. So I think we observed, and we can clarify it later when we the pull up records, but you filed the provisional application in February, correct?

A. Correct.

Q. So you hired a patent agent to help you with that after February?

A. Yes.

Q. Approximately when did you hire him?

A. I don't know. I'm not really sure. I didn't think to think about, like, when. I just had hired him.

Q. Okay. But it's after February of '23?

A. Correct.

Q. Which is after you had already ordered the product, correct?

A. Yeah.

Q. Okay. And I don't want to make any assumptions, so can you be very clear and specific about

what you mean when you say you're knowledgeable about the USPTO?

A. In my training I was taught to do Google searches, patent searches, go to the USPTO. Really look around at the different patents that were there.

I mean, I looked up magnetic holsters and there was, like, Chad's one and then there was another one which was sort of made of Kydex. It had screws in it that was not relevant.

So I made sure when I looked at Chad's claim that, okay, well, I don't have the three magnets, so -- and then I had my patent agent do an analysis on it.

Q. When did you first look at Chad's claim?

A. It would be in August.

Q. August of --

A. That' when I started doing my research, because I was already using the USPTO for other products.

Q. Okay. So August of '21?

A. '21. Uh-huh.

Q. Okay. So you were --

A. I've been very careful about how I design my products. I researched a lot on the USPTO.

Q. Okay. So you started your search in August of '21. You found JM4's patent.

Page 30

A. Yeah.

Q. And did you -- what did you do after you identified his patent?

A. Just started designing it, ready for prototyping. I certainly didn't order it until well after I had done everything.

Q. And this is personal research, right? Not research with an attorney?

A. Not with an attorney. I didn't need to. I had the training. I had hired professionals. They were -- like, have been in the industry for a very long time. So I was taught well. I didn't feel like I needed an attorney on top of that.

Q. Okay. Did that training expand into the consequences of patent infringement?

A. No. You're in trouble if you infringe. I knew that.

Q. Okay. But that training, in your mind, satisfied you as to your ability to distinguish between patent claims?

A. Yes. Yeah.

Q. Okay.

A. The course I took was in January, so I had already been taking the course for a good six months.

Q. All right. Let's clarify that. When you say

Page 31

you took the course in January, does that mean you completed it or you started it?

A. No, I started it. So where they talk about patents is in module one, lesson eight. So it was in the very first module. There are like eight modules.

Q. Okay. So you reached the module on patents in January of '22?

A. '21. Yeah, it was in '21.

Q. '21?

A. '21.

Q. Even though you didn't even start researching for your product until August of '21?

A. Correct. Yeah.

Q. Okay.

A. I had done six months' worth of training.

Q. I see.

A. And I had already been researching other products for other industries, and then -- yeah, so I had six months of working with the USPTO, of researching, designing, before I looked at Chad's one. And Chad's -- so the idea of the magnetic holster, I -- so I had purchased The Running Buddy, which is the magnetic cell phone holster, because I am in the film industry, I always have a fanny pack on me. And I wanted something that was a little bit slimmer, so

Page 32

I bought The Running Buddy, which is a magnetic holder for a cell phone. I bought that in July. That's what gave me the idea.

I thought, oh, my gosh, this is such a great idea for a holster. And then that's when I started looking.

Q. Okay. I appreciate the clarification.

I wasn't looking at dates in January of '21 and so this is when you started your IP training.

A. Yeah.

Q. And then you were satisfied with the quality of that training.

A. Yeah. Well, I mean -- yeah, you look at the first claim, making sure that you are not infringing on every single one of those points of the first claim.

Q. And you felt qualified to make that claim without consulting counsel?

A. Yeah. I don't think you had to be a brain surgeon for that, no. Yes.

Q. We took a little detour there, but we're back to the Requests for Admission. Can you confirm whether or not you've owned, operated, created, or managed the content identified in Request 24 and 25?

A. I don't know the numbers, but it looks like, yes, I managed it for Her Tactical, the business.

objection as I previously made regarding the cumulative Rule 1006 summaries.

MR. LEAVITT: And I was thinking about it over the break, Mr. Pehrson. You seem to be repeating the same objections over and over. If you'd like to make a standing objection, we can note that for the record and maybe move this along a little quicker.

MR. PEHRSON: I appreciate the offer. I think that what the court rules require is to make a specific objection as to each question. I'll do so as expeditiously as I can.

When there's a line of questioning that's very similar, I think it's appropriate to carry over objections for a handful of questions, so I will look for opportunities to do that and just state "same objection" when I'm copying the last objection.

MR. LEAVITT: All right. Thank you.

BY MR. LEAVITT:

Q. Ms. Johnston, I propose that we proceed with these interrogatories in the same way that we ended up with the admissions, where we have the legal language here for to you to read, and when I ask you a question, I will paraphrase it to make it a little bit more easy for you to understand.

A. Thank you.

Q. Okay.

MR. PEHRSON: I repeat the same objection I made to this approach.

BY MR. LEAVITT:

Q. All right. So the first question, I'm asking to the extent that you have made a defense or a claim or an argument in this case, how does your argument differ from any of your codefendants?

A. I don't know.

MR. PEHRSON: I'm going to object on the grounds of vagueness.

BY MR. LEAVITT:

Q. So for example, E&R on 5/31/23 clarified that they are a company which is a construct of corporate law and therefore not a person. So E&R says I'm different from the other defendants because I'm not a real person. Does that make sense?

A. Yeah.

Q. Okay. I understand from some of your earlier responses that you consider yourself in your personal capacity to be distinct from the other defendants because anything you've done yourself was on behalf of E&R. Is that a correct conclusion?

A. Yes. I mean, the product is under E&R. I am employed by E&R. This is all about this business.

Page 84

App-182

I don't do anything personally to do with the business.

It's all for the business.

Q. Okay. And this isn't Mr. Cheal's deposition, but you did refer to him as a volunteer. So do you distinguish yourself from Mr. Cheal in that you consider him a volunteer as opposed to yourself as an employee?

MR. PEHRSON: I'm going to object as vague and compound and ambiguous.

THE WITNESS: Could you repeat that, please?

BY MR. LEAVITT:

Q. Well, I was suggesting a difference. Maybe in your own words, how are you, Vicky Johnston, in her personal capacity and as a representative of E&R, a different kind of defendant than Blake Cheal?

A. He has nothing to do with this business.

Q. Okay. In question 2 I was asking who designed the Her Tactical holsters and the response I got from E&R was you can get that through the documents we've produced. And specifically, those documents are HerTactical -- for the record, that's one word -- _0003-0830, meaning Her Tactical production documents 3 through 830.

If I were to review those documents and find -- if I were to review those documents, am I going to find that you designed them? What am I going to find?

A. I don't know.

Q. Okay.

A. I'm sorry.

Q. All right. But the answer is in there.
That's what you're saying, is the answer is in there?

A. (Witness nods head.)

Q. Okay.

A. That's what I've stated.

Q. All right. No. 3, I was asking if there were any express or implied agreements between you and any other defendant in the case.

A. There is nothing there, no.

Q. All right. So your answer on 5/31 is that you're married to Blake Cheal.

A. Uh-huh.

Q. You also testified earlier today that you have permission to sell -- or to conduct business from your home, and that he gave you that permission. Is that correct?

A. He didn't actually give me permission, like, in words. It's just a performance thing. You know, if he didn't want me doing it in his house, then he could state that. He's just not stated that.

Q. Oh.

A. So I'm assuming he's given me permission by

Page 86

performance.

Q. All right. So as opposed to an expressed

permission --

A. Yes.

Q. -- you have an implied permission?

A. Right.

Q. Okay. And then because you have an implied

permission, E&R also has an implied permission?

A. I guess so, yes.

Q. And then you mentioned that you're an employee

of E&R.

A. Uh-huh.

Q. So is there a relationship between you, Vicky

Johnston, in your personal capacity, and the entity E&R?

MR. PEHRSON: Objection; vague and ambiguous.

Calls for a legal conclusion.

THE WITNESS: That was so -- okay.

BY MR. LEAVITT:

Q. I have to ask.

A. I am the principal owner of E&R LLC --

Q. Okay.

A. -- d/b/a Her Tactical as Vicky Johnston,

working in the capacity of that business. I don't do

things personally for the business. I am employed by my

business, by E&R.

Page 87

Q. But you're not a volunteer, right? You're an employee, not a volunteer?

A. I'm not a volunteer.

MR. PEHRSON: Object.

And just let me make my objections.

Vague. Ambiguous.

THE WITNESS: Most of this feels voluntary, because I'm not making any money. So let's put it that way.

BY MR. LEAVITT:

Q. But if there were money --

A. Uh-huh. I would pay myself.

Q. -- it goes in your pocket; you're paying yourself?

A. As an employee. Uh-huh.

Q. Okay.

A. Yes.

Q. I'm sorry, turn the page, I want to go back to No. 3 real quick.

A. Sure.

Q. No, I change my mind. It's back to No. 4.

A. No problem.

Q. Sorry for the whiplash.

A. Uh-huh.

Q. No. 4 is related to No. 3. No. 3 was asking

Page 88

about financial relationships.

A. Uh-huh.

Q. And No. 4 is asking about any commonalty of purpose.

A. Okay.

Q. Okay. So for example, I note from several of your court filings -- I note from several of your court filings a personal backstory that kind of led you to this moment where you designed the Her Tactical holsters and maybe even formed the company. Right?

A. Uh-huh.

Q. And that is, if I might suggest the word, "a purpose for you." Is that correct?

A. Sure.

Q. Is that the same purpose that the company E&R has?

A. E&R was established in 2017. So it had a different purpose.

Q. What was that purpose?

A. Running real estate.

Q. Okay. So the entity E&R runs real estate, but now it has a d/b/a for Her Tactical. So does it not at least now share the purpose of the Her Tactical venture?

A. You mean real estate? Now she has the purpose of Her Tactical?

Page 89

Q. Well, I understand --

A. They are completely separate.

Q. Well...

A. It's a d/b/a.

Q. And what does that mean to you?

A. It has -- it's about Her Tactical. So that -- so that -- so the company name is E&R, but my d/b/a is solely about the purpose of why I created Her Tactical. It doesn't cross over with real estate at all.

Q. Okay. But the entity owns that d/b/a?

A. Uh-huh.

Q. It's the entity that receives, for example, payments?

A. Right.

Q. And then distributes those payments to vendors, employees, etc.?

A. Uh-huh.

Q. And it's through that d/b/a that it does it. So you just mentioned that the d/b/a shares your purpose. If the -- if E&R owns the d/b/a, then at least in some part it shares the purpose, right?

A. Yeah. Yeah.

Q. Okay. Does Mr. Cheal share your purpose?

A. He supports me.

MR. PEHRSON: I'm going to object on grounds

of relevance. Vague. Ambiguous.

THE WITNESS: Yeah. He cheers me on.

BY MR. LEAVITT:

Q. Okay.

A. You need someone like that.

Q. I agree. I agree. So his purpose is strictly to support you, but not necessarily your purpose, which is to empower -- I mean, I guess I never asked you what your purpose is, but --

A. Yeah.

Q. -- is your purpose to empower women and -- and --

A. Yes, it is. It's for the protection of women, and to provide options so that women can fully protect themselves.

Q. Okay. And through the d/b/a, E&R shares that purpose, but Mr. Cheal doesn't share that purpose. He just supports you in your purpose?

A. Yeah. He's just a cheerleader for me.

Q. Okay.

A. Yeah. He's my biggest fan. He doesn't -- he is an extraordinarily busy person. There's no way he could operate my business.

Q. Okay. What goes into operating your business?

A. Oh --

App-189

MR. PEHRSON: I'm going to object to --

THE WITNESS: There's a lot. I'm sorry.

MR. PEHRSON: -- vagueness.

You've got to let me make my objections. I'll make them very quickly and then it will be your turn.

Vague. Ambiguous.

Please go.

THE WITNESS: So I'm sorry about that.

I can't remember what I was going to say.

BY MR. LEAVITT:

Q. The question was, what goes into running your business?

A. Really, it would take up quite some time for me to express everything that goes into my business. You know, everything from photography, marketing, negotiating with manufacturers, designing, graphic design, accounting, web development. All of that. Like, it's just like a normal business would run. Chad could probably tell you how a business is run.

Q. How much of your time goes to that?

A. It depends, because at the beginning it was -- you know, I put in a lot of effort. Since my business had declined, not as much.

Q. Could you estimate roughly how many hours per week?

App-190

A. It depends.

Q. Maybe an average?

MR. PEHRSON: I'll object on grounds of relevance.

THE WITNESS: I don't know. I'd have to calculate it. Yeah.

BY MR. LEAVITT:

Q. Okay. Is it more than ten hours per week?

A. Oh, yes.

Q. More than 20?

A. Sometimes.

Q. Maybe 15 to 20 roughly?

A. Well, the reason why I say it depends is because sometimes I do trade shows.

Q. Uh-huh.

A. That's a full weekend. Sometimes I don't.

Q. How often do you do trade shows?

A. Just whenever the season has trade shows over the winter.

Q. So over the winter, maybe into the spring. Do you do any in the summer and fall?

A. No. No, because they don't have trade shows in the summer.

Q. How many trade shows per year do you do?

A. Maybe six.

Page 93

Q. Okay. You get a lot of business at those trade shows?

MR. PEHRSON: I'm going to object. Vague and ambiguous.

THE WITNESS: Yeah. I wouldn't do it otherwise.

BY MR. LEAVITT:

Q. Okay. You mentioned that business has slowed down. Is it because we're coming out of the summer?

A. No. It's because of a lawsuit. Sorry if that wasn't obvious. I mean, it's just been terrible.

Q. Well, I mean, I'll be direct about it. What about this lawsuit has slowed down your business?

A. Everything.

Q. Walk me through it.

A. I mean, I can't reach out to retailers. Gosh. Oh, my goodness. Chad spoke to A Girl With a Gun. They sent out, you know, an email to say don't work with me. I have had disparaging videos made about me. All of that has an effect.

Q. Okay.

A. When I'm at trade shows, that's probably more of my happy place, because I actually work with people face to face and they love -- I get so many wonderful compliments from both men and women because they can see

App-192

my passion and drive behind why I'm doing this.

So, yeah. So, I mean, I've had things happen to me on Amazon. Yeah. I have reported it to Amazon. I've had my Etsy store shut down. It's now back up. I don't have the funds to continue buying product because I'm paying for this lawsuit.

Q. I don't have an exhibit for this, but I observe that the product has -- on your website says, "unavailable."

A. Uh-huh.

Q. Is it unavailable because you're out of stock or is it unavailable because you're choosing not to sell it until the resolution of the lawsuit?

A. I am choosing to halt my sales right now.

Q. When did you make that choice?

A. In September.

Q. Why September? This is September of '23, I assume?

A. This -- yeah, just the last month or two. Yeah.

Q. Why did you make that choice in September?

A. Because I'm researching this next patent that has come out.

Q. Okay. So you got notice of a new patent registration, and you have held back sales until you can

get to the bottom of that?

A. Yeah.

Q. Were you aware of that patent in the spring?

A. I don't recall.

Q. Okay. Are you aware that proof of a notice of allowance for that patent had been produced to your counsel in the spring?

A. I don't recall.

Q. Okay. So the first time you personally became aware of that patent was in September?

A. Yes. When I became aware.

Q. Okay. No. 5 we've had some trouble with. Back to the interrogatories. We have asked for you to identify all the bank accounts that are associated with the accused instrumentalities, the Her Tactical products.

On the one hand you said, "I don't know anything about that in my personal capacity." But then, when speaking with your business hat on, you said irrelevant.

A. Yeah.

Q. All right.

A. That's it.

Q. So let's explore that. When you receive payments for the Her Tactical holster, where do those

Page 96

A. Yeah. There's only one account. I have --
I have a checking account and a PayPal account which
goes through my checking account.

Q. Okay.

A. So...

Q. Does your business have a Venmo account?

A. No.

Q. Okay.

A. I received two payments from an Eleace Pierce.
She turned up at my -- one of the workshops and she
turned up at my house. That went through my Venmo
account, but that gets -- introduced funds into my
checking account.

Q. Why did you take that payment by Venmo?

A. Because she didn't order it online. She was
meeting me in person. She said, "Can I pay by Venmo?"
I'm like, "Okay."

Q. Okay.

A. It's not a big deal. Like, it still gets
transferred into the accounting system.

Q. And there would be a record of that?

A. Sure. Yeah.

Q. So it seems to me that the E&R checking
account, the E&R PayPal account, and at least with
respect to that transaction from Venmo, that Venmo

account, are in fact, relevant to the claims and defenses in this case. Are they not?

MR. PEHRSON: I'm going to object. It calls for a legal conclusion.

BY MR. LEAVITT:

Q. I mean, do you have any problem with producing those records for us?

A. I would not want to produce those. Those are my, like, business records that -- I mean...

Q. Well, how else are we supposed to confirm, you know, your income and expenses?

A. Well, you can ask me. Like, why would you need my bank account? I can give you, you know, something else, but you don't need to look at all of that.

Q. Well, I've got a question about this later, but -- about something else. We did ask for access to your Alibaba records, which you also denied us.

A. I don't sell on Alibaba.

Q. But you purchase from Alibaba, correct?

A. Yes.

Q. So...

A. And that's private, like, confidential information about my suppliers.

Q. You can mark it confidential. You can even

Page 98

App-196

mark it attorneys' eyes only and then I'm the only one who sees it.

A. Sure.

Q. If we agree that your bank records and your Alibaba records will be designated attorneys' eyes only, will you produce them to us?

A. I don't see how this is actually relevant to an infringement case.

Q. Well, if we win the infringement case, we get damages. Damages are a disgorgement of profits. So it's important to ascertain what those profits are.

A. Well, we can cross that when we get to it.

Q. Okay. I have the right to ask. If you won't give it to me, I'm going to have to file a motion to compel.

A. Sure.

Q. Do you understand that?

MR. PEHRSON: I'm going to object to the line of questioning. I mean, if you have factual questions for the witness, I invite you to ask them. If you'd like to discuss with me issues related to our production, I'm always happy to discuss that with you.

BY MR. LEAVITT:

Q. So do I understand from you that you won't produce those unless your counsel changes his mind or

the court requires it? Is that your position?

MR. PEHRSON: Again, I'm going to object to the question. We're here to obtain facts and not to discuss --

MR. LEAVITT: It's a factual request.

MR. PEHRSON: -- not to discuss litigation strategy or the status of discovery requests.

MR. LEAVITT: It's not litigation strategy or discovery requests.

BY MR. LEAVITT:

Q. I'm asking if you'll produce it. Yes or no?

A. No, not right now.

Q. Okay. Thank you.

Interrogatory Request No. 6. This is related to No. 5. It's asking about who the signers and owners of those accounts are.

So as the only individual involved with E&R, I'm assuming that you are the owner and signer of the business account.

A. Right.

Q. Okay. Does E&R have a separate business account for each of its d/b/a's or is it one account for everything?

A. Just one account.

Q. Okay. So your real estate transactions and

Page 100

income, that goes into the E&R business account as well?

A. Uh-huh.

Q. I think you've got a casting company; is that correct?

A. Uh-huh.

Q. Okay.

(The reporter asked for clarification.)

A. Yes.

Q. Let's try to give yeses and nos for the court reporter. All right. I think we discussed the content of No. 7, so let's move to No. 8. This is one that your counsel and I have gone back and forth quite a bit with. And on June 14th I've noted that he proposed a supplementary response with the following phrase, "Her Tactical has sold the Accused Instrumentalities. I am a member and manager of Her Tactical. Her Tactical operates as my hobby business and I'm the only person who makes decisions for it. I am the sole agent for Her Tactical and the sole 'employee.' As such, I act in obvious ways to enable various Her Tactical business decisions, including the design and sale of Her Tactical's magnetic holsters for women." Now, I note that you haven't actually supplemented your responses with that, but it seems consistent with your testimony today. Do you agree with

A. Well, I keep in contact with my patent agent.

Q. Okay.

A. So he does do analysis for me. Whenever, you know, there's some new development or there's a product that I want him to research.

Q. Okay. But with respect to the holsters.

A. He's done several analyses, yeah.

Q. Has he provided you written opinions on those analyses?

A. I have a full report, yeah.

Q. I think you're obligated to produce that to us. If it's not listed among the things we've just identified, do --

A. I can provide it. I mean, it's --

Q. Yeah.

A. I mean, it goes in my favor, obviously. But, if you really wanted it, I mean...

Q. Well, all the more reason to get it to me, right?

A. Yeah. Well, I mean, you -- it was never requested. So it's just personal stuff that I do for my business to make sure I'm keeping in check with not infringing on anyone's patent.

Q. Well, Exhibit 3 was a request for production. I think it is requested. So let's make it happen, if

Page 113

that is okay with you.

A. Okay.

Q. All right.

All right. No. 18, we asked for the total number of units sold and their dollar value by quarter, in both gross and net profits. What we got was a single number totaling $26,000 through February of 2023.

A. Okay.

Q. Is there any reason you can't give us updated figures that are broken down into gross and net profits?

MR. PEHRSON: I'm going to object. Vague and ambiguous. And I'll -- I believe there is an accounting definition of gross profits.

BY MR. LEAVITT:

Q. It works to my favor. All I have to do is prove gross profits and I get it all unless you can prove expenses. So you're invited to send me...

A. Yeah. I did, like, all of my sales, as of, like, two days ago. So with all of the magnetic holsters from the time I started, it was 48,000.

Q. Okay. And you will supplement your response in production to reflect those numbers?

A. Yeah. I will need some time to pull the reports.

Q. Okay.

MR. PEHRSON: I believe there's some confusion or ambiguity regarding the term profits and revenue. Could you address that, Ms. Johnston?

THE WITNESS: Yeah. It's a gross revenue. I'm sorry that I haven't done anything else other than, like, pull the reports and then give you, like, retail gross revenue on what was made. So that is not including any of my expense whatsoever or even returns.

BY MR. LEAVITT:

Q. All right.

A. Just giving you a full picture of --

Q. I appreciate that. And at the end of the day, it's all I need as a --

A. Okay.

Q. -- plaintiff's attorney. That is the only number I need to prove. Okay.

A. Okay.

Q. Any expenses that you can prove will detract from that. But if you don't produce them, then nobody can rely on them or prepare a plan for them. So if you have expenses, I'm asking that you get them to us so that we can, you know, properly prepare for that. Okay?

A. Uh-huh.

Q. Okay. And of course updated gross revenue figures as well.

App-202

Okay. No. 19 is just asking who answered these and I see that on May 31st you answered on behalf of yourself and you answered on behalf of E&R; is that correct?

A. Looks like it.

Q. Okay. Thank you.

You guys are still good? No break?

MR. PEHRSON: Can you tell us how much time we've been on the clock?

(Comments off the record.)

MR. LEAVITT: Let's make it a five-minute break then.

(Whereupon a lunch break was taken.)

(Deposition resumed without Mr. Platz.)

BY MR. LEAVITT:

Q. All right. We are back from lunch. I had handed out Exhibit 3 before lunch, but I think we can skip that for now.

Exhibit 4, which I have handed to you, is just to show that you stated you're the owner of Her Tactical, but I think you've already established that, correct?

A. I believe so.

Q. All right. So moving on to Exhibit 5. That exhibit was to show that you were taking preorders for

Page 116

the accused instrumentalities at least as early as

September '21.

A. Oh, yeah.

Q. Now, you didn't actually testify if that is

the case, but is that true?

A. That was actually a prototype and I was really

excited to get it on the market. Now, my website wasn't

really set up to accept any orders.

Q. Okay. In fact, I think from your testimony,

you didn't really make -- you didn't even really order

them yourself until about December?

A. Yeah.

Q. Okay.

A. That is actually a prototype.

Q. Okay.

A. Yeah.

Q. Did you sell the prototype to anybody?

A. No. I still have it.

Q. Okay. Then let's move on to Exhibit 6.

Exhibit 6 is just a bunch of corporate formation

documents. And the reason why I'm giving them to you is

I want to talk about all the d/b/a's for E&R.

A. Uh-huh. Is it relevant, though? It's got

nothing to do with Her Tactical.

Q. Well, I mean, there is some relevancy to --

Page 117

there is some relevancy, and we might get to that.

But, at the very least, I'll ask the questions. Okay?

A. Uh-huh.

Q. So I think we are about three pages into this exhibit. And here's a printout from the secretary of state website for E&R and it says, "Doing business as," and then I read, "Utah Casting, Her Tactical, Elegance & Romance, Envy & Revere, and then Utah Relocations." Is that an accurate list of the d/b/a's?

A. Yes. It looks like it.

Q. Is there anything missing from this list?

A. No, I don't think so.

Q. Do you personally run all of those businesses?

A. No. They're just ideas, really. The rest of them are real estate or a store that I thought of doing.

Q. Okay. So which of these -- and I know technically it's all E&R doing business as, but which of these are active businesses?

A. Utah Casting, Her Tactical, and Utah Relocations.

Q. Okay. So Utah Relocations I assume is your real estate business.

A. Uh-huh.

Q. And how much revenue does that bring in?

MR. PEHRSON: I'm going to object on grounds

of relevance.

THE WITNESS: Yeah.

BY MR. LEAVITT:

Q. You can still answer.

A. I don't have an answer for that.

Q. Could you approximate?

A. It varies every year.

Q. Does it vary -- I'm assuming because you take commissions on home sales and home sales are not always going to be consistent?

A. Correct.

Q. Okay. But you do -- do you do pretty well as a real estate agent?

A. Sometimes. Some years I have. Yeah.

Q. I imagine things are pretty rough this year, if it's like everybody else.

A. Yeah. It's not like any other year.

Q. Yeah. And then Utah Casting, is that producing revenue?

A. Yes. Every now and then.

Q. Okay. About how much?

A. Oh, I don't know for sure. It's very random.

Q. Okay.

MR. PEHRSON: I just want to register a standing relevance objection to the questions associated

Page 119

with the exhibit.

MR. LEAVITT: Noted. Thank you.

BY MR. LEAVITT:

Q. And you're the registered agent for all of these businesses and that makes sense because they're you, right?

A. Well, they're --

MR. PEHRSON: Objection.

THE WITNESS: -- E&R.

BY MR. LEAVITT:

Q. E&R. Thank you.

All right. Now, the company address is 69 East 200 North, Kaysville. I think I looked that up once. Is that, like, a real estate office? Is that what that is?

A. Yes.

Q. Okay. Do you actually conduct any Her Tactical business out of that office?

A. Some.

Q. All right. Then...

All right. This is one, two, three, four, five, six pages in it looks like. I didn't paginate them. I apologize. I'm looking at the business name d/b/a form --

A. Okay.

Page 120

Q. -- for Her Tactical.

A. Uh-huh.

Q. This is JM4HT-0888. All right.

Now, what it shows here is that you applied for this d/b/a on behalf of E&R on January 6, '22, correct?

A. Looks like it.

Q. Okay. Is that the date that you formed the d/b/a for Her Tactical?

A. I guess just by going by this date here, if this is a state form.

Q. Okay. Were you calling the business Her Tactical before you registered the d/b/a?

A. I don't know. I was still going through my training. A lot of things were going on at the same time. I couldn't be precise on a particular date.

Q. You said you started your training in January of '21, right?

A. Uh-huh.

Q. Maybe I misunderstood you. I thought it was about six months of training.

A. The training can go on for years if you want it to.

Q. Okay.

A. Yeah. As long as you -- you pace yourself.

Page 121

MR. LEAVITT: Okay.

THE WITNESS: I'm sorry. And at what stage are we talking about?

BY MR. LEAVITT:

Q. I think that is a great question to clarify. So we have got a little bit of a timeline here where you did your own homework, no lawyers. Then you consulted a patent agent primarily for your application.

A. (Witness nods head.)

Q. And I thought that was clean. But then you just mentioned that you might have also talked about the '530 patent.

A. Yes. I spoke about that. It's just a verbal conversation.

Q. Okay. And my question is, you having already done your own research and being confident in your research, and then your position that prior art is insignificant in this case, why did you then talk to a patent agent about the '530 patent?

MR. PEHRSON: I'm going to object to the question for the same things previously stated. It mischaracterizes court filings. Mischaracterizes prior testimony. It's vague. Ambiguous. Irrelevant. And it's been asked and answered.

BY MR. LEAVITT:

Page 137

App-209

Q. You can answer.

A. I do like to get things right, you know.

I don't want to find myself in incidents like this.

Okay?

Q. All right. Thank you.

Exhibit 15 was to establish that the FTO analysis, that is freedom to operate that you provided Chad Myers, was dated after the date that he reached out to you. But I think we have established that.

A. It was one business day. So it was a weekend. He reached out on a Friday. I had responded by Monday, which I don't know how much sooner I could have responded.

Q. So let's skip to Exhibit 16. So I made this exhibit from the disclosures you gave us a couple of days ago with the website changes.

A. Uh-huh.

Q. All right. Which was a response to our Request for Production No. 9, which is also part of the exhibit. I would like to direct your attention to the bottom left -- bottom right-hand corner. That is what is called a Bates label, HT_ Site_Revisions_0001 is the first page.

A. Uh-huh.

Q. I would like to direct your attention to the

next page, which is 0006.

A. Okay.

Q. Now, it's cut off here. I don't have in this screenshot what you added, but do you see here where you deleted the text, "We are a family owned business based in Utah. My husband and I," and then parentheses, "(Vicky) started Her Tactical with the hope of empowering women to become educated and feel confident with carrying a concealed firearm or weapon for self-defense."

You wrote that language, right?

A. I did, yes.

Q. What date did you write that language into the website?

A. If this is all continuous, it would be -- I don't know when I wrote it, but I know when I took it out. So it was probably while I was developing the website.

Q. And if we look at the previous page, 0001, in that top left corner it says, "Revision by Vicky 12 months ago (30th October @ 10:47)." So is that documentation that you removed this sentence on October 30th?

A. Yes, that is what it says, what date is indicated.

Page 139

Q. And that would be October 30th of 2022, correct?

A. Right.

Q. Okay. Now, I was asking you earlier about shared purposes between you and the other defendants.

A. Okay.

Q. It says here that you and your husband -- that is Blake Cheal, correct?

A. Correct.

Q. It says you and Blake Cheal started Her Tactical hoping to empower women. It looks to me like he shares your purpose, doesn't he?

A. Yeah. He --

MR. PEHRSON: I'll object on grounds of relevance. Vague and ambiguous.

THE WITNESS: Again, he supports me. He supports my idea. A lot of men support me. A lot of women support me. A lot of groups support me.

BY MR. LEAVITT:

Q. So why specifically write that he and you started it?

A. Because he's my best friend. He's my husband. You know, we have pillow talk. He's -- you know, it's -- it's a company that I created and it's -- yeah, just showing that he supports me.

Page 140

Q. Well, there's a big difference between saying

"my husband supported me in starting this business" and

"my husband and I started this business."

A. Yeah. He supports me with any idea that

I have. He knows my work ethic. So, yeah, that is all

I have to say about that. It's a shame I had to take

that out because someone's scrutinizing me.

Q. Is that why you took it out?

A. No. I just -- I mean -- oh, well, after, yes.

It was just, like, where do they get that he's part of

my business? I don't get that.

And then I thought it must be from this

sentence here, because it's a family-owned business,

meaning it's my family that have helped and supporting

me. But it's not -- they don't run the business. They

don't have ownership. They don't -- they are not an

employee. They have no financial gain.

Q. All right.

So it's a family-owned business that you and

your husband started, but it's only family-owned because

they support you. And he's only helped you start it by

way of support; is that the testimony?

MR. PEHRSON: Objection; argumentative. Asked

and answered. Mischaracterizes testimony.

THE WITNESS: I have answered it.

BY MR. LEAVITT:

Q. Okay.

And I see above here, that the header -- you also changed it from "Our Story," to what looks like maybe, "Story." I can't see the right-hand column. You removed the "Our" part of it, correct?

A. Our. I've taken out our. I don't know.

Q. You took that out for the same reason that you took out "we," and "my husband and I"?

A. I don't recall. Our story? I don't have a story with him. I don't know.

Q. Okay. And then on the next page, which is 0604, see that the revision date is 11 months ago, 10th of December at 16:50. So that would be a change you made to the website December 12, 2022, correct?

A. 2023? No, '22. 11 months ago. Yeah.

Q. Okay. And that change on page 0608, there's a JPEG photo.

A. Yes.

Q. That was -- looks like it was uploaded September '21.

A. Uh-huh.

Q. Titled "BlakeVicky." Do you see that?

A. It wasn't uploaded. It was removed.

Q. Well, so the date 2021 and 09 shows the upload

Page 142

date. And yes, it was removed, I agree with you.

So I'm reading this -- tell me if you agree.

I'm reading this as a JPEG titled "BlakeVicky," that was removed on December 10, 2022, that had been uploaded on September 9th -- in September of 2021?

A. Okay.

Q. Does that seem right to you?

A. I don't know about the dates. So that date that is showing in there is -- I don't know what that date refers to, whether it's an upload date or a remove date.

Q. I submit that it's an upload date. And let's look at the right-hand column. I think you will agree with me.

A. Okay.

Q. On the right-hand column we see what you added to the website.

A. Okay.

Q. Which is a JPEG titled 20220912 --

A. Okay.

Q. I don't know if that is an underscore or a space, and then 095728. And then you see to the left of that, 2022/12.

A. Okay.

Q. Which I read as December '22, as the upload

App-215

date, which would make sense if that was the same date that you removed the BlakeVicky JPEG, correct?

A. Okay. I guess -- I don't know, but yeah.

Q. Okay. I guess it doesn't really matter exactly when you uploaded it. I'm just trying to establish a timeline.

A. Yeah. I don't understand all of the numbers in here because it could be the name of the file or when the photo was taken or -- I don't -- I can't confirm that at all.

Q. When did you create your website?

A. 2021.

Q. Around September maybe?

A. I would have to have a look to see how far back.

Q. Okay. Did -- so let's go to the next page.

A. Yes.

Q. This is JM4HT-17002. Do you see in the bottom left-hand corner the print screen it has the URL of this JPEG?

A. Yes.

Q. Does that match the URL of the JPEG that was removed in December of '22?

A. It should. It's the same photo.

Q. Okay. Has this photo -- had this photo been

App-216

on your website from the beginning?

A. Yes. I'm very proud of that.

Q. Okay. And it's not anymore, correct?

A. No. I didn't want to take it down, but I just thought this is so stupid. But I had another photo I wanted to put up, which is that one there.

Q. So on the next page, JM4HT-17003, this is the one that you put up?

A. Yes.

Q. And that URL matches the one indicated in the --

A. Yeah. It should.

Q. Okay. And you didn't want to take it down, but you did. And I understand that you did because you didn't want him implicated with the Her Tactical company?

A. Well, I put it on there because I'm also very proud of, you know, having that television spot. So that's enough. And sometimes people aren't interested in seeing family. But they want to -- you build credibility with, you know, press releases and that type of thing.

Q. Now, I notice from Exhibit 19 here that you removed the text in October, but left the photo until December.

TAB

# 17

# Declaration of Vicky Arlene Johnston

Executed May 6, 2026.

SOURCE

*Sworn declaration of Defendant Vicky Arlene Johnston, executed in support of her concurrently filed Motion for Summary Judgment.*

Chad S. Pehrson (Utah Bar No. 12622) cpehrson@knh.law
Nathan Gardner (Utah Bar No. 19537) ngardner@knh.law

**KNH LLP**
50 W. Broadway, 9th Floor
Salt Lake City, Utah 84101
Telephone: (801) 994-4646

*Attorneys for Defendants*

---

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| JM4 TACTICAL, LLC; and JAMES CHADWICK MYERS, <br><br> Plaintiffs, <br><br> v. <br><br> E&R LLC, d/b/a HER TACTICAL; VICKY ARLENE JOHNSTON, an individual; and BLAKE CHEAL, individually and as settlor and trustee of THE BLAKE AND TANYA CHEAL FAMILY LIVING TRUST, <br><br> Defendants. | **DECLARATION OF VICKY ARLENE JOHNSTON IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 1:22-cv-00121-AMA-DBP <br><br> District Judge Ann Marie McIff Allen <br> Magistrate Judge Dustin B. Pead |

I, Vicky Arlene Johnston, hereby declare as follows:

1. I have personal knowledge of the matters set forth in this Declaration. I make this Declaration in support of my Motion for Summary Judgment in this action.

2. References herein to "Her Tactical" refer collectively to E&R LLC and HER TACTICAL, LLC. Both are single-member limited liability companies organized under the laws of Utah, of which I am the sole member. Through Her Tactical, I design and arrange for the manufacture of magnetic holsters for women. The "Her Tactical" magnetic-holster

1

business at issue in this action has been continuously operated under the "Her Tactical" brand since 2021.

3. My work with Her Tactical is a side project. In my full-time profession, I work as a real estate agent.

4. I started the Her Tactical magnetic-holster business in 2021 after concluding that available concealed-carry holsters did not adequately meet the needs of many women's clothing and carry preferences. In my work as a real estate agent, I frequently work alone in empty houses. I attended firearms courses, began carrying for self-protection, and later designed holsters intended to address those needs.

5. I have been the sole member of Her Tactical since the magnetic-holster business began in 2021. No other person, including my husband, Blake Cheal, is, has ever been, or has any equity, profit, or distribution interest in Her Tactical. Mr. Cheal is not a member, manager, officer, or owner of Her Tactical and has never been a member, manager, officer, or owner of Her Tactical.

6. I am the only person who manages or operates Her Tactical's business. Her Tactical has used third-party vendors and professionals only as outside service providers, not as owners, managers, officers, employees, or agents.

7. I do not operate or hold myself out as operating the holster business in my individual capacity. When I make sales, design products, communicate with customers, contract with manufacturers, post on Her Tactical's social media accounts, or perform any other

2

commercial activity related to the holster business, I do so on behalf of Her Tactical, not in my individual capacity.

8. My husband, Blake Cheal, is not, and never has been, an officer, member, manager, employee, or agent of Her Tactical. Mr. Cheal does not work for Her Tactical, does not direct Her Tactical's decisions, and has no operational role in the business. He supports me as a spouse, but he does not run, manage, or operate the business.

9. To the extent Her Tactical has at any time used the phrase "family-owned business" in marketing materials, that phrase reflected the support I receive from my family for my work, not a co-ownership, co-employment, or co-financial-gain interest by anyone in my family, including my husband. No member of my family, including my husband, has ever owned any interest in Her Tactical, drawn a salary from Her Tactical, received profit distributions from Her Tactical, or received compensation from Her Tactical for services.

10. Her Tactical's registered office address is the same as my and my husband's residence because I perform administrative work for the business from my home. Her Tactical does not pay personal household expenses, and I keep Her Tactical's finances, books, records, and business activities separate from my personal affairs.

11. Her Tactical maintains a separate business checking account, a separate PayPal account (which is tied to the business checking account), and separate corporate books and records. All sales revenue is deposited into Her Tactical's business checking account. All business expenses are paid from Her Tactical's business checking account or PayPal account. I am

3

extremely careful to keep Her Tactical's finances separate from my personal finances and I do not commingle the two.

12. On a single occasion, a customer named Eleace Pierce asked to pay for a holster via Venmo at an in-person meeting because she was not ordering online. I accepted the payment through my personal Venmo account because, at that moment, that was the practical way to complete the transaction. I promptly transferred the funds into Her Tactical's business checking account so that the transaction would be reflected in the company's accounting system. That is the only instance I am aware of in which any sale of a Her Tactical product was processed through any account other than the company's. It was not, at any point, my intention to use my personal Venmo account as a sales channel for Her Tactical's products.

13. On a few occasions, a vehicle owned by The Blake and Tanya Cheal Family Living Trust (the "Trust") was used for incidental transportation of Her Tactical inventory, signage, and display equipment to and from in-person events that I was attending on behalf of Her Tactical. The Trust has never owned any interest in Her Tactical, received compensation from Her Tactical, received profit distributions from Her Tactical, or had any role in managing or operating Her Tactical. The vehicle was not held out as a Her Tactical asset and was not used as a regular operational asset of the business.

14. Since the magnetic-holster business began in 2021, I have maintained Her Tactical's corporate existence in good standing. I have filed required annual reports with the Utah Division of Corporations, filed required tax filings, kept books and records, executed contracts on Her Tactical's behalf, and operated the magnetic-holster business under Her

4

Tactical's registered name and trademarks. I have at all times treated Her Tactical as a separate legal entity from myself.

15. Before launching the Her Tactical business commercially, I conducted my own patent searches in the U.S. Patent and Trademark Office's public databases. I have a working familiarity with USPTO procedures, having previously prepared and filed a provisional patent application of my own. I conducted these searches because I wanted to ensure that my designs did not infringe any existing patents.

16. In August 2022, I received pre-suit demand correspondence from Plaintiff JM4 Tactical, LLC referencing only U.S. Patent No. 9,784,530 (the "'530 Patent"). Upon receiving JM4's correspondence, I promptly retained Michael R. Schramm of Schramm Patent Services, LLC, a qualified patent agent, to conduct a freedom-to-operate analysis of my Her Tactical products against the '530 Patent. Based on the analysis I received, I understood that the Her Tactical products did not infringe the '530 Patent, and I conveyed that position to JM4. I did not receive a substantive response from JM4 before JM4 filed this lawsuit.

17. I had no knowledge of U.S. Patent No. 11,747,109 (the "'109 Patent") prior to its issuance on September 5, 2023, which occurred after this litigation was already pending. The first time I personally became aware of the '109 Patent was in or about September 2023.

18. I have never intended to encourage any third party to infringe any of Plaintiffs' asserted patents or any other patent. I have never directed any third party to use, sell, manufacture, or import any product for the purpose of infringing any patent.

5

App-223

19. With the exception of the single Venmo transaction described in ¶ 12 above, every sale of a Her Tactical product has been processed through Her Tactical's business accounts and accounted for in Her Tactical's books. I have never sold any Her Tactical product in my personal capacity, as a personal merchant, outside the operations of Her Tactical.

20. I have always operated Her Tactical openly under its own brand name. I have never intended for Her Tactical's products to be confused with any of Plaintiffs' products and have not been informed of any actual confusion among customers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: May 06, 2026.

_Vicky Johnston_

Vicky Arlene Johnston

6

TAB

# 18

# Declaration of Blake Cheal

Individually and as settlor and trustee of The Blake and Tanya Cheal Family Living Trust.

SOURCE

*Sworn declaration of Defendant Blake Cheal, executed in support of his concurrently filed Motion for Summary Judgment (in his individual and trustee capacities).*

DigiSign Verified - b2310f2e-564f-4492-86cc-40545482bb29

Chad S. Pehrson (Utah Bar No. 12622) cpehrson@knh.law
Nathan Gardner (Utah Bar No. 19537) ngardner@knh.law

**KNH LLP**
50 W. Broadway, 9th Floor
Salt Lake City, Utah 84101
Telephone: (801) 994-4646

*Attorneys for Defendants*

---

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| JM4 TACTICAL, LLC; and JAMES CHADWICK MYERS, <br><br> Plaintiffs, <br><br> v. <br><br> E&R LLC, d/b/a HER TACTICAL; VICKY ARLENE JOHNSTON, an individual; and BLAKE CHEAL, individually and as settlor and trustee of THE BLAKE AND TANYA CHEAL FAMILY LIVING TRUST, <br><br> Defendants. | **DECLARATION OF BLAKE CHEAL IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 1:22-cv-00121-AMA-DBP <br><br> District Judge Ann Marie McIff Allen <br><br> Magistrate Judge Dustin B. Pead |

I, Blake Cheal, hereby declare as follows:

1.  I have personal knowledge of the matters set forth in this Declaration. I am an engineer by profession. Since August 2020, I have been married to Vicky Arlene Johnston. References herein to "Her Tactical" refer collectively to E&R LLC, d/b/a HER TACTICAL, and HER TACTICAL, LLC.

2.  I am not, and have never been, an officer, member, manager, employee, or agent of Her Tactical. I have no employment relationship with Her Tactical. I have no decision-

1

App-224

DigiSign Verified - b2310f2e-564f-4492-86cc-40545482bb29

making authority over Her Tactical's business. I am not a signatory on any of Her Tactical's bank or PayPal accounts. I am not authorized to bind Her Tactical by contract or otherwise act on its behalf.

3. I do not own, and have never owned, any equity, membership interest, partnership interest, or other ownership interest in Her Tactical. I have no profit interest in Her Tactical. I have no distribution interest in Her Tactical.

4. I have not received any salary, wages, sales commission, profit distribution, or other monetary compensation from Her Tactical. Her Tactical has not paid me a salary, wage, distribution, or commission for any work or service.

5. I do not direct, control, or influence Her Tactical's business decisions. Just as I do not tell my wife what to do, I do not tell my wife's business what to do. Ms. Johnston runs Her Tactical; I have no operational role in the business.

6. I have not personally made, designed, manufactured, imported, advertised, or distributed any Her Tactical product, and I have not sold any Her Tactical product on my own behalf or for my own account. On a limited number of occasions, I have volunteered to help my wife at trade shows and in-person events that Her Tactical was attending — for example, by helping staff her booth or assist customers. I did not receive compensation for that volunteer help. Any sales transactions during those events were processed through Her Tactical's payment system, the proceeds went to Her Tactical, and I did not retain any portion of any sale proceeds.

7. I have not authored or posted any advertisement, marketing statement, public statement, or commercial communication about any Her Tactical product, or any holster of any

2

DigiSign Verified - b2310f2e-564f-4492-86cc-40545482bb29

kind. I have not appeared in any of Her Tactical's marketing materials in an operational capacity. I have not directed or approved any of Her Tactical's marketing decisions.

8. I have not received any payment from any sale of a Her Tactical product. I have never received any sale proceeds via Ms. Johnston's personal Venmo or PayPal accounts, or by any other channel. In early 2022, before this lawsuit was filed, I allowed Ms. Johnston to use a personal credit card in my name to make purchases as Her Tactical was getting established. Ms. Johnston reimbursed me for those amounts in full by approximately early 2023. Since the filing of this lawsuit on September 19, 2022, I have not used a personal credit card or any other personal financial instrument to make any purchase on Her Tactical's behalf.

9. I had no knowledge of U.S. Patent No. 9,784,530 (the "'530 Patent") or any of Plaintiffs' four asserted Design Patents (U.S. Design Patent Nos. D788,451; D811,731; D836,329; and D841,979) before the filing of this lawsuit on September 19, 2022. I do not recall Ms. Johnston or anyone else identifying any specific JM4 Tactical patent to me before that date. I had no knowledge of U.S. Patent No. 11,747,109 (the "'109 Patent") prior to its issuance on September 5, 2023, which occurred after this litigation had already been filed.

10. I have not formed any belief as to whether any Her Tactical product infringes any of Plaintiffs' patents, any other patent, or any trade dress.

11. I have not directed, encouraged, or instructed any third party to use, sell, manufacture, import, or perform any other act with respect to any product for the purpose of infringing any patent or any trade dress.

3

DigiSign Verified - b2310f2e-564f-4492-86cc-40545482bb29

12. I am the settlor and a trustee of The Blake and Tanya Cheal Family Living Trust (the "Trust"). The Trust was established for ordinary family estate-planning purposes. The Trust holds personal and family assets.

13. The Trust does not own, and has never owned, any equity, membership interest, or other ownership interest in Her Tactical. The Trust has no profit interest in Her Tactical. The Trust has no distribution interest in Her Tactical.

14. The Trust has not received any compensation, profit distribution, payment, or other financial benefit from Her Tactical.

15. The Trust has not managed, operated, or directed Her Tactical's business. The Trust has not had any role in Her Tactical's decision-making. The Trust does not employ any Her Tactical personnel, does not contract on Her Tactical's behalf, and does not hold any of Her Tactical's books or records.

16. On a small number of occasions, a vehicle owned by the Trust has been used to transport Her Tactical inventory, signage, and display equipment to and from trade shows and similar in-person events that my wife was attending on behalf of Her Tactical. The Trust-owned vehicle has not been used as a means of regular commercial delivery or shipment of Her Tactical products to customers. The vehicle was not held out as a Her Tactical asset. The Trust did not receive, request, or expect any compensation from Her Tactical for that occasional use of the vehicle. The vehicle is not a regular operational asset of Her Tactical.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

4

App-227

DigiSign Verified - b2310f2e-564f-4492-86cc-40545482bb29

DATED: __05/07/2026__, 2026.

*Blake Cheal*

_____

Blake Cheal

5

App-228

TAB

# 19

# Defendants' Final Non-Infringement Contentions

Served June 27, 2025.

SOURCE

*Served by Defendants in this action; produced as a discovery disclosure under Local Patent Rules 3.1(b) and 2.4(c)–(e).*

Chad S. Pehrson (12622)
Bryan B. Todd (19099)
**KB&A**
50 West Broadway Ste 1000
Salt Lake City, UT 84101
Telephone: (801) 994-4646
cpehrson@kba.law
btodd@kba.law

*Attorneys for Defendants*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| JM4 TACTICAL, LLC; and JAMES CHADWICK MYERS, <br><br> Plaintiffs, <br><br> v. <br><br> HER TACTICAL, LLC; E & R LLC, d/b/a HER TACTICAL; VICKY ARLENE JOHNSTON, an individual; and BLAKE CHEAL, an individual; <br><br> Defendants. | **DEFENDANTS' FINAL NON-INFRINGEMENT  CONTENTIONS** <br><br> Case No. 1:22-cv-00121-AMA-DPB <br><br> Judge Ann Marie McIff Allen <br><br> Magistrate Judge Dustin B. Pead |

Pursuant to LPR 3.1(b) and 2.4(c)-(e), Defendants Her Tactical, LLC, ("Her Tactical"),

E&R LLC ("E & R"), Vicky Arlene Johnston ("Johnston") and Blake Cheal ("Cheal")

(collectively, "Defendants") serve the following Final Non-Infringement and Unenforceability

Contentions. This disclosure is made solely for the purpose of this action. Discovery in this

matter is underway. Further, this disclosure is based upon information that the Defendant has

been able to obtain to date, together with Defendant's current good faith beliefs regarding the

Accused Instrumentalities, and is given without prejudice to Defendant's right to obtain leave to

supplement or amend its disclosures as discovery is provided, additional facts and information is ascertained, analysis is made, research is complete, and claims are construed.

This disclosure is based at least in part upon Defendants' present understanding of the patents-in-suit, U.S. Patent Nos. 11/747,109 (the "'109 Patent"), 9/784,530 (the "'530 Patent), D788,451 (the "D'451 Patent"), D811,731 (the "D'731 Patent), D836,329 (the D'329 Patent"), and D841,979 (the "D'979 Patent") (collectively the "Patents-in-Suit"), and the scope of the Patents-in-Suits' claims. Given that the scope of the claims of the Patents-in-Suit is a legal matter not yet determined by the Court, Defendants reserve the right to seek leave to supplement or amend this disclosure if its understanding of the claims changes, including if the Court issues a claim construction order that construes the claims of the Patents-in-Suit in a manner different from Defendants' current understanding.

To the extent that Defendants' contentions herein reflect constructions of claim limitations consistent with or implicit in Plaintiffs' infringement allegations as set forth in the Complaint or Final Infringement Contentions, no inference is intended nor should any be drawn that Defendants agree with Plaintiffs' infringement allegations or claim interpretations, and Defendants expressly reserve the right to contest such allegations. Defendants offer such contentions in response to Plaintiffs' infringement allegations as set forth in the Complaint and Infringement Contentions, and without prejudice to any position that Defendants may ultimately take as to any claim construction issues. Specifically, Defendants base these non-infringement contentions at least in part upon the claim scope and certain claim constructions that are implicitly or explicitly asserted by Plaintiffs, and nothing herein should be construed or represented as evidencing any express or implied agreement with any of Plaintiffs' claim construction or infringement positions.

Defendants reserve the right to amend or supplement their non-infringement and unenforceability contentions in accordance with the Court's schedule, rules, and procedures.

**LPR 2.4(b) – Non-Infringement Contentions**

    a.  <u>Non-Infringement of Asserted Patents</u>

In accordance with LPR 2.4(b), attached as Exhibit A is a chart, responsive to the chart served by Plaintiff under LPR 2.3(c), that identifies for each identified element in each asserted claim, to the extent known by Defendants, whether such element is present literally or under the doctrine of equivalents in each Accused instrumentality and, if not, the reason for such denial and the relevant distinctions.

    b.  <u>Non-Infringement Under the Doctrine of Equivalents</u>

Additionally, we disagree that prosecution history estoppel is limited. The *Amgen* Court was clear that "a narrowing amendment to satisfy any requirement of the Patent Act may give rise to an estoppel." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1345 (Fed. Cir. 2003).

Here, on December 1, 2016, the original claims were filed, the relevant portion of Claim 1 reading "a first magnet disposed within a thickness of the fastener protrusion; and a second magnet disposed within a thickness of the housing; wherein the first magnet is configured to engage with the second magnet." Several months later, on April 19, 2017, a non-final rejection of the claim was filed. In this Rejection, the Examiner rejected the claims under 35 U.S.C. 103 under Esposito in light of McStay. The Examiner noted that "Esposito does not disclose the first magnet disposed <u>within</u> the thickness of the fastener protrusion; and the second magnet disposed <u>within </u>the thickness of the housing; wherein the first magnet is <u>configured</u> to engage with the second magnet." But he went on to cite McStay saying "McStay teaches the first magnet (i.e.

App-231

Ferromagnetic Material) (See Paragraph 0027) disposed <u>within</u> the thickness of the fastener protrusion (120); and the second magnet (114, 144 & 152) disposed <u>within</u> the thickness of the housing (142) (See Figures 3, 4, 5, & 6) (See Paragraph 0032 & 0033) wherein the first magnet (i.e. Ferromagnetic Material) is <u>configured</u> to engage with the second magnet (114, 144 & 152) (See Paragraph 0027)." After McStay, the Examiner noted that it "would have been obvious to one having ordinary skill in the art at the time the invention as field to make the first magnet disposed <u>within</u> the thickness of the fastener protrusion; and the second magnet disposed <u>within</u> the thickness of the housing; wherein the first magnet is <u>configured</u> to engage with the second magnet."

On June 1, 2017, a set of amended claims was filed. These new claims included, in relevant part, the following: "a ~~first~~ <u>two magnets</u> ~~magnet~~ disposed within a thickness of the fastener protrusion; and a ~~second~~ <u>third</u> magnet disposed within a thickness of the housing; wherein the <u>two magnets are</u> ~~first magnet is~~ configured to engage with the ~~second~~ <u>third</u> magnet." It was not until after these amendments were made that Plaintiffs had an interview with the Examiner on July 31, 2017. Thus, it is clear that the amendment from two to three magnets was in direct response to overcome the obviousness rejection under 35 U.S.C. § 103. Thus, estoppel should not be limited to structural arrangements, but should apply to equivalence theories based on functional magnetic retention.

c.  <u>Non-Infringement From Individual Defendants (Johnston and Cheal)</u>

Defendants Johnston and Cheal maintain that they were never directly involved in the infringement of the asserted patents, as they individually never made, sold, or offered to sell any infringing products. All alleged acts of infringement were taken by Her Tactical.

As to Plaintiffs' contentions of inducing infringement, as set forth in Defendants' Initial Non-Infringement Contentions, Plaintiffs must plead and prove that (i) as to a particular patent of the four alleged patents, Defendants had knowledge of that particular patent; (ii) Defendants knowingly induced a third party to infringe the patents; and Defendants had specific intent to induce a third-party to infringe the patent. *See DSU Med. Corp. v. JMS Co. Ltd.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (en banc).  Plaintiff has not sufficiently pled these elements.

Further, neither of the Individual Defendants had knowledge of the '109 patent prior to its issuance, and neither of the Individual Defendants induced any act of infringement.  *See USC IP P'ship, L.P. v. Facebook, Inc.*, 6:20-CV-00555-ADA, 2021 WL 3134260, at * (W.D. Tex. July 23, 2021) (citing *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766, 769 (2011) ("[I]nduced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement" or at least "willful blindness" to the likelihood of infringement.).

Dated: June 27, 2025

Respectfully submitted,

**KB&A**
*/s/ Bryan B. Todd*
Chad S. Pehrson
Bryan B. Todd
*Attorneys for Defendants*

App-233

<u>**CERTIFICATE OF SERVICE**</u>

I, Bryan Todd, certify that on the 27th day of June, 2025, a true and correct copy of the foregoing **DEFENDANTS' FINAL NON-INFRINGEMENT  CONTENTIONS**  was served on counsel of record with the Court via the email.

*/s/ Bryan B. Todd*

**EXHIBIT A**

**LPR 2.4(a) Non-Infringement Contentions Claim Chart for Case No: 1:22-cv-00121-AMA-DBP**

| Claim Language US 11/747,109 | Infringement Analysis | Response |
|---|---|---|
| **[P]** A gun holster system for carrying a gun, comprising: | Each Accused Instrumentality is designed and marketed as a gun holster system. Defendants' own product descriptions identify their products as gun holster systems designed to carry firearms. | Defendant Her Tactical's Accused Instrumentalities are marketed as gun holsters, not gun holster systems. |
| **[A]** a body having an upper opening disposed between a front side and a back side, wherein the upper opening is configured to receive at least a portion of the gun therethrough; | **Literally satisfied.** Defendants describe their holster body as having front and back sides with a wide opening at the top for gun insertion. Defendants' technical specifications and photographs show the required body structure with upper opening configuration. | Defendants note that the claim language cited by Plaintiffs is not the claim language of Claim 1 of the '109 Patent. Rather, the '109 Patent should read "a body having a front side and a back side that form an upper opening disposed therebetween." Despite this, this element is not infringed as Defendants' gun holsters have a body with three distinct sides. A front, a back, and a spine. There is an opening created by these three sides where a firearm can be inserted, but Defendant's technical specifications (HERTACTICAL_003) clearly indicate that there is a third side, the spine, which is not claimed in Plaintiff's patent. |
| **[B]** a strap assembly comprising: **(i)** an elongated strap extending from the back side of the body; | **Literally satisfied.** Defendants' "flap" performs the same function as the claimed "strap" - the semantic distinction is insubstantial. Technical Drawings Showing Strap/Flap Assembly: | Defendants note that the claim language cited by Plaintiffs is not the claim language of Claim 1 of the '109 Patent. Rather, the claim language should read "a strap assembly secured to the back |

**LPR 2.4(a) Non-Infringement Contentions Claim Chart for Case No: 1:22-cv-00121-AMA-DBP**

| | | |
|---|---|---|
| |  Defendants' product documentation shows elongated strap/flap component extending from the holster body. | side of the body, the strap assembly having: (i) an elongated strap extending from the back side of the body."  Despite this, this element is not present. The flap in Defendant Her Tactical's Accused Instrumentalities is not an extension of the body, and the technical specifications (HERTACTICAL_003) indicate that the flap iss attached to the front side of the body. |
| **[B](ii)** a fastener protrusion extending from a back surface of the elongated strap; | <u>**Literally satisfied.**</u> Defendants' technical drawings show magnetic protrusions extending from their flap/strap assembly.   Defendants' technical documentation depicts magnetic protrusions on the strap component. | This element is not present. Defendant Her Tactical's Accused Instrumentalities comprises a single magnet in the flap, to the extent this magnet does protrude, it protrudes on the front surface of the flap. |
| **[B](iii)** a fastener housing extending from an outer surface of the back side of the body, the fastener housing being configured to engage with the fastener protrusion; | <u>**Literally satisfied.**</u> Defendants' documentation shows housings extending from the holster body configured to engage with the protrusion. Magnetic Housing and Protrusion Engagement:  | This element is not present. As explained in the Specification of the '109 Patent, "The fastener protrusion is configured to engage within a *cavity* 307 created by a housing 305 the extends from the surface 303." (emphasis added). There is no housing present on the Accused Instrumentalities. As noted by Plaintiff, "Defendants' technical drawings show magnetic **protrusions** extending from their flap/strap |

**LPR 2.4(a) Non-Infringement Contentions Claim Chart for Case No: 1:22-cv-00121-AMA-DBP**

| | | |
|---|---|---|
| | Defendants' technical documentation shows housing extending from body with magnetic engagement functionality. | assembly." (HERTACTICAL_003) (emphasis added). As Plaintiff noted there are protrusions, plural, and as these protrusions are magnetic, they engage with one another, and one is not housed within the other as required by this claim. |
| | | Plaintiff's chart wholly omitted the following element: "wherein the elongated strap folds backwards and away from the upper opening to cause the fastener protrusion and the fastener housing to engage."<br><br>No response is provided due to absence of contention by Plaintiff. |
| **[C]** a first magnet disposed within a thickness of the fastener protrusion;<br><br>**[D]** a second magnet disposed within a thickness of the housing;<br><br>**[E]** wherein the first magnet is configured to engage with the second magnet, and wherein the engaging of the first magnet and the second magnet does not cause the elongated strap to | <u>**Literally satisfied.**</u> **[C]** Defendants explicitly acknowledge using embedded magnets that secure the folded flap with magnets positioned within the fastener components. **[D]** Defendants describe the second magnet positioned within the housing thickness to engage with the first magnet. **[E]** Defendants describe the second magnet positioned within the housing thickness to engage with the first magnet. **[F]** Defendants describe magnetic engagement that does not obstruct gun access, with the magnets positioned to keep the holster body firmly in place without interference.<br><br> | Element C is not present in Defendant Her Tactical's Accused Instrumentalities as any protrusion is caused by the magnet.<br><br>Element E is not present in Defendant Her Tactical's Accused Instrumentalities as the Accused Instrumentalities place the flap low enough on the holster body that the flap does not readily obstruct gun access, as is more common with a single piece holster like the one described in the '109 Patent.<br><br>Element F in the '109 Patent is described as the retention mechanism of the holseter. Plaintiffs fail to acknowledge that Defendant Her Tactical's Accused Instrumentalities |

App-238

**LPR 2.4(a) Non-Infringement Contentions Claim Chart for Case No: 1:22-cv-00121-AMA-DBP**

| | | |
|---|---|---|
| obstruct the upper opening of the body and does not obstruct or hinder removal of the gun from the body;<br><br>**[F]** wherein a combined magnetic retention strength generated by the first magnet and the second magnet is strong enough to retain the gun within the body; | 11<br><br><br><br>**[C]** Defendants' product specifications show magnet placement within fastener components, and Johnston has admitted to using exactly two magnets. **[D]** Defendants' product documentation shows second magnet location and magnetic engagement between components. **[E]** Defendants' technical documentation describes magnetic engagement without obstruction, and marketing materials emphasize quick gun access. **[F]** Defendants' marketing materials emphasize strong magnetic hold for gun retention using their two- magnet configuration. | don't rely solely on magnetic retention, but have added an additional mechanism to secure the gun in place, an elastic retention strap that extends across the upper opening of the body and can be fastened and unfastened. This crucial element to Defendant Her Tactical's design is not contemplated or taught in the '109 Patent. Thus, the claim that the magnets retain a gun in Element F does not support infringement, as they ignore a crucial element of Defendant Her Tactical's Accused Instrumentalities. |
| **[G]** wherein the elongated strap is configured to fold over an article of clothing such that the first magnet and the second magnet provide magnetic retention to retain the gun holster system to the article of clothing. | Literally satisfied. Defendants describe exactly this functionality, with the magnetic flap designed to close over undergarment fabric and engage magnets to keep the holster body firmly in place.<br><br>Defendants' technical specifications describe undergarment placement and magnetic closure using embedded magnets in the flap. | |

Claim 1 of U.S. Patent No. 9,784,530

| Claim Element | Accused Instrumentality | Doctrine of Equivalents Analysis | Response |
|---|---|---|---|

**LPR 2.4(a) Non-Infringement Contentions Claim Chart for Case No: 1:22-cv-00121-AMA-DBP**

| | | | |
|---|---|---|---|
| **[P]** A gun holster system for carrying a gun, comprising: | Each Accused Instrumentality is designed and marketed as a gun holster system. Defendants' own product descriptions identify their products as gun holster systems designed to carry firearms. | Same as literal infringement analysis for '109 patent - no dispute on this element. | Defendant Her Tactical's Accused Instrumentalities are not "gun holster systems" rather they are marketed simply as gun holsters. |
| **[A]** a body having an upper opening disposed between a front side and a back side, wherein the upper opening is configured to receive at least a portion of the gun therethrough; | **Literally satisfied.** Defendants describe their holster body as having front and back sides with a wide opening at the top for gun insertion. Defendants' technical specifications and photographs show the required body structure with upper opening configuration. | N/A - literal infringement established. | Defendant Her Tactical notes that the claim language cited by Plaintiffs is not the claim language of Claim 1 of the '530 Patent. Rather, the claim language should read "a body having a front side and a back side forming an upper opening disposed therebetween and forming a lower opening at a lower surface of the body."<br><br>Defendant Her Tactical's gun holsters have a body with three distinct sides. A front, a back, and a spine. There is an opening created by these three sides where a firearm can be inserted, but Defendant's technical specifications (HERTACTICAL_003) clearly indicate that there is a third side, the spine, which is not claimed in Plaintiff's patent. |

App-240

**LPR 2.4(a) Non-Infringement Contentions Claim Chart for Case No: 1:22-cv-00121-AMA-DBP**

| | | | |
|---|---|---|---|
| **[B]** a strap assembly comprising: **(i)** an elongated strap extending from the back side of the body; | **Literally satisfied.** Defendants' "flap" performs the same function as the claimed "strap" - the semantic distinction is insubstantial. Defendants' product documentation shows elongated strap/flap component extending from the holster body. | N/A - literal infringement established. | Defendant Her Tactical notes that the claim language cited by Plaintiffs is not the claim language of Claim 1 of the '530 Patent. Rather the claim language should read "a strap assembly integrally secured to the back side body, the strap assembly having: (i) an elongated strap extending from and integrally secure to the back side of the body."<br><br>Defendants' technical specification (HERTACTICAL_003) comprises a folding magnetic flap attached to the front side of the holster, not the "back side of the body" as claimed by the '530 Patent. |
| **[B](ii)** a fastener protrusion extending from a back surface of the elongated strap; | **Literally satisfied.** Defendants' technical drawings show magnetic protrusions extending from their flap/strap assembly. Defendants' technical documentation depicts magnetic protrusions on the strap component. | N/A - literal infringement established. | Defendant Her Tactical's Accused Instrumentalities comprise a flap that has a magnet contained within the strap. But the magnet does not create a protrusion extending from the back surface of the flap; rather, any protrusion created by the magnet extends from the front surface of the flap. |

App-241

**LPR 2.4(a) Non-Infringement Contentions Claim Chart for Case No: 1:22-cv-00121-AMA-DBP**

| | | | |
|---|---|---|---|
| **[B](iii)** a fastener housing extending from an outer surface of the back side of the body, the fastener housing being configured to engage with the fastener protrusion; | **Literally satisfied.** Defendants' documentation shows housings extending from the holster body configured to engage with the protrusion. Defendants' technical documentation shows housing extending from body with magnetic engagement functionality. | N/A - literal infringement established. | The specification for the '530 Patent states that the "fastener protrusion is configured to engage within a cavity **307** created by a housing **305** that extends from surface **303**." None of the Accused Instrumentalities have any cavity created by a housing. Rather, the flap is secured by two magnets engaging one another. Thus, the element of a fastener housing is not present in the Accused Instrumentalities. |
| **[C]** wherein the elongated strap folds backwards and away from the upper opening to cause the fastener protrusion and the fastener housing to engage; | **Literally satisfied.** Each Accused Instrumentality meets this limitation literally because they each comprise an elongated strap that folds backwards and away from the upper opening to cause the fastener protrusion and the fastener housing to engage, as described and shown in the Defendants' disclosures. Defendants describe exactly this functionality where their magnetic flap/strap folds backwards from the holster opening, bringing the magnetic protrusion and housing components into engagement position. Defendants' technical documentation and product photographs demonstrate the | N/A - literal infringement established. This element describes the specific mechanical action that enables magnetic fastener engagement. Defendants' products clearly demonstrate this folding motion in their technical specifications, marketing materials, and instructional content. The strap/flap component physically folds away from the gun opening to bring magnetic components together for secure closure. | The specification for the '530 Patent states that the "fastener protrusion is configured to engage within a cavity **307** created by a housing **305** that extends from surface **303**." None of the Accused Instrumentalities have any cavity created by a housing. Rather, the flap is secured by two magnets engaging one another. Thus, the element of a fastener housing is not present in the Accused Instrumentalities. |

**LPR 2.4(a) Non-Infringement Contentions Claim Chart for Case No: 1:22-cv-00121-AMA-DBP**

| | | | |
|---|---|---|---|
| | folding motion that enables magnetic closure. | | |
| **[D]** two magnets disposed within a thickness of the fastener protrusion; | **Satisfied under doctrine of equivalents** using one magnet instead of two in the protrusion. Defendants acknowledge using embedded magnets within their fastener components. | **Function:** Provides magnetic force for closure engagement and retention. **Way:** Magnet(s) disposed within protrusion thickness create magnetic field for engagement with housing magnet. **Result:** Secure magnetic connection with housing magnet enabling holster closure. **Insubstantial Difference:** One vs. two magnets performs substantially the same function - both create magnetic force sufficient for engagement. Technical evidence shows single magnet achieves same functional result. | Plaintiff's doctrine of equivalents arguments fail as prosecution history estoppel restricts Plaintiff from asserting this doctrine. The prosecution history of the '530 Patent clearly shows that the examiner considered the number of magnets to be a material difference. The originally filed Claim 1 claimed "a first magnet disposed within a thickness of the fastener protrusion; and a second magnet disposed within a thickness of the housing." On April 19, 2017, a Non-Final Rejection was issued. Shortly thereafter, on June 1, 2017, Claim 1 was amended to claim "two magnets disposed within a thickness of the fastener protrusion; and a third magnet disposed within a thickness of the housing." |

**LPR 2.4(a) Non-Infringement Contentions Claim Chart for Case No: 1:22-cv-00121-AMA-DBP**

| | | | |
|---|---|---|---|
| **[E]** a third magnet disposed within a thickness of the housing; | **Satisfied under doctrine of equivalents** using second magnet (defendants' housing magnet) instead of third magnet. Defendants describe the second magnet positioned within the housing thickness to engage with the first magnet. | **Function:** Provides corresponding magnetic force to attract and engage with protrusion magnet(s). **Way:** Magnet disposed within housing thickness creates attractive magnetic force. **Result:** Secure magnetic retention system enabling reliable closure. **Insubstantial Difference:** Second vs. third magnet performs substantially the same function of providing housing-based magnetic attraction. | Plaintiff's doctrine of equivalents arguments fail as prosecution history estoppel restricts Plaintiff from asserting this doctrine. The prosecution history of the '530 Patent clearly shows that the examiner considered the number of magnets to be a material difference. The originally filed Claim 1 claimed "a first magnet disposed within a thickness of the fastener protrusion; and a second magnet disposed within a thickness of the housing." On April 19, 2017, a Non-Final Rejection was issued. Shortly thereafter, on June 1, 2017, Claim 1 was amended to claim "two magnets disposed within a thickness of the fastener protrusion; and a third magnet disposed within a thickness of the housing." |
| **[F]** wherein the two magnets are configured to engage with the third magnet; | **Satisfied under doctrine of equivalents** using two-magnet engagement (one protrusion magnet engaging with one housing magnet). Defendants describe magnetic engagement between their strap and housing components. | **Function:** Creates magnetic retention force between strap and housing components. **Way:** Magnetic attraction between protrusion and housing components through magnetic field interaction. **Result:** Secure closure without mechanical fasteners, enabling quick access while maintaining | Again, Plaintiff's doctrine of equivalents argument fails as prosecution history estoppel restricts Plaintiff from asserting this doctrine. The '530 Patent claims two magnets engaging a third magnet. This is not present in any of Defendants' Accused Instrumentalities. Each |

**LPR 2.4(a) Non-Infringement Contentions Claim Chart for Case No: 1:22-cv-00121-AMA-DBP**

| | | retention. **Insubstantial Difference:** Two- magnet vs. three-magnet engagement achieves same magnetic retention function. | Accused Instrumentality comprises one magnet engaging a second magnet, and no third magnet is anywhere present. |
|---|---|---|---|
| **[G]** wherein the engaging of the two magnets and the third magnet does not cause the elongated strap to obstruct the upper opening of the body and does not obstruct or hinder removal of the gun from the body; | **Satisfied under doctrine of equivalents.** Defendants describe magnetic engagement that does not obstruct gun access, with magnets positioned to keep holster body firmly in place without interference. Marketing materials emphasize quick gun access. | **Function:** Ensures unobstructed gun access during magnetic engagement. **Way:** Magnetic positioning and engagement design that avoids interference with gun opening. **Result:** Secure magnetic retention while maintaining clear gun access path. **Insubstantial Difference:** Two- magnet system achieves same non-obstruction function as three- magnet system. | Defendants note that the claim language cited by Plaintiffs is not the claim language of Claim 1 of the '530 Patent. Rather the claim language should read "wherein engaging the two magnets with the third magnet does not obstruct the upper opening and does not obstruct or hinder entire removal of the gun from the body; and."<br><br>Again, Plaintiff's doctrine of equivalents argument fails as prosecution history estoppel restricts Plaintiff from asserting this doctrine. The '530 Patent claims two magnets engaging a third magnet. This is not present in any of Defendants' Accused Instrumentalities. Each Accused Instrumentality comprises one magnet engaging a second magnet, and no third magnet is anywhere present. |

**LPR 2.4(a) Non-Infringement Contentions Claim Chart for Case No: 1:22-cv-00121-AMA-DBP**

| | | | |
|---|---|---|---|
| **[H]** wherein a combined magnetic retention strength generated by the two magnets and the third magnet is strong enough to retain the gun within the body; | **Satisfied under doctrine of equivalents.** Defendants advertise "strong magnetic hold" and "2 embedded magnets that secure the folded flap" to "keep your gun securely in place" using their two-magnet system. **Technical Evidence:** Defendants acknowledge that stacked magnets "will work as one to exert a greater magnetic force." Technical literature confirms stacked magnets act like a single magnet and exhibit nearly the same strength as a single magnet of combined size. | **Function:** Provides sufficient magnetic retention force for gun security within holster body. **Way:** Combined magnetic forces from multiple magnets working together to create retention strength. **Result:** Secure gun retention within holster body preventing unintended movement or loss. | Again, Plaintiff's doctrine of equivalents argument fails as prosecution history estoppel restricts Plaintiff from asserting this doctrine. The '530 Patent claims two magnets engaging a third magnet. This is not present in any of Defendants' Accused Instrumentalities. Each Accused Instrumentality comprises one magnet engaging a second magnet, and no third magnet is anywhere present. |

**LPR 2.4(a) Non-Infringement Contentions Claim Chart for Case No: 1:22-cv-00121-AMA-DBP**

**Claim 3 of U.S. Patent No. 9,784,530**

| Claim Element | Accused Instrumentality | Doctrine of Equivalents Analysis | Response |
|---|---|---|---|
| **[P]** The system of claim 1, | As demonstrated in the claim 1 analysis above, each Accused Instrumentality infringes the system of claim 1 under the doctrine of equivalents. The two-magnet configuration performs substantially the same function, in substantially the same way, to achieve substantially the same result as the claimed three-magnet system. | Incorporates all claim 1 doctrine of equivalents analysis by reference. The foundational gun holster system with magnetic retention functionality is established. | As demonstrated above, Defendants' Accused Instrumentalities do not practice each limitation of Claim 1 of the '530 Patent, and Plaintiffs' doctrine of equivalents arguments are barred by prosecution history estoppel. |
| **[A]** wherein the lower opening is configured to receive a portion of the gun therethrough. | **Literally satisfied.** Defendants' holster body includes a lower opening configured to receive a portion of the gun therethrough. Defendants' technical specifications and product photographs show the holster body with both upper and lower openings designed for gun insertion and partial extension. | N/A - literal infringement established. This element adds no complexity to the infringement analysis as it describes a standard feature of gun holsters that allows the gun barrel or trigger guard to extend through the bottom of the holster body. | |

**Design Patent D788,451**

| Prior Art (from D788,451) | D788,451 | Accused Instrumentality | Response |
|---|---|---|---|
| | | | |

**LPR 2.4(a) Non-Infringement Contentions Claim Chart for Case No: 1:22-cv-00121-AMA-DBP**

| | | | |
|---|---|---|---|
| U.S. Patent No. 4,435,506 (issued Apr. 20, 1982) | | | Defendants' Accused Instrumentalities have a different appearance and create a different overall visual impression as the flap wherein each magnet is housed in a separate piece from the body of the holster. Additionally, Defendants' Accused Instrumentalities comprise an elastic retention strap not present in the D'451 Patent. |
| U.S. Patent No. D543,354 (issued May 29, 2007) | | | Plaintiff's infringement contentions here rely on comparisons between the D'451 Patent and technical drawings associated with Defendants' Accused Instrumentalities. This approach is legally flawed and insufficient to establish design patent infringement. The test for design patent infringement under *Egyptian Goddess* requires the side-by-side comparison of the patented design and the accused product itself, not technical drawings or renderings of the accused product. *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 676 (Fed. Cir. 2008). |
| U.S. Patent No. D543,353 (issued May 29, 2007) | | | |

**LPR 2.4(a) Non-Infringement Contentions Claim Chart for Case No: 1:22-cv-00121-AMA-DBP**



| | | | |
|---|---|---|---|
| Cox, U.S. Patent No. D718,523 (Dec. 02, 2014) | | | . |
| | | | |

i.    **Design Patent D811,731 – Prior Art vs. Claimed Design vs. Accused Product:**

| Prior Art (from D811,731) | D811,731 – claim 1 | Accused Instrumentality | Response |
|---|---|---|---|
| Nichols, U.S. Patent No. D811,731 (Jan. 19, 1988) | | | Plaintiff's infringement contentions here rely on comparisons between the D'731 Patent and technical drawings associated with Defendants' Accused Instrumentalities. This approach is legally flawed and insufficient to establish design patent infringement. The test for design patent infringement under *Egyptian Goddess* |

**LPR 2.4(a) Non-Infringement Contentions Claim Chart for Case No: 1:22-cv-00121-AMA-DBP**



| | | | requires the side-by-side comparison of the patented design and the accused product itself, not technical drawings or renderings of the accused product. *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 676 (Fed. Cir. 2008). |
|---|---|---|---|
| Kalasountas, U.S. Patent No. D356,677 (Mar. 28, 1995) | | | |
| Cox, U.S. Patent No. D718,523 (Dec. 02, 2014) | | | |
| Crouch, U.S. Patent No. D770,172 (Nov. 01, 2016) | | | |
| Myers, U.S. Patent No. D788,731 (patent-in-suit) | | | |

    **ii.**       **Design Patent D836,329 – Prior Art vs. Claimed Design vs. Accused Product:**

**LPR 2.4(a) Non-Infringement Contentions Claim Chart for Case No: 1:22-cv-00121-AMA-DBP**

| Prior Art (from D836,329) | D836,329 – claim 1 | Accused Instrumentality | Response |
|---|---|---|---|
| Nichols, U.S. Patent No. D811,731 (Jan. 19, 1988) | | | Plaintiff's infringement contentions here rely on comparisons between the D'329 Patent and technical drawings associated with Defendants' Accused Instrumentalities. This approach is legally flawed and insufficient to establish design patent infringement. The test for design patent infringement under *Egyptian Goddess* requires the side-by-side comparison of the patented design and the accused product itself, not technical drawings or renderings of the accused product. *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 676 (Fed. Cir. 2008). |
| Kalasountas, U.S. Patent No. D356,677 (Mar. 28, 1995) | | | |
| Cox, U.S. Patent No. D718,523 (Dec. 02, 2014) | | | |
| | | | |

**LPR 2.4(a) Non-Infringement Contentions Claim Chart for Case No: 1:22-cv-00121-AMA-DBP**

| | | | |
|---|---|---|---|
| Crouch, U.S. Patent No. D770,172 (Nov. 01, 2016) | | | |
| Myers, U.S. Patent No. D788,731 (patent-in-suit) | | | |

LPR 2.4(b) Non-Infringement Contentions Claim Chart for Case No. 1:22-cv-00121-AMA-DBP

iii. **Design Patent D841,979 – Prior Art vs. Claimed Design vs. Accused Product:**

| Prior Art (from D841,979) | D841,979 – claim 1 | Accused Instrumentality | Response |
|---|---|---|---|
| Nichols, U.S. Patent No. D811,731 (Jan. 19, 1988) | | | Plaintiff's infringement contentions here rely on comparisons between the D'979 Patent and technical drawings associated with Defendants' Accused Instrumentalities. This approach is legally flawed and insufficient to establish design patent infringement. The test for design patent infringement under *Egyptian Goddess* requires the side-by-side comparison of the patented design and the accused product itself, not technical drawings or renderings of the accused product. *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 676 (Fed. Cir. 2008). |
| Kalasountas, U.S. Patent No. D356,677 (Mar. 28, 1995) | | | |
| Cox, U.S. Patent No. D718,523 (Dec. 02, 2014) | | | |

App-253

LPR 2.4(b) Non-Infringement Contentions Claim Chart for Case No. 1:22-cv-00121-AMA-DBP



| | | | |
|---|---|---|---|
| Crouch, U.S. Patent No. D770,172 (Nov. 01, 2016) | | | |
| Myers, U.S. Patent No. D788,731 (patent-in-suit) | | | |